```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3   --------------------------------X
                                     :
 4   ROSIE MARTINEZ,                 :
                                     :  16-CV-00079 (AMD)
 5               Plaintiff,          :
                                     :
 6          v.                       :
                                     :  225 Cadman Plaza East
 7   CITY OF NEW YORK, et al.,       :  Brooklyn, New York
                                     :
 8               Defendants.         :  January 3, 2018
     --------------------------------X
 9
            TRANSCRIPT OF CIVIL CAUSE FOR SHOW CAUSE HEARING
10            BEFORE THE HONORABLE CHERYL L. POLLAK
                  UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:         BAREE N. FETT, ESQ.
                                GABRIEL PAUL HARVIS, ESQ.
14                              Harvis & Fett LLP
                                305 Broadway, 14th Floor
15                              New York, New York 10007

16

17   For the Defendants:        KAVIN SURESH THADANI, ESQ.
                                MARY O'FLYNN, ESQ.
18                              PAUL HASAN JOHNSON, ESQ.
                                New York City Law Department
19                              100 Church Street
                                New York, New York  10007
20

21

22   Court Transcriber:         SHARI RIEMER, CET-805
                                TypeWrite Word Processing Service
23                              211 N. Milton Road
                                Saratoga Springs, New York 12866
24

25


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service
```

1    (Proceedings began at 2:32 p.m.)

2           THE CLERK:  All rise.  This is Case No. 16-CV-79,

3    <u>Martinez v. City of New York</u>, Civil Cause for Show Cause

4    Hearing.

5           Counsel, please state your appearances for the

6    record.

7           MS. FETT:  Good afternoon, Your Honor.  Baree Fett

8    for plaintiff Rosie Martinez.

9           THE COURT:  Good afternoon.

10          MR. HARVIS:  Gabriel Harvis also for the plaintiff.

11   Good afternoon, Your Honor.

12          THE COURT:  Good afternoon.

13          MR. THADANI:  Good afternoon, Your Honor.  Kavin

14   Thadani, Office of the Corporation Counsel on behalf of

15   defendant City of New York for Jason Weitzman.

16          MS. O'FLYNN:  Good afternoon, Your Honor.  Mary

17   O'Flynn also from Corporation Counsel on behalf of defendants.

18          THE COURT:  All right.

19          MR. JOHNSON:  Paul Johnson also on behalf of

20   defendants.

21          THE COURT:  All right.  Good afternoon, everyone.

22   You may be seated.  So we're here because again there's been

23   an application before this court for sanctions, and I feel

24   like we were just here maybe less than a month ago.  I have

25   reviewed all the papers.  I guess I will defer to plaintiff's

3

1  counsel if you would like to go first and explain on the

2  record what the situation is from your perspective and then

3  I'll hear from defendants' counsel.

4          MS. FETT:  Thank you, Your Honor.  This is Baree

5  Fett for plaintiff.  You know, looking back over the record of

6  this litigation, we see that at the time plaintiff filed her

7  complaint in January of 2016 there were already three separate

8  NYPD investigations and one CCRB investigation that was

9  underway.

10          These investigations were being conducted by

11  municipal agents and what appears to be a large portion of the

12  leadership team at the 107th Precinct.  That includes Captain

13  Valergo, Captain Hanrahan, Lieutenants Cammy and Robinton and

14  Sergeant DiGenero, the intelligence officer.

15          All these officers were involved in one way or

16  another with the disputed events here.  We found out last

17  month that multiple GO15s were conducted.  There were multiple

18  substantiated findings.  There were over 1,000 pages of

19  investigative documents generated, and they were all about the

20  disputed events here.  And during the course of this

21  litigation over the last two years, we have heard from defense

22  counsel repeatedly in our attempts to find out the identity of

23  the officers and to locate documents and to find out what

24  happened to Ms. Martinez, we were told -- and it -- and it was

25  represented to the Court that defendants were investigating

4

1   the matter, that they had spent hundreds of hours

2   investigating the matter.  In fact, in defendants' October

3   8th, 2017, letter they represented:  "Supervisors in this

4   department have also spent dozens of hours assisting the

5   undersigned in locating documents, have kept close tabs on the

6   case to make sure that every discovery demand in this matter

7   is answered promptly.  Paralegals from this office, record

8   keepers at the New York City Department of Corrections, police

9   officers from the 107th Precinct, and the New York City Police

10  Department's Civil Litigation Unit all were spending hundreds

11  of hours to make sure that they were being responsive to the

12  demands in this case."

13          And what we would want to know and what we would

14  want to ask the Court is what was really going on when they

15  were representing that they were looking for answers in this

16  case, that they were looking for documents, that they were

17  attempting to identify officers?  What was really being done

18  during those hundreds of hours?

19          And what we think is defendants' latest response in

20  their answer to our latest sanction motion, it's very telling

21  because they -- I don't believe the defendants and the City of

22  New York thinks they've done anything wrong.  I think they

23  believe that it's the plaintiff's fault.  And we believe that

24  is why a stronger sanction is necessary here because if the

25  City can't learn from this case how to conduct discovery and

5

1   how to satisfy its obligations, then I can't imagine that they

2   would learn that in any case.  We believe that a pass in this

3   case will give the impression that it's okay and it's

4   tolerated by the courts.  The next time someone sues the City,

5   it needs to know that an investigation, besides running the

6   name of an officer through the system, is not enough.

7        As Judge Weinstein discussed in <u>De Casa</u> [Ph.], most

8   civil rights plaintiffs like Ms. Martinez, they don't have the

9   identity of their assailants.  They don't know who the people

10  are that violated their rights.  The accessed information is

11  uneven in this case.  It is defendants that have the

12  information.  The plaintiffs do not.  But in our case,

13  plaintiffs were repeatedly attempting, through drips and drabs

14  of information, to try to get that information.  The

15  defendants have an affirmative obligation not just to its

16  clients but to the citizen of this city to do an

17  investigation.  The defendants here were met with a litany of

18  orders from this course -- from this Court forgive me, along

19  with multiple document requests, interrogatories, and demands

20  from plaintiff.

21        An example of the defendants' failure in this case

22  is in their discovery responses.  In May of 2016 -- and I

23  believe -- well, all the investigations were ongoing at that

24  point, and I think some of them were concluded at that point.

25  Defendants responded to Document Request No. 4:  "Produce the

6

1  complete files, including transcripts, audio recordings,

2  exhibits, and enclosures of each investigation conducted by

3  any governmental body, i.e., CCRB, IAB, et cetera."  And their

4  response was [inaudible] objections.  Upon information and

5  belief, defendant states that no such documents exist but

6  they're continuing to search.  That was May 2016.  Then we

7  have another round of responses in January 2017, and their

8  response to that same exact document request was the same

9  exact response.  "No such documents exist.  We're continuing

10  to search."

11          It's unclear, Your Honor, how this can be fixed at

12  this point.  We're not in a position to start the case over.

13  We're about 19 days away from the statute of limitations.  And

14  we believe the prejudice to plaintiff, a woman who alleges,

15  credibly alleges, she was abused by male officers inside the

16  107th Precinct has been severely prejudiced.  We have taken 11

17  depositions without key information and documents, and the

18  investigations that were disclosed in December, that's not

19  even the full complement of documents.

20          It's also the documents that we've been litigating

21  before Your Honor for two years now.  It's buy reports

22  produced after a deposition.  It's half of a disciplinary file

23  produced after a deposition.  It's half of a scheduling and

24  assignment information about Defendant Weitzman produced after

25  his deposition.  It's not having access to Captain Hanrahan

7

1  who conducted one of the depositions who has since passed

2  away.  It's needless delay.  It's an enormous amount of fees

3  and costs.  It's the fact that memories have faded.

4  Defendants have admitted that some of the witnesses that

5  they've since disclosed don't have a memory of the incident.

6  Even plaintiff's expert was not able to examine her in the

7  context of the injury that defendant was describing, and now

8  he can be opened up to cross-examination as can plaintiff.

9           The defendants on the other hand will have an

10 opportunity to present an expert.  They have the full story in

11 front of them, and it's just simply unfair to plaintiff.  And

12 we're not sure at this point how that can be solved.  Thank

13 you, Your Honor.

14          MR. THADANI:  Kavin Thadani on behalf of defendants.

15 First of all, Your Honor, the City and defendants take their

16 discovery obligation extremely seriously.  It's our contention

17 that we have complied with the orders of the Court and with

18 our duties in terms of discovery as best as we can.

19          THE COURT:  Really?  Are you kidding me?  You're

20 going to start with that?  Why have I had to issue so many

21 orders in this case?

22          MS. O'FLYNN:  Your Honor, if I may, it appears that

23 there's been a moving target in this case since the beginning.

24          THE COURT:  Yeah.  It -- the moving target, Ms.

25 O'Flynn, is the fact that despite efforts on the part of this

8

1    Court to obtain what is clearly, clearly relevant information,

2    relevant documentation, there has been delay and delay and

3    obfuscation.  And here we are, as Ms. Fett noted, on the eve

4    of the statute of limitations finding out now that there's an

5    investigation that was never -- and I'm holding up a folder of

6    almost two inches' worth of pages that were never disclosed

7    before.  So please do not insult the intelligence of this

8    Court by going immediately to defendants have complied with

9    all of their discovery obligations.  Ms. O'Flynn, you were not

10   here last time when I held an order to show cause why the City

11   should not be held in contempt and that was even before --

12   before -- the December revelations of an investigation --

13   actually, three investigations that had never been disclosed

14   before.

15        So I would ask you to take a breath and go back and

16   start over again and explain to me why -- why -- in all the

17   20-some years that I have been sitting in this court I have

18   never seen -- never seen -- such a dereliction of duty on the

19   part of corporation counsel.  So take a minute and regroup

20   before you go down that road.

21        MR. THADANI:  Your Honor, if I may just with --

22   again, the disclosures on December 18th, 2017, were

23   respectfully with respect to the IAB investigations.  As we've

24   described in our letter, we did not learn about that

25   information until Officer -- the arresting officer in the

1  case, Eric Ryan [Ph.] was -- plaintiff's counsel indicated

2  that they wanted to depose that officer.  In preparing for

3  that deposition I had a conversation with him.  He'd indicated

4  to me that he spoke with IAB in terms of an underlying

5  investigation.  That was the first --

6             THE COURT:  Well, I understand --

7             MR. THADANI:  -- that we have heard --

8             THE COURT:  I understand that you're new to this

9  case, that you have been recently assigned, perhaps in

10  response to this Court's suggestion.  But I have no way to

11  understand why the arresting officer was not at least

12  interviewed -- interviewed -- by your officer before this

13  last-minute deposition request.  I mean why was this IAB

14  investigation never uncovered?  Or frankly, what the other

15  inference is is that there has been a blatant coverup here,

16  whether on behalf of the Corporation Counsel's Office or the

17  New York City Police Department.  One way or the other that's

18  the other inference.  The innocent inference is incompetence,

19  but the other inference is that there has been a blatant

20  attempt to prejudice the plaintiff here by failing to disclose

21  this.

22             Now I understand your claim is that you have no way

23  to search your files by the plaintiff's last name because she

24  didn't make the complaint.  But really?  Then isn't that on

25  you to come up with a better system?

1          MS. O'FLYNN:  Well, Your Honor, if I may, with

2    respect to why the arresting officer was not brought in and

3    questioned in more detail, I think the nature of this case is

4    such that from the beginning we were informed it was not the

5    arresting officer involved.  I think that's pretty clear that

6    plaintiff never alleged that the arresting officer was

7    involved.  It was these unknown officers.  In a perfect world,

8    that would have been a good course of action to interview that

9    officer early on, but from the beginning of this case we've

10   been trying to uncover information just as much as plaintiffs

11   have been about who these unidentified officers might be.  The

12   reason why the records could not be searched is that that

13   investigation was tied to the arresting officer.

14          I do not dispute that that system is not ideal.

15   There have been improvements made since, you know, the

16   incident date.  I think PD is always trying to improve the way

17   we can search for files.  Unfortunately, this investigation

18   was tied to the arresting officer who had been put to the side

19   because we were dedicating time and resources trying to locate

20   photos of anybody at the precinct, trying to match a

21   description which as the Court might remember was rather

22   general, a white male between 30 and 50, salt-and-pepper hair,

23   a male, white, in his 30s from the 107.  I understand a lot of

24   time in the beginning of this case was dedicated to trying to

25   provide photos.  There were disputes over the photos.  There

 1   were disputes about whether they should be labeled or

 2   unlabeled.  But I assure the Court our office does take these

 3   obligations very seriously.  And to the extent that anybody

 4   was in a position to know about a potential IAB, as we noted

 5   in our letter plaintiff spoke to IAB.  Plaintiff did not

 6   inform any of us in any of the discovery responses, in any of

 7   her sworn testimony that she had had a conversation with an

 8   investigator.  To the extent plaintiff thinks we're trying to

 9   blame out that's not what we're trying to do.  We're trying to

10   set the record in terms of what the chronology in this case

11   was.

12        THE COURT:  You had multiple officers in the 107th

13   Precinct aware of this IAB investigation, a captain and a

14   lieutenant.  So don't tell me it's the plaintiff's fault that

15   she didn't tell you she was -- she was spoken to by IAB.  And

16   my understanding is that what they investigated or spoke to

17   her about wasn't even this issue.  It was something separate

18   that happened to her allegedly during the course of this

19   arrest.

20        Am I wrong about that?

21        MS. FETT:  No, that's correct, Your Honor.  To

22   respond, first of all, Eric Ryan was -- that's the arresting

23   officer, was initially identified I believe in defendants'

24   initial disclosures in response to Your Honor's Valentin

25   order.  We would have assumed that in offering his name they

1  would have done an interview of him, and they would have

2  gotten the information that I believe the most recent

3  assistant corporation counsel got in his first interview from

4  Mr. Ryan.  That should have been done two years ago when the

5  name was first provided.  That's the first -- and when

6  Hanrahan was still alive.  That's the -- that's the first

7  point.

8          The second point is plaintiff specifically -- and I

9  think Your Honor might have heard in the audiotapes -- she

10 believed that she was simply making a statement about her

11 missing property, and she specifically declined to discuss her

12 -- the abuse because of this litigation.  Now to call the

13 subjects of plaintiff's abuse moving targets, she specifically

14 in her 50-h in December of 2015 in her deposition in response

15 to interrogatory requests she did the best she could to

16 identify the -- these officers.  But it is corporation counsel

17 who has access to their officers, to their precinct, to their

18 databases.  It's on them.  They have the affirmative duty as

19 the attorneys for the City to do a thorough and competent

20 investigation.

21         MR. THADANI:  Your Honor, again, as my colleague had

22 already -- has already referenced, the focus wasn't on the

23 arresting officer.  There was no claim that the officers that

24 allegedly assaulted the plaintiff at the precinct was the

25 arresting officer, was any officer involved in the

1    investigation leading up to the plaintiff's arrest.

2                THE COURT:  But counsel --

3                MR. THADANI:  Was an officer that --

4                THE COURT:  -- any reasonable attorney with any

5    degree of intelligence would know that if there's a question

6    as to who the officers were who were in the precinct at the

7    time the arresting officer arrived and brought the plaintiff

8    in, one obvious person to interview would be the arresting

9    officer.  The fact that he wasn't even spoken to until two

10   years into the investigation is astonishing.

11               MS. O'FLYNN:  Your Honor, he was spoken to.  He was

12   spoken to with respect to confirming that he was the arresting

13   officer and that information.  But with respect to a more

14   detailed interview that would engage what kind of

15   investigations -- the topic came up not with respect to an

16   investigation into this because we didn't think there was one.

17   The topic came up because he was being deposed and then this

18   came to light.

19               MR. THADANI:  And again, Your Honor --

20               THE COURT:  It's just getting -- it's getting worse

21   and worse every time you say something.  I -- how could you

22   conduct an investigation or even an interview in which you

23   don't talk to the officer about has anybody else spoken to you

24   about this, have you been interviewed, was that was an IAB

25   investigation?  I mean I just don't understand --

1          MR. THADANI:  I just -- one statement.  Sergeant

2     Forgione -- or Sergeant DiGenero DiGeneroPh.] was the lead

3     investigator in this case.  He gave the college grind because

4     he was in the 107th Precinct.  Sergeant DiGenero's the one who

5     led the entire investigation who was the one who had all the

6     information about leading to the arrest, leading to the search

7     warrant.  It was represented to us that Mr. Ryan's role in

8     this was minimal.  And again, Your Honor, our focus early on

9     in the case was identifying individuals that matched the

10    description provided by plaintiff which was not the arresting

11    officer.

12         THE COURT:  Oh, look, I know what the focus was.  I

13    had to issue I don't know how many orders in an effort to try

14    to get you to identify the officers.  So I don't need to be

15    reminded of that.  But I still -- I go back to the fact that I

16    don't understand why there weren't multiple people interviewed

17    in the 107th Precinct in an effort to identify these officers

18    and you would have not discovered that there was an -- three

19    separate investigations being conducted?  I just -- I don't

20    understand how that happens.

21         MR. THADANI:  And again, Your Honor, with respect to

22    the two separate investigations, one involves missing

23    property.  It's not the subject of plaintiff's claims in this

24    action.  Plaintiff's claims in this action involve an alleged

25    use of excessive force at the 107 Precinct.  It has nothing to

1   do with the execution of the search warrant, any alleged

2   missing property during the search warrant.  The evidence

3   discrepancy also has nothing to do with plaintiff's claims,

4   does not even --

5           THE COURT:  And yet you're using it --

6           MR. THADANI:  -- involve the defendants in this

7   case.

8           THE COURT:  -- to blame the plaintiff for not

9   disclosing the existence of the IAB investigation.

10          MR. THADANI:  Your Honor, we were not trying to

11  blame the plaintiff.

12          THE COURT:  You can't have it both ways.

13          MR. THADANI:  We were just -- again we were

14  apprising the Court as to the chronology of events and what

15  occurred in this litigation.  The fact remains that plaintiff

16  in their discovery responses, despite the fact that she had

17  been interviewed by IAB and despite the fact that she received

18  a letter about her complaint and received a letter explaining

19  that the complaint was unsubstantiated did not disclose --

20  specifically disclosed in her discovery responses that there

21  was no complaints made to any governmental body with respect

22  to anything to do with this incident.

23          THE COURT:  What complaint did she make to a

24  governmental body?  Where is it?

25          MR. THADANI:  She made a complaint to IAB with

1  respect to alleged missing property during the execution of

2  the search warrant.

3          THE COURT:  Well, what does that have to do -- you

4  just said that has nothing to do whatsoever to the issue in

5  this case.  So why is it relevant?

6          MR. THADANI:  Your Honor, it's relevant to the

7  extent that plaintiff's counsel raised it in their letter as

8  documents that they believe were untimely disclosed.  The crux

9  of the matter is the investigation concerning a prisoner

10 injured in custody.  And again, as we already explained, we

11 weren't able to retrieve that information by searching the

12 plaintiff's name.  Officer Ryan wasn't spoken to in the detail

13 of -- in much detail prior to just recently because he wasn't

14 noticed for a deposition despite the fact that he was listed

15 as an -- in our initial disclosures early on in the case

16 because again the focus was on these two other defendants, one

17 of whom there is ample evidence in the record to suggest

18 wasn't even at the 107 Precinct at the time plaintiff alleges

19 this occurred and the other officer was a desk officer who had

20 no involvement in the investigation that led to the search

21 warrant execution and no involvement in the arrest.

22         THE COURT:  But again --

23         MR. THADANI:  And --

24         THE COURT:  -- you're blaming the plaintiff for her

25 inability to identify officers when clearly the NYPD is in a

26 much better position to know who was involved in the precinct

1  at the time.  And again I --

2         MR. THADANI:  Your Honor, we're not -- we're not

3  blaming plaintiff.  Again, the -- there was a photo --

4  photographs were produced early on in this litigation in which

5  plaintiff identified to individuals as the defendants in the

6  case.  As plaintiff's counsel states in their letter, she has

7  a vivid recollection of the events, and she's certain that

8  these are the two defendants that assaulted her at the

9  precinct.  Discovery, for the most part, has revolved around

10 identifying those officers, deposing those officers, and

11 placing those officers at the 107th Precinct or not.  With

12 respect to this particular IAB investigative file that was

13 produced, this internal investigation concerning the fact that

14 it corroborates, one, information that plaintiff knew about

15 early on in this case, it was part of defendant's initial

16 disclosures to produce plaintiff's medical records.  The

17 plaintiff's medical records disclosed that an officer at the

18 hospital told the medical staff that the plaintiff was

19 observed kicking and punching a wall at the precinct and that

20 was the source of her injury.

21         THE COURT:  And then --

22         MR. THADANI:  So that was nothing new.  That's been

23 known.

24         THE COURT:  -- if my recollection serves me

25 plaintiffs have spent a lot of time trying to figure out who

26 that person was unsuccessfully.  And at the same time, the

18

1   City's position was that the plaintiff was not injured in the

2   precinct.  So again, you know, you're turning it around on the

3   plaintiff which you're saying well, the plaintiff knew.  She

4   should have figured this out long ago.

5           MR. THADANI:  We're not -- we're not trying to turn

6   it on the plaintiff.  First of all --

7           THE COURT:  Do you see it this way, Ms. Fett, or is

8   just me?  I -- maybe I'm misreading the defendants' response.

9           MS. FETT:  Your Honor, I couldn't -- I couldn't

10  agree with you more.  And in fact, I think defendants'

11  response in their last letter was offensive.  I think it was

12  insulting to the plaintiff.  I think it more than turned it

13  around on her.  I think defendants believe she's a liar.  I

14  think they believe that she was not injured and the two

15  officers that she identified were not in the precinct at the

16  same time so this never happened.

17          What they're ignoring is that they have an officer

18  calling IAB, a lieutenant, Lieutenant Cammy, admitting that he

19  put his hands on plaintiff that night.  We found that out two

20  weeks ago.  You have DiGenero who they want to say knew

21  everything about this investigation.  We were never told that

22  DiGenero was the subject of four investigations, three IAB and

23  one CCRB, and he was actually substantiated.  We just found

24  that out a few weeks ago.  It just -- this -- I just think

25  that defendants are missing the points.  I think that -- I

26  think -- I assume what we should do now is figure out how the

1   plaintiff can move forward in litigating the case.

2          THE COURT:  Well, I think that's right.  I mean I

3   guess what I would ask is what is it that you are suggesting

4   in terms of a sanction here?

5          MR. HARVIS:  Sure, Your Honor.  This is Gabriel

6   Harvis for the plaintiff.  So, you know, we think that in

7   order to deal with the issues of where we are in the case

8   right now that it would be appropriate to equitably toll the

9   statute of limitations so that we're not under the 19-day time

10  limit in order to get this sorted out.  And I also want to

11  note that the focus on these two claims is really unfair

12  because we've only been able to focus on these two claims

13  because it's been so difficult to pull the information about

14  them from the defendants.

15          But in reality, what we've learned two weeks ago is

16  that this is in fact a much bigger case.  It involved

17  potentially a coverup, as Your Honor alluded to, and there are

18  -- we have a number of other claims now based on this that we

19  want to explore and potentially add to the case.  So we would

20  like leave or I suppose an adjustment of the Rule 16

21  scheduling deadline so that we have the opportunity to file an

22  -- and propose amended complaint.

23          We would also like the opportunity to have plaintiff

24  do a line up with the individuals that were involved in this,

25  both in the investigation and the search warrant, including

20

1   the investigators.  And we propose that that happen at One

2   Police Plaza so that Ms. Martinez has a full and fair

3   opportunity to see these people and determine who was

4   involved.  That goes to resolving where we are in the

5   litigation.

6          But then there's a question of how do we make sure

7   that something like this doesn't happen in the future.  And I

8   want to refer the Court to an order from Honorable Martin of

9   the Southern District.  This was in 1998, and I think it was

10  at a relatively similar point in time.  This is 1998 West Law

11  677583.

12          THE COURT:  677- --

13          MR. HARVIS:  -583.

14          THE COURT:  -- -583.  Okay.

15          MR. HARVIS:  And that was a situation where -- it's

16  called James v. City of New York.

17          THE COURT:  Okay.

18          MR. HARVIS:  And that was a case where Judge Martin

19  determined that this -- the Law Department needed to

20  understand that only a severe sanction would let the

21  Department realize what kind of errors had been made.  And so

22  in that case that case actually resulted in the creation of

23  the Special Federal Litigation Division, the reorganization of

24  the Law Department.  And for a time when Ms. Fett and I were

25  there, I can say from personal experience discovery

1  obligations felt like they were handed in a different way, and

2  I think that that drew somewhat from Judge Martin's decision.

3          So what we think is an appropriate sanction here

4  would be either a default judgment or striking of the answer

5  and some sort of monetary award that either in part or in

6  whole makes the plaintiff whole for the time and attorney

7  energy that has been spent trying to extract this information

8  from the defendants.  So that would be our suggestion.

9          THE COURT:  All right.  Counsel.

10         MR. THADANI:  First of all, Your Honor, again with

11 respect to the request for a lineup, I struggle to, like, even

12 understand what the -- what the function of that is.  Again,

13 the plaintiff was provided with photographs of all of the

14 officers at the 107 Precinct during the time that she was in

15 custody there including the individuals that were disclosed in

16 this new information that has been provided in terms of

17 Lieutenant Cammy, Captain Hanrahan, et cetera.

18         Those individuals' photographs were in the

19 photographs produced to plaintiff.  Plaintiff had an

20 opportunity to review those documents, review those

21 photographs.  She identified the two defendants in the case

22 and made no mention of any of the other individuals.  She then

23 mentioned Lieutenant Cammy and that Lieutenant Cammy had an

24 interaction with her she had done so that may have led to an

25 earlier finding of all of these documents that are now being

22

1  disputed right now.  So first of all, with respect to a

2  lineup, they've already had the opportunity to review

3  photographs of the officers and identify the officers who she

4  alleges were involved in terms of the allegations she's making

5  in the complaint.

6          In terms of the sanctions that they're seeking in

7  terms of monetary awards and default judgment, Your Honor,

8  again, the plaintiff hasn't shown any prejudice in the case.

9  And what I mean by that is the documents that are being

10  produced, the documents concerning the fact that Ms. Martinez

11  was injured and self-inflicted her injuries relates to our

12  defenses in the case.  It does not relate to the plaintiff's

13  claim that she was assaulted by two other completely different

14  officers at the precinct.  These documents just corroborate

15  information the plaintiff has already had the entire course of

16  this litigation.  It was not our contention that the plaintiff

17  was not injured at the precinct.  Our contention was that the

18  defendant officers and no member of service caused the

19  injuries to the plaintiff.  We have evidence --

20          THE COURT:  So your position is that the fact that

21  they may have spent thousands of dollars on depositions

22  without relevant documentation is not prejudiced?  If that's

23  the case is it the City's position, corporation counsel's

24  position, that there's never a need to disclose information

25  that is helpful to your defense because who cares?  It doesn't

1  support their case.

2          MR. THADANI:  Your Honor, that is not our position.

3  But at the time that the --

4          THE COURT:  Well, that seems to be the argument --

5          MR. THADANI:  During --

6          THE COURT:  -- that you're making at this moment.

7          MR. THADANI:  During the course of this entire

8  discovery period that plaintiff's counsel was aware that one

9  of our defenses was that the plaintiff self-inflicted her

10 injuries.  The only difference now is that Lieutenant Cammy

11 has been identified as someone who observed that actually

12 happening.  Certainly the plaintiff is more than free to

13 depose Lieutenant Cammy, and that's on -- and Officer Ryan, in

14 fact, and Officer Ryan actually was already noticed and

15 scheduled for a deposition prior to this conference which was

16 canceled before it was scheduled to take place.  With respect

17 to the fact that --

18         THE COURT:  And you don't think --

19         MR. THADANI:  -- certain information was not --

20         THE COURT:  And you -- and you don't think that all

21 the time and energy that plaintiff's counsel spent following

22 up on was it Lieutenant Weitzman?

23         MS. FETT:  Yes, Your Honor.

24         THE COURT:  Who we ultimately discovered after much

25 travail wasn't even there.  That that time and money is not

1   prejudicial to the plaintiff?

2          MR. THADANI:  Wait, Your Honor, it's our

3   understanding that plaintiff continues to insist that

4   Lieutenant Weitzman was at the precinct and was one of the

5   officers that assaulted the plaintiff regardless of the fact

6   that there's documentation suggesting he's no -- he wasn't at

7   the precinct at the time.  The plaintiff had photographs of

8   all of the officers at the 107 Precinct including all of the

9   officers disclosed in the documents that were recently

10  produced.  The plaintiff had an opportunity to review those

11  photographs and identify to the defendants -- identify to the

12  City who the two individual officers she was alleging

13  assaulted her were.  They did that.  They identified Forgione.

14  They identified Weitzman.  They've been named as defendants in

15  the case.  They did not identify any other officers.  They

16  didn't tell the City well, Lieutenant Cammy observed me

17  punching the wall or I was questioned about whether or not any

18  member of service had any wrongdoing or whether Lieutenant

19  Cammy put hands on me at the precinct.  Nothing like that was

20  disclosed by the plaintiff.

21          THE COURT:  Well, maybe because it didn't happen.

22          MR. THADANI:  But it's our contention that it did

23  happen and their contention --

24          THE COURT:  I understand that, but, you know --

25          MR. THADANI:  And --

1          THE COURT:  -- we're in -- what almost two years

2    into this litigation and now you're turning up a key witness

3    -- a key witness -- who's going to say that he saw the

4    plaintiff punching the wall.  You don't think this is

5    something that they would have wanted to know at the very

6    beginning of the case?  How can you argue to me really with a

7    straight face -- honestly how can you argue with a straight

8    face that that's not prejudicial?

9          MR. THADANI:  Your Honor, it's information we would

10   have liked to have had too.  It supports our central defense

11   in the case that the plaintiff's injuries were a result of her

12   self-inflicting injuries.  We had this medical record.  Early

13   on in the case plaintiff acknowledges in their motion for

14   sanctions that it indicated that an officer observed the

15   plaintiff self-inflicting her injuries, punching and kicking

16   at a wall.  We both -- both parties have been trying to

17   discover more information about that.  We've had to discover

18   the identity of escort officers and officers who relieved

19   escort officers and sergeants who came to the hospital to see

20   that the escort officers were there and officers who

21   transported the plaintiff back to the precinct.  That's been

22   an investigation that we've had to take on that plaintiff has

23   pursued that we pursued.

24          Now we -- again, the information that our defense

25   was already well known during discovery.  Plaintiff's counsel

1   had a chance to ask all of the witnesses they deposed did you

2   observe the plaintiff punching and kicking the wall at the

3   precinct.  Did you hear anyone telling you that the plaintiff

4   self-inflicting her injuries?  They had that opportunity to

5   ask those questions.  They did ask those questions of certain

6   officers.  Yes, Lieutenant Cammy is a relevant witness.

7   Lieutenant Cammy is being disclosed now but discovery is still

8   open.  The statute of limitations has not expired.  Lieutenant

9   Cammy --

10          THE COURT:  Well, 19 days.

11          MR. THADANI:  -- can be --

12          THE COURT:  19 days.  We got 19 days.

13          MR. THADANI:  Well, what would the --

14          THE COURT:  Why is that not prejudicial?

15          MR. THADANI:  But, Your Honor, the plaintiff hasn't

16   indicated what sort of claim would be filed against Lieutenant

17   Cammy.  They've identified the officers that they claim allege

18   the -- injured the plaintiff at the precinct.

19          THE COURT:  Maybe it's because they have several

20   thousand pages of a report to digest and review before they

21   can simply amend their complaint and raise claims against the

22   City's officers.  You would move against them for Rule 11

23   sanctions if they didn't do sufficient investigation before

24   amending their complaint and naming new officers.  So again I

25   -- you know, I just can't believe you're really making this

1   argument.

2           MR. THADANI:  Your Honor, understanding that there

3   are thousands of pages in the -- in that booklet, again, with

4   respect to the prisoner injured in custody it's six pages.

5   And yes, there's relevant information there, but it's relevant

6   to our defenses.  Plaintiff's I imagine would certainly

7   dispute that any of that happened, that the plaintiff

8   self-inflicted injuries, that Lieutenant Cammy made any

9   observations, that Officer Ryan made any observations.  Their

10  contention I imagine still will continue to be that the two

11  defendant officers in this case assaulted her at the precinct.

12  Our contention is different obviously.  But again the

13  documents that were produced are supportive of our defenses,

14  not -- it's not related to plaintiff's claims per se because

15  again it supports a defense that was well known during the

16  course of this litigation.  The remaining pages in that

17  booklet are --

18          THE COURT:  What about your own concession that

19  witnesses have lost their memory about some of this stuff,

20  that when questioned they couldn't remember details?  How is

21  that not prejudice?  Isn't that the quintessential definition

22  of prejudice as a result of delay?

23          MR. THADANI:  We did not make any representations

24  that witnesses did not -- I don't know where that's coming

25  from exactly.

1          THE COURT:  I thought -- well, maybe the plaintiff's

2    made --

3          MR. THADANI:  But irrespective --

4          THE COURT:  I apologize.

5          MR. THADANI:  But irrespective of that --

6          THE COURT:  The plaintiffs may have made that but --

7          MR. THADANI:  I believe the conversation we had was

8    relating to escort officers at the hospital after the

9    plaintiff had already been injured and being seen by doctors

10   that they didn't remember basically sitting at the hospital

11   and waiting for her to be checked by doctors.  With respect to

12   Lieutenant Cammy and Officer Ryan we never made any indication

13   that they did not remember what happened or they didn't have

14   any recollection.  But again, even as I mentioned in our

15   opposition letter, to the extent they do have a lack of memory

16   of what happened that goes to the credibility of the defense

17   we're trying to present not to plaintiff's claim which is that

18   two different officers assaulted the plaintiff at the

19   precinct.

20         MR. HARVIS:  May we be heard, Your Honor?

21         THE COURT:  Yeah, I mean I gather there's no

22   prejudice.

23         MR. HARVIS:  Right, yeah.  No, we're fine.  No.  No.

24   Well, I just want to -- just to take these in order.  The --

25   we were provided with photographs of an unknown vintage while

1  -- with all of the officers on a green screen having no ID,

2  completely absolved of any context, and at which point we were

3  focused on, indeed, identifying these two individuals.  We

4  have never -- now that the case has expanded and we've

5  received a variety of highly relevant disclosures --

6  including, for example, an audio recording of plaintiff's

7  person who she lived with at the time, Danny Rivera [Ph.] who

8  described hearing her scream and observing her request for

9  medical attention being denied -- the case has expanded in

10 terms of its scope.

11         And we are -- and we believe that we're entitled to

12 be where we would have been at the beginning of the case which

13 is having known about this investigation, understanding what

14 the defenses were, exploring the witnesses through that

15 discovery, allowing Cammy and Ryan to be the first witnesses

16 or among the first witnesses who were deposed, presenting them

17 and examining them about this evidence, perhaps when

18 Lieutenant -- excuse me, Captain Hanrahan was still alive, he

19 could still answer questions.  He -- Captain Hanrahan is the

20 exceedingly important witness in this case because he is the

21 person who actually allegedly, six days before the whole thing

22 happened, interviewed Ryan and Cammy and took certain

23 statements.  There's no record of those interviews that's been

24 provided to us.  There's no recording of them.  So we just

25 have a memorialization that's unsigned of a dead man.  That is

1   what we now have to go on because the City decided to make

2   their disclosures in this fashion.  And I think I'll step

3   down.

4           MR. THADANI:  Your Honor, first of all, with respect

5   to Captain Hanrahan, I don't have the precise date but he

6   passed away shortly after the complaint was filed.  This is

7   not an issue of well if we have disclosed it earlier Captain

8   Hanrahan could have been deposed.  That -- within the time

9   frame of this litigation that was not something that was a

10   realistic possibility.  Of course it's unfortunate that he

11   passed away.  We would certainly like to have him as a witness

12   as somebody who, according to the documents, interviewed the

13   plaintiff specifically about her injuries and the plaintiff

14   specifically informed him that she was not alleging any

15   wrongdoing by members of service which is obviously completely

16   contrary to the allegations the plaintiff is making in this

17   case against the two defendants in this case.

18           Again, with respect to this information, we did not,

19   you know, intentionally withhold this information.  It's

20   documents that support our defense in this case.  We have no

21   benefit in withholding the documents or withholding this

22   witness.  If anything it would have made clearer to plaintiff

23   early on in this case that their case had little merit, not

24   that, well, there's this cryptic note in this medical record

25   and we have no corroborative evidence of it.

1         Now we have evidence that corroborates that a

2    contemporaneous audio recording but a lieutenant at the

3    precinct who indicated shortly after the incident that the

4    plaintiff injured herself, what her injuries were, and what

5    happened.  Before we just had this medical record identifying

6    an officer.  We have no reason to withhold officers that

7    support our defense.  It just turns out that because Officer

8    Ryan wasn't thoroughly interviewed until he was noticed for a

9    deposition we did not learn about the investigation.

10        Obviously during the course of discovery we have a

11   duty to supplement our discovery responses and supplement our

12   initial disclosures and that's what we did.  The documents

13   that were produced weren't related to any order in the case.

14   There wasn't ever an order in this case as far as I'm aware

15   that related to identifying any individual who observed the

16   plaintiff injure herself or relating to investigatory files.

17   The prior orders in the case involved identifying the

18   defendants in this case, which was done, and then requesting

19   specifically delineated documents.

20        THE COURT:  But I'm sorry.  Let me just back up for

21   a second.  If Lieutenant Cammy is the one who observed her

22   smashing her fist into the wall, as you allege, why was he not

23   named then as a person with information such that they could

24   figure out maybe he's the defendant in the case?  So when you

25   say they -- the orders didn't relate to any of that, I don't

1  -- I don't really quite follow that.

2          MR. THADANI:  Again, Your Honor, early -- again, we

3  produced photograph because we weren't able -- the orders

4  related to who were the officers that allegedly interrogated

5  the plaintiff.  Our contention was that the plaintiff wasn't

6  interrogated at all.  Then there was orders with respect to

7  providing photographs of all of the officers who were at the

8  precinct during the time that the plaintiff was there so the

9  plaintiff could identify which officers fit the description of

10 the officers she claimed injured her.

11         The plaintiff was provided those photographs,

12 identified the two defendants.  Lieutenant Cammy, among

13 others, was also in -- among those photographs, was not

14 identified by the plaintiff.  So to say that Lieutenant

15 Cammy's a potential defendant in the sense that he may have

16 been one of the officers that assaulted the plaintiff would be

17 -- would mean that the plaintiff then misidentified --

18 purposely misidentified defendants in a photo array first of

19 all.  Second of all, we disclosed --

20         THE COURT:  Her -- wait a minute.

21         MR. THADANI:  -- Lieutenant Cammy, we --

22         THE COURT:  Hold it.  Why would she purposely

23 misidentify Lieutenant Cammy?

24         MR. THADANI:  No, Your Honor, what I -- what I'm --

25         THE COURT:  Explain that logic to me.

1      MR. THADANI:  What my point is that Lieutenant

2  Cammy, his photograph appeared among the photographs that were

3  produced to plaintiff.  She did not identify Lieutenant Cammy

4  as a defendant or somebody who assaulted her at the precinct

5  or even as someone she had an interaction with at the

6  precinct.  And then with respect to disclosing Lieutenant

7  Cammy we disclosed of him in our recent disclosures because

8  that's when we learned of his -- the fact that he specifically

9  had an interaction with plaintiff and then he made specific

10  observations.  We disclosed that information as soon as we

11  learned of that information.

12      THE COURT:  Two weeks ago.

13      MR. THADANI:  It was two weeks -- it was roughly two

14  weeks ago.  Again, on December 1st when we first went to the

15  opposition letter we submitted to the Court there was a

16  discussion between myself and plaintiff's counsel about

17  outstanding depositions.  One of the depositions they wanted

18  to schedule was Officer Ryan's.  On December 1st I spoke with

19  Officer Ryan to confirm the dates that we had agreed on to

20  schedule his deposition to confirm that we could go ahead on

21  those dates.  I spoke with him.  I had a discussion with him.

22  He had detailed to me that he recalled speaking to IAB in

23  connection with the plaintiff's arrest.

24      I wasn't expecting an investigation into a prisoner

25  injured in custody.  But based on that information I looked up

1   his IAB officer resume.  He was going to be coming in to be

2   deposed and to prep for deposition that was already scheduled.

3   And upon doing that that's when I learned and we learned that

4   there were three investigations that were done.  We got the

5   files.  We produced the files.  All of that happened in the

6   course of less than three weeks to, one, learn about the

7   investigation occurring and then get the documents, review the

8   documents, and produce the documents to plaintiff including

9   the recordings that were produced, including the disposition

10  form that was produced.  We just didn't learn of that

11  information beforehand.

12            And again we had no reason or incentive to withhold

13  the information.  We didn't wait until the expiration of the

14  statute of limitations if that even matters in the sense that

15  again the plaintiff is -- are -- has already identified the

16  two officer defendants she alleges assaulted her in the case.

17  And again we -- that is -- it is -- Lieutenant Cammy is one of

18  the key witnesses for our defense, supportive of our defense.

19  We have -- we're -- it's not -- we have no incentive or any

20  reason to have withheld his identity for any reason.  It's

21  just that we -- when we finally learned of his identity, when

22  we finally learned of his involvement in the case, when we

23  finally obtained the IAB documentation we produced it to

24  plaintiff which is according to our duties and our

25  responsibilities to supplement our discovery responses and our

1    initial disclosures during the scope of discovery.

2              THE COURT:  Let me just make this comment to Ms.

3    O'Flynn as a supervisor in the officer.

4              MS. O'FLYNN:  Yes, Your Honor.

5              THE COURT:  This case --

6              MS. O'FLYNN:  Yes.

7              THE COURT:  -- has given me extreme pause as to

8    whether or not this kind of lack of diligence maybe is the

9    polite way to put it occurs in every single case before me

10   because I am appalled.  I hear the arguments.  Frankly, I

11   don't buy them.  But honestly there has to be a change, and

12   you need to go back to your office and explain to them that

13   the Court is not happy about any of this.  I have spent more

14   time on this case issuing order after order after order and

15   this is no reflection on you, Counsel, because you just came

16   into the case and hasn't been as familiar with it as I am.

17   But I shouldn't have to do this.  It is your responsibility as

18   the Corporation Counsel for the City of New York to make sure

19   that discovery obligations are fulfilled in the manner as

20   required by the Federal Rules of Civil Procedure and that

21   there isn't this kind of last minute, oh, my God, we just

22   discovered it because whatever reason.

23             MS. O'FLYNN:  Absolutely, Your Honor, and I'm happy

24   to bring that message back.  And I completely understand where

25   the Court is coming from.  I think, you know, in a perfect

1    world this case would have started off differently, and

2    unfortunately we've been sort of -- been chasing the entire

3    time of this case.

4            I will note respectfully that to the extent the

5    Court has had to issue many orders many of those orders were

6    in response to orders to compel that respectfully were

7    submitted in a way that appeared like counsel was trying to

8    burden our assistant corporation counsel to the point -- I'll

9    give an example, Your Honor.  Going through the docket it's

10   quite clear what was ordered at various conferences.  Without

11   fail, knee-jerk reaction not before the deadlines had expired

12   there were motions to compel additional documents.  So we had

13   our attorney trying to comply with the court order and then a

14   motion to compel on another set of documents.

15           For example, there was the court order -- the first

16   motion to compel was filed in July of 2016, Docket 14.  On

17   June 28th there had been a conference and we were given 30

18   days, which would have been until July 27th, to quote,

19   "identify the officers who interrogated plaintiff, " and if no

20   officers were found then a photo array was going to

21   potentially happen.  A week later, July 6th, was the first

22   order to compel wherein counsel filed an application claiming

23   they needed labeled photographs of all the officers with

24   respect to discovery requests.  So that's a different track

25   now with respect to photo array.  Mr. Johnson was in the

1    process of identifying who had interrogated plaintiff and in

2    the process of compiling photographs for this array.  So

3    that's the first order to compel.

4            In August there's a second motion to compel, and

5    that followed our production of what we learned to be the CCRB

6    file with additional records.  And Mr. Johnson indicated that

7    he had in fact confirmed who the interrogating officer was,

8    that photos of all of the people involved in the search

9    warrant and the arrest were in the CCRB.  Ms. Fett and her

10   client were going to go through those records to see if they

11   could narrow down where we were going.  That's the second

12   motion to compel.

13           I will note that on each of the motions to compel,

14   we did file a response on the docket where we laid out

15   everything we did.  Now when a million things are being

16   requested and emails are coming with additional requests

17   things do get lost in the mix, but all along we were

18   diligently trying to figure out who the unknown officer that

19   assaulted.  I think a big issue in this case, Your Honor, is

20   our very different views of what happened.  So we've always

21   understood that plaintiff injured herself.  They've alleged

22   that these unknown officers assaulted her.  The officers that

23   they identified we believe did not do any such thing.  We

24   believe all along it was this self-inflicted injury.  To the

25   extent she may not have picked Lieutenant Cammy out of the

1  photo array it may have been perhaps because he was the one

2  who stopped her from injuring herself further.  We don't know.

3      Needless to say I think all of us would have liked

4  this case to have been handled differently but I think the

5  motions to compel were filed in a very aggressive manner in

6  this case, and I will note that Mr. Johnson is not the only

7  attorney in our office who has been subjected to this kind of

8  litigation tactics but the plaintiff's firm.  And I think it's

9  something that our office -- it does not go unnoticed, and

10 because they previously worked with us I think they know which

11 buttons to push.  I think they know what voluminous things

12 they can ask us to request.

13      By way of another example, on one of the requests

14 for a motion to compel they attached 13 items that they had

15 emailed Mr. Johnson less than two weeks prior, and the Court's

16 endorsed that as produce all these records.  So there were

17 multiple avenues where Mr. Johnson was trying to track down

18 records, produce things, and the docket does reflect that we

19 did respond with the steps we had taken.  I -- of course all

20 of us would have liked to have known this information earlier

21 without a doubt, Your Honor.  But to the extent they claim

22 they were prejudiced we have also been prejudiced by having to

23 -- you know, it's been a wild goose chase for us, for the

24 Court.

25      And to the extent anybody could have given us a

1    little bit of a clue that they spoke to somebody at CCRB, that

2    they spoke to somebody at IAB, I think our focus in terms of

3    where to find information would have been directed in a more

4    directed way.  That being said I think, you know, within the

5    past unfortunately we can't change, but I do assure the Court

6    that we do take these obligations extremely seriously.  And as

7    the Court knows we settle cases where we think there's merit.

8    Unfortunately, when a case is marked no pay our experience

9    with this firm in particular has been that they go -- they go

10   just to such extremes to put our attorneys under such pressure

11   that I will tell you that several attorneys have been brought

12   to tears by them by the type of aggressive behavior they've

13   used in terms of phone calls and the like.

14          So I just think here is where we are.  We now have

15   the information that all of us would have preferred much prior

16   to now.  But to the extent our office has been trying

17   diligently, Your Honor, I assure you we have been working

18   hard.  And the fact that counsel has been changed on this case

19   I think represented our office does take this seriously.

20   We're trying to get to the bottom of this, and we apologize

21   for the Court's time that's been taken.  But I do think that

22   it's a two-way road at this point.

23          MR. HARVIS:  May I just briefly be heard, Your

24   Honor?

25          THE COURT:  Sure.

1      MR. HARVIS:  So I think that it is the diligence of

2  Ms. Fett and myself that is the only reason why there was ever

3  any discovery that were received in this case.  I think that

4  if the defendants were left to their own devices or perhaps a

5  less diligent firm were handling the prosecution of the case

6  it would have been exactly -- it would have been a [inaudible]

7  response with no investigation.  It would have been an initial

8  conference and an order from the Court with no investigation.

9  It would have been just multiple repeated orders from the

10  Court to specifically identify the officers that literally

11  were defied completely no action taken whatsoever.  And so to

12  suggest that it is our diligence -- and as I was saying to Ms.

13  Fett on the way over here, there is -- if it were not for us

14  having taken such an affirmative attempt to get this material

15  Ms. Martinez would have -- they would have succeeded in

16  keeping Ms. Martinez from being able to timely assert her

17  claims, and she would have been victimized yet again.

18          And to just speak to the merits of this amazing

19  defense that warrants a no pay position, I first of all want

20  to note that the decision about this case was made in a

21  complete vacuum by them.  They had no idea what the actual

22  case was about, what their defense was, who the witnesses

23  were.  They just made that in a most unprincipled way

24  possible, and frankly the plaintiff is very seriously injured.

25  And every single credible data point in this case proves that

41

1   they have absolutely no legitimate defense to it.

2          Just looking for one second at this Hanrahan file,

3   we have Lieutenant Cammy nine hours after the plaintiff was

4   injured, when he should have called it in immediately.  Only

5   after it's determined that she's been hurt does she -- does he

6   place the call.  He specifically says that she's hurt in the

7   juvenile processing room which is on one side of the precinct.

8   And then lo and behold when Hanrahan interviews him six days

9   earlier he's saying that it happened in the arrest processing

10  cell which is on the other side of the precinct.  So the idea

11  that this is some kind of proof that plaintiff didn't -- it's

12  opposite.  This is a -- the weakest defense you could imagine.

13         And I just want to add Ryan was not the only person

14  who had this information.  There were almost a dozen GO15s of

15  different officers in connection with this investigation,

16  specifically DiGenero who was -- who they're describing as

17  this intelligence officer who knew everything, he knew he had

18  been GO15'ed twice.  He knew he had been substantiated in

19  these allegations.  He's coming in for a deposition and there

20  apparently wasn't even a discussion with him about have you

21  ever been investigated about this, did you ever give any

22  testimony about this, any of those basic due diligence things

23  that you think someone would do.  So the idea that somehow

24  Ryan is the -- you can point to him and say, you know, he

25  didn't -- we didn't speak to him is -- the entire leadership

42

1    of the 107th Precinct knew about this.

2            I also want to note it is not the standard for the

3    imposition of sanctions whether or not it was helpful to them

4    to withhold it.  That isn't the part of the inquiry.  The

5    inquiry was about whether the plaintiff was prejudiced and

6    whether the obligations were unfulfilled.  And we believe that

7    not only the inherent affirmative obligations of the

8    Government attorneys but the affirmative obligation both by

9    the [inaudible] order and like the five or six other orders

10   that relate to the officer identities all impose additional

11   layers of burden here none of which were met.  And frankly the

12   most problematic part is the failure to take responsibility

13   for it.  And what I see is this continuing effort to --

14   somehow because we are aggressive -- I'm so glad that we're

15   aggressive.  I'm glad that that happened, and I just -- I hope

16   that every other plaintiff's counsel is so aggressive because

17   it seems like the only way to get anything from the City of

18   New York.

19           MS. O'FLYNN:  I respectfully disagree.  With respect

20   to how we decide our settlement position, early on it was

21   clear that it appeared plaintiff injured herself.  She was

22   arrested for a search warrant that would be -- recovered over

23   200 [inaudible] of heroin.  This was not a case that we valued

24   early as being a case that we thought we needed to put a

25   substantial amount of money on if the injuries are self-

1    inflicted.

2              With respect to the orders in this court to

3    identify, the Valentin asked us to identify officers involved

4    in the arrest.  We did that.  The order --

5              MR. HARVIS:  No, you didn't.  No, you didn't.

6              MS. O'FLYNN:  The officers involved in the arrest?

7              MR. HARVIS:  No, you identified Zac Raymond [Ph.],

8    and he was not involved in the arrest.  He was [inaudible].

9              MS. O'FLYNN:  And we asked you to give more

10   identification so we could try to identify the others.

11             MR. HARVIS:  I won't speak directly to counsel.  I

12   apologize.

13             MS. O'FLYNN:  That is what the letter said.  The

14   next order told us to identify the officer who interrogated

15   plaintiff which we did.  We were then told to investigate

16   officers who matched the description which we did.  We

17   provided the photos and plaintiff picked out two officers.

18   Cammy was in the photos, and she did not pick out him.  This

19   has been a belabored process, but I respectfully take offense

20   to the fact that you would think that this is the right to

21   litigate a case.

22             MR. JOHNSON:  I think just if I may here Your

23   Honor --

24             THE COURT:  I'm sorry.  She's been standing here for

25   a minute.  I'll give you a chance, Mr. Johnson.

1          Go ahead.

2          MS. FETT:  I just wanted to note for the Court that

3    initially when defendants made their disclosures on December

4    18th they didn't even produce the entire investigative file to

5    us.  And in fact it was Mr. Harvis that had to ask -- right,

6    it was four pages out of those 1,000 pages that you have.  And

7    defendant -- I'm sorry.  And Mr. Harvis --

8          THE COURT:  I'm sorry.  I'm sorry.  Say that again,

9    the documents that I -- that I picked up a minute ago, this

10   whole file, you're saying you got four pages?

11         MR. HARVIS:  Exhibit 25, Your Honor.

12         MS. FETT:  We initially got Exhibit 25 and Mr.

13   Harvis asked defense counsel there's got to be more because

14   there's Worksheet 26 and Worksheet 27, so where is the rest?

15   And defense counsel specifically said he has to go back to his

16   supervisors.  He doesn't know if they're going to turn it

17   over.  And it wasn't until we pressed them that we got the

18   entire file.

19         The second thing I just wanted to add, Your Honor,

20   is that I know defendants keep saying that of course they

21   would have wanted to disclose it because it was good for them,

22   and I know Mr. Harvis addressed it.  But the file actually is

23   not good for them.  You have Officer Ryan going back and forth

24   saying he saw her, he didn't see her.  So I know that's not

25   the test whether or not that's good for them, but that's a

1  failing argument anyway because it's not good for them.

2  That's all, Your Honor, thank you.

3          MR. THADANI:  Your Honor, just to -- just to add

4  some color to what plaintiff's point was --

5          THE COURT:  I said Mr. Johnson could speak.

6          MR. THADANI:  My apologies, Your Honor.  Yes, of

7  course.

8          THE COURT:  I mean you guys can fight among

9  yourselves.

10          MR. THADANI:  Okay.

11          THE COURT:  But I did tell him he could speak next.

12          MR. JOHNSON:  Just to provide some context on why

13  this file wasn't found earlier.  The first thing we were

14  looking for and the suggestion of plaintiff's counsel, was

15  that UF-49 I think that was called, the unusual incident

16  report?  And something like that would be filed if something

17  happened at the precinct, so we were looking for that.  And

18  that never materialized.  Another place which plaintiff's

19  counsel also suggested was that look at the Command Log.  If

20  there was some sort of injury that happened at the precinct it

21  would be noted on the Command Log.  So when I looked at those

22  avenues and didn't find either of those things that was one

23  indication that maybe that was -- that -- there was nothing

24  else there.

25          The fact that I did not have more information from

1   Officer Ryan is that I had -- you know, we were -- we moved on

2   to trying to identify the defendants and that took a very long

3   time.  And then from there we were producing the disciplinary

4   records of the defendants.  And by the time we got back to the

5   idea of Officer Ryan a lot of time had passed.  And, you know,

6   to the extent if we had better information this would have

7   come up earlier because, you know, if there was a UF-49 that

8   would have been -- that would have shown up very easily in our

9   records and then that would have alerted us to the fact that

10  there was more information to be had.  There was a notation in

11  the Command Log that, you know, there's some sort of injury in

12  the precinct then that would have, you know, [inaudible] us to

13  Lieutenant Cammy earlier.

14          We -- to the extent that we did find the file, it is

15  -- you know, it is -- it is a perk of where the databases

16  were.  We found the CCRB file I think somebody mentioned that

17  the CCRB file was in Danny Rivera's name, and so that's how we

18  found the CCRB file.  A lot of these things were just not

19  under the right names and weren't able to find unless -- you

20  know, we talked to a lot of people in this case.  We talked to

21  a lot of officers in this case.

22          You know, the fact that we didn't return to Officer

23  Ryan again, you know, in a perfect world we should have done

24  that, but there were dozens of officers that we were talking

25  to.  We talked to people at Queens Central Brooking, for

1   example, because at Queens Central Booking that's when she's

2   first sent to the hospital.  So our focus entirely then was

3   that it must have been somebody at Queens Central Booking who

4   told, you know, the hospital that she might have injured

5   herself.  In fact, a theory that we had was that if she was

6   banging her hands against the wall this happened at Queens

7   Central Booking and that's why she was sent from Queens

8   Central Booking back to the hospital.

9          So that, you know, the fact that we couldn't find

10  this file at the -- you know, at the time during all these

11  investigations is because, you know, we had some assumptions

12  about this case.  For example, that maybe if she did injure

13  herself it happened at Queens Central Booking.  There were

14  names of officers who were there at Queens Central Booking who

15  noted her injuries on the prisoner report.  For example, the

16  Queens Central Booking guy, I think it was Lieutenant -- or

17  Sergeant Seeman [Ph.] who signed the prisoner interview

18  record, so that made us think that he was the one who maybe

19  had that information.  And then maybe there was another person

20  at Queens Central Booking who also dealt with her that we

21  thought maybe he said that.  So it wasn't the fact that, you

22  know, we should have known by Lieutenant Cammy.  We should

23  have in a perfect world, but the evidence that we had gotten

24  at that time led us to believe that a -- self-inflicted

25  wounds, that if they exist, it happened at Queens Central

48

1  Booking so we spent a lot of time doing that.

2        And then once that didn't add up we went to the

3  escort officers because we're like well, if the escort

4  officers -- if somebody needs taken to the hospital it'd be

5  the escort officers.  So we interviewed the escort officers.

6  And we [inaudible] they did escort them, and -- but they had

7  no recollection of whether or not they even had said that to

8  Queens Central -- to the hospital.  So we didn't really know

9  whether or not any statements were made by those escort

10  officers to -- excuse me, to the hospital.  They also didn't

11  have a recollection or -- of, you know, anyone calling into

12  IAB that was asked during the deposition.

13        So I mean, you know, it wasn't, like, a nefarious

14  thing to cover it up.  It's just that we went on the wrong

15  track because we thought hospital note suggested that whatever

16  happened in self-inflicted wounds happened at Queens Central

17  Booking.  And we spent a lot of energy and time looking at

18  that because in a perfect world if she had been injured at the

19  precinct she should have been taken to the hospital from the

20  precinct and that would have led us to believe that somebody

21  in the precinct called the hospital or told the hospital.  So

22  we had a lot of different avenues and, you know, and to try --

23        THE COURT:  So there are a lot of things in this

24  perfect world that didn't happen.

25        MR. JOHNSON:  Well --

1          THE COURT:  She didn't -- she didn't get taken for

2    medical attention which we now know she should have because it

3    appears from the new records that she was injured in the

4    precinct whether self-inflicted or otherwise.  There's no

5    unusual incident report which should have been prepared if she

6    was in fact injured in the precinct.  And there's no reference

7    in the Command Log.  So the perfect world here seems to have

8    fallen apart in many, many instances, and while that may not

9    be your fault, Mr. Johnson, it certainly is not a good thing

10   for the New York City Police Department.

11          So I said he could speak and then, Mr. Harvis, I'll

12   give you a chance.

13          MR. HARVIS:  Okay.

14          MR. THADANI:  Your Honor, just two points.  One just

15   to address plaintiff counsel's contentions about the documents

16   in the booklet with respect to the underlying investigation.

17   On December 18, 2017, Your Honor ordered us pursuant to --

18   there was a joint letter that was submitted to the Court,

19   number of discovery, outstanding discovery issues, that

20   plaintiff, that defendants indicated as well.  Your Honor

21   ordered the defendants to produce all of the outstanding

22   documents that plaintiff requested by the 18th.  We did that.

23   In addition to that we produced these investigative files.

24   What we did produce was all the documents we had in our

25   possession concerning the prisoner injured in custody, the

1  self-inflicting injury incident, and we produced excerpts

2  initially of the file pertaining to the missing property

3  because our contention is that again plaintiff's claims in

4  this case do not relate to missing property or stolen

5  property.

6          What we did produce, and it was indicated in our

7  production letter, was we were producing relevant excerpts of

8  the file which did not involve any of the defendants as

9  subject officers but rather what we did produce was a

10  worksheet and audio recordings pertaining to interview of

11  Hector Rivera who was the individual -- I may be getting the

12  name wrong -- Danny Rivera who was the individual who was

13  arrested along with plaintiff as well as the plaintiff because

14  both of those individuals referenced -- in passing but did

15  reference -- plaintiff's allegations concerning being injured

16  at the 107 Precinct, so we produced those documents.

17  Plaintiff's counsel then after having had a chance to review

18  our disclosures had a discussion with me about producing the

19  remainder of the file.  It wasn't like a secret that I only

20  produced excerpts because literally the production letter

21  stated we produced excerpts of the file.  Then I had -- we had

22  a discussion internally about producing the remainder of the

23  file, and we decided that -- to do that in which we did within

24  I think two days.

25          I think one other thing that, you know, I'd like to

1   just mention is yes, I think we all agree that things could

2   have been done differently.  It's unfortunate that these

3   documents are being produced now.  Ideally, they would have

4   been produced earlier.  But I think also what's being lost is

5   the fact that the -- there are issues -- not blame but there

6   are issues on both sides of the table here.  The plaintiff's

7   attorney -- and they haven't even tried to address in the

8   reply or today why in their discovery response that they

9   specifically state the plaintiff never made any complaints to

10   IAB, why there wasn't any discussion about that, why there

11   wasn't an identification of Cammy in the photo array.

12              THE COURT:  Well, did she file a formal complaint

13   with IAB?

14              MR. THADANI:  She called in and made a complaint to

15   IAB regarding missing property.  She was -- she called CCRB

16   and tried to make a missing property complaint to them, too,

17   and they kicked her to IAB.  She was interviewed by IAB.  She

18   received a letter which we attached as an exhibit to our

19   opposition that indicated we have received your complaint

20   about missing property, we have resolved your complaint, and

21   it indicated that the complaint was closed and what the

22   results of those complaints were and to call somebody at IAB

23   if she had any questions or wanted to discuss the

24   investigation further.  That was never disclosed.

25              THE COURT:  But I guess I don't really understand

1   because your position all along, at least this afternoon, has

2   been that her complaint about the missing money has nothing

3   whatsoever to do with the claim of injury and therefore if it

4   wasn't relevant, you didn't think it was relevant, why should

5   they think it was relevant?

6          MR. THADANI:  That's fair, Your Honor, but the

7   response in the discovery responses weren't that there were no

8   relevant investigations or no relevant complaints made.  They

9   made a specific representation in the sworn discovery response

10  that there were no investigations, no complaints made by the

11  plaintiff.  They never supplemented that response to change --

12  to change that response.  They never produced the letter that

13  they received with respect to the IAB investigation.

14          That's true that we contend that the investigation

15  is moot but plaintiff's contention here as a result of these

16  GO15s of these other officers and there was this whole full-

17  blown investigation, again, none of this has to do with

18  plaintiff's claims with regarding being injured because

19  whenever she was asked by CCRB or by IAB about these injuries

20  she said I have a lawyer, I don't want to talk about it, I

21  don't want to tell you about it.  IAB and CCRB are telling

22  her, well, we investigate those claims, too, are you sure?

23  We'd like to investigate this too.  No, I don't really want to

24  talk about it.  Let me talk to my lawyer first.  I'll get back

25  to you, and she never did.  So the investigations related to

1   missing property.  But again, the plaintiff did make a

2   specific disclosure and representation in this that she didn't

3   make any complaints.

4           THE COURT:  About this incident.  Okay.  About the

5   injuries.  Okay.

6           Mr. Harvis.

7           MR. HARVIS:  Very briefly, Your Honor.  I don't want

8   take a lot of the Court's time.  I just want to say, you know,

9   we're not conspiracy theorists.  We don't think any kind of

10  far-ranging thing, but, you know, oftentimes the most simple

11  explanation is the correct one.  Here Your Honor just detailed

12  the absence of any of the appropriate notifications in the

13  record, and while counsel may have acted in some semblance of

14  good faith in attempting to locate the stuff if -- even if it

15  was the NYPD who buried it by not doing the right forms and

16  mislabeling the numbers and everything else they are still

17  subject to this Court's power to hold them accountable and

18  they cannot be shielded from that by having their attorneys

19  not know what's going on and not disclosing this.  And Ryan in

20  particular in addition to DiGenero who was deposed, they never

21  said anything about these investigations and we believe they

22  have a duty to disclose it especially given the Court's

23  orders.  And the last thing that I want to mention --

24          THE COURT:  Were they asked if they were interviewed

25  by IAB about this?

1        MR. HARVIS:  Well, Ryan was not -- was never

2   deposed.

3        THE COURT:  No, no, no.  DiGenero.

4        MR. HARVIS:  DiGenero, I don't think we asked him

5   that specific question, so I don't think that question was

6   asked.  But again, you know, we have no way of knowing --

7   sure, Ms. Martinez knew she had that single conversation about

8   missing property, but she didn't know that behind that was an

9   entire universe of GO15s and hearings and investigations and

10  investigative pathways that would have led to the disclosure

11  of all this relevant information.  So, you know, all -- we had

12  no idea to even ask about that because we had -- we were told

13  affirmatively in repeated discovery responses that there was

14  no investigation.  So how could we then -- how were we to

15  divine that that existed so we could then ask him about it?

16  That goes to what we were missing at -- from the beginning of

17  the -- of the discovery period.

18        And the last thing I want to say is we still don't

19  know who told the hospital staff that she was punching the

20  wall.  And in fact when we finally got all the disclosure that

21  document that or a series of memo books of people who are --

22  now that we've learned are allegedly the police officers that

23  were -- that were involved in taking her back and forth and

24  then we showed defense counsel the other day in that memo book

25  right at the moment in time corresponding almost perfectly to

1   when that notation was made in the record is the scratch of a

2   sergeant at the hospital who's scratching the memo book of one

3   of these officers in between when the officer arrives at the

4   hospital and when the -- for the 107th Precinct.  So that

5   sergeant is there.  We don't know who that is, and, you know,

6   it just goes to the drips and drabs and, you know, we never

7   have everything.  And even at this late stage we have no idea

8   and they do.  And we [inaudible].

9          THE COURT:  I have one question before we complete

10  this proceeding and that is plaintiff's counsel has asked as a

11  sanction that the Court toll the statute of limitations.  And

12  my question to you is because Officer Ryan -- if you're an

13  officer -- is not named as a defendant can you toll the

14  statute of limitations with respect to him even though he's

15  not really a party at this point and you don't actually

16  represent him?

17         MS. O'FLYNN:  I believe, Your Honor, because the

18  statute has not passed yet I believe an order from the Court

19  could extend the -- you know, the deadline in our case to give

20  them more time to amend.  I think we'd be in a different

21  position if the statute had passed.  So we would not oppose an

22  enlargement of the time to amend the complaint.

23         THE COURT:  Can you submit a letter by the end of

24  the day with -- just I don't need a long involved thing --

25  just case citations supporting that because I don't want to

1   issue an order that would later be challenged and by Officer

2   Ryan who might go out and get his own attorney.

3           MS. O'FLYNN:  This is true.

4           THE COURT:  And they would be out of luck.  So --

5           MS. O'FLYNN:  Be happy to do that, Your Honor.

6           THE COURT:  If you -- if you wouldn't mind.

7           MR. HARVIS:  And, Your Honor, just -- sorry, for

8   clarity of the record I just wanted to note I mean we believe

9   that there are a number of additional defendants who may be

10  added to the case.  So I just want to be clear we are not only

11  contemplating Ryan [inaudible].

12          THE COURT:  I understand but the other officers are

13  in the same position --

14          MR. HARVIS:  Exactly.

15          THE COURT:  -- I assume as Officer Ryan.  They're

16  not currently defendants.  They're not currently represented

17  by corporation counsel, so if counsel -- corporation counsel

18  doesn't have the authority to waive for Officer Ryan I'm

19  assuming they don't have the authority to waive for the -- for

20  the others, and I reiterate the reason for the authority is I

21  want to --

22          MS. O'FLYNN:  Absolutely, Your Honor.

23          THE COURT:  --I make sure that my order is not going

24  to be a problem down the line.

25          MS. O'FLYNN:  Absolutely.

57

1          MR. HARVIS:  Thank you, Your Honor.

2          MS. O'FLYNN:  I believe this came up in another case

3  so I think there is a case to back me up.  So --

4          THE COURT:  Okay.  Well, that would be very helpful.

5  All right.  Anything else anybody wants to add?

6          MR. HARVIS:  Not from plaintiff, Your Honor.

7          MS. O'FLYNN:  We appreciate your time, Your Honor.

8          THE COURT:  All right.  Thank you.

9          MS. FETT:  Thank you, Your Honor.

10  (Proceedings concluded at 3:43 p.m.)

11                    *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

1      I certify that the foregoing is a court transcript from

2 an electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5 _____

6                        Shari Riemer, CET-805

7 Dated:  January 3, 2018