UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ROSIE MARTINEZ,

                            Plaintiff,

                  -against-

CITY OF NEW YORK; Lieutenant JASON
WEITZMAN; Sergeant JASON FORGIONE,
Shield No. 2894; Police Officer ERIC RYAN;
Lieutenant DAVID CAMHI; Sergeant JOSEPH
DIGENNARO; Captain PAUL VALERGA;
Sergeant KEITH LALIBERTE; Sergeant JOSEPH
PONTECORVO; Police Officer BLAKE
FICKEN; Police Officer ALBERT TROTTER;
Police Officer PETER KANDINOV; Police Officer
MATTHEW RIPPEL; Detective JAMES
DAVNEIRO; Police Officer BRYAN POST; Police
Officer TIFFANY WOLF; Police Officer CASEY
WOLFF; Sergeant RICHARD LAVELLE; Police
Officer JAMES SEDDIO; Police Officer DANIEL
MENDEZ; Police Officer RICHARD RUSSO;
and JOHN and JANE DOE 1 through 10,
individually and in their official capacities (the
names John and Jane Doe being fictitious, as the
true names are presently unknown),

                            Defendants.
----------------------------------------------------------------x

**SECOND AMENDED COMPLAINT**

16 CV 79 (AMD)(CLP)

Jury Trial Demanded

## NATURE OF THE ACTION

1.    This is an action to obtain money damages and equitable relief arising

out of the violation of plaintiff's rights under the Constitution.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

3.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343 and 1367(a).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

5.     This Court has supplemental jurisdiction over the New York State claims pursuant to 28 U.S.C. § 1367.

## JURY DEMAND

6.     Plaintiff demands a trial by jury in this action.

## PARTIES

7.     Plaintiff Rosie Martinez is a resident of Queens County in the City and State of New York.

8.     Defendant City of New York is a municipal corporation organized under the laws of the State of New York. It operates the NYPD, a department or agency of defendant City of New York responsible for the appointment, training, supervision,

promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

9.     At all times relevant, the individual defendants named herein were officers, employees and agents of the NYPD. The defendants are sued in their individual and official capacities.

10.    At all times relevant defendants John and Jane Doe 1 through 10 were police officers, detectives or supervisors employed by the NYPD. Plaintiff does not know the real names and shield numbers of defendants John and Jane Doe 1 through 10.

11.    At all times relevant herein, defendants John and Jane Doe 1 through 10 were acting as agents, servants and employees of the City of New York and the NYPD. Defendants John and Jane Doe 1 through 10 are sued in their individual and official capacities.

12.    At all times relevant herein, all individual defendants were acting under color of state law.

## STATEMENT OF FACTS

13.    Near the end of her work day on January 22, 2015, plaintiff Rosie Martinez received a call on her cell phone from a neighbor reporting that police were

present at her apartment in Queens.

14.     Unbeknownst to Ms. Martinez, who is hardworking and law-abiding, a man she had recently begun dating, Danny Rivera, was evidently involved with drugs.

15.     That evening, with Ms. Martinez at work and Mr. Rivera in her apartment for what she believed were lawful reasons, police executed a search warrant at Ms. Martinez's residence, arresting Mr. Rivera and allegedly recovering narcotics from him.

16.     Ms. Martinez arrived home to find NYPD officers searching her apartment.

17.     Male officers searched Ms. Martinez at the scene, finding nothing illegal.

18.     Ms. Martinez was then arrested, her property confiscated, and she was taken to the 107th Precinct, arriving around 10:00 p.m.

19.     Several of the defendant officers stole property from Ms. Martinez, including cash, gift cards and other valuables from her home and purse.

20.     None of the stolen items were vouchered or returned.

21.     Upon information and belief, the defendants directly involved in the theft of Ms. Martinez's property were defendants Ryan, Digennaro, Davniero and Rippel, along with Lieutenant Robinson.

22.     Several of the other defendants, including Valerga, Camhi and

Pontecorvo, along with the late Captain Hanrahan, are believed to have participated in later efforts to cover up the theft.

23.     Without a warrant or any other lawful basis, defendants Digennaro and Ryan also took custody of and searched plaintiff's vehicle, in violation of Ms. Martinez's Fourth Amendment rights. Property from the vehicle was never vouchered or returned.

24.     At the 107th Precinct, Ms. Martinez was brought before the desk officer and was noted to be in normal physical condition with no injuries.

25.     After being searched again, plaintiff was brought to the precinct's juvenile detention room and her left hand was handcuffed to a bench.

26.     Approximately an hour later, an officer entered the room and told plaintiff not to worry as she would be leaving as soon as she answered some questions.

27.     Ms. Martinez immediately invoked her right to counsel, requesting an attorney and handing the officer the business card of a criminal defense attorney.

28.     The officer informed Ms. Martinez, in sum and substance, that she could speak with an attorney after they had finished questioning her.

29.     A short time later, the officer returned with an individual believed to be defendant Digennaro.

30.     Digennaro and the other officer brought Ms. Martinez to the holding

cell area on the other side of the 107th Precinct, where Mr. Rivera was inside one of the cells.

31.     In Ms. Martinez's presence, the officers demanded information from Mr. Rivera, promising to release Ms. Martinez if he obliged.

32.     Mr. Rivera provided information to the officers that was apparently unsatisfactory to them, and the officers grew very angry.

33.     The officers told Ms. Martinez, in sum and substance, that she must know something, calling her a "fucking bitch" and telling her that they "weren't going to waste any more fucking time with her."

34.     The officers then brought Ms. Martinez back to the juvenile room and handcuffed her to the bench again.

35.     Shortly after midnight on January 23, 2015, defendants, believed to be Lieutenant Weitzman and Sergeant Forgione, entered the room and began to aggressively interrogate Ms. Martinez.

36.     When Ms. Martinez truthfully explained that she knew nothing, the officers cursed at her, becoming enraged and physically violent.

37.     The male officers assaulted and choked Ms. Martinez while her hand was handcuffed to the bench, severely injuring her.

38.     While attacking her, one of the officers said, in sum, "this is for not

talking bitch."

39.     Danny Rivera could hear Ms. Martinez's screams from his cell across the precinct.

40.     Both of Ms. Martinez's hands were then handcuffed extremely tightly, and her feet were shackled.

41.     Ms. Martinez's repeated requests for medical treatment, made continuously over the ensuing five hours, were ignored.

42.     During this time, Ms. Martinez was taken back to the holding cell area, where Mr. Rivera observed Ms. Martinez's visible injuries and she explained to him what the officers had done.

43.     Ms. Martinez's severe hand injuries made it difficult and extremely painful for her to be fingerprinted.

44.     Ms. Martinez was placed in the back cells of the precinct and continued her futile efforts to obtain medical care.

45.     An unidentified officer asked Ms. Martinez how she had been injured and she described her assailants. The officer took no action to assist her.

46.     Despite plaintiff's obvious physical injury and repeated requests that she receive medical care as articulated by her and Mr. Rivera, all of the officers at the precinct, including Ryan, Laliberte, Camhi, Forgione, Post, Wolf/Wolff, Davneiro,

Lavelle, Digennaro, Russo, Weitzman and others, failed to request or obtain medical treatment for Ms. Martinez.

47.    No ambulance was called to the precinct, no report was made to internal affairs regarding Ms. Martinez being injured in custody, no medical treatment of prisoner form was prepared, no entry was made in the command log or any officer's memo book, and no UF-49 Unusual Occurrence Report was completed.

48.    In the 5 a.m. hour on January 23rd, when it came time for Ms. Martinez to be taken to Central Booking, her wrists and hands had swollen to the point where she could not be handcuffed with a single set of cuffs and, with her in obvious agony, two sets of handcuffs were applied to her injured wrists.

49.    Instead of obtaining medical treatment for Ms. Martinez as they were obligated to do under the Constitution, defendants Seddio and Mendez took Ms. Martinez to Queens Central Booking in shackles.

50.    At Central Booking, a medical screener observed and noted plaintiff's injury and ordered Seddio and Mendez to take her to the hospital.

51.    Again, no ambulance was called and Ms. Martinez was transported in a police vehicle.

52.    Within minutes of Ms. Martinez being sent to the hospital, defendant Camhi entered a mysterious "62A re Inj Pris" notation in his memo book. Upon

-8-

information and belief, "10-62A" is NYPD code for "Out of Service – Mechanical."

53.     The activities Camhi undertook in connection with the injured prisoner notation, if any, are unknown at this time, but they did not include making the requisite notification to Internal Affairs or, upon information belief, preparing any of the forms required when a prisoner is injured in custody.

54.     According to medical records, Ms. Martinez arrived at the hospital at approximately 6:17 a.m. complaining of injuries she had sustained while in custody.

55.     While Ms. Martinez was at the hospital, defendants Seddio and Mendez were relieved by defendants Trotter and Kandinov; defendant Pontecorvo also arrived at the hospital.

56.     The officers remained with plaintiff during her medical exam, taking note of her diagnosis and, according to a progress note, telling medical providers at approximately 8:30 a.m. that Ms. Martinez's injures were self-inflicted.

57.     Ms. Martinez observed an officer use his phone to relay her diagnosis; Ms. Martinez heard the officer telling someone that plaintiff had no broken bones.

58.     Moments later, defendant Camhi called Internal Affairs, stating, in a recorded call:

> This call is in regards to an injured prisoner….Yeah when she was in police custody. The injury wasn't caused by, uh, any MOS, she did it to herself….She was secured in the juvenile

room [of the precinct], uh, with one cuff, cuffed to the bench. Uh, she started ripping things off the wall…then she started punching the wall and kicking at cabinets, uh, I secured her while she was in there rear-cuffed and then secured those cuffs to the bench to keep her secured. When she was transported down to central booking she complained about pain in her right hand, she did have some visible swelling in her right hand…she was brought over to QGH…just contusions no broken bones, no stitches no nothing else…[the injury happened] approximately, uh, I'm not even sure, midnight thirty I believe…she's being released and she'll be brought back to central booking…

59.     Much of what defendant Camhi told Internal Affairs was fabricated, including his statements regarding the circumstances of plaintiff's injury.

60.     Indeed, Ms. Martinez was not brought back to Central Booking but, instead, after her hand was splinted at the hospital, she was inexplicably taken to the 107th Precinct around 9:30 a.m. by defendants Trotter, Ficken and Kandinov.

61.     No entries were made in NYPD's prisoner tracking system to reflect Ms. Martinez's transport back to the precinct.

62.     As a result, official NYPD records falsely reflect that Ms. Martinez remained at the hospital for the next eight plus hours.

63.     In reality, Ms. Martinez was held in the back cells of the 107th Precinct until the late afternoon of January 23rd, before being returned to central booking and arraigned at approximately 7:10 p.m.

64.     The defendants went to great lengths to cover up their misconduct.

65.     Defendant Valerga and the late Captain Hanrahan created a report purporting to reflect interviews with defendants Ryan and Camhi, as well as plaintiff, that Hanrahan claimed exonerated the officers ("Hanrahan Report").

66.     There are a number of errors in the Hanrahan report, which is unsigned, including indications that interviews were held six days before the incident, that Ryan and Camhi described the events as occurring in the holding pen area (as opposed to the juvenile room as Camhi originally claimed), and the false claim that plaintiff had been interviewed and denied officer misconduct.

67.     Plaintiff was never interviewed by Captain Hanrahan.

68.     Upon information and belief, the Hanrahan report, as part of an intentional cover-up, was suppressed and assigned incorrect and/or misleading tracking numbers. Documents underlying the Hanrahan Report also appear to have been destroyed.

69.     Despite Ryan and Camhi's alleged direct observation of plaintiff injuring herself on January 23rd, neither officer noted the incident in their memo book, nor were the allegedly damaged area in the precinct or plaintiff's injuries photographed or documented.

70.     Multiple overlapping investigations of the events were ultimately conducted. But, as a result of the cover up, plaintiff's allegations of physical injury and

stolen property were never appropriately investigated.

71.     In multiple official interviews, defendant Ryan never disclosed what he allegedly observed regarding plaintiff's injury on January 23rd.

72.     Defendant Camhi was never properly identified as having any role in the incident, and, upon information and belief, was never appropriately interviewed.

73.     The cover up directly impeded plaintiff's ability to prosecute the instant civil action.

74.     Despite multiple Court orders over the course of two years, the defendants in the instant action never disclosed key information regarding the witnesses and investigation surrounding plaintiff's allegations.

75.     In this civil litigation, plaintiff has been forced to expend tremendous effort and expense, including, *inter alia*, taking eleven depositions, without the benefit of basic, vital information, to her substantial prejudice.

76.     The January 23rd assault left Ms. Martinez with permanent injuries and altered the trajectory of her life.

77.     Within ninety days after the claim alleged in this Complaint arose, a written notice of claim was served upon defendants at the Comptroller's Office.

78.     At least thirty days have elapsed since the service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

-12-

79.     This action has been commenced within one year and ninety days after the happening of the events upon which the claims are based.

80.     Ms. Martinez suffered damage as a result of defendants' actions. Plaintiff suffered, *inter alia*, emotional distress, mental anguish, fear, pain, permanent bodily injury, lost wages and employment opportunities, deprivation of the fair opportunity to litigate her civil action, deprivation of personal property without due process, anxiety, humiliation and damage to her reputation.

## FIRST CLAIM
### Deprivation of Due Process & Improper Vehicle Search

81.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

82.     By their conduct as described herein, including stealing plaintiff's property and searching her vehicle, the individual defendants violated plaintiff's rights to due process.

83.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
### § 1983 Conspiracy

84.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

85.     By their conduct as described herein, the individual defendants engaged in a conspiracy to violate plaintiff's federally-protected rights and to cover-up the violation, and their conduct included numerous overt acts in furtherance of the conspiracy as described above.

86.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM
### Denial of Access to Courts / § 1983 Cover-Up

87.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

88.     By their conduct as described herein, the individual defendants prevented plaintiff from fairly litigating the instant civil action, including by delaying her ability to obtain vital information in advance of the expiration of the governing statute of limitations, in violation of plaintiff's rights to access the Courts.

89.    Defendants engaged in a purposeful cover up intended to frustrate plaintiff assertion of her rights, to hide and destroy evidence and to prejudice plaintiff in this action.

90.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## FOURTH CLAIM
### Unreasonable Force

91.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

92.    The individual defendants who used excessive force against plaintiff violated the Fourth and Fourteenth Amendments.

93.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM
### State Law Assault and Battery

94.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

95.    By their conduct, as described herein, the defendants are liable to plaintiff for having assaulted and battered her.

-15-

96.     Defendant City of New York, as an employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

97.     As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

<u>SIXTH CLAIM</u>
**Negligence; Negligent Hiring, Training & Retention**

98.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

99.     Defendant City, through the NYPD, owed a duty of care to plaintiff to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to plaintiff or to those in a like situation would probably result from the foregoing conduct.

100.    Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

101.    Upon information and belief, defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

102.   Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused each of plaintiff's injuries.

103.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

<u>SEVENTH CLAIM</u>
Intentional Infliction of Emotional Distress

104.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

105.   By reason of the foregoing, and by assaulting, battering, and using gratuitous, excessive, brutal, sadistic, and unconscionable force and failing to prevent other defendants from doing so, the defendants, acting in their capacities as NYPD officers, and within the scope of their employment, each committed conduct so extreme and outrageous as to constitute the intentional infliction of emotional distress upon plaintiff.

106.   The intentional infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as NYPD officers.

107.   Defendants, their officers, agents, servants, and employees were responsible for the intentional infliction of emotional distress upon plaintiff. Defendant City, as employer of each of the defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior*.

108.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
## Negligent Infliction of Emotional Distress

109.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

110.   By reason of the foregoing, and by assaulting, battering, and using gratuitous, excessive, brutal, sadistic, and unconscionable force, failing to prevent other defendants from doing so, the defendants, acting in their capacities as NYPD officers, and within the scope of their employment, each were negligent in committing conduct that inflicted emotional distress upon plaintiff.

111.   The negligent infliction of emotional distress by these defendants was unnecessary and unwarranted in the performance of their duties as NYPD officers.

112. Defendants, their officers, agents, servants, and employees were responsible for the negligent infliction of emotional distress upon plaintiff. Defendant City, as employer of each of the defendants, is responsible for their wrongdoings under the doctrine of *respondeat superior*.

113. As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## NINTH CLAIM
### Failure to Intervene

114. Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

115. Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

116. Accordingly, the defendants who failed to intervene violated plaintiff's rights under the Constitution.

117. As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## TENTH CLAIM
### Deliberate Indifference

118.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

119.   In failing to obtain medical treatment for Ms. Martinez and acting with deliberate indifference to her safety, the individual defendants violated plaintiff's constitutional rights.

120.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## ELEVENTH CLAIM
### Supervisory Liability

121.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

122.   The individually-named supervisory defendants (i) personally participated in the violation of plaintiff's rights; (ii) were aware that plaintiff's rights were being violated but failed to remedy the wrong; (iii) created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (iv) were grossly negligent in the supervision of their subordinates; and (v) were deliberately to the rights of Ms. Martinez.

123.   Accordingly, the supervisory defendants are liable for the deprivation of plaintiff's rights.

124.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## TWELFTH CLAIM
### *Monell*

125.   Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

126.   The City of New York, and its policies, customs and practices, were the moving force behind plaintiff's constitutional deprivations.

127.   As a matter of policy, the City of New York fosters an environment at the precinct- and borough-levels that allow NYPD officers to cover up acts of excessive force, as happened in this case.

128.   The City, as a matter of policy, inadequately investigates in-custody injuries, emboldening NYPD officers to commit acts of violence without consequence, as happened in this case.

129.   As a matter of policy, NYPD's Internal Affairs affirmatively attempts to discredit complainants in order to pre-textually exonerate NYPD officers, as happened in this case.

130.   NYPD's prisoner tracking system is deficient and lacks safeguards against misconduct, allowing for the inaccurate recording of prisoner whereabouts, as happened in this case.

131.   NYPD's civilian complaint filing system is deficient and allows for reports to be miscategorized, compartmentalized and suppressed without detection, as happened in this case.

132.   As a matter of policy, NYPD Internal Affairs seeks to subvert complainant's invocation of the right to counsel, as happened in this case.

133.   As a matter of policy, NYPD Internal Affairs attempts to minimize or avoid allegations brought against police officers, as happened in this case.

134.   The New York City Law Department, as a matter of policy, avoids investigation of civil rights complaints and, even under federal Court order, fails to conduct investigations sufficient to comply with plaintiffs' constitutional right to access the courts, as happened in this case.

135.   As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a) Compensatory damages against all defendants, jointly and severally;

(b) Punitive damages against the individual defendants, jointly and severally;

(c) Injunctive and equitable relief to address the deficiencies in the policies of the City of New York;

(d) Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(e) Such other and further relief as this Court deems just and proper.

Dated:     January 23, 2018
           New York, New York

HARVIS & FETT LLP

_____
Baree N. Fett
305 Broadway, 14th Floor
New York, New York 10007
(212) 323-6880
bfett@civilrights.nyc

*Attorneys for plaintiff*

-24-