UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ROSIE MARTINEZ,

                              Plaintiff,

                 -against-

CITY OF NEW YORK *et al.*,

                             Defendants.
----------------------------------------------------------X

**REPORT AND
<u>RECOMMENDATION</u>**
16 CV 79 (AMD) (CLP)

**POLLAK**, United States Magistrate Judge:

       On January 7, 2016, plaintiff Rosie Martinez commenced this Section 1983 civil rights

action against the City of New York and certain unidentified police officers, alleging that her

civil rights had been violated and that she was subjected to excessive force and denied medical

treatment following her arrest on January 22, 2015.  Discovery in this case has been ongoing for

almost two years, and this Court has issued 14 orders requiring defendants to comply with their

discovery obligations.  On December 18, 2017, on the eve of the expiration of the statute of

limitations and the conclusion of discovery, the defendants disclosed, for the first time, that there

were three separate investigations conducted by the NYPD into the events surrounding plaintiff's

arrest and injury.  They also disclosed the identity of key witnesses that plaintiff has been

seeking since the commencement of the action and plaintiff indicated that there may be

additional files that were never previously disclosed.  Plaintiff moves for sanctions.

<u>FACTUAL BACKGROUND</u>

       Plaintiff Martinez alleges that, following her arrest in connection with an alleged drug

transaction (which she denies), she was held in custody at the 107 Precinct from 9:00 p.m. on

January 22, 2015 until 5:22 a.m. on January 23, 2015. (Am. Compl.[1] ¶¶ 13, 14). Plaintiff alleges that while in custody, she was interrogated by several police officers, despite her request for counsel. (Id. ¶ 15). She alleges that when she had no information to provide defendants, the officers "became violent" and assaulted her, choking her, hitting her in the face, and violently bending her fingers backward, causing permanent injury to her right hand. (Id. ¶¶ 16-17). She further alleges that despite her requests for medical treatment for her hand while at the Precinct, her requests were denied. (Id. ¶ 19).

Eventually, Ms. Martinez was sent to Queens Central Booking for arraignment. There, court personnel noted her complaints of injury and directed the escort officers from the 107 Precinct to take her to the hospital. (Id. ¶ 20). At Queens Hospital Center ("Queens General Hospital" or the "Hospital"), a physician assistant noted in a progress note at 8:39 a.m. on January 23, 2015, that plaintiff had reported being choked and assaulted during her arrest the night before. (See Queens Hospital Center Progress Note, DEF000763, Ex. 17 to Pl.'s Reply in Support of Sanctions, ECF No. 91-17). The note indicates that plaintiff made this statement in the presence of an unidentified NYPD officer. (Id.) According to the Hospital record, the NYPD officer reported that plaintiff had been "punching a wall in the cell." (Id.) At the Hospital, Ms. Martinez's hand was splinted.[2] (Am. Compl. ¶ 20).

---

[1] Citations to "Am. Compl." refer to the plaintiff's Amended Complaint, filed on November 17, 2016, ECF No. 28.

[2] She also claims that the officers stole money from her. (See Pl.'s 12/21/17 Motion for Sanctions at 3, n.3 (explaining that Ms. Martinez alleged officers stole over $5,000 from her, but that even after their belated production on December 18, 2017, defendants have only produced two of twenty-seven investigative reports related to the corruption investigation)).

Plaintiff brings claims of excessive force, state law claims of assault and battery, negligent hiring, training and retention claims against the defendant City, intentional and negligent infliction of emotional distress, and failure to intervene.

PROCEDURAL HISTORY

From the very beginning of this case, plaintiff's counsel sought to determine the identities of the NYPD officers who allegedly assaulted plaintiff.  The search for these officers began even before the initial conference held before this Court in April 2016 and is reflected in over six months of discovery requests and 14 Orders from this Court.  Plaintiff contends that "from the outset," defendants took the position that plaintiff was not injured in the 107 Precinct and therefore it was impossible for them to identify the officers who were responsible.  (Pl.'s 12/21/17 Ltr. at 1, ECF No. 85).  Defendants asserted that plaintiff was "lying" about being injured in the Precinct and that her claims were manufactured.  (Id.)

Finally, in November 2016, believing that they had identified the proper officers, plaintiff's counsel filed the Amended Complaint, naming Lieutenant Jason Weitzman and Sergeant Jason Forgione as defendants.  On December 18, 2017, over one year and 11 depositions later, defendants, on literally the eve of a conference scheduled before this Court, suddenly disclosed certain files that changed the entire landscape of the lawsuit.  (See id. at 2; Defs.' 12/26/17 Ltr. at 1, ECF No. 87).  With that disclosure, it became clear to plaintiff and to this Court that despite almost a year and a half of discovery, plaintiff had not been provided with critical information about her case despite her counsel's repeated requests and 14 Orders from this Court.  In order to understand the truly outrageous conduct of the NYPD and the City's attorneys, and the prejudice to the plaintiff, it is necessary to review the lengthy history of

plaintiff's discovery requests, the defendants' responses, and the various Orders issued by the Court.

1)   <u>Initial Discovery Proceedings and Court Orders</u>

Following the filing of the Complaint on January 7, 2016, the City was granted an extension of time to answer and the initial conference was held before the Court on April 15, 2016.  At that time, counsel was Ordered to obtain plaintiff's medical records, determine the officers' identities,[3] and respond to written discovery by May 20, 2016.  (4/15/16 Minute Order, ECF No. 10).

The settlement conference originally scheduled for June 28, 2016 was subsequently converted, at defendants' request, to a status conference.  Although more than 30 days had passed since the initial conference, the City had not provided the identity of any of the officers who had been involved in or who witnessed the injury to plaintiff, so the Court issued a second Order to defendants to identify the officers who interrogated plaintiff within 30 days or the Court would entertain an application to produce the photographs and memo books sought by plaintiff. The plaintiff had requested the production of photographs and memo books in an effort to identify the officers at the 107 Precinct who had interrogated her, based upon the belief that the officers who questioned plaintiff were the ones who assaulted her when they became unhappy with her answers.  The Court indicated that if no officers were identified, the Court would consider ordering the production of photographs and memo books of the officers on duty that

---

[3] On April 14, 2016, plaintiff served defendants with her first set of document requests and interrogatories.  Interrogatory Number 1 sought the identities of 12 categories of NYPD officers in the 107 Precinct on the night of Ms. Martinez's arrest.  (<u>See</u> Pl.'s 4/16/16 1st Set of Interrogs. and Reqs. for Prod. ("Pl.'s 4/16/16 Discovery Requests"), attached as Exhibit A to Pl.'s 7/6/16 Mot. to Compel, ECF No. 14-1)).

night.  The next conference was then scheduled for July 27, 2016.  (6/28/16 Minute Order, ECF No. 13).

2)   Plaintiff's July 6, 2016 Motion to Compel

On July 6, 2016, plaintiff filed her first motion to compel the production of recent labeled, color photographs and memo books of the plainclothes officers at the Precinct at the time of plaintiff's interrogation.  (Pl.'s 7/6/16 Ltr. at 1, ECF No. 13).  Plaintiff argued that the defendants had been aware of the physical description of these officers since plaintiff's Section 50-h Hearing held in December 2015, and yet despite the Court's April 15, 2016 Order, the only officers who had been identified by the City were the arresting officers.  (Id. at 1-2).

On July 25, 2016, less than 24 hours before the previously scheduled conference, defendants moved to adjourn the conference.  The Court denied the request as untimely and ordered the parties to appear.  Since defendants still had not identified the officers who interrogated plaintiff, the Court ordered the production of photographs in an effort to determine the identity of the officers.  (7/27/16 Minute Order, ECF No. 17).

3)   Plaintiff's August 16, 2016 Motion to Compel

a)   The Request for Photographs and the Officers' Identities

On August 16, 2016, plaintiff moved to compel certain discovery, including an inspection of the Precinct, along with the officers' photographs and memo books, noting that the initial deadline for production of the officers' identities had expired with no information being provided by defendants.  (Pl.'s 8/16/16 Ltr. at 1, ECF No. 18).  Plaintiff indicated that instead of complying with the Court's Order to produce photographs and identify the officers, defendants

had produced a 300-plus page CCRB file, along with a letter asserting that review of that file would resolve the identification issue.  (Id.)  Despite a review of this file with their client, plaintiff's counsel indicated that the "CCRB never investigated the matters in dispute [and] review of that file provided little assistance to plaintiff's identification effort," because the photographs in the file were of eight officers involved only in the underlying arrest and search. (Id. at 1-2).  Thus, plaintiff continued to request the production of photographs and memo books of NYPD personnel in the Precinct that night who reasonably resembled plaintiff's description, including officers in the Detective Squad, Queens North Narcotics, and the Intelligence Division. (Id. at 3).

In a letter dated August 18, 2016, counsel for defendants argued that the "motion is moot" and the City "has identified all the individuals who 'interrogated' plaintiff or participated in plaintiff's arrest."  (Defs.' 8/18/16 Ltr. at 1, ECF No. 19).  Defendant's counsel represented that he had produced the photographs and memo books of Sergeant Joseph DiGennaro and his supervisor, Lieutenant Eric Robinson, identifying DiGennaro as the "intelligence officer" for the 107 Precinct.  (Id. at 2).  The City had also produced the memo books and photographs of the arresting officers.  (Id.)  Therefore, defendant's counsel took the position that "plaintiff has failed to provide a good faith basis for production of further photographs."  (Id.)

b) Medical Treatment of Prisoner Form, Central Booking Medical Screening Form, Command Logs for the 107 Precinct and Central Booking, and Inspection of the Precinct, Among Other Requests

In a further attempt to identify the responsible officers and to obtain certain core discovery, plaintiff also reiterated her request for certain information previously requested in April, including inter alia:  1) the Medical Treatment of Prisoner Form; 2) Central Booking Medical Screening Form; 3) FDNY Pre-Hospital Care Report; 4) Ambulance Call Report;

5) Computer Aided Dispatch; 6) unredacted Precinct Prisoner Pen Holding Roster; 7) Roll calls

from Central Booking and the 107 Precinct; 8) the 107 Precinct Command Log; 9) the identity of

officers assigned to a particular squad car; 10) the Log Book for Central Booking; and 11) text

messages and phone calls between Sergeant DiGennaro and Lieutenant Robinson related to

plaintiff.  (Id.)  According to plaintiff, defendants had refused to provide any additional

photographs, refused to permit inspection of the Precinct, refused to produce an unredacted

version of the prisoner roster, and refused to provide discovery of communications between the

officers.  (Id.)  As to the remainder of the requested information, defendants' counsel would not

agree to produce it before October 3, 2016 despite the fact that plaintiff had demanded this

information in her initial discovery demands almost six months earlier.

     During a telephone conference held on August 19, 2016, this Court Ordered defendants

to produce:  1) the names of all intelligence officers at the Precinct at the time of plaintiff's arrest

and their photographs; 2) the names of any Queens Narcotics officers at the Precinct and their

photographs; and 3) the photographs of any other officers at the Precinct matching the

descriptions provided by plaintiff.  Production of these items was due by September 9, 2016.

(8/19/16 Minute Order, ECF No. 20).  Defendants were also Ordered to arrange for an inspection

of the Precinct by September 19, 2016. (Id.)  The Court further Ordered defendants to produce

all documents responsive to the list provided by plaintiff on or before September 30, 2016. (Id.)

     4)  Plaintiff's September 26, 2016 Motion to Compel Photographs and Memo Books

     On September 26, 2016, plaintiff's counsel moved to compel the production of "labeled

photographs" and memo books which the Court had earlier ordered, but which still had not been

produced.  (Pl.'s 9/26/16 Ltr., ECF No. 21).  Plaintiff also demanded that defendants produce the

documents they had relied on in determining which photographs to produce, and requested that defendants undertake a further investigation for officers matching the description provided by plaintiff, among other things.  (Id.)

In objecting to plaintiff's motion for production of this information, defendants argued that the memo books were protected by the law enforcement privilege and further stated that "defendant City has stressed that any identification of officers beyond those already identified would be futile as there was no evidence any other officers interacted with plaintiff on the night of the incident."  (Defs.' 9/28/16 Ltr. at 2, ECF No. 22).

The Court held a telephone conference on September 30, 2016 and issued an Order, dated October 3, 2016, granting in part and denying in part the plaintiff's motion to compel.  (10/3/16 Order, ECF No. 24).  Plaintiff's counsel was Ordered to try to provide defendants with a narrowed window of time in which plaintiff believed the alleged incident occurred and defendants were then to investigate and produce  photographs of the officers who were in the Precinct during this narrowed period of time.  (Id.)


5)  The Amended Complaint

Following the issuance of the Court's October 3, 2016 Order, the plaintiff received and reviewed certain photographs and identified several additional officers.  (Pl.'s 10/21/16 Ltr., ECF No. 25).  Defendants then agreed to produce the names and memo books of the officers she identified.  (Id.)  Thereafter, based on this review and plaintiff's counsel's belief that they had finally identified the proper defendants, plaintiff filed an Amended Complaint on November 17, 2016, naming NYPD Lieutenant Jason Weitzman and Sergeant Jason Forgione as defendants in lieu of the John Doe defendants previously sued.  (See generally Am. Compl.).

Following service upon the officers and the filing of an Answer to the Amended

Complaint, the Court held a status conference on January 5, 2017, at which time defendants were

Ordered to produce certain personnel and disciplinary files for the named defendant officers.

(1/5/17 Minute Order, ECF No. 39).  Following the production of these files, the parties were to

arrange for the depositions of the defendants, and identify and depose other witnesses by

February 28, 2017.[4]  Pursuant to defendants' request, the Court granted an extension of time to

complete discovery and scheduled a settlement conference for April 26, 2017.  That conference

was adjourned on consent of both parties.

Although plaintiff's counsel believed that they had finally identified the two officers most

likely to have been involved in the assault on the plaintiff, as discovery proceeded, it became

apparent that, despite all of their efforts, they had not been given the full story.  Each of the

officers deposed by plaintiff denied any involvement and claimed a lack of knowledge as to what

had occurred to cause plaintiff's injuries.  Moreover, the discovery disputes continued unabated

and documents previously ordered to be produced by this Court remained a subject of

contention.

6) <u>The May 2017 Discovery Disputes</u>

On May 19, 2017, counsel for plaintiff filed a letter indicating that a dispute had arisen

relating to defendant Forgione's deposition and the production of certain information not

produced prior to his deposition.  (Pl.'s 5/19/17 Ltr. at 1, ECF No. 45).  Counsel requested

---

[4] Based on a letter submitted by defendants' counsel, dated February 28, 2017, an inspection of the 107 Precinct was held prior to this status letter.

additional time to brief the dispute and to complete the depositions of Lieutenant Weitzman and non-party Sergeant DiGennaro.  (Id.)

         a)   Defendant Forgione's Disciplinary Files

Plaintiff contended that Forgione's complete personnel file had not been disclosed prior to his deposition and that disciplinary records had been produced only for certain time periods. (5/22/17 E-mail from B. Fett to P. Johnson, ECF No. 48-1).  Among the missing records were files for the year of the plaintiff's arrest and files for 2012-2013 when IAB conducted an investigation into a complaint lodged by Andrew James, which plaintiff claims was probative of defendant Forgione's truthfulness.[5]  (Id.)  In addition, plaintiff noted that there were other files involving this defendant officer that had not been provided but raised claims of stolen or missing property, use of force, and prisoner injured in custody, all of which might be relevant given the nature of plaintiff's claims in this case.  (Id.)

    In response to plaintiff's motion to re-open defendant Forgione's deposition, defendants argued that the so-called "core" material that plaintiff claimed had not been disclosed prior to his deposition was "unrelated to the case in chief," and plaintiff had had at her disposal all information necessary to question the officer at his deposition.  (Defs.' 5/19/17 Ltr. ECF No. 46).

         b)   Medical Treatment of Prisoner Form and Other Requests

Following this exchange of letters, on May 23, 2017, plaintiff moved to compel the production of certain other outstanding items that plaintiff had requested and that this Court had previously Ordered be produced by September 30, 2016.  (Pl.'s 5/23/17 Ltr. at 2, ECF No. 49 (citing Order dated August 19, 2016)). (See discussion, supra, at 5-7).  Plaintiff also moved to

---

[5] Apparently, the officer testified that he been subjected to a recorded sworn interview relating to this unrelated incident and yet defendants had not produced the transcript or audio recording of the officer's testimony.  (Pl.'s 5/23/17 Ltr. at 2-3).

compel compliance with this Court's January 5, 2017 Order requiring production of various personnel and disciplinary files.  (Pl.'s 5/23/17 Ltr. at 2).  Of particular interest to plaintiff's counsel was the Medical Treatment of Prisoner Form which plaintiff had been seeking in legible form since her initial discovery requests served in April 2016.  (Id. at 2 n.1).

On May 31, 2017, plaintiff submitted a third letter raising a dispute that had arisen regarding plaintiff's request to take the depositions of non-party Officers Mendez, Siddio, and Russo, Sergeant Laliberte, Sergeant Rehman, and Lieutenant Donna, whom defendants had identified in their disclosures as being expected to offer relevant testimony.  (Pl.'s 5/31/17 Ltr., ECF No. 52).  Although plaintiff indicated that subpoenas had been emailed to defendants' counsel in reliance on his representation that he would accept service on behalf of these NYPD police witnesses and that he would ascertain their availability, defendants moved to quash the subpoenas on the grounds that the witnesses "have no or minimal connection to plaintiff." (Defs.' 6/1/17 Ltr. at 1, ECF No. 53).  Defendants also complained that in serving the subpoenas, plaintiff had selected dates for the depositions without conferring with defendants as to the availability of the witnesses.  Defendants took the position that they had agreed to extend discovery, but asserted that "these depositions serve no legitimate purpose other than to draw out the litigation in this matter."  (Id.)  While defendants' counsel observed that the timing of the subpoenas was unreasonable, counsel never disputed plaintiff's representation that defendants' counsel had agreed to accept service of the subpoenas and work out the dates.  (See id. at 1-2).

On June 2, 2017, the Court held a conference at which time defendants were Ordered to provide a written response to plaintiff's May 23, 2017 letter, indicating if the documents listed in plaintiff's letter 1) had been previously produced and, if so, listing the Bates numbers;

2) indicating if plaintiff could inspect the originals; or 3) indicating that there were no responsive documents.  As for the Precinct Roster, defendants were directed to produce both the redacted and unredacted version of the document to the Court and explain the reasons for the redactions. (6/2/17 Minute Order, ECF No. 54).  The deadline for completing the nonparty depositions was extended.

In a subsequent telephone conference held on June 29, 2017, the Court Ordered defendant to produce:  1) the officers' personnel files; 2) the Medical Screening Form for plaintiff; and 3) the Central Booking Roster; or 4) an affidavit from a custodian of records indicating that they had searched for these records and could find no responsive documents.  In that same Order, defendants were directed to make available for inspection the original Medical Treatment of Prisoner Form and the Command Log, and to provide plaintiff's counsel with the unredacted version of the prisoner holding pen roster limited to Danny Rivera.  Plaintiff was Ordered to put her request for the address of a witness in writing and defendants were given a week to object.  (6/29/17 Minute Order, ECF No. 58).

7)  Plaintiff's July 11, 2017 Motion to Compel

On July 11, 2017, plaintiff filed a letter motion for sanctions pursuant to Fed. R. Civ. P. 37(b)(2)(A), arguing that defendants had failed to comply with several aspects of the June 29, 2017 Court Order.  (Pl.'s 7/11/17 Ltr., ECF No. 61).  Among the documents plaintiff claimed she had not received were:  1) the Central Booking Medical Screening Form (Ordered on August 19, 2016 and again on June 29, 2017);[6] 2) the Medical Treatment of Prisoner Form (Ordered on

---

[6] Apparently, defendants informed plaintiff's counsel on July 5, 2017 – nine months after the first Order to produce – that a release was necessary before this document could be disclosed.

August 19, 2016 and June 29, 2017); and 3) the Central Booking Command Log (Ordered on

August 19, 2016 and June 29, 2017). (Id.) Despite these two prior Court Orders, plaintiff

complained that she had been forced to take four depositions without these specific documents

and was actually scheduled to take two more depositions, beginning the next day, again having

not received the documents that were Ordered to be produced by July 10, 2017.

In response, defendants submitted a letter on July 12, 2017 – two days beyond the

deadline set by the Court for producing the discovery – stating that on July 11, 2017, counsel had

informed the plaintiff's counsel that they could go to Queens Central Booking to review the

original Medical Treatment of Prisoner Form,[7] and they could go to the 107 Precinct to review

the original Command Log. (Defs.' 7/12/17 Ltr., ECF No. 62). As for the two officers being

deposed by plaintiff that week, defendants argued that these officers did not accompany plaintiff

to the Hospital and had no knowledge of any treatment she received. (Id.) Nor could they testify

about what transpired in the precinct. (Id.)

With regard to the Central Booking Screen Form, defendants' counsel stated that he

"expects to produce this document later today." (Id. at 2). Counsel acknowledged that he had

failed to request additional time to produce the document, but he claimed that since plaintiff

"never specified what form it was they were looking for only that such a form existed,"

defendants had not been able to identify it and it was "only through process of elimination" that

they determined that the plaintiff may be referring to the Pre-Arraignment Screening Form

produced by the Department of Corrections at Queens Central Booking. (Id.) Since access to

---

[7] Defendants disputed plaintiff's claim that the Medical Treatment of Prisoner Form was important, noting that all it stated was that plaintiff was taken to Queens General Hospital on January 22, 2015 at 6:00 a.m. by Officer Mendez, who had already been deposed on June 22, 2017.

this document required another release from plaintiff, defendants' counsel represented that it would be produced by the end of the week.  (Id.)  Defendants urged the Court not to impose sanctions, arguing that the witnesses and documents were not critical and plaintiff had been offered the option of inspecting the originals of the other documents.  (Id.)

Based on the limited information available at the time, and believing that defendants' counsel was simply overwhelmed by his caseload, but was not deliberately trying to delay the case, the Court denied the motion for sanctions and granted an extension of time to complete discovery to September 11, 2017.

### 8)   Plaintiff's September 12, 2017 Motion to Compel

#### a)   The Prisoner Movement Slip and Live Scan Machine Report

On September 12, 2017, plaintiff moved to compel defendants to produce certain discovery, including the Prisoner Movement Slip, which plaintiff had previously requested. (Pl.'s 9/12/17 Ltr. at 2, ECF No. 69).  Plaintiff sought this document in an effort to determine which officer was responsible for fingerprinting Ms. Martinez, surmising that he or she would have observed the injury to plaintiff's hand, corroborating plaintiff's claim that she was injured while in the 107 Precinct.  (Id. at 2).  In addition, plaintiff's counsel had learned, during the deposition of NYPD Officer Richard Russo, that when an arrestee is fingerprinted using the 107 Precinct's Live Scan machine, the processing officer enters certain identifying information and then the fingerprint machine generates the Prisoner Movement Slip.  (Id.)   Although both documents had been requested previously, defendants had failed to produce either of them.  (Id.)

In opposing plaintiff's motion to compel, defendants' counsel submitted a letter, dated September 19, 2017, arguing that "[t]he information sought by plaintiff is highly duplicative of

material already produced by defendants and therefore there is no good cause to reopen discovery to obtain these materials."  (Defs.' 9/19/17 Ltr. at 1, ECF No. 71).  As for the specific documents requested in plaintiff's September 12, 2017 letter, defendants represented that they had searched for the Prisoner Movement Slip and could not find it, arguing, however, that the same information was available in other documents previously produced.  (Id. at 2).  As for the Live Scan machine records, counsel represented that "these documents are irrelevant, may not be preserved, and would not produce additional information about the incident" that was not already contained in other documents which plaintiff had.  (Id.)

On September 21, 2017, this Court held a conference to address the issues raised in counsel's letters.  At that time, plaintiff's counsel further explained the need for the Live Scan fingerprint machine printout, noting that plaintiff understood from one of the officers' testimony that the report generated from this machine would reflect who fingerprinted the plaintiff. (9/21/17 Tr. [8] 12:25-13:20).  Plaintiff sought the identity of the officer who fingerprinted her because presumably that officer would have seen plaintiff's hand and could testify if it was injured at that time or not.  (Id.)  According to plaintiff's counsel, all of the officers deposed to date had denied printing plaintiff.  (Id. at 13:11-12).  In response, defendants' counsel argued that the "sample" form Prisoner Movement Slip had no place for such a notation and thus would be irrelevant, and he was trying to determine if the Live Scan machine record contained such information.  (Id. at 13:21-14:4).

---

[8] Citations to "9/21/17 Tr." refer to pages in the Transcript of Proceedings before this Court on September 21, 2017, ECF No. 77.

b) <u>Overtime Reports and Records for Defendants Weitzman and Forgione</u>

In her September 12, 2017 motion, plaintiff also sought production of overtime reports and other records for the named defendants, Lieutenant Weitzman and Sergeant Forgione, based on defendants' position that these officers could not have assaulted plaintiff because they were not at the Precinct at the same time. (Pl.'s 9/12/17 Ltr. at 1). Defendant Weitzman testified at his deposition in August 2017 that he was assigned out of the Precinct on the date of the incident, working in a "Critical Response Vehicle" ("CRV"), but there were no entries in the Command Log or other documented source to verify his testimony as to the timing of that assignment, which was relevant to determining if he could have injured the plaintiff. (<u>Id.</u> at 2). Defendant Weitzman, who retired from the NYPD in December 2015, testified that he never looked for his memo book, which would have resolved the timing issue, because he "'threw everything out'" when he retired.[9] (<u>Id.</u>)

During the September hearing, plaintiff's counsel further explained that because defendants had taken the position that Weitzman was out of the Precinct at the time of plaintiff's alleged assault, counsel had been attempting to determine when Lieutenant Weitzman had been in the 107 Precinct on that day and when he left. (9/12/17 Tr. at 5:3-6:16). The only information provided was a notation indicating that he received overtime for "CRV." (<u>Id.</u> at 5:11-16). After much discovery and confusion, it was determined what "CRV" stood for, but there was no reference to his CRV assignment in Weitzman's discovery responses and no documentation as to

_____

[9] Plaintiff argues that the NYPD Patrol Guide mandates that upon retirement, officers should maintain their memo books. (Pl.'s 9/12/17 Ltr. at 2 n.1). Plaintiff indicates that she intends to move for spoliation sanctions based on the destruction of this memo book. (<u>Id.</u>) Defendants contend that the Patrol Guide encourages officers upon retirement to keep their memo books, but points out that the language of the Patrol Guide is "should," not "shall." (Defs.' 9/19/17 Ltr. at 2 n.2). The Court expresses no view on the issue at this time.

when he was out of the Precinct on that assignment.  (Id. at 5:17-6:16).  Again, plaintiff claims

that although the City's lawyer had been aware of this assignment since the end of 2016, it was

not disclosed to plaintiff until Weitzman's deposition in August 2017, and still no documentation

had been produced.  (Id. at 7:8-8:3).

Defendants' counsel argued that plaintiff had deposed the officers who drove plaintiff to

the Hospital, as well as the two officers from Queens Central Booking, and it was clear that

"defendants could not have assaulted plaintiff because they were not in the precinct at the same

time." (Defs.' 9/19/17 Ltr. at 1).  As for the information about defendant Weitzman's CRV

assignment, defendants argued that any further records would be "duplicative" and that they had

already produced the memo book of Weitzman's driver, which would presumably show where

Weitzman was for the day.  (Id.)

c)  Inspection of Queens Central Booking and Original Documents

Finally, plaintiff sought to conduct an inspection of Queens Central Booking because

defendants were taking the position that the injury had not occurred while plaintiff was at the 107

Precinct.  (Id. at 15:9-25).  Plaintiff also reiterated her request for an opportunity to inspect the

Queens Central Booking sign in and sign out log as well as the original of the illegible Medical

Treatment of Prisoner Form.  (Id.)  Defendants had been previously Ordered to arrange for such

an inspection of the originals of these items in July.

Instead of arranging such an inspection or producing legible copies, or seeking

reconsideration of the Court's Order, defendants' counsel objected to an inspection of Queens

Central Booking and the original documents on grounds of relevance and the fact that discovery

in the case had closed as of August 15, 2017, with the exception of two remaining depositions.

(Defs.' 9/19/17 Ltr. at 3).  During the hearing held on September 21, defendants argued that the

logbook would simply have plaintiff's name, the name of the officer who signed her out, and the time, suggesting that it was irrelevant.  (9/21/17 Tr. at 16:1-8).  Similarly, rather than producing the Medical Treatment of Prisoner Form, as Ordered, defendants' counsel argued that it would have the same information as the pre-screening form and the records produced in the Hospital. (Id. at 16:11-22).  Thus, counsel stated:  "I'm just thinking at some point it's getting duplicative." (Id. at 16:22-23).

        d)   The DD5s and Buy Reports

During the September 21, 2017 Court conference, plaintiff's counsel reported to the Court an additional concern.  During the course of deposing Sergeant DiGennaro, counsel learned that there were buy reports and DD5 reports prepared by DiGennaro in connection with the alleged drug sale by Danny Rivera that took place in Ms. Martinez's apartment.  (9/21/17 Tr. at 2).  According to the Sergeant's deposition testimony, these records reflect the fact that Ms. Martinez was actually part of the sale.  (Id. at 2:16-3:3).[10]  Despite plaintiff's request for such documents in April 2016, these buy reports and DD5s had never been produced to plaintiff's counsel.  (Id. at 2:25-3:3).  Plaintiff noted that although the Sergeant recalled preparing these records, he did not have them with him at the deposition, and had difficulty remembering the details "so his testimony was not very clear."  (Id. at 3:3-7).

In response, defendants' counsel attempted to explain the absence of these documents by arguing:  1) that since the plaintiff was not claiming false arrest, just excessive force, these

---

[10] Originally, it appeared that Danny Rivera, who was Martinez's boyfriend, was selling drugs out of Martinez's apartment.  The information as initially presented to counsel was that Martinez was not present for the sale but rather was arrested when she returned to the apartment, making the discovery of these buy records reflecting plaintiff's alleged involvement in the drug sale an important change in the story.  (See 9/21/17 Tr. at 2:16-3:7).  As it turned out, contrary to DiGennaro's testimony, the records, when finally produced, showed that plaintiff was not in the apartment at the time of the sale.  (See discussion infra at 22).

documents were not relevant because "[t]he documents were [not] related to excessive force, [but] to whether or not Ms. Martinez sold drugs in her apartment."  (9/21/17 Tr. at 3:25-4:2). Moreover, defendants justified the non-production of these documents by arguing that there was confidential informant information contained in the documents that would allow someone to identify the informant.  (Id. at 4:6-15).  However, there is no dispute that defendants not only never identified these documents, but also never submitted a privilege log or asked the Court for a protective Order.  Counsel simply decided not to disclose them.

As yet a further explanation for the failure to disclose these documents, defendants' counsel curiously claimed, without further explanation:  "I didn't get those documents to begin with[.]"  (Id. at 4:16-17).  The Court noted that counsel should have determined the existence of these documents—which were clearly related to the incident—before the conclusion of all of the depositions, and Ordered the buy reports and DD5s to be produced "right away."  (Id. at 4:19-5:2).

At the conclusion of the proceeding, this Court Ordered defendants to:  1) produce the DD5s and buy reports; 2) produce documents identified by Weitzman in his deposition; 3) produce the overtime activity reports for Weitzman; 4) either produce the Prisoner Movement Slip and Live Scan printout or provide an affidavit from the custodian of records that a search for these documents had been conducted and they could not be found; and 5) arrange for an inspection of Queens Central Booking and the original documents maintained there within two weeks.  (9/21/17 Minute Order, ECF No. 72).

9)  <u>Plaintiff's September 26 and October 12, 2017 Letters</u>

On September 26, 2017, plaintiff's counsel submitted a letter to defendants indicating that despite the Court's prior Order, defendants had not confirmed dates for the inspection, nor had they produced the DD5s and buy reports which the Court had Ordered be produced immediately.  (Pl.'s 9/26/17 Ltr. to Defs., ECF No. 73-1).  Plaintiff also noted that the overtime reports, Prisoner Movement Slip and Live Scan printouts had not been produced, nor had affidavits been provided as ordered.  (<u>Id.</u> at 2).  Plaintiff also specified some of the information sought with respect to defendant Weitzman's CRV assignment, indicating that if the materials outlined in the letter were not produced by September 29, 2017, plaintiff reserved the right to seek costs pursuant to Fed. R. Civ. P. 37(b)(2)(A).  (<u>Id.</u>)

On October 12, 2017, plaintiff notified the Court that defendants had still failed to produce the DD5s and buy reports, the Prisoner Movement Slip, and the Live Scan printout.  Nor had they submitted an affidavit from a records custodian as Ordered by the Court on September 21, 2017, even after plaintiff's counsel wrote to the defendants on September 26, 2017.  (Pl.'s 10/12/17 Ltr. at 1-2, ECF No. 73).  Although plaintiff had received some records relating to the CRV documentation and overtime activity reports for defendant Forgione, plaintiff still had not received Weitzman's overtime reports.  (<u>Id.</u> at 1-2).

In response, defendants submitted a letter dated October 13, 2017, indicating that they had produced all CRV reports and records relating to defendant Weitzman's overtime.  (Defs.' 10/13/17 Ltr. at 1-2, ECF No. 74).  Counsel represented that "Defendants have not been able to locate any DD5s or Buy Reports.  Defendants performed a diligent search for this information." (<u>Id.</u> at 2).  As for the Prisoner Movement Slip, defendants represented that they were preparing an affidavit to certify that it could not be located, and as for the Live Scan machine report,

counsel represented for the first time that such records, "if any exist," were not within the City's custody and control, but rather were kept by the State of New York.[11]  (Id.)  In conclusion, counsel stated:  "Based on the foregoing, defendants submit they have complied with their discovery obligations pursuant to the Court Order."  (Id.)

The Court held a conference on October 17, 2017 to address these issues.  At that time, the Court directed the production of certain discovery, authorized plaintiff to take depositions of new officers, and ordered discovery to be completed by November 17, 2017.  (10/17/17 Minute Order, ECF No. 75).

10) Plaintiff's November 2, 2017 Motion for Contempt

By letter motion dated November 2, 2017, plaintiff moved pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vii) to hold defendants in contempt for their continuing failure to comply with this Court's Orders.  (Pl.'s 11/2/17 Ltr., ECF No. 76).  In response to that motion, the Court issued an Order to Show Cause why defendants and their counsel should not be sanctioned and why their failure to obey the Court's Orders should not be treated as contempt.  (11/3/17 Order to Show Cause, ECF No. 78).  On November 9, 2017, the Court held a hearing on plaintiff's motion to hold the City defendants in contempt for their continuing failure to comply with this Court's various discovery Orders.  (11/9/17 Minute Order, ECF No. 80).

a)  The DD5s and Buy Reports

In her November 2, 2017 letter and during the contempt hearing, plaintiff's counsel represented to the Court that despite the Court Order issued on September 21, 2017, directing

---

[11] Defendants did not address whether they had requested such records from the State or whether they possessed the legal right to request the records.

defendants to produce Sergeant DiGennaro's DD5 and buy reports "right away," the reports still had not been produced seven (7) weeks later.  (Pl.'s 11/2/17 Ltr. at 2; 11/9/17 Tr. at 3:12-25, ECF No. 88).  Plaintiff's counsel represented that they were told on several occasions following the September 21, 2017 Order that the defendants had conducted a search but no reports had been found.  (11/9/17 Tr. at 3:16-23).  Moreover, during the conference held before this Court on October 17, 2017, defendants had indicated that they were still looking for the reports, causing this Court to reiterate its prior Order that they produce an affidavit from the custodian of records regarding search efforts.  (Id.)  No such affidavit had been produced prior to plaintiff's November 2, 2017 letter motion.  Indeed, defendants' letter response, dated November 8, 2017, which was filed one day before the contempt hearing, indicated that the buy reports could not be found and that defendants would produce the affidavit which the Court had Ordered weeks earlier.  (Defs.' 11/8/17 Ltr. at 3-4, ECF No. 79; 11/9/17 Tr. at 3:23-25).

However, the very next day, during the contempt hearing, plaintiff's counsel informed the Court that the night before the hearing, defendants had finally produced the DD5s and buy reports after weeks of defendants' counsel claiming that these documents could not be located. (11/9/17 Tr. at 4:1-2).  According to plaintiff's counsel, the reports were actually "computer generated documents, so I'm not sure why they couldn't have been produced in response to our discovery requests in April 2016."  (Id. at 4:2-5).  More problematic was counsel's observation that "the buy reports actually contradict what the officer testified to."  (Id. at 4:8-9).  According to plaintiff's counsel, contrary to DiGennaro's testimony, there was nothing in the reports implicating plaintiff in the drug sale or suggesting she was even present for a drug sale.  (Id. at 4:9-13).  It was clear to plaintiff's counsel that the Sergeant had gone into his deposition

unprepared, and thus, plaintiff requested an opportunity to re-depose Sergeant DiGennaro.  (Id. at 4:13-5:2).

Plaintiff's counsel argued that this was typical of what had been going on throughout discovery with defendants "blind siding us with information during a deposition" and unnecessarily prolonging discovery by forcing plaintiff's counsel to spend time during depositions "playing catch-up."  (Id. at 5:3-7:3 (citing the example of defendant Weitzman's deposition where counsel spent time finding out what the abbreviation "CRV" meant); id. at 7:11-10:12).

When asked during the hearing to explain the late production of the DD5s and buy reports, and why their existence was not discovered much earlier during the preparation of Sergeant DiGennaro, defendants' counsel stated:  "We produced everything that we thought was available to us, the arrest report, the DA file, the court file, the search warrants, the arrest report of Danny Rivera."  (Id. at 13:21-25).  Counsel explained that because Sergeant DiGennaro was retired, he would not have access to the documents in the Precinct.  (Id. at 15:6-8).  Nevertheless, counsel was unable to explain why someone else still working in the Precinct could not have found these documents, which were actually maintained in a computer database.  Nor did he explain why the documents were only produced on the eve of the contempt hearing, and why it took so long to produce them since they appear to have been computer generated and presumably easily accessible.  Counsel claimed that he did not know why the documents were not found earlier, stating, "I do not know. That's – the client produced these documents, not me.  I wasn't the one, like, searching for them, so I wouldn't know why it took so long.  I asked them for it, and they produced them when they produced them."[12]  (Id. at 15:15-19).  Instead, he reiterated

---

[12] This appears to have been the attitude of defendants' counsel from the beginning.

his earlier lack of relevance argument, asserting that the fact that "Ms. Martinez participated in drug sales is totally unrelated to whatever she's alleging with Lieutenant Weitzman and Sergeant Forgione.  They had no knowledge about her drug sale.  They don't know anything about her." (Id. at 15:22-25).

However, as plaintiff's counsel noted, defendants' counsel seemed to think he could decide what the plaintiff's theory of the case was and, under that theory, determine what discovery plaintiff should receive.  (Id. at 17:6-20).  Plaintiff argued that if defendants believed plaintiff was involved in a drug sale in her home, that would impact the way that the officers might interrogate her, and would support plaintiff's theory that they assaulted her because "they were furious that she was refusing to give them those answers."  (Id. at 17:16-17).  Thus, that is why plaintiff's counsel was seeking production of these records and why she was entitled to receive them.  (Id. at 17:17-20).  Moreover, as the Court pointed out, defendants had been ordered to produce these documents despite their arguments otherwise and it was counsel's responsibility to obtain them.  (Id. at 18:8-14, 18:16, 18:21-23).

b)  Forgione's Disciplinary History

Another example of defendants' continued failure to comply with the Court's Orders and their discovery obligations, which was raised by plaintiff during the contempt hearing, was the plaintiff's request for defendant Forgione's disciplinary history.  (11/9/17 Tr. at 7:11-25).  As noted in an earlier application (see discussion supra at 9-12), plaintiff claimed that there was a disciplinary file in which defendant Forgione had a substantiated complaint of perjury.  Despite

---

Despite Court Orders and deadlines, counsel for the City would produce documents when the client, the City of New York, "produced them," regardless of whether they were timely or not, and counsel rarely considered seeking an extension of time to produce documents, choosing instead to ignore the Court's Orders.

the Court's Orders and numerous requests to defendants' counsel, the file was never produced

prior to the time of defendant Forgione's deposition and plaintiff's counsel had been forced to

depose the defendant without the benefit of that file. (Id. at 7:18-20). In response, defendants'

counsel argued that the substantiated complaint against defendant Forgione was not about

perjury; it involved an illegal search and there was no search in this case. (Id. at 10:16-11:2).

Again, apart from arguing lack of relevance, counsel provided no explanation for his

noncompliance with the Court's earlier Orders to produce these documents.

      c)   <u>The Live Scan Machine Printout</u>

Plaintiff's counsel also complained that despite the Court's Order of September 21, 2017,

defendants still had not produced the Live Scan documents, nor had they produced an affidavit

from a custodian of records regarding the search as directed by the Court in September. (Id. at

6:17-23).

Plaintiff's counsel informed the Court that on October 13, 2017, arrangements had finally

been made to allow them to conduct an inspection of Queens Central Booking. (Id. at 8:4-5).

During that inspection, they reviewed the original Medical Treatment of Prisoner Form which

had been previously produced in illegible form, and they also found the names of two officers

they believed may have transported plaintiff to and from the Hospital and the 107 Precinct. (Id.

at 8:6-16). The names of these officers had been requested in April 2016 and never previously

disclosed. (Id.) The Court granted plaintiff's request to depose these officers and the deposition

of one of them, Officer Walsh, was set for November 2, 2017. Despite plaintiff's requests, her

counsel did not receive Officer Walsh's memo book until a half hour before the deposition was

scheduled to start, at which time they learned that he was actually <u>not</u> the officer who transported

plaintiff to Queens General Hospital. (Id. at 8:20-25). Counsel noted that they still did not have

the identity of those escort officers which was important because some officer—still unidentified after over 19 months of discovery—had told a healthcare provider at the Hospital that plaintiff had injured herself.  (Id. at 9:5-14).

The Court was further informed that despite the Court's Order that plaintiff's counsel be allowed to inspect the Central Booking Command Log, they were told on October 13, 2017 that they would not be allowed to look at the Command Log because there was some type of ongoing investigation, even though defendants had made no application to the Court to be relieved of their obligation under the Order to allow plaintiff to inspect the Command Log.  (Id. at 9:23-10:7).  Instead, plaintiff was given photographs of a few pages but not the complete log from the day of plaintiff's arrest.  (Id. at 10:7-12).

In their letter seeking to hold defendants in contempt, plaintiff's counsel indicated that despite plaintiff's requests and the Court's October 17, 2017 Order, defendants still had not provided the memo book of Officer Jason Graham who escorted plaintiff from the Hospital back to the 107 Precinct, instead of to Central Booking.  (Pl.'s 11/2/17 Ltr. at 2).  Not only had this officer's identity never been disclosed by defendants during almost two years of discovery,[13] but plaintiff's counsel was scheduled to depose the officer on November 2, 2017 and his memo book still had not been produced.  (Id.)

Defendants' counsel attempted to explain the situation with Lieutenant Weitzman, indicating that they had produced the Command Log showing that he had 6 hours of overtime for CRV, and noting that Captain Robinson had testified as to what that assignment was, and the

---

[13] According to plaintiff's letter of November 2, 2017, plaintiff's counsel had only discovered that this officer had any involvement with plaintiff when counsel reviewed the log book at Central Booking, which they had been asking for and which defendants had not produced.  (Pl.'s 11/2/17 Ltr. at 2).

Lieutenant's driver's memo book had been produced.  (Id. at 11:3-13).  Counsel once again contended that he had produced the required discovery, and remarked that if plaintiff's counsel "felt the answer was inadequate they can ask us."  (Id. at 12:13-14).

At the conclusion of the proceeding, plaintiff's counsel summarized the issues created by defendants' failure to timely produce documents ordered by this Court:  1) being "sandbagged" at the depositions of the named defendants, Forgione and Weitzman; 2) not being allowed to inspect the Central Booking Command Log despite this Court's Order; 3) not having the DD5s and buy reports when deposing DiGennaro; 4) having no information as to the identity of the officer who fingerprinted plaintiff and not having the Live Scan documents which other officers testified would contain that information; and 5) not knowing the identity of the officers who escorted plaintiff to the Hospital.  (11/9/17 Tr. at 19:15-22:5).

        d)  <u>Prisoner Movement Slip</u>

Finally, plaintiff's counsel noted that the evening before the Show Cause Hearing, defendants produced an affidavit regarding the Prisoner Movement Slip that the Court had previously Ordered be produced.  The affidavit stated that the document was in the custody of the Department of Correction ("DOC").  (Id. at 21:18-22:5).  When asked why the Corporation Counsel could not produce a document that was in the custody of another City agency, defendants' counsel responded:  "plaintiff was never in the custody of the Department of Corrections so they wouldn't have that document."  (Id. at 22:7-9).  When asked then to explain the affidavit which suggested that DOC had the document, the Assistant Corporation Counsel, Paul H. Johnson, told the Court:  "That they – well, if they don't have it maybe the Department of Corrections would have it.  But as – she would have to have been in the Department of Corrections, and she was not.  She was released on her own recognizance."  (Id. at 22:16-20).

Despite that nonsensical explanation, the Court asked if Mr. Johnson had checked with the DOC

to see if they had the document and he responded that he had and the DOC did not have the

document.  (Id. at 22:21-23:5).  Mr. Johnson could not explain why the affidavit that he produced

stated that "Prisoner slips, if generated, . . . are given to the Department of Correction when the

prisoner is transferred from the custody of the NYPD to the DOC for arraignment," suggesting

that the prisoner slips were transferred to the DOC regardless of whether the person is remanded

into custody or not.  (Id. at 24:17-21).[14]  Similarly, with respect to the Live Scan document, Mr.

Johnson told the Court that this document was in the custody of the State of New York and that

he would be producing an affidavit to that effect.  (Id. at 25:6-14)

In concluding the proceeding and declining to recommend that Mr. Johnson and the

defendants be held in contempt, the Court stated that "Mr. Johnson is overwhelmed with the

cases that he has.  I don't think that he is acting deliberately in an effort to prevent discovery

from occurring.  I don't think he is deliberately acting in violation of this Court's orders."  (Id. at

26:17-27:20).[15]  Instead, the Court ordered counsel to confer on a schedule for producing the rest

of the information and conducting any additional depositions.

---

[14] It is possible that what the affidavit was suggesting, but did not explain, is that no
Prisoner Movement Slip was ever created for plaintiff.  This, however, remains unclear.

[15] The Court notes that this is not the first case where Assistant Corporation Counsel for
the City of New York Johnson has been called upon to explain his continued failure to produce
discovery.  In Bethea v. City of New York, the Honorable Steven M. Gold sanctioned Mr.
Johnson for repeated discovery failures, threatening to strike the answer and recommending that
liability be established.  16 CV 2522 (E.D.N.Y. Aug. 17, 2017).  See also Goins v. City of New
York, 15 CV 7105 (E.D.N.Y. Mar. 6, 2017) (where Judge Orenstein stated that the plaintiff was
seeking "no more than the disclosures I've already ordered the defendants to produce," and
threatening to strike the City's answer if compliance was not immediate); Harris v. City of New
York, 15 CV 456 (S.D.N.Y. July 14, 2017) (where Judge Ellis issued an Order to Show Cause
why Mr. Johnson should not be sanctioned for failing to produce documents in light of his
representation that the documents had already been produced).

In retrospect, given what occurred thereafter, the Court may have been too lenient in denying plaintiff's motion for contempt both with respect to Mr. Johnson and one of his clients, the City of New York.

11)   The Parties' December 11, 2017 Status Report and Court Order

Following the contempt hearing, a new attorney from the Office of Corporation Counsel for the City of New York was assigned to assist in the representation of the defendants in this matter.  The parties thereafter conferred and submitted a joint status report dated December 11, 2017.  (12/11/17 Status Report, ECF No. 82).

Although more than a month had passed since the Order to Show Cause Hearing, the joint letter indicated that little if any additional progress seems to have been made.  Plaintiff's counsel asked the Court to set a firm deadline of December 18, 2017 for production of the Live Scan login information; for defendants to provide an explanation of and documentation for the end of defendant Weitzman's CRV tour; photographs and memo books of two female NYPD officers at the 107 Precinct; the results of the search by the DOC for the Prisoner Movement slip; the 107 Prisoner roster for the night of plaintiff's arrest; the complete file relating to the charge against Forgione in the James matter; and the identity of the officers who escorted plaintiff to the Hospital.  (Id. at 2).

For the first time in months, new counsel for defendants raised alleged deficiencies in plaintiff's discovery responses relating primarily to her claimed damages.  (Id. at 4-5).  New counsel for defendants also indicated, contrary to the prior representations of ACC Johnson and after the deadline established by the Court, that the defendants intended to move for summary judgment.  (Id. at 5).

In response to this joint status letter, the Court granted plaintiff's request and Ordered defendants to produce all outstanding discovery by December 18, 2017.  (12/14/17 Order, ECF No. 83).  The Court also noted that as for defendants' newly stated intention to move for summary judgment, not only was new counsel bound by the agreements of prior counsel, but the Court had previously Ordered the defendants to notify the Court by November 30, 2017 if they intended to file a motion for summary judgment.  Since no such notification was ever filed, and no showing of good cause had been made to modify the prior Order, the Court held that "plaintiff is therefore correct that defendants improperly seek to avoid this Court's prior Order."  (Id. at 3). The Court directed defendants that if they sought to file a motion for summary judgment, they were required to notify the district court that the request was untimely in light of this Court's prior Order.  (Id.)

12)  Plaintiff's December 21, 2017 Motion for Sanctions and the January Hearing

    On December 21, 2017, plaintiff moved once again for sanctions based upon defendants' production of over 1,000 pages of documents which cast a completely different light on what may have occurred in the Precinct on the night of plaintiff's arrest.  (Pl.'s 12/21/17 Ltr., ECF No. 85).  The Court held a hearing on January 4, 2018 to address the issues raised by plaintiff's letter and defendants' response.  (1/4/18 Minute Order, ECF No. 93).

    In her letter motion of December 21, 2017, plaintiff informed the Court that on December 18, 2017, defendants produced, for the first time, documents demonstrating that on January 23, 2015, the morning of plaintiff's injury, a recorded call was placed to the Internal Affairs Bureau ("IAB") from NYPD Lieutenant David Camhi of the 107 Precinct.  The pertinent portion of the call stated:

> This call is in regards to an injured prisoner. . . . Yeah when she was in police custody.  The injury wasn't caused by, uh, any MOS, she did it to herself. . . . She was secured in the juvenile room [of the precinct], uh, with one cuff, cuffed to the bench.  Uh, she started ripping things off the wall . . . then she started punching the wall and kicking at cabinets, uh, I secured her while she was in there rear-cuffed and then secured those cuffs to the bench to keep her secured.  When she was transported down to Central Booking, she complained about pain in her right hand, she did have some visible swelling in her right hand . . . she was brought to QGH. . . . Just contusions, no broken bones, no stitches, no nothing else.

(Pl.'s 12/21/17 Ltr. at 2).  The call went on to indicate that the incident had occurred at "approximately, uh, I'm not even sure, midnight thirty."  (Id.)

Along with this revelation, plaintiff also learned on December 18, 2017 that even though Lieutenant Camhi never noted this incident in his memo book or in the Command Log, and never prepared a UF-49 "Unusual Occurrence Report," his call to IAB prompted multiple investigations by IAB, by the Queens Patrol Borough, and by the 107 Precinct – none of which had been disclosed to plaintiff's counsel in the two years of discovery prior to December 18, 2017.  (Id. at 3-4).

During the January 4, 2018 hearing, plaintiff's counsel noted that these various investigations were ongoing at the time plaintiff's Complaint was filed in this federal action, and they were being conducted by "a large portion of the leadership team of the 107 Precinct, . . . includ[ing] Captain Valergo, Captain Hanrahan, Lieutenants Camhi and Robinson, and Sergeant DiGennaro."  (1/4/18 Tr. at 3:10-14, ECF No. 94).  Not only were there over 1,000 pages generated as a result of these investigations, but there were "multiple substantiated findings."  (Id. at 3:17-18).

Defendants also disclosed for the first time in December 2017 that Captain Matthew D. Hanrahan of the 107 Precinct, now-deceased, allegedly conducted an investigation into the

incident reported by Camhi, and interviewed plaintiff about her injury on the day it happened. (Pl.'s 12/21/17 Ltr. at 3).  His unsigned report, dated May 16, 2015, indicated that plaintiff made no allegations that any officers were involved.  (Id.)  Hanrahan's report also indicates that he interviewed Lieutenant Camhi and arresting officer Eric Ryan, both of whom allegedly witnessed plaintiff causing harm to herself.  (Id.)  However, the report indicates that these officers were interviewed on January 17, 2015 – six days before plaintiff's arrest. (Pl.'s 12/30/17 Ltr. at 3).  Moreover, contrary to the call from Camhi, the Hanrahan report indicates that Ryan reported that plaintiff was in the "arrest processing cells," not the juvenile cell, when Ryan observed her "kick and punch the wall in the cell," after which she was "removed to the hospital."  (Id.)  Obviously, it would be important to plaintiff to inquire as to why Ryan reported that she was taken to the Hospital, when all of the other records produced to date indicate that she was not taken to the Hospital from the 107 Precinct, but rather was only taken to the Hospital after she was transferred to Central Booking.  Similarly, the discrepancies between the two officers' observations as to where the incident allegedly took place and the reason why the report reflects interviews of these two officers days prior to the incident occurring is very troubling.[16]

It is of further concern that Officer Ryan was also questioned during the course of a CCRB investigation into injuries allegedly suffered by Danny Rivera during his arrest.  Despite being questioned about events in the precinct that night, Ryan, plaintiff's arresting officer, apparently never mentioned Ms. Martinez's self-inflicted injuries during that inquiry.

---

[16] Captain Matthew D. Hanrahan, who passed away in March 2016 (Pl.'s 12/21/17 Ltr. at 3), seems to have conducted the earliest investigation into the events of that evening and yet there are notable inconsistencies between what he reports the witnesses as having said, not to mention the reference in the report that suggests he interviewed the officers days before the incident actually occurred.  While that may very well be a typographical error, without being able to interview the Captain, the parties will not be able to determine what actually occurred during the preparation of the report.

In addition to the investigations conducted by Hanrahan and the CCRB, apparently there was an IAB investigation into some discrepancy discovered with respect to the heroin. Captain Valerga of the 107 Precinct supervised not only the Hanrahan investigation but he also supervised the IAB lab discrepancy investigation, which plaintiff asserts was ultimately substantiated. During the lab discrepancy investigation, Lieutenant Robinson interviewed both Officer Ryan and Sergeant DiGennaro. Despite all of the depositions conducted by plaintiff's counsel, no one who was deposed, including DiGennaro, mentioned this IAB investigation or Captain Valerga's involvement. (Id. at 3-4).

Defendants further disclosed on December 18, 2017 that IAB had also conducted a "corruption" investigation into the allegations that officers had taken money from plaintiff on the date of her arrest. (Id. at 3). During this investigation, IAB conducted a 43 minute recorded interview with the plaintiff. Not only was a copy of this interview never provided to plaintiff before her deposition was taken, but again, plaintiff's counsel was never told about this investigation until December 18, 2017. This investigation generated a lengthy file and recorded interviews of Ryan, DiGennaro, Rivera, and others. (Id.) According to plaintiff's counsel, despite the 43 minute interview with plaintiff, which was conducted in November 2015, the officer conducting the interview, Investigator Airam Cruz, did not address the plaintiff's abuse allegations which form the basis of this litigation. (Id.)

Finally, in their December 18, 2017 disclosure, defendants identified the officers who accompanied Ms. Martinez to the Hospital. (Id.) However, neither of these officers reportedly has any recollection of their interactions with plaintiff.

Plaintiff's counsel's letter noted that despite the thousands of dollars spent conducting 11 police depositions, the City and the named defendants, as well as all of the non-party police

officer witnesses, had consistently asserted that nothing happened to the plaintiff at the 107

Precinct.  Now, long after discovery had closed, defendants had come forward with two key

witnesses and documents from multiple investigations that finally explain the cryptic reference in

the Hospital medical note indicating that plaintiff had injured herself "punching a wall in the

cell." (Id. at 2).  Despite plaintiff's herculean efforts to get to the bottom of what happened that

night, no one prior to December 18, 2017 could explain how the plaintiff came to be injured or

who was responsible for the injury, and defendants resisted discovery every step of the way,

requiring the issuance of 14 Orders from this Court, many of which were simply ignored.  As

plaintiff noted, the "December 18th production has now thrown the case into disarray, profoundly

changed the landscape of the litigation to plaintiff's prejudice and revealed that the Law

Department never conducted any legitimate investigation of the events, in spite of this Court's

orders and defense counsel's repeated representations." (Id.)  Not only would plaintiff have

named Officer Camhi as a defendant, but she could have avoided multiple depositions, others of

which may need to be retaken, plus there are additional claims that could potentially have been

brought.  Given the expense and delay that has already occurred and given that the statute of

limitations is set to expire on January 23, 2018, plaintiff has been severely prejudiced.

   During the hearing held on January 4, 2018, plaintiff's counsel noted that all throughout

the course of discovery, it had been represented to counsel and this Court that not only had the

assigned Assistant Corporation Counsel been investigating the events, but "'Supervisors in this

department have also spent dozens of hours assisting the undersigned [Mr. Johnson] in locating

documents, [and] have kept close tabs on the case to make sure that every discovery demand in

this matter is answered promptly.'" (1/4/18 Tr. at 4:3-12).  Plaintiff's counsel observed that in

their response to the latest motion, "defendants and the City of New York thinks [sic] they've done [nothing] wrong . . . that it's the plaintiff's fault."  (Id. at 4:21-22).

Citing Judge Weinstein's decision in DaCosta v. City of New York, No. 15 CV 5174, 2017 WL 5176409 (E.D.N.Y. Nov. 8, 2017), plaintiff argued that Ms. Martinez, like many civil rights plaintiffs, did not know the identity of her assailants.  It is clear that the information available to the parties is "uneven" and it is the defendants who have access to that information. (Id. at 5:10-12).  However, in this case, plaintiff made every effort to get this information and "defendants' [counsel] have an affirmative obligation not just to its clients but to the citizens of this city to do an investigation."  (Id. at 5:14-17).

Plaintiff's counsel noted that even in light of plaintiff's efforts to ferret out information about that night, defendants responded to plaintiff's April 2016 request for files relating to any investigation conducted by CCRB, IAB, etc. that "upon information and belief, . . . no such documents exist," but they were continuing to search.  (Id. at 6:3-6).  This response was provided while some of these investigations were still ongoing.  (Id.)  Defendants gave the same response to the same request six months later in January 2017, denying the existence of documents relating to these four investigations, three by the IAB and one by the CCRB.  (Id. at 6:6-10; see id. at 18:21-24).

In seeking sanctions, plaintiff noted that there was no way to fix this now; "[w]e're not in a position to start the case over."  (Id. at 6:12).  Not only has plaintiff incurred an enormous amount of fees and costs taking depositions without information that they now have, but there has been "needless delay," "memories have faded," the statute of limitations may have run as to the two most critical witnesses, and even plaintiff's expert was unable to examine her in the context of the injury defendants' recent disclosures suggest.  (Id. at 6:13-7:8).  It was not even

clear whether all of the documents previously Ordered had finally been produced by the date of the hearing or whether all of the relevant parties and witnesses have been identified.  (Id.)  For these reasons, plaintiff requested the imposition of sanctions.

During the January 4, 2018 hearing, defendants' counsel, in his opening remarks to the Court stated:  "It's our contention that we have complied with the orders of the Court and our duties in terms of discovery as best we can."  (1/4/18 Tr. at 7:16-18).  When the Court expressed disbelief that the City would take this position, counsel explained that the City's counsel did not learn about the IAB investigations until plaintiff's counsel indicated that they wanted to depose the arresting officer.  (Id. at 8:24-9:5).

In attempting to explain why this information had not been discovered earlier, defendants' counsel's remarks at the hearing and in defendants' letter response, dated December 26, 2017, appear to shift the blame to plaintiff.  In their letter, defendants argued that even though plaintiff had known about the identity of the arresting officer, Eric Ryan, since defendants' initial disclosures in April 2016, "plaintiff only just recently sought to depose him in this case."  (Defs.' 12/26/17 Ltr. at 2, ECF No. 87).  Thus, it was only during the course of preparing Officer Ryan for his deposition that new counsel for defendants first learned that Ryan had been interviewed by the IAB.  (Id.)  Upon review of Ryan's IAB officer résumé, counsel discovered there were three IAB investigations into the events surrounding plaintiff's arrest, in addition to the CCRB investigation.  (Id. at 2-3).  When asked why defendants' counsel waited almost two years to interview the arresting officer, counsel indicated that the officer had been spoken to, but only to confirm that he had in fact been the arresting officer.  (1/4/18 Tr. at 13:11-13).  At the hearing, defendants' counsel stated that "from the beginning we were informed it

was not the arresting officer involved.  I think it's pretty clear that plaintiff never alleged that the arresting officer was involved."  (Id. at 10:4-7).

Apparently, despite the disclosure obligations imposed by the Federal Rules of Civil Procedure, numerous requests by plaintiff, and Court Orders attempting to identify witnesses with relevant knowledge and responsive documents, defendants' counsel never thought to interview the one person who they knew had had contact with the plaintiff, the arresting officer, until plaintiff chose to depose him, even though defendants listed him as a witness in their own disclosures.  Regardless of the plaintiff's decision as to when, if ever, to depose the arresting officer, not even asking him if he was aware of the injury and deprivations plaintiff claimed to have suffered is at best just negligence on the part of defendants' counsel.

Defendants also did not explain why, despite the involvement of multiple high level officers within the 107 Precinct, no one informed defendants' counsel of the existence of the various IAB and precinct investigations during the many months that plaintiff had been seeking information about potential witnesses to that night's events.

Not only did defendants' counsel suggest that if plaintiff had simply sought to depose Ryan earlier, these investigations would have been discovered earlier, but he further asserted that plaintiff's counsel should have known about the investigations because plaintiff was aware of the investigations as a result of her interview by IAB.  (Id. at 31:7-9; 51:14-24).  In their letter, defendants asserted that plaintiff had made misrepresentations and withheld information, failing to acknowledge in response to interrogatories that she had been interviewed and denying that she "lodge[d] complaints with any government agencies in connection with this incident."  (Defs.' 12/26/17 Ltr. at 4).

At the hearing, counsel for plaintiff made it clear that when plaintiff was interviewed, she believed she was only making a statement about her missing property.  (1/4/18 Tr. at 12:8-12).  She declined to discuss the abuse because of the pending litigation.  (Id.)  Thus, plaintiff's counsel took the position that her responses to the defendants' discovery requests were correct; she had not lodged any complaint about the abuse with any government agency and she had not been interviewed in connection with the abuse investigation.

Indeed, defendants' own statements attempting to explain why they had not discovered the various investigations supported plaintiff's position.  Defendants' counsel argued that these were "two separate investigations, one involves missing property.  It's not the subject of plaintiff's claims in this action.  Plaintiff's claims in this action involve an alleged use of excessive force at the 107 Precinct.  It has nothing to do with the execution of the search warrant, any alleged missing property during the search warrant [sic].  The evidence discrepancy also has nothing to do with plaintiff's claims."  (Id. at 14:21-15:3).

 Defendants' counsel further explained that there was no other way to discover this information; "we weren't able to retrieve that information by searching the plaintiff's name."  (Id. at 16:10-12).  In their letter response, defendants stated: "[u]nfortunately, . . . the way the internal investigation concerning plaintiff's self-inflicted injuries was indexed and maintained, it was not possible to discover this investigation or obtain documents related to the investigation by searching plaintiff's name."  (Defs.' 12/26/17 Ltr. at 3).  Instead, it was Lieutenant Camhi's report that triggered the investigation.  The only way to locate the records would have been to search for the arresting officer, Officer Ryan.  (1/3/18 Tr. at 10:11-13). [17]

---

[17] It was never fully explained why, even though Camhi's report triggered the inquiries, the only way to locate the records was through the name of the arresting officer and not through a search of plaintiff's or Camhi's name.  Moreover, even though counsel knew the name of the

In seeking sanctions, plaintiff's counsel sought to have the Court issue an order equitably tolling the statute of limitations. He stated: "what we've learned two weeks ago is that this is in fact a much bigger case. It involved potentially a cover-up . . . and there are . . . a number of other claims now based on this that we want to explore and potentially add to the case." (1/4/18 Tr. at 19:15-19). In addition to the equitable tolling, plaintiff seeks a lineup at One Police Plaza with all the individuals involved in the investigation and search warrant. (Id. at 19:23-20:5). Finally, plaintiff asked for either a default judgment or striking of the answer, and a monetary award. (Id. at 21:3-8).

In response, defendants objected to the lineup and argued that sanctions in terms of either a monetary award or default judgment were not warranted because "the plaintiff hasn't shown any prejudice in the case." (Id. at 22:8). Instead, defendants contend that the documents relate to their defense and demonstrate that plaintiff's injuries were self-inflicted and no officers were involved. (Id. at 22:9-12). When asked whether it was the City's position that there was no prejudice to plaintiff in the expenditure of thousands of dollars in wasted discovery and there was no obligation to disclose information helpful to the defense, counsel argued that plaintiff's counsel knew that one of the defenses was that the injury was self-inflicted as indicated in the medical report; "the only difference now is that Lieutenant Camhi has been identified as

---

arresting officer, it appears that defendants' counsel only sought to search by plaintiff's name and did not perform any other search, except of the individual defendants' names, which also did not return any results. (See Defs.' 12/26/17 Ltr. at 3 n.8). It would seem that counsel was unfamiliar with the City's databases and recordkeeping systems—including their limitations—despite counsel's clear, affirmative obligation to understand his client's recordkeeping system. See, e.g., Industrial Quick Search, Inc. v. Miller, Rosado & Algois, LLP, No. 13 CV 559, 2018 WL 264111, at *10 (S.D.N.Y. Jan. 2, 2018); Williams v. New York City Transit Auth., No. 10 CV 5024280, 2011 WL 5024280, at *4 (E.D.N.Y. Oct. 19, 2011); Zubulake v. UBS Warburg LLC ("Zubulake V"), 229 F.R.D. 422, 432 (S.D.N.Y. 2004); Zubulake v. UBS Warburg LLC ("Zubulake I"), 217 F.R.D. 309, 324 (S.D.N.Y. 2003).

someone who observed that actually happening.  Certainly the plaintiff is more than free to

depose Lieutenant Camhi and . . . Officer Ryan."  (Id. at 23:10-13).  Not only do defendants

dispute that plaintiff was prejudiced in any way, counsel argued instead that it was defendants

who were "prejudiced by not having the recording of her statements prior to her deposition[.]"[18]

(Defs.' 12/26/17 Ltr. at 5).

<u>DISCUSSION</u>

**A.  Legal Standards for Sanctions**

　　1.  <u>Authority to Impose Sanctions</u>

　　　　a.  <u>Rule 37 of the Federal Rules of Civil Procedure</u>

It is clear that sanctions may be imposed upon a party or counsel who deliberately fails to

comply with a court order.  <u>See, e.g.</u>, <u>United States v. Local 1804-1, Int'l Longshoremen's</u>

<u>Ass'n</u>, 44 F.3d 1091, 1096 (2d Cir. 1995); <u>Drywall Tapers, Local 1974 v. Local 530</u>, 889 F.2d

389, 394 (2d Cir. 1989), <u>cert. denied</u>, 494 U.S. 1030 (1990).  Rule 37 of the Federal Rules of

Civil Procedure is the primary, though not the exclusive, mechanism for enforcing a court's

discovery orders.  <u>See</u> <u>World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.</u>, 694 F.3d

155, 158 (2d Cir. 2012).  The Rule provides in relevant part that "if a party or a party's officer,

director, or managing agent . . . fails to obey an order to provide or permit discovery, including

an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further

---

[18] In making this argument, defendants fail to comprehend that the IAB files, including
documents evidencing statements made by plaintiff, were in the possession of IAB, which is part
of the New York City Police Department, which is in turn a part of the City of New York.  Thus,
defendants had the information in their possession, custody, and control the entire time, but
failed to take reasonable steps to locate and produce that information.  Thus, any prejudice
complained of was caused by defendants and their counsel, not by plaintiff.

just orders." Fed. R. Civ. P. 37(b)(2)(A).  In  Update Art, Inc. v. Modiin Publ'g, Ltd., the

Second Circuit described the three purposes behind sanctions under Rule 37:

> First, they ensure that a party will not benefit from its own failure to
> comply.  Second, they are specific deterrents and seek to obtain
> compliance with the particular order issued.  Third, they are intended
> to serve a general deterrent effect on the case at hand and on other
> litigation, provided that the party against whom they are imposed
> was in some sense at fault.

843 F.2d 67, 71 (2d Cir. 1988) (citing National Hockey League v. Metropolitan Hockey Club,

Inc., 427 U.S. 639 (1976) (per curiam)).  See also  Southern New England Tel. Co. v. Global

NAPs Inc., 624 F.3d 123, 149 (2d Cir. 2010) (quoting Update Art, Inc. v. Modiin Pub'g, Ltd.,

843 F.2d at 71); Cine Forty-Second St. Theatre Co. v. Allied Artists Pictures Corp., 602 F.2d

1062, 1066 (2d Cir. 1979).  As the court in Baba v. Japan Travel Bureau Int'l, Inc., noted:

"'[A]ll litigants . . . have an obligation to comply with court orders.  When they flout that

obligation[,] they . . . must suffer the consequences of their actions.'" 111 F.3d 2, 5 (2d Cir.

1997) (quoting McDonald v. Head Criminal Court Supervisor Officer, 850 F.2d 121, 124 (2d

Cir. 1988)).

The Rule lists seven possible sanctions, including "striking pleadings in whole or in

part," "rendering a default judgment against the disobedient party," and "treating as contempt of

court the failure to obey any order except an order to submit to a physical or mental

examination."  Fed. R. Civ. P. 37(b)(2)(A)(iii), (vi), (vii).  In addition, the Rule provides that the

court may issue an order that certain designated facts be taken as established in accordance with

the claim of the party obtaining the order, Fed. R. Civ. P. 37(b)(2)(A)(i); see Santrayll v. Burrell,

No. 91 CV 3166, 1998 WL 60926, at *3 (S.D.N.Y. Jan. 21, 1998), or may issue an order

"prohibiting the disobedient party from . . . introducing designated matters in evidence."  Fed. R.

Civ. P. 37(b)(2)(A)(ii); accord Kang v. Lee, No. 96 CV 1145, 1997 WL 669787, at * 3 (S.D.N.Y. Oct. 27, 1997).

In lieu of or in addition to these sanctions, the Rule requires that the court order the disobedient party, its attorney, or both to pay "the reasonable expenses, including attorney's fees," caused by the failure to comply, unless the court finds the failure "substantially justified" or that "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). Indeed, courts have awarded attorney's fees and costs where sanctions were appropriate but where the court found that the sanctioned party's conduct did not rise to a level that would warrant the more severe sanctions of dismissal or default. See, e.g., Roadway Express, Inc. v. Piper, 447 U.S. 752, 763-64 (1980). The listed sanctions are non-exclusive, and the Rule explicitly contemplates that courts will order other sanctions so long as they are just. See Local Union No. 40 of the Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers v. Car-Win Constr., Inc., 88 F. Supp. 3d 250, 262 (S.D.N.Y. 2015).

An order requiring a party to comply with its discovery obligations or with another party's discovery requests is a necessary predicate to sanctions under Rule 37(b). See, e.g., Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1364 (2d Cir. 1991) (observing that "there must be a valid court order in force before sanctions may be imposed pursuant to Rule 37(b)(2)"). An order enforceable under Rule 37(b) need not, however, have been issued under a particular rule, so long as its effect was to require a party "to provide or permit discovery." See Fed. R. Civ. P. 37(b)(2)(A); Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16 CV 318, 2017 WL 3671036, at *18 (S.D.N.Y. July 18, 2017) (collecting authority). An order need not be written to be enforceable under the Rule. See Penthouse Int'l, Ltd. v. Playboy Enters., Inc., 663 F.2d 371, 388 (2d Cir. 1981).

b.   <u>The Inherent Power of the Court</u>

Even in the absence of a court order, Rule 37 provides for sanctions where "a party fails to provide information or identify a witness as required by Rule 26(a) or (e)."  Fed. R. Civ. P. 37(c)(1).  In addition, where a court has not issued an explicit discovery order and there has not been a qualifying failure to disclose under Rule 37(c), "a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs."  <u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 106-07 (2d Cir. 2002); <u>see generally</u> <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 43 (1991) (explaining that "[i]t has long been understood that '[c]ertain implied powers must necessarily result to our [c]ourts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a [c]ourt, because they are necessary to the exercise of all others'") (quoting <u>United States v. Hudson</u>, 11 U.S. (7 Cranch) 32, 34 (1812)).  Indeed, "[w]here exercise of inherent power is necessary to remedy abuse of the judicial process, it matters not whether there might be another source of authority that could address the same issue."  <u>CAT3, LLC v. Black Lineage, Inc.</u>, 164 F. Supp. 3d 488, 498 (S.D.N.Y. 2016); <u>accord</u> <u>Southern New England Tel. Co. v. Global NAPs Inc.</u>, 624 F.3d at 144.

c.   <u>Section 1927 Sanctions Against An Attorney</u>

In addition to the sanctions that are available under Rule 37, sanctions may be imposed against an attorney under 28 U.S.C. § 1927.  <u>See</u> <u>United States v. International Bhd. of Teamsters</u>, 948 F.2d 1338, 1344-45 (2d Cir. 1991).  Section 1927 provides that:

> Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.  Section 1927 imposes an obligation on attorneys to avoid dilatory tactics, see Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986), cert. denied, 480 U.S. 918 (1987), and was enacted to "'deter unnecessary delays in litigation.'"  United States v. International Bhd. of Teamsters, 948 F.2d at 1345 (quoting H.R. Rep. No. 96-1234, at 1 (Conf. Rep.) (1980), reprinted in 1980 U.S.C.C.A.N. 2176, 2782).  The imposition of sanctions under Section 1927 is discretionary and requires a finding that the "attorney's actions [are] so utterly without justification as to compel the conclusion that these actions were undertaken for an improper purpose."  Schoenberg v. Shapolsky Pub'rs, Inc., 971 F.2d 926, 935 (2d Cir. 1992), overruled on other grounds, Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343 (2d Cir. 2000).

Unlike Rule 37, sanctions under Section 1927 may only be imposed against attorneys, not their clients, and may only be imposed where there has been a showing of bad faith; "[b]ad faith is the touchstone of an award under this statute."  United States v. International Bhd. of Teamsters, 948 F.2d at 1345; see also Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1010 (2d Cir. 1986) (holding that the imposition of sanctions under Section 1927 requires a "clear showing of bad faith").  Before imposing sanctions on an attorney under Section 1927, the attorney must be afforded due process, including "'fair notice and an opportunity for a hearing on the record.'"  Schoenberg v. Shapolsky Pub'rs, Inc., 971 F.2d at 936 (quoting Roadway Express, Inc. v. Piper, 447 U.S. at 767).

2. Considerations in Determining an Appropriate Sanction

A district court has broad discretion to sanction a party for discovery abuses and other litigation misconduct, whether exercising its inherent power or acting pursuant to the Federal Rules of Civil Procedure.  Gao v. Perfect Team Corp., No. 10 CV 1637, 2014 WL 2465589, at

44

*4 (E.D.N.Y. May 30, 2014); Curcio v. Roosevelt Union Free School Dist., 283 F.R.D. 102, 107

(E.D.N.Y. 2012); see World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., 694 F.3d

at 159 (explaining that "imposing sanctions pursuant to Rule 37 is within the discretion of the

district court and a decision to dismiss an action [or enter default judgment] for failure to comply

with discovery orders will only be reversed if the decision constitutes an abuse of that

discretion") (quotations and citations omitted).

     Courts are guided by the prophylactic, punitive, and remedial rationales in the exercise of

their discretion to impose an appropriate sanction.  The breadth of the court's discretion to select

a sanction appropriate to the circumstances of a particular case reflects the "considerable

deference [afforded] to the district court's familiarity with the proceedings."  Bhagwanani v.

Brown, 665 F. App'x 41, 43 (2d Cir. 2016) (quoting Friends of Animals, Inc. v. U.S. Surgical

Corp., 131 F.3d 332, 334 (2d Cir. 1997)).

     The court's inquiry in deciding whether to impose less severe sanctions, such as fines and

cost-shifting, focuses primarily on the misconduct of the party to be sanctioned.  Nycomed U.S.,

Inc. v. Glenmark Generics Ltd., No. 08 CV 5023, 2010 WL 3173785, at *3 (E.D.N.Y. Aug. 11,

2010).  Additional considerations govern the decision to impose harsher sanctions, such as an

order of preclusion, the imposition of an adverse inference, dismissing the case, or entering

default judgment.  See id.

     Entering default judgment, like striking a pleading or dismissing a case, "is a 'drastic

remedy' generally to be used only when the district judge has considered lesser alternatives."

Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d at 144.  "Discovery orders are

meant to be followed," Bambu Sales, Inc. v. Ozark Trading, Inc., 58 F.3d 849, 853 (2d Cir.

1995), and thus the harshness of such measures "is justified if the district court finds that the

failure to comply with discovery orders was due to 'willfulness, bad faith, or any fault of the party sanctioned.'" Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d at 144 (quoting Salahuddin v. Harris, 782 F.2d 1127, 1132 (2d Cir. 1986)). Indeed, the availability of these most severe sanctions in appropriate cases is essential to the efficient functioning of the courts, especially if the Federal Rules of Civil Procedure are to achieve their stated goal of "secur[ing] the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1; see Valentine v. Museum of Modern Art, 29 F.3d 47, 49-50 (2d Cir. 1994) (quoting National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. at 643). Thus, even long before the widespread availability of electronically stored information caused exponential increases in the complexities of litigation, the Second Circuit admonished that "in this day of burgeoning, costly and protracted litigation[,] courts should not shrink from imposing harsh sanctions where . . . they are clearly warranted." Jones v. Niagara Frontier Transp. Auth., 836 F.2d 731, 734-35 (2d Cir. 1987) (quoting Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d at 1068).

## B. Factors to Guide the Court's Discretion

Courts generally consider the following factors in determining whether to exercise their discretion to enter default judgment or to impose another dispositive sanction: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance[;] and (4) whether the non-compliant party had been warned of the consequences of non-compliance." Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 302 (2d Cir. 2009) (citation and quotation marks omitted).

In addition to the four Agiwal factors, courts also regularly consider the extent of any prejudice to the party moving for sanctions. In doing so, however, courts must be mindful that

46

"real prejudice to a litigant may serve as a compelling consideration in support of dispositive relief," but that "a lack of prejudice should not be given significant weight in the overall analysis." Local Union No. 40 v. Car-Win Constr., Inc., 88 F. Supp. 3d at 263. The absence of prejudice is given little weight, even though its presence tilts the scales heavily in favor of sanctions, because both the Second Circuit and the Supreme Court "have consistently rejected the 'no harm, no foul' standard for evaluating discovery sanctions[.] Although *one* purpose of Rule 37 sanctions may in some cases be to protect other parties to the litigation from prejudice resulting from noncompliance with discovery obligations, Rule 37 sanctions serve other functions unrelated to the prejudice suffered by individual litigants." Southern New England Tel. Co v. Global NAPs Inc., 624 F.3d at 148-49 (citations omitted) (emphasis in original); see Local Union No. 40 of the Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers v. Car-Win Constr., Inc., 88 F. Supp. 3d at 263.

Although these enumerated factors provide useful guidance, they are not exclusive. No single factor controls, and it is not an abuse of discretion for a district court to order a dispositive sanction even when not every factor weighs against the party to be sanctioned. Southern New England Tel. Co v. Global NAPs Inc., 624 F.3d at 144. "Sanctions must be weighed in light of the full record in the case." Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d at 1068 (citing National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. at 642). It is up to the trial court to determine on a case-by-case basis whether a dispositive sanction is appropriate in light of the court's familiarity with the proceedings, the prophylactic, punitive, and remedial purposes of sanctions, and the paramount requirement under Rule 1 and Rule 37 that any order issued must be just.

1. <u>Willfulness</u>

Non-compliance with a court's discovery order is willful when the order is clear, the party understood the order, and the failure to comply is not due to factors beyond the party's control.  <u>See, e.g.</u>, <u>Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC</u>, 2017 WL 3671036, at *21; <u>Jensen v. Allied Burton Sec. Servs.</u>, No. 10 CV 2043, 2011 WL 4382347, at *3 (E.D.N.Y. May 27, 2011) (quoting <u>Davidson v. Dean</u>, 204 F.R.D. 251, 255 (S.D.N.Y. 2001)). "Willful non-compliance is routinely found, for instance, where a party has 'repeatedly failed to . . . produce documents . . . in violation of the district court's orders.'"  <u>Doe v. Delta Airlines, Inc.</u>, No. 13 CV 6287, 2015 WL 798031, at *8 (S.D.N.Y. Feb. 25, 2015) (quoting <u>Robertson v. Dowbenko</u>, 443 F. App'x 659, 661 (2d Cir. 2011) (summary order)), <u>aff'd</u>, 672 F. App'x 48 (2d Cir. 2016).

It is particularly important to consider a party's course of conduct throughout the litigation when evaluating willfulness.  "Taken out of context, perhaps, any individual incident of discovery misconduct may appear forgivable—especially when framed by some post hoc excuse that rings of reasonableness."  <u>Local Union No. 40 of the Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers v. Car-Win Constr., Inc.</u>, 88 F. Supp. 3d at 264.

a. <u>The Willful Violation of Court Orders</u>

As demonstrated by the procedural history set forth in some detail herein, this case has been marked by an unprecedented and disturbing pattern of delay and failure to comply with the Orders of this Court.  This Court has had to hold 13 conferences to resolve various discovery disputes, including two hearings to address plaintiff's motions for contempt and sanctions, and has issued 14 Orders to defendants to produce discovery that is clearly mandated by the Federal Rules of Civil Procedure even in the absence of a request or order.

48

From the very outset of this case, the defendants' attorney was aware that the key inquiry in the case was to identify the officer or officers who had either assaulted or inflicted harm on plaintiff, as plaintiff claimed, or who could support defendants' various theories that either she did not suffer any injury while in the 107 Precinct or, if she did, the injury was self-inflicted, as noted in a cryptic reference in her medical record.  Yet despite numerous requests from plaintiff's counsel and suggestions as to ways in which to identify officers in the Precinct who may have interacted with plaintiff that night, for months defendants resisted requests for photographs and memo books, even after being Ordered to provide them by the Court.

Perhaps the most critical failure on the part of defendants' counsel was not to interview the officers who defendants knew had contact with plaintiff to ask a simple question:  "Plaintiff claims she was injured in the Precinct.  Do you know anything about this?"  Eric Ryan, the arresting officer, identified by defendants as a witness for the defense, was never asked about plaintiff's injury until almost two years into discovery when it was learned that he was one of the few officers who actually claims to have witnessed the incident in which defendants contend plaintiff injured herself.  It is even harder to fathom how defendants' counsel, his supervisors, paralegals from Corporation Counsel, and record keepers from the DOC, the 107 Precinct, and the NYPD Civil Litigation Unit could have spent "hundreds of hours" trying to respond to the discovery in this case without locating basic and highly relevant information.  (See 1/4/18 Tr. at 4:2-12).  Not only does it now appear that high ranking police officials, including a captain, several lieutenants, and at least one sergeant, were involved in investigating the events that took place on the night of plaintiff's arrest, but 11 NYPD officers were deposed by plaintiff's counsel and presumably interviewed by defendants' counsel, and yet none of them came forward with information about this incident or the investigations for almost two years.  This suggests either a

failure to conduct even the most superficial investigation by counsel or, of deeper concern, that counsel was deliberately not informed due to a cover-up perpetrated by the NYPD officers from the Precinct.[19]

Perhaps even more astonishing is that this utter failure to discover the key witnesses and produce over 1,000 pages of relevant documents occurred in the context of 14 Court Orders to produce and a contempt proceeding. Apart from the overarching failure to identify key witnesses and documents, defendants deliberately failed to comply with clear orders of this Court.

At the initial conference held in April 2016, the defendants were ordered to identify the officers who interrogated plaintiff; defendants were given until May 20, 2016 to provide that information. (See 4/15/16 Minute Order). Not only did defendants fail to comply with that Order, they never requested additional time to search for that information prior to the date set for production. On June 29, 2016, the Court issued a second Order giving the defendants an additional 30 days to identify the officers, and warning that if they were unable to do so by that date, the Court would Order the production of photographs and memo books for officers in the Precinct. (See 6/29/16 Minute Order). Again, defendants failed to comply and did not request additional time to do so. By the end of July when there was no further progress toward the

---

[19] This Court has supervised discovery in numerous cases over the years where the plaintiff claiming false arrest or excessive force has not been able to identify the NYPD officers involved and the Court has had to issue a Valentin order, directing the defendants to identify the officers. See generally Valentin v. Dinkins, 121 F.3d 72 (2d Cir. 1997). The instant case is not the first where the City has claimed that they had no paperwork relating to the plaintiff and they were therefore unable to identify any involved officers. Given what occurred in this case during litigation, as well as what is alleged to have occurred that prompted the litigation, the City should be concerned as to whether their procedures for recording interactions with citizens and for investigating such claims in an effort to identify witnesses should be reexamined.

identification of the officers who interrogated plaintiff, the Court Ordered defendants to produce photographs.  (See 7/28/16 Minute Order).

By mid-August, defendants had not identified the officers, nor had they produced the photographs previously ordered by the Court.  Instead, defendants decided that they would simply provide a CCRB file, telling plaintiff's counsel that this would resolve the issue.  (Pl.'s 8/16/16 Ltr. at 1).  While there were eight photographs in the file, plaintiff's counsel determined that none of these officers were involved with plaintiff after she was taken to the Precinct and they reiterated their request for production of photographs and memo books of officers from the 107 Precinct who were present that night.  Defendants' counsel resisted, despite the prior Court Order, arguing that the "motion is moot," and that the City had "identified all the individuals who interrogated plaintiff or participated in plaintiff's arrest."  (Defs.' 8/18/16 Ltr. at 1). Defendants never requested reconsideration of the Court's three prior Orders and the Court again Ordered defendants to produce the photographs.  (See 8/19/16 Minute Order).

Defendants' failure to comply with this Court's Orders to identify officers and produce photographs was not the only time defendants failed to produce discovery or simply ignored this Court's Orders.  Throughout the course of discovery, the Court issued Orders requiring defendants to produce certain documents sought by plaintiff or provide an affidavit from a records custodian indicating that a search had been undertaken but no responsive documents had been found.  The Medical Treatment of Prisoner Form was requested in plaintiff's original discovery requests served in April 2016 and when it had not been provided, the Court Ordered its production by September 30, 2016.  (8/19/16 Minute Order).[20]  Although counsel produced an

---

[20] The Court notes that many of the documents which were Ordered to be produced by the Court on multiple occasions were documents which defendants had an obligation to produce in response to the normal discovery processes and rules.  Apart from their failure to comply with

illegible copy in October 2016, plaintiff's counsel sought several times to have a legible copy produced.  When it still had not been produced almost eight months later, and no request for an extension of time was made, the Court issued a second Order to produce the original on June 29, 2017.  (See 6/29/17 Minute Order).  On July 11, 2017, plaintiff's counsel moved for sanctions because the defendants still had not complied with the Court's Orders of August 19, 2016 and June 29, 2017 to produce the Medical Treatment of Prisoner Form.  Finally, in July 2017, defendants informed plaintiff's counsel that they could go to Queens Central Booking to view the original form.  (See Defs.' 7/12/17 Ltr. at 1 (explaining that "defense counsel has informed plaintiff's counsel they could go to Queens Central Booking to review the original")).

Another example of defendants' failure to comply with their discovery obligations and with the Court's Orders relates to the disciplinary records of Sergeant Forgione.  Following the filing of the Amended Complaint, the Court Ordered defendants to produce the disciplinary and personnel files for the newly named defendant officers, including defendant Forgione.  (See 1/5/17 Minute Order).  Despite this Order, defendants only produced a partial file for Forgione and plaintiff's counsel proceeded to depose him without having been given his files for the year of plaintiff's arrest and without producing the James file which suggested dishonesty on the part of the defendant.  When plaintiff moved to compel the production of these files, defendants' counsel objected on relevance grounds.  Defendants never once objected prior to Forgione's deposition nor did they seek to modify the Court's Order to produce only certain portions of his

---

the Court's Orders, defendants ignored their obligations under the Federal Rules of Civil Procedure.  Even where defendants did respond, they did so subject to numerous vague, unsupported objections that rendered it difficult to discern whether and the extent to which they had furnished responsive information.  Such responses are improper.  See, e.g., Fed. R. Civ. P. 33(b)(4) (providing that objections "must be stated with specificity").  Here, the improper responses obfuscated the full extent of defendants' noncompliance, undermined the very purpose of discovery, and deprived the plaintiff and the Court of crucial information.

disciplinary files; they simply decided on their own to withhold certain files.  On June 29, 2017, the Court issued a second Order to produce these files.  (See 6/29/17 Minute Order).  During the contempt proceeding held on November 9, 2017, plaintiff's counsel indicated that the files for Forgione still had not been produced (e.g. 11/9/17 Tr. at 7:15-20; 20:25-21:4), and it is unclear whether those files remain outstanding to date.

Similar examples of noncompliance and the need to issue several orders involved the request for the Central Booking Medical Screening Form (see, e.g., 6/29/17 Minute Order; 8/19/16 Minute Order); the 107 Precinct Command Log (see 6/29/17 Minute Order; 8/19/16 Minute Order); and the Central Booking roster or Command Log. (See 6/29/17 Minute Order; 8/19/16 Minute Order).  The Court also issued several Orders requiring defendants to produce the Prisoner Movement Slip and the Live Scan machine report.  (See 9/21/17 Order; 10/17/17 Order).  These documents were sought by plaintiff's counsel in an effort to identify the officer responsible for fingerprinting plaintiff based on information provided during the deposition of one of the NYPD witnesses.  Presumably this officer would have observed the injury to plaintiff's hand and would support her claim that she was injured in the Precinct.  Defendants' counsel objected that the information was "highly duplicative" of information previously produced; that the Live Scan machine records were "irrelevant, may not be preserved, and would not produce additional information about the incident."  (Defs.' 9/19/17 Ltr. at 2).  The Court Ordered production of the documents over defendants' objections.  Despite the Order, defendants did not produce either document, requiring the Court to hold another conference on October 17, 2017, at which defendants represented for the first time that the Prisoner Movement Slip could not be found and the Live Scan document was in the custody of the State.  (See 10/18/17 Minute Order).  Although defendants' counsel indicated that they would be producing an affidavit as to

53

the Prisoner Movement Slip, no such affidavit was provided until the night before the November 9, 2017 contempt hearing.  Although this affidavit suggested for the first time that the document was in the custody of the DOC, defendants' counsel claimed that it did not exist because plaintiff had never been in DOC custody, contradicting his own client's affidavit.

Finally, defendants failed to produce the DD5s and buy reports identified by Sergeant DiGennaro in his deposition.  Not only did the Sergeant indicate that these documents implicated plaintiff in the drug sale that prompted her arrest, but these core documents had never been produced in all the months leading up to his deposition.  In objecting to their production, defendants' counsel argued that they were not relevant because they were "not related to excessive force" and that he "didn't get those documents to begin with."  (9/21/17 Tr. at 3:23-4:2).  Despite this Court's Order to produce these reports "right away" (id. at 5:1), it took a second Order of the Court in October 2017 and plaintiff's motion to hold defendants in contempt to finally see the production of these documents the night before the contempt hearing on November 9, 2017.  Counsel never provided an explanation as to why it took so long to produce these documents.

It also warrants mention that the defendants and their counsel have repeatedly insisted that they have complied fully with the Court's Orders and their discovery obligations.  Indeed, defendants' counsel chose to open his remarks to the Court at the second show cause hearing by insisting that defendants had satisfied all of their obligations.  (See 1/3/18 Tr. at 7:15-18).  Such a disingenuous claim indicates willfulness and weighs in favor of severe sanctions.  See Chowdhury v. Hamza Express Food Corp., 308 F.R.D. 74, 83 (E.D.N.Y. 2015) (finding willfulness where counsel disingenuously claimed to have complied with all court orders despite a history of violations).

Given the repeated and numerous violations and examples of noncompliance with this Court's Orders, the element of willfulness has clearly been established. Defendants have not claimed that they did not understand the Court's Orders or that they were unclear. Even if there were reasons outside of defendants' control to explain the failure to comply with some of the Orders, none have been offered. Thus, the Court finds that the first prong of the test—defendants' willful disobedience of this Court's Orders—has been satisfied on multiple occasions and weighs heavily in favor of dispositive sanctions.

b. <u>Noncompliance with Basic Discovery Obligations</u>

Even if the defendants' repeated failures to obey this Court's Orders were insufficient to evince willfulness, the failure of defendants and their counsel to comply with the most basic discovery requirements set out in the Federal Rules of Civil Procedure can itself demonstrate willfulness that weighs in favor of a dispositive sanction. At the outset of litigation, Rule 26 requires that "a party must, without awaiting a discovery request, provide to the other parties: the name . . . of each individual likely to have discoverable information—along with the subject of that information—that the disclosing party may use to support its claims or defenses [and] a copy . . . of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses[.]" Fed. R. Civ. P. 26(a)(1)(A)(i)-(ii). Such disclosures must be "based on the information then reasonably available [to the party]." Fed. R. Civ. P. 26(a)(1)(E).

Crucially, by signing a discovery response or disclosure, a party or its attorney "certifies that to the best of the person's knowledge, information, and belief *formed after a reasonable inquiry*[,] with respect to a disclosure, it is complete and correct as of the time it is made." Fed. R. Civ. P. 26(g)(1)(A) (emphasis added). The obligation to conduct a reasonable inquiry is

fundamentally important, and although it runs first to counsel, it applies with equal force to the party itself. See, e.g., Zubulake v. UBS Warburg LLC ("Zubulake V"), 229 F.R.D. at 432 (explaining that "counsel and client must take some reasonable steps to see that sources of relevant information are located"); id. at 433 n.80 (observing that "the obligation to [locate relevant evidence] runs first to counsel, who then has a duty to advise and explain to the client its obligations") (quoting Telecom Int'l Am. Ltd. v. AT & T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999)). Such a complete failure to perform a straightforward and required inquiry is patently unreasonable and could only result from an intentional failure to act. See Moody v. CSX Transp., Inc., No. 07 CV 6839, 2017 WL 4173358, at *12 (W.D.N.Y. Sept. 21, 2017).

Defendants and their counsel were required to conduct a reasonable inquiry at the beginning of this litigation into the information, documents, and witnesses available to the defendants. Given what has developed over the last year and a half of discovery, it is clear that both defendants and their counsel failed to conduct the required inquiry. Had they done so, there would have been no need for the plaintiff, her counsel, and the Court to dedicate tremendous amounts of time attempting to determine the identities of potential parties and witnesses.

For example, in addition to the mandatory initial disclosures that defendants should have made without prompting, plaintiff also sought information and documents by serving interrogatories and document requests on April 14, 2016. (See Pl.'s 4/16/16 1st Set of Interrogs. and Reqs. for Prod. ("Pl.'s 4/16/16 Discovery Requests"), attached as Exhibit A to Pl.'s 7/6/16 Mot. to Compel, ECF No. 14-1). Those interrogatories specifically directed defendants to identify crucial witnesses, including the arresting officer, the arresting officer's partner or partners, any other officer or supervisor present at the time, the commanding officer of the squad, the desk officer of the precinct to which plaintiff was brought, any officer who took custody of or

transported plaintiff, any officer who transported plaintiff to the hospital, any officer who was

with plaintiff at the hospital, any officer who was with plaintiff while she traveled to or was at

Central Booking, and various other witnesses.  (See id. Interrog. No. 1).  In response, defendants

offered boilerplate objections and only identified the two arresting officers, Officer Eric Ryan

and Sergeant Zaka Rehman.  (See Defs.' 5/27/16 Resps. to Pl.'s 1st set of Interrogs. and Reqs.

for Prod. ("Defs.' 5/27/16 Discovery Resps.") No. 1, attached as Exhibit B to Pl.'s 7/6/16 Mot. to

Compel, ECF No. 14-2).

At the same time in April 2016, plaintiff also requested various documents from the

defendants, such as the Command Log entry, Precinct Prisoner Roster, Prisoner Movement Slip,

Medical Treatment of Prisoner Form, Unusual Incident Report (RF-49), and the Central Booking

Medical Screening Form.  (See Pl.'s 4/16/16 Discovery Requests at 8-10).  Once again,

defendants responded with largely improper and unsupported boilerplate objections, but

otherwise "refer[red] plaintiff to Defendant's Initial Disclosures dated April 15, 2016 for

responsive information."  (See Defs.' 5/27/16 Discovery Resps. at 20).  This response was utterly

improper because none of these items were contained in defendants' Initial Disclosures.

Plaintiff's discovery requests sought, from the outset of litigation, precisely the

information and documents that defendants later claimed they did not know to search for and

produce.  Defendants offer the excuse that, in addition to the discovery requests, plaintiff's

counsel offered various proposals on how to determine the identities of the officers at the

Precinct described in the Complaint.  According to the defendants, they were incapable of

simultaneously attempting to identify the officers involved and complying with their other

discovery obligations.  Thus, defendants argue that having to consider plaintiff's proposals

significantly delayed their ability to comply with their discovery obligations and may have

actually prevented them from uncovering the highly information even though it was already in the City's possession, custody, and control.  The excuse has no merit.

Plaintiff never should have been forced to make such proposals:  those proposals were necessary only because of defendants' complete abdication of the clear duty imposed by the Federal Rules of Civil Procedure.  Moreover, plaintiff's proposals, which were designed to comply with the Court's directive that the parties work together to identify the officers involved, did not excuse defendants and their counsel from their obligation to provide responses to plaintiff's discovery requests that were complete when made and *formed after a reasonable inquiry*.  See Fed. R. Civ. P. 26(g)(1)(A).  It should not be too much to ask attorneys or litigants to multitask, especially where, as here, the attorneys and litigants are supported by a sophisticated municipal law department.  Even if defendants or their counsel truly were not capable of dividing their attention between the Orders and the discovery requests, they did not have the option of choosing between the two obligations.  If defendants or their counsel were unsure whether they were able to certify as to the completeness of their responses or the reasonableness of their inquiry, they should have sought leave to delay their responses or some other intervention by the CLP.  They may not do what was done here:  file their responses without regard to their Rule 26(g) obligations, and then offer *post hoc* excuses why their discovery responses were deficient or they were unable to comply with their obligations.

Defendants also may not rely on counsel's inability to search for the relevant documents and information.  Defendants' counsel explained during the January 4, 2018 hearing that they "weren't able to retrieve [information about plaintiff's injury] by searching the plaintiff's name." (1/4/18 Tr. at 16:10-12).  Attorneys have a duty to understand the ways in which their clients store documents and information, whether in traditional physical media or electronically.  See,

e.g., Zubulake v. UBS Warburg LLC ("Zubulake V"), 229 F.R.D. 422, 432 (S.D.N.Y. 2004)

(explaining that, to comply with discovery obligations, "counsel must become fully familiar with

her client's document retention policies . . . [and] data retention architecture," and must also

communicate with "key players in the litigation in order to understand how they stored

information"). Furthermore, the client, too, is obligated to search for and preserve relevant

information in its possession, custody, or control. Courts have held that "a party's failure to

maintain electronic data in an accessible format may constitute sanctionable conduct." Moody v.

CSX Transp., Inc., 2017 WL 4173358, at *12. Here, both physical documents and ESI are at

issue, but the inaccessibility of the information at issue, regardless of format, is equally

sanctionable.

The City of New York and the NYPD are constantly subject to litigation and thus should

be keenly aware of the obligation to retain and search for relevant information in state and

federal litigation. Indeed, this matter was handled by the City of New York's "Special Federal

Litigation Division." (See, e.g., Defs.' 2/1/16 Ltr., ECF No. 6 (the City is represented by "the

Special Federal Litigation Division of the New York City Law Department)). As is its routine,

the Corporation Counsel's first action in this litigation was to request that the Court extend its

time to answer by several months to allow the City and its counsel "to properly investigate the

allegations of the Complaint and fulfill [their] obligation under Rule 11 of the Federal Rules of

Civil Procedure." (See id.)[21] This boilerplate language invoking the obligation to conduct a

reasonable inquiry under Rule 11 (of which Rule 26(g) is the analog in the discovery context)

---

[21] The complete absence of a reasonable inquiry in the instant case calls into question the
good faith of the City's routine requests for additional time to answer. In light of the
proceedings in this case, such requests could be seen as part of a policy calculated to delay the
litigation unnecessarily.

demonstrates awareness on the part of the City, including the NYPD and their counsel, of their routine litigation obligations.  Given this admitted awareness, it is no excuse that the City's counsel is unable to search for or locate information and documents relevant to the litigation.  In the context of constant litigation and a profound understanding of its discovery and preservation obligations, the failure of the City, including the various agencies and departments of which it is comprised, to maintain its documents and information in a system that is conducive to efficient searches in litigation must be viewed as a conscious choice.  Such a choice is fundamentally "willful," and may not be used to excuse compliance with discovery obligations or court orders. The Federal Rules do not allow a party to choose to exempt itself from discovery.

   2.  Duration of the Period of Non-Compliance

   Periods of non-compliance as brief as a few months have been held to weigh in favor of dispositive sanctions.  See Local Union No. 40 of the Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers v. Car-Win Constr., Inc., 88 F. Supp. 3d at 265 (collecting cases). Here, the City's non-compliance has lasted, at least in significant part, for almost two years. Furthermore, it is possible that the non-compliance continues.  The City repeatedly has produced documents that it previously insisted did not exist.  There is no way to determine, at this juncture, what other documents might be found that the City was required to produce much earlier but still has not turned over.  It is also far from clear that all potential witnesses have been identified.

   This factor also weighs in favor of dispositive sanctions because, even if the City eventually complies with its obligations, it nonetheless "ha[s] dragged plaintiff[] and this court through 'a pattern of prolonged and vexatious obstructions of discovery.'" Local Union No. 40 of the Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers v. Car-Win Constr., Inc.,

88 F. Supp. 3d at 266 (quoting Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d at

148).  Such a history of non-compliance fully supports the imposition of dispositive sanctions.

   3.  Prejudice to the Plaintiff

        Despite defendants' counsel's arguments to the contrary, the prejudice to the plaintiff in

this case is not only obvious, it is egregious.  Plaintiff brought this case over two years ago

seeking redress for a violation of her Constitutional rights and a serious injury to her hand.

Counsel has sent numerous discovery requests to defendants, taken over 11 depositions, filed

countless letter motions and participated in at least 13 conferences and hearings before this

Court, all with the singular goal of determining what transpired on the night of plaintiff's arrest

and who was responsible for the injury to her hand.  Apart from the obvious cost in fees,

expenses, and time spent in having to engage in almost two years of discovery without the

critical documents, the delay in readying this case for trial is also obvious and it does not appear

at this time that the parties are even close to completing discovery.  Depositions will invariably

have to be reopened; additional document demands have already been suggested; plaintiff's

expert may have to supplement his report, opening himself up to cross examination on any

changes in the report necessitated by the recent and still forthcoming discovery.  It has been

represented to the Court that some witnesses may no longer remember the events of that night

due to the passage of time and indeed, one of the investigating officers whose report contains

some major inconsistencies and concerns is no longer living.

        Most important, while the Court may decide to equitably toll the statute of limitations, the

case law seems clear only to the extent that such tolling may apply to the pre-existing

defendants.[22]  (See Defs.' 1/4/18 Ltr. at 1-2, ECF No. 95).  Defendants have cited cases that

---

        [22] On January 23, 2018, plaintiff sought permission from this Court to amend the

suggest there is a possibility that equitable tolling could be appropriate against a new defendant, such as Ryan or Camhi, but such cases speak only in broad terms. The cases cited explain that equitable tolling is only appropriate where "the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." Yahraes v. Restaurant Assocs. Events Corp., No. 10 CV 935, 2011 U.S. Dist. LEXIS 23115, at *4 (E.D.N.Y. Mar. 8, 2011). Uncertainty results, however, from the lack of cases with analogous facts, in which equitable tolling is invoked against a non-party sought to be added as a defendant, and the extraordinary circumstances were created by a pre-existing defendant in the litigation.

However, there might be other ways to avoid the bar of the statute of limitations. For instance, Judge Weinstein recently held that there was such a unity of interest between the City of New York and a previously-unnamed defendant that an amended complaint would relate back. See generally DaCosta v. City of New York, No. 15 CV 5174, 2017 WL 5176409 (E.D.N.Y. Nov. 8, 2017) (holding that, where "[p]laintiff was not afforded the opportunity to file [suit] against the correct officer because the Corporation Counsel did not supply him with the necessary information to do so," amendment to add correct police officer related back and thus was not barred by the statute of limitations) (Weinstein, J.) (reconsideration pending). Should it be determined that there is no way around the statute of limitations, plaintiff's claims against the

---

Complaint for a second time, adding 18 new defendants and a number of new claims based on the newly produced discovery. (Pl.'s 1/23/18 Ltr. Mot. to Amend, ECF No. 96). This Court granted plaintiff's motion to amend given the impending expiration of the statute of limitations, but noting that it was without prejudice to defendants' ability to move to dismiss at a later date. Although it appears that the Second Amended Complaint may be timely filed within the statute of limitations period, as plaintiff notes in her cover letter dated January 23, 2018, discovery remains incomplete and she may seek to add new claims or parties in the future.

newly-identified officers, such as Ryan and Camhi, will be lost forever, all due to defendants'
failure to provide the discovery that would have identified them long ago.  In the context of a
motion for sanctions, the Court construes the uncertainty caused by defendants' misconduct
against them.  Viewed in that light, the prejudice to plaintiff is overwhelming.[23]

The Court completely rejects defendants' efforts to shift the blame to plaintiff or her
counsel for not seeking to depose Eric Ryan earlier in the case and for not realizing that when the
plaintiff was interviewed by Investigator Cruz shortly after her arrest, that this was part of an
IAB investigation into her claims of assault.  Indeed, defendants' own counsel seems to have
conceded at the January 2018 hearing that the two were unrelated.  The defendants' claim that
they are the ones prejudiced by this late disclosure also rings hollow.  If allowed to proceed and
present this newly discovered evidence that supports their claim that plaintiff injured herself,
they have not suffered any prejudice whatsoever.  Moreover, the Court notes that on several
occasions prior to the discovery of this information critical to their case, defendants urged the
Court to reject plaintiff's efforts to enforce the Court's discovery orders, arguing that "discovery
has closed."  (See, e.g., Defs.' 9/19/17 Ltr. at 1).  The Court agrees and finds that discovery had
closed prior to the production of this newly found evidence, except for the information that
plaintiff had been requesting all along and that the Court had previously Ordered defendants to
produce.  Defendants should not be permitted to profit from their lack of diligence and their
noncompliance.

---

[23] This case presents a clear instance of a plaintiff who acted diligently through her
counsel and extraordinary circumstances caused by an opposing party that warrant reaching into
equity to toll the statute of limitations.  Should the district court decline to adopt the Court's
recommendation that a case-terminating sanction be entered, the Court would further recommend
that, if the statute of limitations is raised as a defense, the district court equitably toll the statute
of limitations against the newly-identified defendants after further briefing on the issue.

Accordingly, the Court finds that the overwhelming prejudice to plaintiff weighs heavily in favor of dispositive sanctions for defendants' conduct in this case.

### 4. Notice of Consequences

The defendants and their counsel have received innumerable warnings that sanctions would be imposed if they failed to comply with the Court's Orders and their discovery obligations.

In November 2017, when plaintiff moved to hold the defendants in contempt, the Court issued an Order to Show Cause, setting a hearing and warning defendants "to show cause why sanctions should not be imposed under Rule 37 of the Federal Rules of Civil Procedure and why their failure to obey this Court's previous Orders should not be treated as contempt." (11/3/17 Order to Show Cause at 2).

The most recent warning was provided in the second Order to Show Cause, issued on December 31, 2017, which provided the following notice:

> The defendants and their counsel, including the New York City Law Department, are therefore **ORDERED TO SHOW CAUSE** before this Court at the hearing scheduled for **January 3, 2018 at 2:30 p.m.** why the Court should not enter sanctions against them and why they should not be held in contempt for repeated failure to obey this Court's Orders.
>
> Defendants and their counsel are specifically put on notice that the Court is considering the full panoply of sanctions available under Rules 11, 16(f), 26(g), and 37 of the Federal Rules of Civil Procedure, up to and including imposing monetary sanctions, recommending entry of default judgment, and treating as contempt the failures to obey the Court's orders, as well as ordering the payment of reasonable expenses caused by such failures. See, e.g., Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii), (C). The Court will also consider whether the defendants and their counsel should be held in contempt for their failures to obey the Court's Orders under both the Federal Rules of Civil Procedure and the Court's inherent power. See, e.g., Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991).

(12/31/17 Order to Show Cause, ECF No. 92 (emphasis in original)).  Given the unambiguous

warning in the second Order to Show Cause and the first Order to Show Cause, as well as the

notice provided by plaintiff's various motions to compel, for sanctions, and to hold the

defendants and their attorneys in contempt, the defendants "cannot credibly argue that [they

were] not sufficiently warned that serious sanctions were imminent."  Guggenheim Capital, LLC

v. Birnbaum, 722 F.3d 444, 453 (2d Cir. 2013).

That defendants received clear, unambiguous notice that severe sanctions were imminent

both by written Order and in open Court weighs in favor of imposing case dispositive sanctions.

5.  Efficacy of Lesser Sanctions

In determining what sanction to impose, courts must consider "the efficacy of lesser

sanctions."  World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp., 694 F.3d at 159

(quoting Agiwal v. Mid Island Mortg. Corp., 555 F.3d at 302).  However, "district courts are not

required to exhaust possible lesser sanctions before imposing dismissal or default if such a

sanction is appropriate on the overall record."  Chowdhury v. Hamza Exp. Food Corp., 308

F.R.D. at 83 (quoting Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123 at

148).

After two years, innumerable conferences with the parties, and numerous Orders, the

Court issued an Order to Show Cause why the defendants and their counsel should not be

sanctioned and why their failure to obey the Court's orders should not be treated as contempt of

court.  (See 11/3/17 Order to Show Cause).  Rather than encourage compliance with the Court's

earlier Orders, the first Order to Show Cause prompted the defendants and counsel to double

down.  Counsel for defendants responded that they were "distressed by the Court's Order."

(Defs.'11/3/17 Ltr. at 3).  The defendants and their counsel continued to insist that defendants

65

actually had complied fully with the Court's earlier Orders and their discovery obligations.  (See id. at 3-4).  The assertion of full compliance was based in large part on the number of pages of documents defendants had produced and the assertion that "[p]aralegals from this office, record keepers at the New York City Department of Correction, police officers from 107 precinct, Queens Central Booking and the City of New York Police Department's Civil Litigation Unit and attorneys from New York City Police Department have also worked hundreds of hours locating documents, arranging inspections and preparing affidavits."  (Id. at 4).  Even if the Court did not have reason to question the veracity of the defendants' description of their efforts, the defendants' discovery obligations and their performance required by the Court's earlier orders should not be measured in the number of pages produced or the amount of time dedicated to the endeavor.[24]

The threat of sanctions and contempt did little to change the defendants' conduct or approach to this litigation.  Almost a month after the first show cause hearing, the defendants' counsel again objected to producing the materials the Court had already Ordered them to produce, based in part on the unsupported contention that the Court-Ordered discovery was unduly burdensome and not proportional to the needs of the case.  (See Joint Status Report, Dec. 11, 2017, ECF No. 82).  The discovery disputes involved "the same issues that the Court has

---

[24] This also serves as a further example of the City's willfulness.  The Court issued Orders requiring the production of certain documents and information.  Despite the Orders, the defendants continued to insist that they were "rightfully *objecting* to the production of documents."  (Defs.' Response to 1st Order to Show Cause at 3 (emphasis added)).  Once the Court issues its Order, however, the time for objections is over, and the only options are to comply or seek reconsideration.  Defendants did neither, but instead "rightfully object[ed]" to Court-Ordered production.  "In other words, [the Court] gave an order and [the defendants and counsel] had the ability to comply, but they purposefully chose not to do so for reasons all their own and without first asking permission from this court.  Without resorting to the dictionary, this seems as good a definition of 'willful' as any."  Local Union No. 40 of the Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers v. Car-Win Constr., Inc., 88 F. Supp. 3d at 264.

repeatedly addressed throughout the course of this litigation." <u>Martinez v. City of New York</u>, No. 16 CV 79, 2017 WL 6403512, at *1 (E.D.N.Y. Dec. 14, 2017), ECF No. 83.  The Court "repeatedly directed the defendants to produce the materials at issue, and it should come as no surprise that the Court expect[ed] defendants to adhere to the Court's prior rulings." <u>Id.</u> Although the Court had already ruled on the issues several time and defendants had made no prior showing of undue burden, the Court allowed them the opportunity to submit affidavits detailing the alleged undue burden. <u>Id.</u>

Despite the Court's indulgence, the defendants failed to submit any affidavits, but instead produced almost a thousand pages of documents at the very last minute.  That the they made no attempt to submit an affidavit to support the objection, and in fact produced the documents shortly after being required to make a proper showing, suggests that the objection was without merit and had no basis in fact.  That the objection was interposed in the first place, despite the prior Court Orders, demonstrates that the earlier Orders, conferences, and the show cause hearing had no effect on the defendants' and counsel's behavior.

The January 3, 2018 show cause hearing merely confirmed that the defendants had made no changes to their conduct and had no intention of doing so.  The new attorney assigned to the case, as well as the supervising attorney who has been assigned to the case for some time, both continued to insist that they and the defendants had complied fully with the Court's orders and their discovery obligations throughout the course of this litigation.  Defendants' counsel made that argument in response to the Court's second Order to Show Cause why the Court should not recommend default and why the defendants and their counsel should not be held in contempt, which issued shortly after defendants finally produced almost a thousand pages of documents that were in the defendants' possession, custody, and control long before the suit was filed and

which the defendants were required to produce two years earlier under both the Federal Rules and the various Court Orders.  That the defendants' and their attorneys continued to insist that they were fully compliant in this context demonstrates that lesser sanctions would not affect the defendants' behavior and would achieve none of the purposes of sanctions.

"Especially in light of repeated warnings to defendants[,] . . . at a certain point, if a court does not eventually follow through on its warnings, it risks undermining its ability to control current and future would-be wayward litigants. '[U]nless Rule 37 is perceived as a credible deterrent rather than a "paper tiger," the pretrial quagmire threatens to engulf the entire litigative process.'"  Local Union No. 40 of the Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers v. Car-Win Constr., Inc., 88 F. Supp. 3d at 265 (quoting Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d at 1064) (citation omitted).

Having reviewed the entire record of this case over the past two years, and in light of the history elaborated above, the Court concludes that no lesser sanction would induce defendants' compliance in this case and that a severe sanction is necessary to serve the deterrence rationale justifying sanctions.  The Court therefore finds that this factor weighs in favor of a severe sanction.

## C.  The City's Egregious Conduct Over Two Years Calls For a Harsh Sanction

Having determined that sanctions are warranted here, the Court notes that sanctions under Rule 37 for noncompliance with a court's discovery orders are "ordinarily considered non-dispositive" depending upon whether the sanction disposes of a claim.  Joint Stock Co. Channel One Russia Worldwide, v. Infomir, LLC, 2017 WL 3671036, *16 (citations omitted). Accordingly, a monetary sanction imposed for noncompliance with discovery orders is usually committed to the discretion of the Magistrate Judge.  See, e.g., Thomas E. Hoar, Inc. v. Sara Lee

Corp., 900 F.2d 522, 525 (2d Cir. 1990).  Similarly, "[a]n order precluding the introduction of

certain evidence or barring certain contentions 'may also be properly characterized as non-

dispositive . . . [a]s long as the order does not wholly dispose of a party's claim or defense.'"

Seena Int'l Inc. v. One Step Up, Ltd., No. 15 CV 1095, 2016 WL 2865350, at *8-10 (S.D.N.Y.

May 11, 2016) (quoting Lan v. Time Warner, Inc., No. 11 CV 2870, 2016 WL 928731, at *1

(S.D.N.Y. Feb. 9, 2016)); see UBS Int'l Inc. v. Itete Brasil Instalacoes Telefonicas, Ltd., 09 CV

4286 & 09 CV 10004, 2011 WL 1453797, at *1 & n.2 (S.D.N.Y. Apr. 11, 2011) (holding that a

magistrate judge "has the authority to preclude disobedient parties from 'advancing certain

arguments'").  Furthermore, a "Magistrate Judge's resolution of discovery disputes deserves

substantial deference."  Pippins v. KPMG LLP, 279 F.R.D. 245, 253 (S.D.N.Y. 2012).

However, where the sanction imposed would effectively terminate the litigation, the

imposition of such a sanction is dispositive and this Court may only recommend imposition of

the case-terminating sanction.  See Fed. R. Civ. P. 72(b)(1); Dorchester Fin. Holdings Corp. v.

Banco BRJ S.A., 304 F.R.D. 178, 180 (S.D.N.Y. 2014).  The ultimate decision therefore rests

with the assigned District Judge.  As explained herein, the sanction which this Court finds is

warranted by defendants' conduct would effectively terminate the litigation.  Therefore, the

Court issues its decision as a Report and Recommendation to the Honorable Ann M. Donnelly,

the assigned District Judge.

In the instant case, the Court finds that the defendants' willful noncompliance with Court

Orders, not to mention defendants' overall failure to comply with their discovery obligations

even absent a court order, merits imposition of the severest form of sanctions available under

Rule 37. See, e.g., S.E.C. v. Razmilovic, 738 F.3d 14, 26-27 (2d Cir. 2013) (affirming entry of

default judgment as a sanction for disobeying a single discovery order where proposed

alternative sanctions would not induce compliance or alleviate prejudice to the opposing party

and where the sanction of default would serve to make discovery orders effective in the instant

case and to deter those who might be tempted to engage in similar misconduct in the future);

Guggenheim Capital LLC v. Birnbaum, 722 F.3d 444, 451 (2d Cir. 2013) (affirming entry of

default judgment and finding no abuse of discretion where district court found that defendant's

"intransigence spanned months, and that less serious sanctions would have been futile"); Joint

Stock Co. Channel One Russia Worldwide v. Infomir LLC, 2017 WL 3671036, at *26 (imposing

severe sanctions based on the fact that the "discovery noncompliance was sustained and

consistent [and the] failure to obey the September 8 Order was part of a broader pattern of

intransigence and misrepresentation"); Chowdhury v. Hamza Express Food Corp., 308 F.R.D.

74, 82 (E.D.N.Y. 2015) (striking answer and granting default judgment after concluding that

although "dispositive relief is a severe sanction that should be granted only sparingly, a

continuing saga of dilatory conduct will satisfy the threshold for entering a default judgment

under Rule 37") (citations and quotations omitted); Walpert v. Jaffrey, 127 F. Supp. 3d. 105,

127-28 (S.D.N.Y. 2015) (finding default judgment an appropriate sanction where defendants'

history of misconduct continued even after the court issued orders threatening to impose

sanctions); Silverman & Silverman LLP v. Pacifica Found., 2014 WL 3724801, at *4 (E.D.N.Y.

July 25, 2014) (striking the answer and entering default judgment where defendant repeatedly

disobeyed discovery orders and demonstrated only minimal compliance with discovery

obligations); Lumbermens Mut. Cas. Co. v. Holiday Vehicle Leasing, Inc., 212 F.R.D. 139, 143

(S.D.N.Y. 2002) (ordering default judgment and prohibiting non-compliant party from

introducing evidence at inquest where party delayed production of documents over eight months

and it was not clear that the party would ever be able to produce them); American Cash Card

Corp. v. AT & T Corp., 184 F.R.D. 521, 524-25 (S.D.N.Y. 1999) (concluding that "the extreme measure of default judgment is required" where a party failed to obey five discovery orders, both written and oral, and lesser sanction of order compelling production did not alter the party's conduct) (Chin, J.).

The Court respectfully recommends that the district court impose a sanction either striking defendants' answer and entering judgment in plaintiff's favor on liability or granting summary judgment in favor of plaintiff on her claims, and sending the case to trial on damages.

In reluctantly concluding that the most severe of sanctions is warranted here, the Court has considered not only the prophylactic and remedial purposes for imposing sanctions in this case, but the absence of any real way to remedy the damage and prejudice suffered by the plaintiff as a result of the defendants' conduct.  Not only has there been a complete and utter failure on the part of defendants to produce the relevant discovery which plaintiff has requested for almost two years, but the defendants' deliberate and unexcused failure to comply with 14 Orders from this Court has continued unabated throughout the course of the discovery.  This is not a case where a single incident of noncompliance might be excused; rather, there has been a course of conduct under which plaintiff seeks production of items relevant and material to the case; defendants fail to produce them; the Court Orders production; and defendants fail to comply, simply ignoring the Court's Orders and not even bothering to request additional time to comply.

Even after numerous motions to compel discovery from defendants were granted, and two motions were filed seeking sanctions and to hold defendants in contempt, defendants continue to take the position that they have fully complied with their discovery obligations. (1/3/18 Tr. at 7:15-18).  How they could take such a position in light of the December 2017

revelation of four investigations into the incident, two witnesses who may have critical knowledge going to the heart of the matter, and over 1,000 pages of never-before disclosed documents produced on the threshold of a sanctions proceeding, is astonishing.  They also claimed at the January 2018 hearing that plaintiff had suffered no prejudice as a result of this last minute disclosure and their prior noncompliance and failure to produce discovery.  Not only did this revelation dramatically alter the nature of the case at a time when discovery had closed, by defendants' own account, several months earlier, but the production of this documentation was made on the eve of the expiration of the statute of limitations, potentially hindering plaintiff's ability to move forward with her claims against certain defendants.  As the court in Chowdhury v. Hamza Express Food Corp. found, these disingenuous claims alone indicate willfulness and weigh in favor of the most severe sanctions.  308 F.R.D. at 83.

As detailed above, the examples of defendants' non-compliance with the Court's Orders clearly establish willfulness, and the length of time and the amount of expense incurred by plaintiff's counsel in essence "chasing their tail" in an effort to obtain discovery is without compare in this Court's experience.  What is paramount, though, in the Court's recommendation to impose the most severe of sanctions—namely, striking the defendants' answer and entry of judgment on the question of liability in plaintiff's favor or entry of summary judgment in favor of the plaintiff on liability—is that there is no alternative sanction or remedy that can undo the harm caused by defendants' conduct.[25]  The prejudice to plaintiff of this last-minute revelation after almost two years of discovery cannot be remedied by monetary sanctions alone.  While the

_____

[25] Although entry of default judgment will not make plaintiff whole for the losses caused by defendants during this litigation, it will ensure that she is not prejudiced further by additional delay, the potential for further last minute revelations, and the reasonable concern that defendants still may not have produced all that they were required to.

Court has recommended an alternative sanction if the district court is disinclined to enter a

default (see discussion infra at 74), this Court is of the view that the entry of judgment on

liability in favor of plaintiff and a trial on plaintiff's damages is needed to discourage future

abuse of the judicial process and to ensure the efficient functioning of the court and the

administration of justice, in light of the goals of the Federal Rules of Civil Procedure to "secure

the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P.

1; see Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d at 1068

(concluding that to allow a party "to flout their obligations, choosing to wait to make a response

until a trial court has lost patience with them . . . [produces] a result directly contrary to the

overall scheme of the federal discovery rules").

Although the prejudice to plaintiff is sufficient to warrant entry of default or summary

judgment in favor of plaintiff on liability, such a sanction is even more warranted in light of the

deterrence such a sanction would provide.  See National Hockey League v. Metropolitan Hockey

Club, Inc., 427 US. at 643 (holding that "the most severe in the spectrum of sanctions . . . must

be available to the district court in appropriate cases, not merely to penalize those whose conduct

may be deemed to warrant such a sanction, but to deter those who might be tempted to such

conduct in the absence of such a deterrent").  Deterrence is particularly important in this case

because the City of New York and the NYPD are constantly subject to litigation and the City's

Law Department, with its 800 lawyers and 690 support staff, see New York City Law

Department, About the Law Department, NYC.gov (2017),

http://www.nyc.gov/html/law/html/about/about.shtml, regularly appears in the Eastern District of

New York in cases similar to this one.  In this Court's experience, the disobedience of court

orders and the conduct of this case is an aberration and, by and large, the lawyers who appear

before this Court representing the City and its agencies are hard-working, knowledgeable about the law, responsive to court orders, and dedicated to providing quality representation to their clients.  Given the number of cases in which the City and its counsel appear before this Court on an annual basis, the Court hopes that they view the proceedings in this case with concern, review their policies for investigating claims and producing discovery, and consider a reevaluation of the way in which counsel and their clients interact in an effort to comply with court Orders. Also, given the difficulty experienced in locating relevant documents, they are encouraged to evaluate the systems currently in place for storing, maintaining, indexing, and accessing records of the NYPD, and to review with all involved the preservation and production obligations attendant to litigation.

        If the district court declines to adopt this Court's recommendation to strike defendants' pleadings and impose the sanction of default or summary judgment in plaintiff's favor on liability, the Court respectfully recommends that the court consider entering as a lesser sanction an order that would preclude defendants from relying at trial on any of the recently produced documents or testimony of the witnesses recently identified who claim that plaintiff injured herself while in the Precinct.  Not only did discovery close long before defendants' production of these documents and identification of these witnesses, but defendants should not be permitted now to profit from their noncompliance with court Orders and their own failure to investigate.  If plaintiff wishes to pursue discovery from these witnesses, and re-open depositions to explore these newly produced documents, that should be up to her; however, this Court recommends that, should an Order establishing liability not enter, defendants should be precluded from using this information which plaintiff and the Court have been endeavoring to unearth for months.

**D.  Payment of Plaintiff's Expenses is Mandatory**

In lieu of or in addition to other sanctions, Rule 37 requires that the court order the disobedient party, its attorney, or both to pay "the reasonable expenses, including attorney's fees," caused by the failure to comply with a discovery order, unless the court finds the failure "substantially justified" or that "other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  The language of the Rule is mandatory absent a showing by the non-compliant party of substantial justification or circumstances that would render awarding expenses unjust.  See id.; Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 574 (S.D.N.Y. 2010) (collecting cases).[26]

Defendants have made no showing that their failures were substantially justified, nor have they raised any extenuating circumstances that would make an award of expenses unjust. Nonetheless, it appears that the individual defendant officers may have had little ability to control the conduct of counsel assigned to them by the City and to affect compliance with the Court's Orders to produce information in the City's possession, custody, or control.  Indeed, there has been no evidence that the individually named defendant officers, one of whom has retired from the NYPD, were responsible for the nonproduction of documents.  Rather, it appears to be a systemic failure on the part of the NYPD and possibly counsel for failing to comply.

Indeed, in the Second Amended Complaint filed on January 23, 2018, plaintiff now, based on the newly discovered information, specifically alleges that the City and the newly

---

[26] Requiring a party or its counsel to pay expenses as a sanction is a non-dispositive matter within this Court's authority to entertain pre-trial matters.  However, to facilitate review, the Court has addressed the payment of costs in this Report and Recommendation.  Should any party object to the Court's recommendation with respect to payment of expenses, this Court's decision on that issue should be subject to review for clear error, rather than de novo review.  See Fed. R. Civ. P. 72(a); cf. Fed. R. Civ. P. 72(b).

named defendants "engaged in a conspiracy to violate plaintiff's federally-protected rights and to cover-up the violation[.]"  (Pl.'s Sec. Am. Compl.[27] ¶ 85).  She alleges that several of the officers "stole property" from plaintiff, and "participated in later efforts to cover up the theft." (Id. ¶¶ 19, 22).  The Second Amended Complaint also adds a claim that the officers took custody of and searched her vehicle and that property taken from the vehicle was never vouchered or returned. (Id. ¶ 23).  Plaintiff alleges that what Lieutenant Camhi stated in his call to IAB was "fabricated;" that plaintiff was not taken back to Central Booking as originally claimed, but returned to the 107 Precinct; no entries were made in the NYPD prisoner tracking system to reflect her transport back to the Precinct, and as a result, it is alleged that the official NYPD records "falsely reflect that Ms. Martinez remained at the Hospital for the next eight hours plus." (Id. ¶¶ 59-62).  Plaintiff alleges that "defendants went to great lengths to cover up their misconduct," including the creation of a false report by Captain Hanrahan, the assignment of "incorrect and/or misleading tracking numbers," and the destruction of documents underlying the Hanrahan Report.  (Id. ¶¶ 65-68).  Plaintiff alleges that the "cover up directly impeded plaintiff's ability to prosecute the instant civil action," and so, in addition to the prior claims of excessive force, assault and battery, infliction of emotional distress, and failure to intervene, the Second Amended Complaint raises new claims of deprivation of due process and unlawful vehicle search, a Section 1983 conspiracy claim, and a claim of denial of access to the courts based on the cover up.  (Id. ¶¶ 73, 82-90).

　　　While it may be that evidence will later show that the two previously named defendants actively participated in the "cover up" and were responsible for the failure to produce discovery,

---

[27] Citations to "Pl.'s Sec. Am. Compl." refer to the Second Amended Complaint, filed January 23, 2018, ECF No. 99.

the Court therefore respectfully recommends that the City of New York, but not the individual defendants, be held responsible and be required to pay plaintiff's reasonable expenses, including attorney's fees, caused by the defendants' non-compliance.  It is further recommended that plaintiff's counsel submit a detailed list of fees and expenses which they contend were incurred unnecessarily as a result of defendants' conduct, including but not limited to the costs and fees expended in having to file and attend conferences and hearings held to adjudicate the numerous motions to compel and for sanctions, and for any depositions that were unnecessary in light of the recent disclosures or which will have to be reopened.  The parties are directed to confer in order to reach an agreement regarding the amount of the award of fees and expenses and to seek Court intervention if they should be unable to resolve the total amount within fourteen days of the district court's decision with respect to the Court's Report and Recommendation.

## E.  Unreasonable and Vexatious Litigation

In light of the conduct at issue and the significant resources expended both by plaintiff and the Court as a result of the conduct, the Court has also considered imposing sanctions under 28 U.S.C. § 1927.  Certainly the proceedings in this case have been unreasonably multiplied and extended with no apparent justification except that documents and witnesses were simply not found for almost two years.  However, given the Court's review of the numerous documents, transcripts, and other filings recently provided, it is not clear to the Court how much of the fault for the delays in this litigation lies with counsel and how much is attributable to the clients themselves.  Given plaintiff's Second Amended Complaint, alleging that the defendants have engaged in a cover up that resulted in the failure to produce the discovery at issue here, the Court declines to recommend sanctions against the defendants' attorney under § 1927.  Although it is clear that defendants' counsel failed to comply with the discovery obligations in any meaningful

77

manner and also failed to exhibit the minimal level of competence expected of all practitioners, the Court lacks sufficient evidence to render a finding that counsel acted in bad faith in this case.

## CONCLUSION

As explained above, the Court finds that defendants and their counsel have demonstrated a pattern of willful noncompliance with the Court's Orders and basic discovery obligations over almost two years despite 14 Court Orders. Their noncompliance has severely prejudiced plaintiff, and it is not clear that any sanction could ameliorate the harm caused to her. Such egregious behavior warrants the strongest of sanctions. It is therefore respectfully recommended that the district court strike the defendants' pleadings and enter default or summary judgment against them in plaintiff's favor with respect to liability as a sanction under Rule 37(b) of the Federal Rules of Civil Procedure.

If the district court declines to adopt this Court's recommendation to strike defendants' pleadings and impose the sanction of default or summary judgment in plaintiff's favor on liability, the Court respectfully recommends that the district court consider entering as a lesser sanction an order that would preclude defendants from relying at trial on any of the recently produced documents or testimony of the witnesses recently identified who claim that plaintiff injured herself while in the Precinct.

Finally, the Court further recommends that the City of New York, but not the individual defendants, be required to pay plaintiff's reasonable expenses, including attorney's fees, caused by the defendants' non-compliance.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days after filing of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's

Order.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); Caidor v. Onondaga County, 517 F.3d

601, 604 (2d Cir. 2008).

      The Clerk is directed to send copies of this Order to the parties either electronically

through the Electronic Case Filing (ECF) system or by mail.

      **SO ORDERED.**

Dated: Brooklyn, New York
      January 24, 2018

                            /s/ Cheryl L. Pollak
                            Cheryl L. Pollak
                            United States Magistrate Judge
                            Eastern District of New York