UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROSIE MARTINEZ,<br><br>                              Plaintiff,<br><br>                    -against-<br><br>CITY OF NEW YORK, et al.,<br><br>                              Defendants. | **PLAINTIFF'S LOC. CIV. R. 56.1(b) COUNTERSTATEMENT**<br><br>**16 CV 79 (RPK) (CLP)** |

Pursuant to Loc. Civ. R. 56.1(b), plaintiff Rosie Martinez respectfully submits the following response to defendants' statement of material facts to which they contend there is no genuine issue to be tried:

1.     In or around November 2014, plaintiff sold her vehicle, a 1999 Ford Explorer, to Danny Rivera. (Dec. 29, 2016 Deposition of Plaintiff at 32:17-33:18, annexed to the Declaration of Kavin Thadani in Support of Defendants' Partial Motion for Summary Judgment and Motion to Dismiss ("Thadani Decl.") as Exhibit A; Deposition of D. Rivera at 187:6-20, 188:21-25, 189:15-190:3, Thadani Decl., Ex. B.).

**Response: Disputed.** Ms. Martinez retained legal title to the vehicle.

In New York State, the owner of an automobile is the individual who possesses the "*original* New York State Certificate of Title.*" See* New York State Department of Motor Vehicles (DMV), *About transferring vehicle ownership and acceptable proofs of ownership* (accessible at: https://dmv.ny.gov/registration/about-transferring-vehicle-ownership-and-acceptable-proofs-ownership) (emphasis in original). To transfer  ownership of her 1999 Ford Explorer, Rosie Martinez was required to:

A.   Record the name Danny Rivera on the "transfer section" of the Title Certificate (DMV Form MV-999);
B.   Sign a "Vehicle Bill of Sale" (DMV Form MV-912);
C.   If the vehicle was a gift, complete Section 6 on Page 2 of a "Statement of Transaction- Sale or Gift of Motor Vehicle, Trailer, All-Terrain Vehicle (ATV),

Vessel (Boat), or Snowmobile" (New York State Department of Finance form DTF-802); and

D. Complete both the "Odometer" and "Damage" Disclosure Statements  on the back of the Title Certificate (DMV Form MV-999).

*Id.*; *see Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara* ("*Pertamina*"), 313 F.3d 70, 86 (2d Cir. 2002) (certificate of title constitutes prima facie evidence of vehicle ownership in New York State) (citation omitted); *see also* Uniform Commercial Code §§ 2-106(1), 2-401 (governing transfer of title).

None of the steps required to legally transfer ownership were taken by Ms. Martinez or Mr. Rivera. *See* Affidavit of Rosie Martinez dated December 18, 2020, annexed to the Declaration of Gabriel P. Harvis dated December 18, 2020 ("Harvis Decl."), as Exhibit 1 ("Martinez Affidavit"), ¶¶ 6-7. Indeed, the record is unsettled as to whether there was even an intention to legally transfer ownership or Rivera was simply granted a bailment. *See* Rosie Martinez Deposition Transcript, December 29, 2016, annexed to Harvis Decl. as Exhibit 2 ("Martinez Tr. I"), p. 33, ln. 7 through p. 34, ln. 14 (I was getting rid of the vehicle…I gave him the vehicle, but he never registered the vehicle."); *Id.* at p. 32, ln. 14-16 ("Did Mr. Rivera have a vehicle [in January 2015]? No."); Danny Rivera Deposition Transcript, October 29, 2018, annexed to Harvis Decl. as Exhibit 3 ("Rivera Tr."), p. 188, ln. 21-23 ("At that time she was *giving* [the vehicle] to me…").

This purported fact is also immaterial, given that Rivera's inchoate possessory interest in the vehicle, if any, did not interfere with plaintiff's continuous legal ownership and was extinguished upon plaintiff's arrest. *See* Martinez Affidavit, Harvis Decl., Exh. 1 at ¶ 8. Further, it is undisputed that defendants (correctly) understood Ms. Martinez to be the vehicle's legal owner when they seized it and that (after an inexplicable 90-day delay) they eventually released the vehicle to Ms. Martinez. *See* Defendants' Exhibit C (describing the vehicle as "registered to Rosie Martinez"); *see also* Property Clerk Invoice #4000286418, annexed to Harvis Decl. as Exhibit 12 ("Registered Owner: Martinez, Rosie;" "Titled Owner: Martinez, Rosie;" "Vehicle Taken From: Martinez, Rosie"); Joseph DiGennaro Deposition Transcript, February 28, 2019, annexed to Harvis Decl. as Exhibit 4 ("DiGennaro Tr. II"), p. 281, ln. 13-19 (admitting that Rosie Martinez owned the vehicle).

2.     After buying the 1999 Ford Explorer from plaintiff, Mr. Rivera did not change the

vehicle registration from plaintiff's name to his name but did purchase automobile insurance  for the

vehicle, or at least was in the process of doing so as of January 22, 2015. (Dec. 29, 2016 Deposition

of Plaintiff at 34:11-14, Thadani Decl., Ex. A; D. Rivera Deposition at 187:6-12, Thadani Decl., Ex.

B.)

**Response: Disputed.** As demonstrated above, there was no sale and Ms. Martinez retained legal title. Martinez Affidavit, Harvis Decl., Exh. 1, ¶¶ 6-7; *see* Rivera Tr., Harvis Decl., Exh. 3, p. 189, ln. 15-20 ("I gave her money but she didn't take it as payment"). Rivera's subjective intention to insure the vehicle is unclear and immaterial. *Id*. at p. 187, ln. 6-22.

3.    After buying the 1999 Ford Explorer from plaintiff, on several occasions, Mr. Rivera

had drugs inside of the vehicle and would drive the vehicle while there were drugs inside of the vehicle.

(D. Rivera Deposition at 190:16-191:22, Thadani Decl., Ex. B.)

**Response: Disputed**. Again, Rivera never owned the vehicle. Martinez Affidavit, Harvis Decl., Exh. 1, ¶¶ 6-7. Rivera's cited testimony establishes *only* that Rivera had "drugs" (which based on the questioning could include legal drugs) in the vehicle on four or five unspecified occasions. Indeed, Rivera specifically testified that the car was "undrivable" as of January 22, 2015. *See* Rivera Tr., Harvis Decl., Exh. 3, p. 187, ln. 17-24. It is also undisputed that Rivera was in Ms. Martinez's apartment at the time of his arrest and not in the vehicle. *See* Joseph DiGennaro Deposition Transcript, September 19, 2017, annexed to Harvis Decl. as Exhibit 6 ("DiGennaro Tr. I") p. 21, ln. 12-16; *see also* Eric Ryan Statement to Internal Affairs, January 21, 2016, annexed to the Harvis Decl. as Exhibit 21 ("Ryan IAB Stmt."), p. 8, ln. 9-25.

4.    On or before January 16, 2015, Sergeant Joseph DiGennaro was informed that Danny

Rivera used a 1999 Ford Explorer, registered to plaintiff, in connection with buying and/or selling

heroin. (Jan. 16, 2015 Complaint Follow-Up Informational Report, Thadani Decl., Ex. C; Feb. 28,

2019 Deposition of J. DiGennaro at 273:16-22, Thadani Decl., Ex. D.)

**Response: Disputed**. There is no admissible or credible evidence to support DiGennaro's purported receipt of such anonymous hearsay. Fed. R. Civ. P. 56(c)(2). Further, this alleged fact is contradicted by the broader record: had DiGennaro received information suggesting that drugs were transported in the vehicle on or before January 16, 2015, which was *four days before the search warrant was obtained*, it would have been presented to the reviewing magistrate, or at the very least noted somewhere in the investigative record, yet DiGennaro's testimony and the search warrant and supporting affidavit prove that did not happen. *See* DiGennaro Tr. II, Harvis Decl., Exh. 4 at p. 280, ln. 15-17 ("I didn't have enough information at the time to get a search warrant for the car."); *see also* Search Warrant Affidavit dated January 20, 2015, annexed to Harvis Decl. as Exhibit 5 ("Search Warrant Affidavit") (describing DiGennaro visiting the premises on January 19, 2015, and making no mention of any vehicle or plaintiff). Notably, DiGennaro admittedly presented false and uncorrected testimony at his deposition regarding the facts and circumstances of the investigation at issue and internal affairs substantiated multiple allegations of misconduct against him in connection with the search. *Compare* DiGennaro Tr. I, Harvis Decl., Exh. 6, p. 52, ln. 18 through p. 53, ln. 14 (describing multiple controlled narcotics buys and the filing of official investigatory

- 3 -

reports naming Rosie Martinez as a participant); *with* DeGennaro Tr. II, Harvis Decl., Exhibit 6, p. 205, ln. 14 through p. 208, ln. 16; (admitting prior testimony was false and never corrected) (Q: So there actually were no controlled buys; there were no DD-5s relating to controlled buys. You're just saying the wrong thing and not correcting it?... A: Yes.); *see Martinez v. City of New York*, 2018 WL 604019, *11 (E.D.N.Y. Jan. 24, 2018) ("More problematic was counsel's observation that 'the buy reports actually contradict what the officer testified to'…contrary to DiGennaro's testimony, there was nothing in the reports implicating plaintiff in the drug sale or suggesting [plaintiff] was even present for a drug sale.") (citation omitted); *id.* at *9 n.10 ("As it turned out, contrary to DiGennaro's testimony, the records, when finally produced, showed that plaintiff was not in the apartment at the time of the sale."); *see also* Evidence Discrepancy Investigation, March 1, 2016, annexed to Harvis Decl. as Exhibit 7 (DiGennaro and Ryan substantiated for invoice errors); Memo of DiGennaro Violations & Misconduct, May 17, 2017 annexed to Harvis Decl. as Exhibit 8 (DiGennaro cited for improper memo book entries).

5.      Based upon that information, Sgt. DiGennaro believed that there may be drugs, specifically heroin, inside of the 1999 Ford Explorer. (Feb. 28, 2019 Deposition of J. DiGennaro at 275:18-21, 280:3-12, 285:18-286:2, 403:20-25, Thadani Decl., Ex. D; E. Ryan Deposition at 47:17-48:19, Thadani Decl., Ex. E.)

> **Response: Disputed**. DiGennaro's subjective belief is irrelevant to the Fourth Amendment analysis and unsupported by admissible or credible evidence. Fed. R. Civ. P. 56(c)(2). In order to establish probable cause for the warrantless seizure of the vehicle DiGennaro authorized, he must present competent, admissible evidence to support the search, which it is undisputed he cannot do on this record. *See* DiGennaro Tr. II, Harvis Decl., Exh. 4, p. 280, ln. 15-17 ("I didn't have enough information at the time to get a search warrant for the car."). Indeed, DiGennaro admitted at his deposition that he seized the vehicle and had it towed to the precinct "to see if I had enough to get the search warrant for the car." *Id.*, p. 292, ln. 15-17.

6.      On January 22, 2015, after Danny Rivera was found to be in the possession of over 280 bags of heroin and thousands of dollars of cash he received from selling heroin, the 1999 Ford Explorer was removed from the street and vouchered for "investigatory purposes." (D. Rivera Deposition at 82:21-84:7, 85:25-86:7, Thadani Decl., Ex. B; Property Clerk Invoice No. 4000286418, Thadani Decl. Ex. F.)

> **Response: Disputed**. DiGennaro – who admittedly lacked information necessary to obtain a search warrant for the vehicle – "directed [subordinate officers] to get the car back to the

precinct *in case we needed it*." DiGennaro Tr. II, Harvis Decl., Exh. 4, p. 442, ln. 14-22 (emphasis added); *see also* Response #5, *supra*. DiGennaro further admitted at his deposition that Ms. Martinez's vehicle was seized "to see if I had enough to get the search warrant for the car." *Id.* at p. 292, ln. 15-17. On this record (and appropriately excluding undocumented, anonymous *post hoc* hearsay), DiGennaro had no basis to conclude that there were drugs in the vehicle.

There is also no evidence in the record to support, let alone establish, that the vouchered funds constituted Rivera's drug proceeds and the competent evidence is to the contrary. Defendants appear to have stolen or misappropriated money plaintiff earned working as a housekeeper.[1] *See* Transcript of Plaintiff's Arraignment on Jan. 23, 2015, annexed to Harvis Decl. as Exhibit 9, p. 3, ln. 18-20 ("Some of the [recovered funds] were legitimate…earnings from [Ms. Martinez's] employment."); Digennaro Tr. II, Harvis Decl., Exh. 4, p. 318-319 (conceding that defendants recorded plaintiff as having no money in the apartment or on her person); Investigation Card, annexed to Harvis Decl. as Exhibit 10 (documenting plaintiff's missing property allegation). Ms. Martinez never received a voucher for the funds taken from her. *See, e.g.,* Martinez Tr. I, Harvis Decl., Exh. 2, p. 81, ln. 14-16 (Q. Did you receive a voucher for that cash? A. No…). As indicated above, Internal Affairs concluded DiGennaro (and other individual defendants) had committed multiple rule violations in connection with the search at Ms. Martinez's apartment. *See* Memo of DiGennaro Violations & Misconduct, Harvis Decl., Exhibit 8. Notably, among the belongings defendants neglected to voucher was the vehicle's registration. *See* CCRB Case # 2015-05687, Case Summary, annexed to Harvis Decl., as Exhibit 11.

7.      On January 23, 2015, at approximately 12:32 a.m., an inventory search of the 1999

Ford Explorer was conducted. (Property Clerk Invoice No. 4000286418, Thadani Decl. Ex. F; E.

Ryan Deposition at 119:22-120:25, Thadani Decl., Ex. E).

**Response: Disputed.** DiGennaro admitted at his deposition that the car was searched "to see if I had enough to get the search warrant for the car." DiGennaro Tr. II, Harvis Decl., Exh. 4, p. 292, ln. 15-17. After the warrantless search of the vehicle was completed and no contraband was recovered, defendants held the vehicle without legal basis (or recourse for Ms. Martinez) for approximately ninety days. *See* Property Clerk Invoice 4000286418, annexed to Harvis Decl. as Exhibit 22 (reflecting that the vehicle was held from January 23, 2015 through April 27, 2015, when it was returned to plaintiff as "owner of property").

---

[1] Ms. Martinez, a domestic worker who was cleaning houses when police summoned her to be arrested her for Rivera's crimes, was unaware of Rivera's drug dealing, which by all accounts was committed while plaintiff was at work. *See* Martinez Tr. I, Harvis Decl., Exh. 2, p. 34, ln. 17- p. 38, ln. 22.

8.      Plaintiff alleges that, shortly after midnight on January 23, 2015, while she was in police custody, she was assaulted and that she subsequently requested medical attention "over the ensuing five hours." (Second Amended Complaint at ¶¶ 35, 41.)

> **Response: Disputed.** Plaintiff's unverified pleading is not evidence. *See, e.g.*, *Marquez v. City of New York*, 14 CV 8185 (AJN), 2016 WL 4767577, *1 n.1 (S.D.N.Y. Sept. 12, 2016) ("On a motion for summary judgment…allegations in an unverified complaint cannot be considered as evidence.") (internal quotation marks and citations omitted). Substantively, the assertion is defective because it fails to adequately present the record surrounding plaintiff's injuries.

### A.   The Events at the Precinct

Following her arrest on the evening of January 22, 2015, defendants brought Ms. Martinez into the 107th Precinct and used her liberty as a bargaining chip to seek information from drug suspect Danny Rivera.[2] *See* DiGennaro Tr. II, Harvis Decl., Exh. 4, p. 485, ln. 19-24 (Q. [W]as there ever a point where you brought Rosie Martinez into the arrest processing room and in front of Danny Rivera basically said tell us where you got the drugs and we'll let this woman go? A. Yes.); Rivera Tr., Harvis Decl., Exh. 3, p. 19, ln. 8-14 ("The first time they brought [Ms. Martinez into the arrest processing room], there was a sergeant. …[A]nd [the sergeant] brought [Ms. Martinez] over and told me that if I tell him where I had got the drugs from, he would release Rosie Martinez[.]"). At his deposition, Mr. Rivera described what happened next:

> Q.      Was that before or after you heard her screaming?
>
> A.      That was before.
>
> Q.      Okay.
>
> A.      And she was perfectly fine.
>
> Q.      Okay.
>
> A.      The second time she came in there, it was for her and me to be fingerprinted, but I was inside [the cell], and when she walked in the door, this is right after the screams, her tears was coming down, she couldn't hold her right hand, she was literally drinking her own boogers, and she told me, look at her neck, which I did.

---

[2] Defendants admit that Ms. Martinez was interrogated without the administration of *Miranda* warnings. *See* Defendants' Response to Plaintiff's Requests for Admission, annexed to Harvis Decl. as Exhibit 29 ("RFA Response"), Nos. 28, 32; DiGennaro Tr. II, Harvis Decl., Exh. 4, p. 425, ln. 21 through p 426, ln. 10; p. 503, ln. 20-22. Plaintiff has also testified that she was denied the ability to consult with an attorney. *See* Martinez Tr. I, Harvis Decl., Exh. 2, p. 48, ln. 21-25; p. 49, ln. 12-17.

> The officer who was fingerprinting her told me, listen, I had nothing to do with that. I said, well, she didn't walk in here, like an hour ago, she wasn't like that, and he answered me again, I had nothing to do with that.

Rivera Tr., Harvis Decl., Exh. 3, p. 19, ln. 15-p. 20, ln. 10; *see also* Keith Laliberte Deposition Transcript, July 31, 2019, annexed to Harvis Decl. as Exhibit 23 ("Laliberte Tr."), p. 145, ln. 9-16 (plaintiff arrived at precinct in "apparently normal" physical condition and with no visible signs of injury).

The cause of Ms. Martinez's injuries is disputed. Ms. Martinez, for her part, has consistently described the incident:

Q.    What did [the officers] say when they entered the [juvenile] room?

A.    They said they need to know who is the…distributor.

Q.    What did you tell them?

A.    I don't know nothing.

Q.    What did they say?

A.    They got very angry….[c]alling me a fucking bitch [and a] stupid bitch…[t]hey said we need to know where did [Rivera] get the drugs from.

Q.    What did you say?

A.    I don't know nothing about drugs.

Q.    What did they say?

A.    The taller officer started pulling my hair….[Then the] taller officer started smacking the side of my head.

Q.    How many times did he hit your head?

A.    Three or four times….[and he stepped on my feet] and at the same time he was proceeding to choke me…Once I started choking, he releases his hand….Then the shorter officer approached me and he proceed[ed] to grab my hand, my right hand. He took my right thumb and push it in the opposite way….

Q.    What did he say while he was doing this to you?

A.    "This is for not talking, bitch."…I was screaming…After that they put both hands behind my back with a cuff, extremely, extremely tight.

Q.    Did you tell the officers that the cuffs were on too tight?

A.    Yes….I was not feeling—my hands were getting numb, they said "Good for you."…I was in there in that room, and I was handcuffed and I was feeling a lot of pain.

> Q.    How long were you in that room?
>
> A.    [A few hours...Then] a different officer...took me to...get fingerprinted.

Martinez Tr. I, Harvis Decl., Exh. 2, p. 56, ln. 6 through p. 62, ln. 4; *see* Transcript of Rosie Martinez IAB Interview, September 9, 2015, annexed to Harvis Decl. as Exhibit 13, ("Martinez IAB Interview Tr."), p. 10, ln. 2-10; p. 14, ln. 9-16; p. 38, ln. 4 through p. 40, ln. 25; IAB Investigative Report - Martinez, September 9, 2015, annexed to Harvis Decl. as Exhibit 25 ("IAB Report-Martinez"), DEF4914-15; *see also* 50-h Hearing Testimony, annexed to Harvis Decl. as Exhibit 14 ("50-h Tr."), pp. 37-41; CCRB File Excerpt, annexed to Harvis Decl. as Exhibit 15; Martinez Tr. I, Harvis Decl., Exh. 2, p. 62, ln. 20-25 (after hours shackled in the juvenile room, an officer attempted to fingerprint plaintiff, but her hands were too swollen from the injury and plaintiff "...was in a lot of pain"); *Id.* at p. 72, ln. 2-8 (hours after being fingerprinted, plaintiff "was begging [the police] to take me to the hospital because I was in a lot of pain"); *see* Rosie Martinez Deposition Transcript, January 23, 2020, annexed to Harvis Decl. as Exhibit 16 ("Martinez Tr. II"), p. 47, ln. 21-23 ("...when they were taking [my] fingerprint...I said, 'Please take me to the hospital.'"); *id.* at p. 54, ln. 8-21; p. 56, ln. 10-20 ("I could tell you when I was [at the police precinct] I request[ed] medical attention constantly."); *see also* Transcript of Danny Rivera IAB Interview, September 9, 2015, annexed to Harvis Decl. as Exhibit 17, ("Rivera IAB Interview Tr."), p. 19, ln. 13 through p. 20, ln. 6; IAB Investigative Report - Rivera, September 9, 2015, annexed to Harvis Decl. as Exhibit 26 ("IAB Report-Rivera"), DEF4912 (reflecting Rivera's recollection of plaintiff's injuries).

At his deposition, Mr. Rivera described his observations of the fingerprinting of plaintiff:

> Q.    Now, describe the process of Ms. Martinez being fingerprinted.
>
> A.    [W]hen she walked in the room...she was all hurt, they tried to...fingerprint her, like, like maybe four, five times, but he couldn't because the way her hand was hurt, then he called a lady officer, and she did it, but with Miss Martinez being in a lot of pain, she just (indicating), and Miss Martinez was crying the whole time.

Rivera Tr., Harvis Decl., Exh. 3, p. 37, ln. 3-15; *id.* at p. 138, ln. 9-p. 139, ln. 20 ("[S]he kept telling the officer, it hurts, I can't do it, I can't do it, it hurts. I'm trying."); Rivera IAB Interview, Harvis Decl., Exh. 17, p. 18, ln. 11 through p. 19, ln. 7 ("....I heard [plaintiff] screaming, literally screaming and crying...This was in the precinct.... They bring her right to where I'm at...and she is crying. Her hand is all twisted and everything, and I asked her, 'What's wrong?' She said, 'Oh, my god, those officers...stepping on my feet'...She's showing me her neck was all scratched, and her hand was all twisted, and she couldn't get that hand fingerprinted.").

B. <u>Defendants' Explanation of Plaintiff's Injuries</u>

By defendants' account, at least three officers saw Ms. Martinez, who was handcuffed to a bench, repeatedly punching a wall inside the "juvenile room" at the precinct at approximately 12:30 a.m. on January 23, 2015. *See* Transcript of Lt. Camhi Call to IAB Command Center, annexed to the Harvis Decl. as Exhibit 24 ("Command Center Call Tr."), p. 3, ln. 2-12 ("She did it to herself….She was secured in the juvenile room [of the precinct] with one cuff cuffed to the bench. She started ripping things off the wall…Then she started punching the wall and kicking at cabinets."); Deposition Transcript of Lt. Camhi, annexed to Harvis Decl. as Exhibit 27 ("Camhi Tr.), p. 95, ln. 20 through p. 96, ln. 2 (Q. How many times did she punch the wall in your presence? A. I believe seeing her punch the wall approximately two to three times. Q. …And which hand was it? A. Her right hand.); Deposition Transcript of Eric Ryan, annexed to the Harvis Decl. as Exhibit 28 ("Ryan Tr."), p. 263, ln. 19 through p. 264, ln. 14 (describing plaintiff's punch to the wall as seeming to have "some force behind it"); *id.* at p. 273, ln. 15-19; ("Do you believe that the punch…or the punches that you saw resulted in injury to Ms. Martinez's hand? …A. It could have."); DiGennaro Tr. II, Harvis Decl., Exh. 4, p. 487, ln. 18-25 (Q. Did you observe any of what Camhi described?...A. Half and half. Q. Tell me what you mean by that. A. I could hear her and see her.); Ryan Tr., Harvis Decl., Exh. 28, p. 255, ln. 7-14:

> Q.    So where on the wall did she punch?
>
> A.    You see in P111 there's like a pin board there?
>
> Q.    Yeah, bulletin board.
>
> A.    I believe that's where she was punching.
>
> Q.    …And how many punches did you say?
>
> A.    I don't remember.



*Figure 1 The room inside the 107th Precinct where Rosie Martinez was injured.*

Q.   And you don't know which hand it was?...

A.   No.

Q.   But she was definitely handcuffed to the bench, right?

A.   Yes.

Defendant Lieutenant David E. Camhi, the 107th Precinct Platoon Commander and highest-ranking supervisor inside the precinct overnight, claims that he entered the juvenile room and physically restrained Ms. Martinez. Command Center Call Tr., Harvis Decl., Exh. 24, p. 3, ln. 12-15 ("…I secured her while she was in there rear-cuffed and then secured those cuffs to the bench to keep her secured…"); Camhi Tr., Harvis Decl., Exh. 27, p. 153, ln. 7-20; *see also* RFA Response, Harvis Decl., Exh. 29, No. 12 (identifying Ryan as in the room with Camhi when he restrained plaintiff); Ryan Tr., Harvis Decl., Exh. 28, p. 313, ln. 18 through p. 314, ln. 3 (Q. [Y]ou heard Lieutenant Camhi state that he restrained Rosie Martinez? A. Yes. Q. Did that happen? A. It could have. I don't remember. Q. Did you see it happen? A. I may have seen it, but I don't have any memory of it.).

The "desk officer" at the time of plaintiff's injury, who was seated next to the juvenile room and was responsible for noting unusual events in the precinct's command log, was Sergeant Keith Laliberte. *See* Laliberte Tr., Harvis Decl., Exhibit 23, p. 140, ln. 6-15; p. 142, ln. 2-8; p. 153, ln. 20 through p. 154, ln. 25. Defendant Laliberte matches plaintiff's description of one of her assailants[3] and ███████████████████████████████████████████ ███████████████████████████.[4]

---

[3] Ms. Martinez has consistently described one of her assailants as a shorter, older, white, male with "salt and pepper hair" wearing "a white shirt with a gold shield." *See* IAB Report-Martinez, Harvis Decl., Exh. 25 at DEF4914 (Internal Affairs report dated September 9, 2015); 50-h Tr., Harvis Decl., Exh. 14, p. 40 (same); Martinez Tr. I, Harvis Decl., Exh. 2, p. 55 (same); Plaintiff's Response to Interrogatory No. 1 annexed to Harvis Decl. as Exhibit 31, pp. 3-4 (same and noting that one of the assailants is "believed to be a sergeant"); *see also* Martinez Tr. I, Harvis Decl., Exh. 2, p. 64 (describing one of the assailants as "sitting at the front desk").

[4] ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████   *See* Video ███████████ annexed to Harvis Decl. as Exhibit 33.



## C. __The Hours After Plaintiff Was Injured__

It is undisputed that Ms. Martinez was seriously injured at approximately 12:30 a.m., that defendants were aware of it but never offered care or documented or reported the incident, and that plaintiff's arms and legs were kept shackled during this period. *See* Command Center Call Tr., Harvis Decl., Exh. 24, p. 2, ln. 2 through p. 5, ln. 19 ("I was calling in regards to an injured prisoner….Yeah when she was in police custody….she complained about pain in her right hand, she did have some visible swelling in her right hand…[the injury happened] approximately, uh, I'm not even sure, midnight thirty I believe…"); QCB Command Log, Harvis Decl., Exhibit 41 at DEF4318 (reflecting use of leg shackles on plaintiff); *see also Martinez*, 2018 WL 604019 at *5 (noting that "Lieutenant Camhi never noted this incident in his memo book or in the Command Log, and never prepared a UF-49 'Unusual Occurrence Report'"); Camhi Tr., Harvis Decl., Exh. 27, p. 108, ln. 13 through p. 109, ln. 9 (Q. So you put your hands on Rosie Martinez?...A. Yes, I did. And you didn't make a single record about it?...A. No, I did not.); Laliberte Tr., Harvis Decl., Exh. 23, p. 151, ln. 12-18 (confirming precinct command log contains no entries regarding plaintiff's conduct or injury).

Ms. Martinez testified that defendants purposefully denied her care in the hope that evidence of the assault would dissipate, leaving her in agony. *See* Martinez IAB Interview, Harvis Decl., Exh. 13, p. 39, ln. 22 through p. 40, ln. 14 ("They refused to take me [to the hospital]…They [kept] coming in and checking on the injuries, and they [kept] saying, 'No, it's still too swollen. We cannot take her.'…they keep coming and checking on me, looking…at the injuries…and they were like, 'No, she cannot go now… until the injuries…[go] down.'").

- 11 -

Approximately five hours later and without ever having offered care, defendants admittedly sent Ms. Martinez – not to the hospital – but for arraignment at Central Booking:

>   A.    …When we were leaving the police precinct, they were having a problem putting the cuff on me because my hand and wrist were so swollen that a handcuff would not fit, so the officer, he said, "I will try not to hurt you." He was looking for cuffs in a bigger size, but he couldn't find any, so he put two cuffs together. Like that he could handcuff me. That's the way he took me out of there.
>
>   Q.    Then you got to Queens central booking?
>
>   A.    Yes.
>
>   Q.    What happened when you got there?
>
>   A.    Immediately they saw my hand and they asked if I'm in need of medical attention, and I said yes, so they immediately took me to the hospital.

Martinez Tr. I, Harvis Decl., Exh. 2, p. 73, ln. 13 through p. 74, ln. 2; *see* Rivera Tr., Harvis Decl., Exhibit 3 at p. 40, ln. 11-18 ("Were you transported to central Booking with Miss Martinez? A. Yes. Q. [W]hat kind of condition was she in on her way to Central Booking? A. The whole time she was crying and in pain."); *id.* at p. 39, ln. 24-25 ("when [central booking staff saw] her, they checked her and they took her straight to the hospital"); *see* Correctional Health Services, Pre-Arraignment Screening Form annexed to Harvis Decl. as Exhibit 34, ("Medical Screening Form"); On-Line Prisoner Arraignment Form annexed to Harvis Decl. as Exhibit 34 ("OLPA") at DEF000005 ("Injury to thumb, to QGH"); Martinez IAB Interview, Harvis Decl., Exh. 13, p. 40, ln. 15-25 ("Finally, when I got to Central Booking, that's when…they look[ed] at me, and I remember Mr. Rivera begging them…to take me…those people who provide the medical attention said, 'That lady needs to go… to [the] emergency room.'…that's when they took me."); Martinez Tr. II, Harvis Decl., Exhibit 16, p. 48, ln. 23 through p. 49, ln. 7; p. 51, ln. 3-12; p. 52, ln. 12-24; p. 53, ln. 2-8 (describing plaintiff's requests for medical attention en route to Central Booking).

According to a hospital progress note entered at 8:39 a.m. (approximately eight hours after her injury) Ms. Martinez stated, in the presence of an NYPD escort officer, that she had been choked and assaulted during her arrest the night before.[5] *See* Figure 3, *infra*.

```
Fri, 23 Jan 15  0839    Documented by Nikeda Givens, PA

Progress Note: 49 y/o female with a hx of asthma and GERD BIBNYPD with c/o BL
               thumb injury. Patient reports both of her thumbs were injured
               during her arrest last night and now is here with c/o pain and
               swelling to the thumbs; denies numbness/tingling. Also reports
               she was choked during the arrest. Accompanying officer reports
               patient was noted to be punching the wall while in the jail
               cell. VS WNL. PE significant for negative signs of head
               injury. Negative vertebral point tenderness, neck supple,
               negative ecchymosis. +right UE 1st digit tenderness and soft
               tissue swelling, + right snuff box tenderness, negative
               lacerations or abrasions, limited ROM 2/2 pain. LUE exam WNL.
               Given Motrin and Maalox. X-rays pending. Splinted RUE.
```

*Figure 3 Exhibit 39 (excerpt, annotated by counsel)*

As Ms. Martinez later explained to Internal Affairs:

> [W]hen I was in the hospital, the officer that took me…told the nurse… to give [the officer] the result of my injuries…to let him know…first….I told the nurse…"I'm the patient. You need to tell me first."…the nurse finally told me my injuries, and [the officer] immediately took…his cell phone, and he called….[he said]… "she sustained this and…that" …he says, "What I'm supposed to do now?"… I don't know what [the officer at the precinct] ordered him, but he brought me back to the…107th….he said, "Sir, this is what they said that she got."… and then…instead of [me] going back to Central Booking, he took me right back to the 107.

Martinez IAB Interview Tr., Harvis Decl., Exhibit 13, p. 41, ln. 1-22.

Forty minutes later, at 9:19 a.m., defendant Camhi first called internal affairs about the events of nine hours earlier. *See* IAB Investigative Report – Prisoner Injury annexed to Harvis Decl. as Exhibit 36 ("Prisoner Injury Report") at DEF4818-4820; Command Center Call Tr., Harvis Decl., Exhibit 24, p. 3, ln. 1-3. Camhi reported Ms. Martinez's injuries as self-inflicted. *Id.* ("The injury wasn't caused by any MOS, she did it to herself…"); *but see* Camhi Tr., Harvis

---

[5] The escort officer who apparently heard plaintiff's brutality allegations (but did not report them) is defendant Albert Trotter. Deposition Transcript of Albert Trotter annexed to Harvis Decl. as Exhibit 44 ("Trotter Tr."), p. 35, ln. 16-20. Defendant Trotter does not deny that he told hospital staff that Ms. Martinez had been "punching the wall." *Id.* at p. 37, ln. 20 through p. 38, ln. 11. However, Trotter claims to have no recollection of the two hours he spent at the hospital with Rosie Martinez or the circumstances surrounding his statements. *Id.* at p. 19, ln. 8-10. The record indicates that defendant Sergeant Joseph Pontecorvo, the 107th Precinct "Patrol Supervisor" was with defendant Trotter and Ms. Martinez at the hospital when the progress note at Figure 3, *infra*, was entered in plaintiff's medical record. Deposition of Joseph Pontecorvo annexed to Harvis Decl. as Exhibit 50 ("Pontecorvo Tr."), p. 47, ln. 17-25; p. 49, ln. 2-5; *see Martinez*, 2018 WL 604019 at *16 ("Now, long after discovery had closed, defendants had come forward with two key witnesses and documents from multiple investigations that finally explain the cryptic reference in the Hospital medical note indicating that plaintiff had injured herself 'punching a wall in the cell.'").

Decl., Exh. 27, pp. 155-61 (discussing Camhi's potential awareness of plaintiff's brutality allegations); NYPD Patrol Guide § 210-04, Prisoners Requiring Medical/Psychiatric Treatment annexed to Harvis Decl. as Exhibit 37; NYPD Patrol Guide § 210-07, Prisoners – Unusual Occurrence annexed to Harvis Decl. as Exhibit 38.



*Figure 4 Plaintiff's right hand as splinted at the hospital on the morning of January 23, 2015.*

Camhi told internal affairs that Ms. Martinez was being "brought back to central booking." Command Center Call Tr., Harvis Decl., Exhibit 24, p. 6, ln. 1-2; OLPA, Harvis Decl., Exh. 35 (reflecting that plaintiff remained at the hospital until 5:17 p.m.). But Ms. Martinez was instead brought to the 107th Precinct. *See* 107th Precinct Command Log annexed to Harvis Decl. as Exhibit 40, DEF4089-4099 at DEF4094-96 (reflecting that plaintiff was returned to the precinct at 9:35 a.m. but with no further entries); Queens Central Booking Command Log annexed to Harvis Decl. as Exhibit 41 ("QCB Command Log") (reflecting plaintiff's arrival at central booking from the 107th Precinct at 5:10 p.m.); but *see* RFA Response, Harvis Decl., Exh. 29, Nos. 5, 39 (admitting that defendants cannot produce prisoner pedigree or holding pen roster forms, which are required to document plaintiff's physical condition at the precinct); *see Martinez*, 2008 WL 604019 at *35 ("Plaintiff alleges that what Lieutenant Camhi stated in his call to IAB was 'fabricated;' that plaintiff was not taken back to Central Booking as originally claimed, but returned to the 107 Precinct; no entries were made in the NYPD prisoner tracking system to reflect her transport back to the Precinct, and as a result, it is alleged that the official NYPD records 'falsely reflect that Ms. Martinez remained at the Hospital for the next eight hours plus.'") (citations omitted); *see also* Queens County District Attorney, Intake Bureau, Crime Report annexed to Harvis Decl. as Exhibit 42 at DEF29 (indicating that the accusatory instrument was ready for defendant Ryan's signature as of 8:03 a.m. on January 23, 2015).

Ms. Martinez's swollen hands, as photographed upon her release from custody, have none of the cuts or scrapes one would expect if she had recently punched a hard surface repeatedly. *See*

Figure 5, *infra*; Queens Hospital Center Medical Record, annexed to Harvis Decl. as Exhibit 39 ("QHC Record") at P24, ("negative for lacerations or abrasions").



*Figure 5 A photograph of plaintiff's hands taken on January 23, 2015 at 9:56 p.m.*

**D.   The Investigations**

In spite of defendants' duty as mandated reporters under the Patrol Guide, defendants caused Ms. Martinez's brutality allegations to be suppressed and miscategorized and thus never officially documented or investigated. Rather, a now-deceased former police captain prepared a document regarding plaintiff's injury that has been described by the Hon. Chief Magistrate Judge of this district as containing "some major inconsistencies and concerns," *Martinez*, 2018 WL 604019 at *28 (the "Hanrahan Report").

Indeed, the Hanrahan Report describes interviews with defendants Ryan and Camhi that allegedly took place days before the underlying events of January 23, 2015. The purported investigation is also variously described as concerning plaintiff's "laceration" and "contusions," when, consistent with plaintiff's account, evidence demonstrates plaintiff had neither condition. *See* Figures 3 and 5, *supra*.

Additionally, Camhi and Ryan are reported to have described the incident as having taken place in the "arrest processing cell," when it is undisputed that Ms. Martinez was injured in the juvenile room on the other side of the precinct. *Compare* Hanrahan Report annexed to Harvis Decl. as Exhibit 19, p. 2 (*see also* Firgure 6, *infra*) ("Lt. Camhi…stated that perpetrator was lodged *in the arrest processing cell* and began to punch and kick the wall in the cell") *with*

IAB Command Center Call Tr., Exh. 24, p. 3, ln. 6-12 (Camhi stated "[s]he was secured *in the juvenile room* [of the precinct], with one cuff, cuffed to the bench. She started ripping things off the wall…then she started punching the wall and kicking at cabinets") (emphasis added); *see also* Ryan Tr., Harvis Decl., Exh. 28 at p. 145, ln. 25 through p. 146, ln. 8; p. 234, ln. 14 through p. 235, ln. 5; p. 335, ln. 13 through p. 336, ln. 6; Camhi Tr., Harvis Decl., Exh. 27 at p. 328, ln. 12 through p. 329, ln. 4; p. 330, ln. 3-8; Figure 1. Plaintiff disputes that she was interviewed by Hanrahan or made the statements attributed to her in his report. *See* Martinez Affidavit, Harvis Decl., Exh. 1, ¶ 5. Defendants admit that no records of the investigation described in the Hanrahan report exist. *See* RFA Response, Harvis Decl., Exh. 29, No. 36.



*Figure 6 The Hanrahan Report, annexed as Exhibit 19 (annotated by counsel)*

By officially categorizing plaintiff's injuries as self-inflicted and lacking a "complainant," there was no bona fide investigation of plaintiff's brutality allegations. *See* Declaration of Peter Callaghan, NYPD Agency Attorney, annexed to Harvis Decl. as Exhibit 45 (purported

explanation of the routing and approval process of the Hanrahan Report; *see also* Inspector General's Report regarding Outside Guidelines complaint process, annexed to Harvis Decl. as Exhibit 20. This is true despite Ms. Martinez and Mr. Rivera each having repeatedly and consistently disclosed detailed accounts of the misconduct. *See* Martinez IAB Interview Tr., Harvis Decl., Exh. 13, p. 10, ln. 2-10; p. 14, ln. 9-16;  p. 38, ln. 4 through p. 40, ln. 25; IAB Report-Martinez, Harvis Decl., Exh. 25, DEF4914-150; Rivera IAB Interview Tr., Harvis Decl., Exhibit 17, p. 18, ln. 11 through p. 19, ln. 7; p. 19, ln. 13 through p. 20, ln. 6; IAB Report-Rivera,  Harvis Decl., Exh. 26, DEF4912.

As discussed in plaintiff's letter to the Court at DE #102 and addressed in the Court's January 24, 2018 order, aside from the Hanrahan Report there were three separate investigations into the events surrounding the search warrant execution and events at the precinct and multiple defendant officers were interviewed and disciplined. Yet no officer made any mention of Ms. Martinez's alleged self-injury – it was as though it had never happened.

Plaintiff's arresting officer, Eric Ryan, who was responsible for plaintiff's well-being, was in the room when she was restrained and claims to have checked on her seventeen times while she was in his custody (although no documentation exists), was interviewed by civilian complaint investigators in September 2015, less than eight months after the incident:

> I don't really have too many specific memories, because to me, I mean, other than the fact it was a good amount of heroin recovered, it doesn't stand out in my mind as like, you know, something that went bad or wrong. It just seemed like it went off without a hitch.

> … [Rivera's] co-inhabitant – I believe it was his girlfriend, Rosie Martinez. She came down to the precinct, I'm assuming, to see why her boyfriend or the man she's living with has been arrested. At which point, she was subsequently arrested, because they both lived in the apartment in which the heroin was found.

> So at that point, she would have been in the same room as him….She'd be on the outside. One arm would be chained to a bench. So at that point, yes, it was definitely two people in the arrest room. [A]gain, I don't really remember that time. We have a lot going on, you know, a lot of paperwork….A lot of moving parts that night….

> I don't remember specifically if [Rivera complained of any pain or injuries] or not, but it's no big thing for us to call for an ambulance. You know, it happens more often than you would think, that people, you know, -- nobody likes to get arrested. I mean, that's -- come on. You know, everybody -- you know, nobody likes to have their freedom taken away, but, you know, it's -- if a prisoner is sick, if he feels like he's in violent pain, whatever, pregnant, takes nothing for me to click a button on the radio and say can I have an ambulance to the 107th station house….

- 17 -

Q.     Now, did he request medical treatment?

A.     I don't -- I don't remember. I don't want to say the wrong thing.

       (Cross-talk)

       I vaguely remember him requesting it, but I don't remember him going to a
       hospital.

Q.     Okay, but –

A.     But it's very possible that he may have and may have been escalated, but –

Q.     But you don't recall him personally asking you for medical treatment?

A.     I'm not confident enough to say yes.

Q.     Okay.

A.     You know, he may have, and if he did, I'm sure I would have acted accordingly,
       because why wouldn't I?

Q.     He was compliant in your custody, correct?

A.     Yeah, I didn't have any problem with him there at the – to physically restrain
       him or anything. I mean, there might have been some foul language coming
       out of him, but, you know, water off a duck's back.

Q.     Okay. And to the best of your recollection, an ambulance didn't come for him,
       correct?

A.     I mean, I can't say -- I don't have it in my -- in my notepad here. Like I said,
       I was – I was doing a lot of paperwork. Lot of moving parts. It very well could
       have been.

Q.     (Indiscernible).

A.     Yeah, I just don't remember.

Q.     Right. And do you know if any other officers interacted with [Rivera] at the
       station house while you were processing him and getting him in to a cell?

A.     I'm sure several may have, but not in a significant way. By either -- I was
       vouchering something, and I had to use the bathroom, another officer might
       have put handcuffs on him, walked him over to where the bathroom is,
       uncuffed him, let him go, cuffed him back. And, you know, nothing – and
       now, this is all again -- you'd have to walk in front of our desk officer and our
       front desk. It's not like we're off in a side corner.

Q.     Okay.

A.     You know, so it's -- it's out in the open, everything we do.

- 18 -

Q        …Okay. Officer Ryan, have you told me everything you remember about this
         incident?

A.       Yes.

Q.       Is there anything else you'd like to add?

A.       No.

CCRB Interview Transcript of Eric Ryan annexed to Harvis Decl. as Exhibit 48 ("Ryan CCRB Interview Tr."), p. 18, ln. 3 through p. 25, ln. 1; *see Martinez*, 2018 WL 604019 at *16 ("It is of further concern that Officer Ryan was also questioned during the course of a CCRB investigation into injuries allegedly suffered by Danny Rivera during his arrest. Despite being questioned about events in the precinct that night, Ryan, plaintiff's arresting officer, apparently never mentioned Ms. Martinez's self-inflicted injuries during that inquiry."); *see also generally* Ryan CCRB Interview Tr., Harvis Decl., Exh. 48; Ryan Tr., Harvis Decl., Exh. 28, p. 301, ln. 10 through p. 302 ln. 25 (Ryan checked on plaintiff approximately seventeen times).

**E.   The Sanctions Order and Defendants' Subsequent Lack of Memory**

The individual defendants also never informed the civil defense attorneys handling this action about Camhi's call to internal affairs or the Hanrahan Report. As a result, defense counsel took the position for years before this Court that Ms. Martinez was not, in fact, injured inside the precinct. It was such misconduct and the resulting "overwhelming" prejudice to plaintiff, as well as the need for deterrence, that led the Hon. Cheryl L. Pollak to recommend terminating sanctions or, in the alternative, preclusion, in a Report and Recommendation issued on the eve of the expiration of the statute of limitations. *Martinez*, 2018 WL 604019 at *30 ("Accordingly, the Court finds that the overwhelming prejudice to plaintiff weighs heavily in favor of dispositive sanctions for defendants' conduct in this case."). As the Court anticipated in a subsequent 2018 opinion, *Martinez v. City of New York*, 2018 WL 1835935, *3 (E.D.N.Y. Apr. 18, 2018), when defendants Camhi, Laliberte, Ryan and DiGennaro subsequently appeared for depositions, they claimed to have amnesia:

Q.       What do you remember about that night?

A.       …Nothing.

Q.        Zero?

A.       Zero.

Laliberte Tr., Harvis Decl., Exh. 23, p. 121, ln. 19-23.

Q.       And so we now have [plaintiff] in the juvenile room punching the wall and
         injuring herself. We have you, based on the Command Log, sitting there at the
         desk; right? Okay. And are you saying there's a way that those two things could
         be true and you didn't know about it?

A.       …I guess.

Q.     It has to be because if you knew about it what would you have done?

A.     …Called internal affairs and got her an ambulance.

Q.     That would have been appropriate; right?

A.     Correct.

*Id.* at p. 154, ln. 3-17; *see* Ryan Tr., Harvis Decl., Exh. 28, p. 274, ln. 2-5 (Q. [T]o your knowledge, who is aware that Rosie Martinez was flipping out in that room? A. The desk officer [Laliberte].); *id.* at p. 274, ln., 17-22 (Q. Because a desk officer would have been positioned to basically see the entire event, right?...A. If he was at the desk in his chair, yes.").

Q.     Detective [Ryan], did you ever put your hands on Rosie Martinez?

A.     Yes.

Q.     Describe that for me.

A.     I don't remember.

Q.     Well, how do you know you did it?

A.     Just -- I'm assuming because of the fact that she's my prisoner and I probably put handcuffs on her or fingerprinted her, but I don't remember specifically or factually what transpired.

Q.     [W]ell, did you fingerprint her?

A.     I don't remember.

Q.     Did you ever observe any other officers put their hands on Miss Martinez?

A.     I may have, but I don't remember.

Q.     …Did you ever handcuff Rosie Martinez?

A.     I may have, but I don't specifically remember if I did or not.

*Id.* at p. 271, ln. 12-p. 272, ln. 13.

Q.     [Lieutenant Camhi, were there] other officers [with you in the juvenile room when you were restraining Rosie Martinez]?

A.     Yeah, there was other people in the room. There was other officers.

Q.     But you don't remember who it was?

A.     …No.

Q.     And you don't how many people there were, right?

A.     …No, I don't.

Q.     You don't know if the desk officer [Laliberte] was there, right?

A.   No.

Q.   But you do remember that she wasn't injured?

A.   …I do recall that she never stated she was injured and never requested medical attention to me; and I was never told by anybody else, and I never overheard her mentioning that she needed medical attention.

Q.   Did you ask her if she needed medical attention?

A.   No, I did not.

Camhi Tr., Harvis Decl., Exh. 27, p. 112, ln. 8 through p. 113, ln. 17; *see also* Ryan Tr., Harvis Decl., Exh. 28, p. 313, ln. 18 through p. 314, ln. 3 (Q. [Y]ou heard Lieutenant Camhi state that he restrained Rosie Martinez? A. Yes. Q. Did that happen? A. It could have. I don't remember. Q. Did you see it happen? A. I may have seen it, but I don't have any memory of it.); *see* Digennaro Tr., Harvis Decl., Exh. 4, p. 496, ln. 12-19; p. 497, ln. 6-15; p. 498, ln. 13 through p. 501, ln. 5; p. 502, ln. 22 through p. 503, ln. 24; p. 510, ln. 3-21; p. 529, ln. 10-22; Trotter Tr., Harvis Decl., Exh. 44, p. 80, ln. 17-24; p. 19, ln. 3-13; p. 23, ln. 6-23; p. 34, ln. 11 through p. 35, ln. 8; p. 45, ln. 24 through p. 46, ln. 3; Pontecorvo Tr., Harvis Decl., Exh. 50, p. 15, ln. 9-11; p. 17, ln. 9-16; p. 54, ln. 15-21; p. 62, ln. 4-6.

9.   Specifically, plaintiff claims to have requested medical attention because she thought her right thumb was broken, and for pain in her hands, neck, head and feet. (Jan. 23, 2020 Deposition of Plaintiff at 58:17-59:21, Thadani Decl., Ex. G.).

**Response: Disputed.** In the cited passage, plaintiff states: "Both of my hands were in pain…I thought that my right thumb was broken…[I had] pain in both of my hands…[and] on my neck…[Indicating hands around her neck]…I had…pain on the back of my head. I had pain on the side of my head…and in both of my feet." However, plaintiff's subjective belief regarding the severity of her injuries is immaterial to the analysis at summary judgment.

10.   On January 23, 2015, at approximately 5:40 a.m., plaintiff was transported to the Queens Hospital Center Emergency Room for evaluation and treatment for her alleged thumb injury.

(Pre-Arraignment Screening Form, Thadani Decl., Ex. H.)

**Response: Disputed.** Upon her arrival at Central Booking, medical screeners observed plaintiff's injuries and directed that she be taken to the hospital. Martinez Tr. I, Harvis Decl., Exh. 2, p. 73, ln. 13 through p. 74, ln. 2. ("Immediately they saw my hand and they asked if I'm in need of medical attention, and I said yes, so they immediately took me to the hospital.").

11.     On January 23, 2015, at approximately 6:17 a.m., plaintiff arrived at Queens Hospital

Center. (Queens Hospital Medical Records at P011, Thadani Decl., Ex. I.)

**Response: Undisputed**.

12.     Plaintiff reported that "both of her thumbs were injured during her arrest last night,"

complained of pain and swelling to her thumbs, reporting pain of 6 on a scale of 1-10, and denied

numbness / tingling. (Id. at P023 – P024.)

> **Response: Disputed.** As discussed above, when plaintiff finally spoke to medical personnel she
> was accompanied by defendant Albert Trotter, a male police officer in telephone contact with
> her assailants back at the 107th Precinct.[6] *See* QHC Record, Harvis Decl., Exh. 39 at P24; *See*
> Trotter Tr., Harvis Decl., Exh. 44; p. 37, ln. 20 through p. 38, ln. 11; p. 78, ln. 16-25;
> Martinez IAB Interview Tr., Harvis Decl.– Exhibit 13, p. 41, ln. 1-22; *see also* Pontecorvo
> memo book annexed to Harvis Decl. as Exhibit 49 at DEF5862; Pontecorvo Tr., Harvis Decl.,
> Exh. 50, p. 52, ln. 7-25; p. 56, ln. 15-25; p. 58, ln. 22 through p. 59, ln. 17.
>
> Defendant Trotter participated in plaintiff's medical screening and, with Pontecorvo,
> interfered with her care and diagnosis, dictating false statements into plaintiff's medical
> records. *See* QHC Record, Harvis Decl., Exh. 39 at P24; *see* Trotter Tr, Harvis Decl., Exh.
> 44, p. 37, ln. 20 through p. 38, ln. 11.
>
> Nevertheless, plaintiff reported severe bilateral thumb pain after being assaulted and choked
> while in police custody. Ms. Martinez reported soft tissue and bony tenderness, swelling to her
> right thumb, limited range of motion due to pain in her right thumb, tenderness in her right
> anatomical snuffbox, and limited extension and flexion. *See* QHC Emergency Physician
> Record annexed to Harvis Decl. as Exhibit 51 at P12-13.

13.     Plaintiff was seen in the emergency room for injury to her thumbs. (Id. at P018 –

P019.)

---

[6] Trotter appears to have been talking to Camhi. At 6:10 a.m. on January 23, 2015 (over three hours before Camhi called the Internal Affairs command center), Camhi entered "62A – injured prisoner" in his memo book. *See* Camhi Tr., Harvis Decl., Exh. 27, p. 127, ln. 4 through p. 129, ln. 25; *id.* at p. 135, ln. 11-17 ("I believe I was told by Captain Hanrahan to stick around until I got the diagnosis."); Camhi Memo Book, annexed to Harvis Decl. as Exhibit 54. Camhi claims to have no memory of the events between his administrative entry and his ultimate call to IAB over three hours later. *Id.* at p. 130, ln. 19-23; p. 132, ln. 20 through p. 133, ln. 19.

**Response: Undisputed that plaintiff went to the emergency room.** However, this document establishes that plaintiff was diagnosed with "assault by other unspecified means" and "pain in limbs" and was "splinted." *See* Figure 4, *supra*.

14.    Specifically, plaintiff was treated with Ibuprofen and a hand splint, and diagnosed with "pain in limb." (Id.)

**Response: Disputed.** While in police custody and with her medical screening compromised as described, plaintiff received ibuprofen and a splint from the emergency room. But the injuries defendants caused have required Ms. Martinez to undergo years of protracted medical treatment, which is ongoing and includes surgery. *See* Rosie Martinez Medical Records, annexed to Harvis Decl. as Exhibit 53; *see also* Photograph of Plaintiff's Incision post-surgery annexed to Harvis Decl. as Exhibit 52.



*Figure 7 Plaintiff's left wrist after surgery in October 2019.*

15.    Plaintiff's x-rays were normal. (Id.)

**Response: Undisputed.**

16.     Plaintiff was discharged at approximately 8:27 a.m., prescribed Motrin for pain and swelling and was advised to follow-up with a hand specialist. (*Id.*)

**Response: Undisputed.** *See* **Response 14.**

Dated:          Briarcliff Manor, New York
                December 18, 2020

                              **ELEFTERAKIS, ELEFTERAKIS & PANEK**

                              _____
                              Gabriel P. Harvis
                              Baree N. Fett
                              80 Pine Street, 38th Floor
                              New York, New York 10005
                              (212) 532-1116
                              *Attorneys for Plaintiff*

- 24 -