1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3     - - - - - - - - - - - - - -   X

4     ROSIE MARTINEZ,                    :
                                         16-CV-79(NM)
5              Plaintiff        :

6
                 -against-             :
7
                                       United States Courthouse
                                       Brooklyn, New York
8     CITY OF NEW YORK, ET AL,     :
                                       November 7, 2022
9              Defendant.       :       2:30 p.m.

10    - - - - - - - - - - - - - -   X

11
                   TRANSCRIPT OF ORAL ARGUMENT
12          BEFORE THE HONORABLE NINA MORRISON
               UNITED STATES DISTRICT JUDGE
13
      APPEARANCES:
14

15    For the Plaintiff:          ELEFTERAKIS ELEFTERAKIS & PANEK
                                   80 Pine Street, 38th Floor
16                                 New York, New York 10005
                                   BY: GABRIEL PAUL HARVIS, ESQ.
17                                     BAREE N. FETT, ESQ.

18
      For the Defendant:          NEW YORK CITY LAW DEPARTMENT
19                                 100 Church Street
                                   New York, New York 10007-2601
20                                 BY: KAVIN S. THADANI, ESQ.
                                       MORGAN C. MCKINNEY, ESQ.
21                                     JEFFREY F. FRANK, ESQ.

22    Court Reporter:             Andronikh M. Barna
                                   225 Cadman Plaza East
23                                 Brooklyn, New York
                                   (718) 613-2178
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer-aided transcription.

2

1          THE COURTROOM DEPUTY:  Civil cause for an oral

2    argument, Case No. 16-CV-79, Martinez v. City of New York,

3    et al.

4          Counsel, please state your appearances for the

5    record, starting with plaintiff.

6          MR. HARVIS:  Good afternoon, Your Honor.

7          Gabriel Harvis of the firm Elefterakis, Elefterakis

8    & Panek for the plaintiff, Rosie Martinez.

9          MS. FETT:  Good afternoon, Your Honor.

10         Baree Fett from the law firm Elefterakis,

11   Elefterakis & Panek for the plaintiff, Rosie Martinez.

12         THE COURT:  Good afternoon.

13         MR. THADANI:  Good afternoon, Your Honor.

14         Kavin Thadani from the Office of the Corporation

15   Counsel on behalf of the defendants.

16         MS. MCKINNEY:  Good afternoon, Your Honor.

17         Morgan McKinney, also with the Office of Corp.

18   Counsel, for the defendants.

19         THE COURT:  Good afternoon.

20         MR. FRANK:  Good afternoon, Your Honor.

21         Jeffrey Frank, also with Corp. Counsel, for the

22   defendants.

23         THE COURT:  All right.  Welcome, everyone.

24         So we are here today for oral argument on what are,

25   by my count, about 26 or so motions in limine filed by the

3

1   various parties.  As you know, the case was referred to me on

2   October 28th.  I kept this trial date because I know these

3   dates are hard to get these days and you have been waiting for

4   a trial for some time.  So my apologies in advance if I ask

5   you what may seem like very basic questions about the history

6   of this case and some of the facts.

7          I have reviewed all of your briefing and a

8   substantial part of the underlying record.  My goal today

9   really is to just make sure that I understand that history and

10  understand your positions, so please don't take too much of my

11  questions about which way I might be leaning on some of these

12  issues.

13         I gather that a number of the pending motions are

14  now moot, in whole or in part, because of some of the things

15  you said in your responses, so I may ask just to confirm that

16  at the end, but I'm going to focus today mostly on what is in

17  dispute.

18         I plan to issue a written opinion on at least some

19  of the issues here.  I think some of them probably need a bit

20  more consideration after argument and you would benefit from

21  some more specific guidance.  I know we're hitting up against

22  the Thanksgiving holiday, so my plan and my hope is to get you

23  a ruling hopefully next week and, if not, before the break so

24  that you can plan your witnesses and evidence accordingly.

25         After we talk about these motions in limine, I want

4

1    to discuss some trial management issues, including scheduling

2    and how I think we might work voir dire and the charges and

3    that sort of thing.  All right?

4            Will more than one counsel be arguing for each side

5    today or is just one of you going to handle it, or does it

6    depend on the motion and the issue?

7            MR. HARVIS:  Yeah, we haven't decided that,

8    Your Honor, if that's okay.

9            THE COURT:  Yes.

10           MR. HARVIS:  Great.

11           MR. THADANI:  Your Honor, I believe, depending on

12   which motion, different counsel will be speaking on the

13   issues.

14           THE COURT:  You're welcome to switch off.  What I do

15   is, I'll let you which motion I'm going to do.  I'm going to

16   take them a little bit out of order, and then you can just

17   tell me who's doing it.  And you can remain seated while

18   you're arguing, just speak in the microphone so the court

19   reporter can hear you.

20           And I will let her know that she is welcome to

21   remind any of us, including me, to speak more slowly.  It is a

22   bad habit I picked up from all my years as a litigator that I

23   am trying to break.

24           All right.  So the first motion I wanted to ask you

25   about is plaintiff's motion to allow some cross-examination

1   into an incident that led to an IAB investigation for one of

2   the officer defendants.

3            Can you let me know how to pronounce his name?  Is

4   it Laliberte?

5            MR. THADANI:  Laliberte, Your Honor.

6            THE COURT:  Laliberte.  Okay.  Thank you.

7            Mr. Thadani, I understand your argument to be that

8   this isn't proper impeachment of the Rule 608(b) because

9   Sergeant Laliberte did not technically lie to the

10  investigators in 2013 when he was asked about this incident

11  regarding a time when he was caught on video punching a

12  detainee; is that right?

13           MR. THADANI:  Sort of, Your Honor.  I don't believe

14  the record is -- I mean, frankly, the record establishes, I

15  believe based on the deposition testimony, that he didn't lie.

16  I believe that plaintiff's counsel, as I indicated in the

17  motion papers, is taking the -- the paperwork they're relying

18  upon, I believe, is vague and not clear as to the fact that I

19  believe what plaintiff's counsel is asserting is that what

20  happened was, after this arrest, this incident that occurred,

21  Sergeant Laliberte was questioned about it.  He made denials

22  about using any force, was shown a video recording showing

23  that he had used force and then basically admitted/apologized

24  for it.

25           I don't believe that that is clearly expressed in

1    the record that they're utilizing.  There is no clear record

2    that that is what happened.  Sergeant Laliberte testified at

3    his deposition that is not what happened.  And so our

4    assertion is that there -- and moreover, as we argue in the

5    papers, there wasn't a finding, there wasn't charges brought.

6    So, for instance, after that occurred, the NYPD could've

7    brought charges for making a misstatement or a false statement

8    during an interview, during an investigation.  They didn't do

9    that, that often happens.  They didn't do that.  And

10   investigator substantiate that sort of allegation.  And,

11   therefore, our position is, there's no finding.

12              And also, the record doesn't assert that that is

13   what occurred, that there was a false statement made.  And we

14   believe, especially given the nature of the underlying action,

15   which is Sergeant Laliberte punching an individual, given that

16   this is an excessive force case, sort of ties into a corollary

17   argument with respect to Rule 403 and the unfair prejudice,

18   that if it's presented the way I believe plaintiff's counsel

19   intends to present it, which is highlighted I think by the

20   fact that a video recording of the punch was listed on their

21   exhibit list, which doesn't really speak to whether there was

22   a false statement or not in the investigation, that that

23   intention and the underlying incident itself then makes this

24   evidence substantially more prejudicial than probative.

25              THE COURT:  I haven't reviewed that part of his

1    deposition.  But when you say he denied or disputed certain

2    aspects of what plaintiff is contending, is he denying what

3    was in the IAB report, that he was asked if he had -- and I'm

4    quoting from an excerpt of it that was in the briefs --

5    observed any members of service punch any of the partygoers,

6    he stated no; when asked if any of the arrestees had any

7    injuries or made any complaints against any member of service,

8    he said no; after viewing the video footage that showed him

9    punching, and then it's redacted, by a detainee in the face,

10   Sergeant Laliberte stated that punching that individual was a

11   bad decision, he made a mistake and is embarrassed by his

12   actions.

13           As I understand it, he's not disputing that the

14   sequence of what he was asked and what he was shown and what

15   he answered in the IAB report is incorrect, or is he disputing

16   that?

17           MR. THADANI:  No, I don't believe he's disputing

18   that.  I don't recall specifically how precise the deposition

19   questioning was.  I don't think it was as specific as asking

20   about that particular sequence of events.  I believe the

21   question was more broad as to did you deny using force during

22   the course of that investigation, and he said no.

23           And I believe actually there was some sequential

24   questioning with respect to chronology of events as in, like,

25   when you were first asked what happened, did you deny it or

8

1    did you not state use force?  And he said basically that he

2    was up front and honest about what happened and felt

3    remorseful about it.  That's what I believe the questioning

4    was.  I don't have it in front of me either, Your Honor.  I

5    don't believe it was as precise though as denying specific

6    portions that you just read.

7           THE COURT:  But he's not disputing -- and I know

8    there's a separate issue about whether the extrinsic evidence

9    of punching could come in, but he's not disputing that he did,

10   as the report says, punch a detainee in the face?

11          MR. THADANI:  No.  No.

12          THE COURT:  Okay.  And I understand as your

13   argument, he was asked about whether he observed anyone else

14   punch or injure an arrestee.  And he said no.  And your

15   argument is, it's not really proper impeachment to say he lied

16   because he wasn't directly asked, did you yourself punch or

17   harm any cuffed arrestee.

18          MR. THADANI:  That's our position.  Frankly, it's a

19   very straightforward issue.  And frankly, if the sequencing

20   occurred the way plaintiff's counsel asserts, the report could

21   have very easily said that, that Sergeant Laliberte was asked

22   whether he punched any individual, and he denied it, he was

23   then shown the video, and he admitted it.

24          And then like I said earlier, Your Honor, in that

25   scenario, internal affairs NYPD could've charged him for

1   making a false statement that he just admitted that he

2   would've made in that scenario, and that didn't occur.  And

3   the report does not clearly state that.  It's, in our view I

4   guess, ambiguous and unclear as to specifically what he was

5   asked and what he denied to with respect to his own actions,

6   as opposed to actions he observed other people taking.

7           THE COURT:  But it seems clear that the investigator

8   who was asking these questions had the video at the time he

9   asked him the questions, right?  He was saying, tell me what

10  happened, he gave an answer, and then he confronted him with

11  the video, and then he gave an additional answer and

12  apologized.  It all happened within that sequence, right?

13          MR. THADANI:  I mean, I don't -- I don't know.  I

14  don't know exactly.  I mean, certainly by reading it, that

15  would be the impression, that the investigator had the video

16  at the time the questioning occurred.  I think that is true.

17          THE COURT:  So don't you think there's a fair

18  argument that it's at least materially misleading for him?

19  You know, he's being asked about what happened in this event,

20  the investigator seems to be giving him a chance to tell his

21  version of what happened.  By leaving out this important fact,

22  he obviously knew he wasn't supposed to be punching a cuffed

23  arrestee, that he is, at the very least, intentionally

24  misleading the investigator, and that that bears on his

25  truthfulness for purposes of 608?

1          MR. THADANI:  I believe that argument can be made,

2     that perhaps -- again, I think it's unclear, the record is

3     unclear as to what specific questions he was asked, either the

4     investigator's notes as to what was -- you know, I don't know

5     how long of an interview.  Depending on the sequencing,

6     certainly that argument could be made.

7          I think what we would add on with respect to that

8     is, again, even to the extent this questioning were permitted

9     by Your Honor, I believe that there is -- you know,

10    plaintiff's counsel has stated in their briefing something to

11    the effect of certain facts with respect to this need to be

12    admitted and not really explaining what that means.

13         And I think given the underlying nature of the

14    action and given what the issue is in this case, even to the

15    extent Your Honor is inclined to admit evidence or testimony

16    or questioning with respect to this, there's a way to do it

17    without revealing, for instance, what plaintiff's counsel

18    repeatedly states as sort of classifying this as a sucker

19    punch, right?

20         For instance, there could be questioning to the

21    effect of, you know, you were involved in an arrest on a

22    certain date, you know, X number of months before this

23    incident.  And during that course of the arrest, you took

24    certain actions.  And following that arrest, you were asked

25    questions about the actions you took.  And you denied -- these

1   are just an example, questions they could ask.  You denied

2   taking a certain action.  And you were shown a video recording

3   showing what happened during that arrest, and then you

4   admitted to that action, something to that effect, right?

5          And that's what plaintiff's counsel is getting at.

6   That doesn't reveal, for instance, what I think is really the

7   more troubling nature of this is, I believe it is a attempt to

8   backdoor what would otherwise be improper character evidence

9   and improper propensity evidence because it involves a use of

10  force by --

11         THE COURT:  And I understand that, that that's the

12  argument.  I guess the concern I have is that without being

13  able to confront him with the specifics of the incident, the

14  jury's understanding of why it bears on his truthfulness, that

15  he only admitted something this serious when he knew there was

16  a video, is lessened.  And the plaintiff is entitled to the

17  full benefit of evidence, not the video itself, but at least

18  the circumstances under which it happened to show why this is

19  a situation under which a truthful officer would be expected

20  to be forthcoming.

21         So how do you address that?

22         MR. THADANI:  I understand that, Your Honor.  I

23  think our feeling would be, this would raise the 403 argument

24  again.  Like, for us, that would be substantially that

25  prejudic- -- that probative need for the jury to understand,

1    we believe, would be substantially -- would be outweighed,

2    substantially outweighed by its prejudicial effect given the

3    fact that this is a case in which some of four officers -- I

4    know this is probably part of another motion, as Your Honor is

5    aware, two out of four of the officers allegedly used

6    excessive force.  This may be one of them, I don't know.  I

7    guess maybe they'll tell us.  But it -- presumably there's an

8    excessive force allegation against him.  Maybe if there

9    wasn't, it'd be different.

10          But to the extent there is an excessive force

11   allegation made against him specifically, and this is a case

12   involving excessive force, this is the danger of the jury

13   hearing then that he has, within a year, roughly a year prior

14   to the incident, used excessive force against a handcuffed

15   individual, which is the allegation in this case, I think

16   argue would be there has to be compromise somewhere in the

17   middle where that underlying facts are not necessary in order

18   for the jury to assess credibility of this particular

19   individual who is going to testify.

20          THE COURT:  Can you see any version of those facts

21   specifically?  And I'm not asking you to necessarily decide

22   what the testimony is going to be or exactly where the bounds

23   are going to be, but somewhere between -- it could be any

24   possible incident, which could be a traffic stop all the way

25   to punching a cuffed arrestee.  What do you think would be the

1  fair compromise in terms of allowing some questioning?

2        MR. THADANI:  I mean, I don't think -- I mean, I

3  have to think through it a little bit, but, you know, thinking

4  through it now, I don't think it would be the nature of the

5  force used for sure.  I mean, it may be used force on an

6  individual, perhaps.  I mean, again, I still feel like given

7  the nature of this case, there are real 403 concerns.  I think

8  with this kind of questioning, there's a way to have it be a

9  little bit less -- like, for instance, the examples I gave,

10  which I understand maybe is on one realm, I think would help

11  remedy those issues a little bit more, but I understand

12  Your Honor's point.

13        But I think perhaps if Your Honor, again, is

14  inclined to permit this questioning and maybe something to the

15  effect of use of force.  But even that, you know, I hesitate

16  to say it because I still think given the fact that's what the

17  claim is in this case presumably against this individual,

18  again, I think maybe the equation does change if there's no

19  excessive force claim being brought against him.  That may be

20  a different analysis.

21        THE COURT:  So I want to come back to that point

22  about excessive force when we get to the issue of which

23  defendants are alleged to have used it.

24        So let me ask plaintiff's counsel.  What's your

25  answer to the concern the City's raised about the video itself

1    in particular being; A, extrinsic evidence under 608 and the
2    whole incident being impermissible propensity evidence?
3    Because the case law says, the more similar it is to the
4    allegations in question, the more skeptically and more
5    carefully I have to view it before it's allowed in.
6           MR. HARVIS:  Well, we agree it's a quite similar.
7    So we certainly agree with that.  We don't have any intention
8    of offering the video in our case in chief unless there is
9    some denials from the officer.  So we were not planning on
10   offering that as, you know, case in chief evidence.
11          But I guess I would just step back and start where
12   Mr. Thadani did and talk about the context a little bit.  So
13   this individual was the sergeant, a supervisor, the desk
14   officer of this precinct.  So he's seated right across, about
15   as far as I am from Your Honor, where Ms. Martinez was
16   handcuffed in that room.  And, you know, we know that a year
17   earlier he had, you know, punched this person while they were
18   handcuffed and never mentioned it until he was confronted
19   about it.
20          So his job is to record what happens in the precinct
21   during that night.  And we know -- it's actually one of
22   admissions that we got from them in discovery -- is that there
23   was no notation.  Sergeant Laliberte made no record at all
24   about this.  So, and then when he came in to testify after we
25   got all the discovery that led Judge Pollak to recommend

1   terminating sanctions, we asked him what he remembered about

2   that night as a desk officer.  And his answer was zero.

3   That's how much he remembers.

4          So, you know, we believe that on these facts we're

5   entitled to have every opportunity to challenge his

6   credibility and the validity of his claim that he actually

7   doesn't remember anything because it's critical to understand

8   why there was no record made of this event.

9          And so we think it all comes down to credibility.

10  We think it's all wrapped up in concealment.  And we think

11  that many of the facts that underlie the prior incident are,

12  in our view, highly probative, which really changes the

13  equation in terms of, it has to be substantially outweighed by

14  the prejudice, not just outweighed.

15         So the more probative it is, the more the prejudice

16  would have to outweigh it in order for it to tip the scales.

17  And we believe that the prejudice has to be not just

18  prejudice, but undue prejudice.  And in a case where someone

19  happened to do something where revealing their untruthfulness

20  happens to show that it's unlikely that they were truthful in

21  this instance is precisely the outcome that the rules were

22  intended to, you know, ensure.

23         THE COURT:  And if I understand how you intend to

24  present at this point, you're seeking only to ask him, when

25  you call him -- obviously you've conceded that as a

1    defendant -- you can lead him on essentially your direct case

2    leading about the questions and answers he was asked at the

3    IAB and you don't intend to offer any extrinsic evidence

4    unless he denies some fact that's refuted by the video in

5    which case I guess we'll take that up, although my

6    understanding is, that's probably barred as impermissible

7    extrinsic evidence under 608 as well.

8            MR. HARVIS:  I agree with everything Your Honor

9    said, yes.

10           THE COURT:  Are there any other records -- until you

11   begin your argument, Mr. Thadani, I wasn't sure if there were

12   other, statements, other records that relate to the specific

13   questions and answers that he was asked during this 2013

14   investigation other than the IAB report.

15           MR. THADANI:  Not that I believe has been produced

16   or disclosed between the parties.

17           THE COURT:  Okay.  And you searched for them

18   yourself when you were attempting to investigate the

19   circumstances of this?

20           MR. THADANI:  Yes, Your Honor, there was.  I don't

21   remember all the specifics of the discovery dispute with

22   respect to this, how much needed to be produced with respect

23   to this particular investigation, but certainly we produced

24   within the scope of what we were, you know, ordered to do so

25   and while we -- what we agreed amongst the parties and I

1    believe under the supervision of Magistrate Judge Pollak.

2           One thing I do want to note.  I don't know that it

3    necessarily moves to the needle, but just to correct the

4    record, plaintiff's counsel just stated something to the

5    effect of Defendant Laliberte testified he had no recollection

6    of this incident.  That is true.  He was deposed twice in this

7    case.  He was deposed as a nonparty initially, and he

8    testified in that manner very early on during discovery.  Then

9    testified again.

10          THE COURT:  Let me just clarify this incident.  You

11   mean the incident involving Ms. Martinez?

12          MR. THADANI:  Yes.  Sorry.  My apologies,

13   Your Honor.  I should've clarified.

14          Yes, with respect to the incident underlying this

15   particular lawsuit involving Ms. Martinez, he testified as a

16   nonparty early on in discovery and at that point, when he

17   wasn't a defendant, testified that he had no recollection of

18   the incident.  Yes, he did testify consistently then when he

19   was named as a defendant and deposed again the same way.

20          I just wanted to clarify that for the record.  I

21   don't know that, like I said, necessarily changes the needle

22   per se, but just so the record is clear.

23          THE COURT:  I understand.

24          Okay.  Let's move on to the next one.

25          Next I'd like to talk about plaintiff's motion to

18

1   preclude the headshot identifications and kind of relatedly to

2   admit some evidence of the City's discovery violations and

3   sanctions.

4           So let me start with the headshot evidence.  I don't

5   know which counsel for the City would like to address it.

6           MR. THADANI:  I can handle it, Your Honor.

7           THE COURT:  Sure.

8           So explain to me relatively concisely what sort of,

9   quote/unquote, headshot evidence you seek to offer and how you

10  see it coming in and explain to me why you think it's relevant

11  to the claims that the jury is going to hear?

12          MR. THADANI:  Sure.

13          So, as I think Your Honor is aware, we listed

14  certain headshot photographs as exhibits.  I believe it's all

15  under one exhibit right now.  It's II.  I believe the

16  intention would be to subpart that in among multiple exhibits.

17  I think there is six photographs probably there.  It's a

18  portion of the photographs that the plaintiff reviewed early

19  on in this case to identify what at the time were John Doe

20  defendants.

21          So the case was brought.  Plaintiff had already

22  testified at what's called a 50-H hearing and gave a

23  description of what the two individuals she claimed assaulted

24  her looked like in terms of facial hair, body type, age,

25  clothing, et cetera.

1          Early on in the case, plaintiff's counsel -- I was

2    not a counsel to the case at the time, but I believe that

3    ultimately there were photographs exchanged in two different

4    parts.  Some photographs were in a Civilian Complaint Review

5    Board file.  And other photographs -- maybe about six or so

6    photographs in there.  And then about 30 photographs, I

7    believe headshot photographs, were produced unlabeled to the

8    plaintiff's counsel in discovery with the intention that I

9    think the idea I believe behind that was that those are the

10   individuals that appeared on the role call as potentially

11   present at the precinct during the relevant period where the

12   plaintiff alleged that the use of force occurred.

13          THE COURT:  Let me stop you for one second.

14          When you say relatively early in the case, do you

15   know when it was that these photos were produced?

16          MR. THADANI:  I think within the first three to

17   six months.  I mean, I don't know specifically.

18          THE COURT:  Three to six months after the complaint

19   was filed or after the CCRB --

20          MR. THADANI:  I believe after the complaint was

21   filed.  And again, this is not a pro se case, but in pro se

22   cases, this is a fairly typical scenario.  The Valentin order

23   is issued.  John Doe defendants need to be identified by the

24   City and also the Corporation Counsel.  And sometimes that

25   results in photographs being provided to the plaintiff to

1   identify somebody after descriptions are given of who did what

2   and who are the proper defendants in this case.

3            So that occurred here.  There were, I think, roughly

4   36 photographs in total, give or take, that were provided to

5   the plaintiff's counsel.  There are letters on the docket that

6   relate to that review with some of which we cited in our

7   papers.

8            And ultimately plaintiff identified two individuals

9   as who she's stated were the ones who assaulted her.  Those

10  are former defendants now, Forgione and Weitzman.  They remain

11  as defendants in the case on the excessive force claim all the

12  way through all of discovery and our summary judgment motion.

13  In fact, today, the complaint that's in this case still names

14  Forgione and Weitzman as the individuals who used excessive

15  force on her, even though they're no longer defendants in the

16  case.

17           It was on summary judgment in opposition that

18  plaintiff presented an affidavit that stated that Eric Ryan,

19  who is one of the defendants, and one of either

20  Joseph Digennaro, David Camhi or Keith Laliberte, who are the

21  other defendants in the case, assaulted her.

22           The purpose for -- to get to your question, what

23  we're sort of intending I think for trial is these photographs

24  are relevant to credibility primarily.  By plaintiff's

25  counsel's admission, they listed two of these photographs as

21

1    their own exhibits and in the JPTO stated that these

2    photographs are relevant to credibility and personal

3    involvement.

4            And the reason why is because -- it goes to

5    credibility is because she had photographs of many individuals

6    at the precinct, including the four defendants who are in the

7    case now, and discounted them.  She identified two individuals

8    and not these other individuals, including the four defendants

9    in the case now.  The fact that that occurred, I think from

10   our view, is clearly relevant to her credibility in terms of

11   the events that she's saying occurred and who committed them.

12           THE COURT:  When you say the photos are relevant to

13   credibility, you want to cross-examine her on the fact that

14   she received 36 photographs including the named defendants and

15   did not select any of them as the individuals she believed

16   were there, or that she had selected two who are no longer

17   defendants in this case?

18           MR. THADANI:  I mean I think our -- you know, I

19   don't know for sure, but I think our intention would be to

20   question about the process.  So you were provided photo -- you

21   gave descriptions, et cetera, you were provided with

22   photographs, you reviewed those photographs and perhaps using

23   some as exhibits to show her some of the photographs she

24   reviewed, have her, I think, yes, establish that she

25   identified two individuals, she didn't identify the four

22

1    individuals who are defendants in the case now.

2          You know, in terms of exactly the sequencing and

3    questioning, you know, I'm not entirely sure, but I think

4    ultimately it would be on a cross-examination, questioning her

5    through the process of reviewing photographs and who she

6    picked and who she didn't pick.

7          THE COURT:  So let me ask you a little bit about

8    your theory of relevancy because now I -- thank you, I

9    understand the chronology of it better.

10         I think I would understand your point better if this

11   were a misidentification case.  You know, but in this case as

12   I understand it, and correct me if I'm wrong, there's a real

13   credibility issue for the jury to resolve in terms of what

14   happened in the precinct because Ms. Martinez is saying she

15   was physically assaulted by two of these officers and others

16   failed to intervene or stood by in some way intentionally and

17   egregiously.

18         And as I understand it, the City and the individuals

19   are claiming that that didn't happen, that she essentially

20   inflicted these injuries upon herself and then is falsely

21   claiming now that it was done to her.

22         So if that's the case and there's no dispute that

23   these four officers were in the station house and interacted

24   with her in some way, which is why they're named defendants

25   and why summary judgment wasn't granted against them, why is

1    her failure to identify the photos some months after the event

2    relevant to her credibility about whether she's telling the

3    truth or not?

4              MR. THADANI:  Sure.  I have several responses to

5    that.  First of all, we didn't actually move on excessive

6    force, so there was no determination as to whether the --

7    actually don't know that all of these individuals interacted

8    with the plaintiff.  I don't know that -- I don't think the

9    evidence is necessarily going to bare that out.  I think it's

10   probably undisputed that three of them did.  Whether defendant

11   Laliberte --

12             THE COURT:  Which three?

13             MR. THADANI:  Ryan, who was the arresting officer,

14   Digennaro and Camhi.  You know, I don't know what the evidence

15   is exactly.

16             THE COURT:  Let me ask about the fourth while we're

17   on this real quick.

18             MR. THADANI:  Sure.

19             THE COURT:  And then Laliberte, there's no dispute

20   that he was seated at the desk, as plaintiff's counsel said,

21   you know, within view of the room, right?

22             MR. THADANI:  He was a desk officer.  He was seated

23   there.  Whether or not he was there at the time depending on

24   which version of events you go with, that I can't -- you know,

25   I don't know what the evidence will bare on that.  But with

24

1   respect to the fact that he was a desk officer at the time,

2   yes, he was.

3          THE COURT:  And "at the time" meaning in the

4   precinct on the night that she was in custody during the hours

5   she was there?

6          MR. THADANI:  Yes, that's correct.

7          THE COURT:  Thank you.

8          MR. THADANI:  I think, again, our -- I didn't read

9   plaintiff's counsel as -- their opposition as indicating this

10  wasn't relevant so much as it opens the door to other

11  information, which I just have a response with respect to that

12  as well.

13         With respect to Your Honor's question as to

14  relevance and credibility, yes, this is ultimately a question

15  about did X happen or did Y happen.  But the fact that, given

16  our contention is that this did not occur, any details that

17  she gives that are inconsistent that indicate an inability to

18  identify the alleged -- I mean, she's in a room by herself,

19  it's well lit, no one's wearing a mask, this is pre-COVID, one

20  would think that she would remember these people's faces.

21         And the fact that she identified different

22  individuals as the ones who assailed her -- and again, this is

23  not like 30 seconds.  She's alleging this goes on for ten, 15

24  plus minutes.  Okay?  And she's bringing this lawsuit to

25  testify about it.  The fact that she doesn't identify these

1  individuals -- in fact, there are statements on the record, on

2  the docket from the plaintiff's attorneys, that says we've

3  ruled out these people as even being involved.

4         Now, two of those people are defendants today.

5  Okay?  And the fact that they listed these photographs and

6  indicated it's relevant to personal involvement, which is

7  still an issue as we've raised already, there's four

8  defendants on a claim involving two people, and to her

9  credibility, they've conceded that much.  And again, I think

10  it's -- it clearly bears on her credibility generally that she

11  saw photographs, identified two other people, did not -- most

12  importantly that she didn't identify these people.  She saw

13  their photographs.

14         And to the extent plaintiff's counsel argues

15  authenticity or the photographs don't look like them, that's a

16  weight argument.  The jury can see the individuals who are

17  sitting in the courtroom and the photographs and can make an

18  assessment on their own, do these photographs look similar?

19  Do person A and B who are dismissed look like person C, D, E

20  and F or not?

21         But that to -- our view is that it's clearly

22  relevant to her credibility, even if it's not the ultimate

23  issue, which is, you know, did X occur, did Y occur?  Any

24  statement she gives with respect to the incident bears on her

25  credibility as to whether it occurred, especially when we're

26

1    saying it didn't happen at all.

2            THE COURT:  Okay.  I think I understand your

3    position.

4            Let me ask counsel for plaintiff, is the City

5    correct that you're not opposing admission of the photos on

6    relevancy grounds, and that your argument is that if they are

7    used to cross-examine her, that the jury should also hear

8    evidence of the City's discovery violations because the delay

9    is, in some part, responsible for her failure to identify them

10   or might be responsible?

11           MR. HARVIS:  No.  I think we're arguing part of

12   that.  But I think that we -- I think that we think that

13   they're irrelevant to her credibility.

14           THE COURT:  Irrelevant?

15           MR. HARVIS:  Yes, irrelevant.

16           And the reason why we think that is because, well, a

17   couple of things.  One is, there are procedures that parties

18   use during discovery if they want to record someone's response

19   to photographs.  You know, you can -- at a deposition, you can

20   bring out the photographs, you can say, hey, will you look at

21   these and tell me what you think.  You know, and is this the

22   person, is this not the person?  There was no procedure of any

23   kind even remotely resembling that.  They never asked her

24   about the photographs.  They deposed her twice, never asked

25   her a single question, never served a discovery demand that

1   required her to respond to these.

2          What they're doing is, they're taking her attorney's

3   statements that were put on the record as part of a good faith

4   process to narrow down who should be in this case and, you

5   know, treating those as if they're statements out of the mouth

6   of Rosie Martinez in a session where everyone understood what

7   was being asked and what was going on.  I mean, for all --

8   this record, it might -- she may very well have identified

9   them and counsel thought there was some strategic reason to

10  describe it in another way.

11         I mean, I'm just saying there's a lot of layers

12  between her review of the photographs and the information that

13  would provide a good faith basis for them to question her

14  about it to begin with.

15         And then if I --

16         THE COURT:  And let me just ask you real quick.

17         MR. HARVIS:  Yeah.

18         THE COURT:  Was there ever any array -- and either

19  counsel address this.  Did Captain Hanrahan or anyone else

20  during the IAB investigation show her any photographs?  And if

21  not, does anyone know why not?

22         MR. HARVIS:  I will let defense counsel answer that.

23         MR. THADANI:  No.  I mean, the investigation, it

24  wasn't an internal affairs investigation per se.  It was a

25  command-level investigation.  And the reason it was a

1    triggered was because there was a prisoner injured in custody

2    and it was triggered by the fact that plaintiff's counsel at

3    central booking requested medical attention, was sent to the

4    hospital with respect to that.

5         THE COURT:  So why weren't -- is -- are photos not

6    typically shown as part of that process to see if they can

7    identify who the individuals were that allegedly caused the

8    injuries?

9         MR. THADANI:  It does happen.  It does happen.  The

10   investigation documents that we have indicate that plaintiff

11   denied wrongdoing by members of service and, therefore, that

12   process was not undertaken.  And the documentation reflects

13   the observations of two of the defendants in the case, Ryan

14   and Camhi with respect to her punching a wall and kicking at a

15   cabinet and needing to be restrained as a result.  So it

16   didn't get to the point where there was identification

17   procedures.

18        THE COURT:  And as I understand it -- I don't want

19   to get into the -- into all the issues around the handwritten

20   report just yet, but I think my understanding is that

21   plaintiff is denying that that interview ever took place.

22   She's claiming she was never interviewed, and of course

23   Captain Hanrahan is not here to answer that question himself

24   or give his version of what he did during the investigation.

25        MR. THADANI:  That is accurate on both accounts.

1          THE COURT:  But as far as we know, nobody during the

2    command -- it's called command-level investigation?

3          MR. THADANI:  Yes.

4          THE COURT:  Ever showed her any photographs of any

5    of the individuals?

6          MR. THADANI:  Not that I'm ware of.

7          One thing I will say, Your Honor, with respect to

8    the questions about deposition.  So I was not counsel at the

9    first deposition.  However, at that point, Forgione and

10   Weitzman were substituted as defendants for the John Doe

11   defendants, and there was no -- there was no questioning on

12   the photographs.  That is true.  With respect to the second

13   deposition, there could have been and would have been

14   questioning.  And there is a record of that.

15         So first of all, that deposition was very limited in

16   scope, partially because of plaintiff's counsel and my

17   negotiation with respect to certain topics that would be

18   raised and moreover because the magistrate judge's view with

19   respect to the proper scope of that deposition.

20         THE COURT:  And that was because it was necessitated

21   by all the late disclosures after that?

22         MR. THADANI:  Partially.  I mean, really I think

23   what the precipitous for primarily the second deposition was,

24   was a change in claims and damages that were being alleged in

25   the case.  There were several more claims being added.  There

1    was a different set of damages being asserted.  There was a

2    lot more medical treatment being asserted, et cetera.

3           So generally the deposition was limited in scope

4    with respect to new claims and damages either newly being

5    asserted or being asserted since the last deposition, so

6    really like a change in circumstances.

7           Plaintiff's counsel has represented several times in

8    attempt to amend the complaint to clarify who she was alleging

9    the excessive force claim was against.  That never happened.

10   Still hasn't happened.

11          Before the deposition, I sent plaintiff's counsel an

12   e-mail, it was on March 18th, 2019, and stated that -- and

13   this was almost a year before the deposition actually took

14   place, the plaintiff's deposition, you know, we talked about

15   what were the topic areas that were appropriate for that

16   deposition.

17          And I state in that e-mail that we had talked -- it

18   was reflecting a phone conversation that we had, that we

19   talked about that if the plaintiff makes any amendments to the

20   complaint, that we would question about those amendments.  And

21   the idea behind that was exactly this.  Had plaintiff amended

22   the complaint to name different defendants on the excessive

23   force claim, I would have asked and shown those photographs

24   and asked these questions.

25          Moreover, at the end of that deposition, and it's on

1   the transcript, I reserved the right to continue the

2   deposition in the event that plaintiff amends the complaint to

3   change her allegations with respect to that claim.  That also

4   still has not happened.  So I just want to just address that

5   because seems to be like a big point here.

6           THE COURT:  And did you ever go back to the

7   magistrate and request a third deposition after --

8           MR. THADANI:  At that point, no, because discovery

9   had -- by the time they changed their view, which again still

10  hasn't fully been cemented, discovery is long closed, we're in

11  motion for summary judgment practice.  And so no, that did not

12  happen.

13          THE COURT:  Understood.

14          I think before we got into that issue, you were

15  going to address the threshold question about the relevancy

16  and admissibility of the headshot identification.

17          MR. HARVIS:  Thank you.  I'll try to do that very

18  briefly.

19          So yes, I'm glad that the Hanrahan report and the

20  IAB and CCRB investigation is now something that we've all

21  discussed, because when we were dealing with all of this, when

22  we were -- when plaintiff, who by the way -- you know, we talk

23  about her giving a 50-H and having these depositions, I mean,

24  she has repeatedly described the officers who assaulted her.

25  She's done it consistently in detail, and it was on the basis,

1    on the strength of her identification that we had tried this

2    process in good faith to get these photographs.

3          And the reason why that was necessary is because

4    there was a really severe coordinated deception and

5    concealment going on where when we were negotiating with them

6    about the photographs and trying to work with Judge Pollak to

7    get the disclosures that we needed, we didn't know about the

8    Hanrahan report, we didn't know that this guy, Lieutenant

9    Camhi, had called internal affairs and called in that a woman

10   had been injuring herself, we didn't know that documents in

11   the Hanrahan report would indicate that both Ryan and Camhi

12   had restrained Ms. Martinez.

13         If we had known all of that, we would've obviously

14   looked at the photographs in a different light than -- and

15   this is really what we're getting at with the question of, you

16   know, what is the jury going to be learn about this, because

17   there's -- there's -- the reason why terminating sanctions

18   were recommended in this case is because I believe Judge

19   Pollak described it as, you know, the worst instance of people

20   chasing their tails without the right information that she'd

21   ever seen in her career.

22         And so, you know, we think that the idea of taking

23   two separate productions where in a very choreographed process

24   where we were trying to get to the truth but we had none of

25   the information that we should've had, and then subselect from

1    those 36 photographs this piecemeal exhibit of six

2    photographs, we don't know when they were taken, we have no

3    idea if they resemble these people or if they resemble them on

4    the night of January 23rd, 2015.  And there were plenty of

5    opportunities to take discovery on that, to sort that out, to

6    get information on that.  None of that was done.

7              And the idea that now, you know, Ms. Martinez is

8    going to be presented with this evidence and that the

9    arguments are going to be made in a vacuum about how crazy it

10   is that she couldn't pick these people out, we think it's

11   misleading to the jury, we think it's not probative in the

12   least, and we think it's highly prejudicial, and we think 403

13   should exclude the evidence.

14             THE COURT:  So if I were to allow the defendants to

15   ask her a limited series of questions about, you know, was she

16   provided photographs or confirming that she was provided

17   certain photographs at a certain time and she can answer

18   truthfully and to the best of her ability, you know, whether

19   she recognized them or was able to identify them and why and

20   you can certainly ask follow-up questions when you examine

21   her, what, if anything, would you have the jury be told about

22   that history and how would you have it come in without this

23   turning into an unwarranted mini trial about discovery

24   violations that the jury will not understand and would risk

25   making a mess of things?

1          MR. HARVIS:  I think what we would want to say is

2    something like early in this case around the same time that

3    these photographs were produced to Ms. Martinez's counsel, a

4    judge in this court determined that they had violated 14 court

5    orders in connection with the provision of information that

6    was needed to identify them and recommended that the case be

7    dismissed without a trial.  And while that order wasn't

8    ultimately adopted, that was a recommendation of a judge of

9    this court regarding their conduct in the events surrounding

10   these photographs.

11          And also, you know, you should know that

12   Ms. Martinez herself, there's no record that she ever even saw

13   all these photographs or what the circumstances were.  I mean,

14   that's my concern, is that they really lack a good faith basis

15   to how do they decide whether she's being honest or not when

16   she responds to these questions.  They weren't there when she

17   showed -- was showed the photographs.  She's speaking, you

18   know what I'm saying, through an attorney writing a letter to

19   the Court.

20          And so I just think, she may say -- they may say,

21   well, did you ever receive these photographs?  And she could

22   truthfully say no.  Did you ever go to your attorney's office?

23   And now we're in the realm of attorney-client communication

24   and what happened in our office with me and Ms. Fett and

25   Rosie Martinez.  And they're allowed to cross her and suggest

1   that her answers are -- she's lying and now they're going to

2   cross her with letters that her attorneys wrote.  I just think

3   the whole thing -- there's a reason why it's a much easier

4   path to just say that that's not an appropriate area of

5   cross-examination on this record and we don't need to talk

6   about the sanctions.  That's kind of how we're seeing it land.

7           THE COURT:  Mr. Thadani, briefly, what's your

8   response to the concern Mr. Harvis raises about

9   attorney-client privilege and communications with her

10  attorneys given that the only evidence you have -- I wasn't

11  aware that there was no formal photo array or that she wasn't

12  asked about in her depositions, but given that the only -- if

13  she says I haven't seen these photographs, your only option is

14  to cross-examine her on statements she made to her attorneys.

15          MR. THADANI:  Yes.  I have responses to the other

16  points, but I'll address your question first.

17          So my response is, first of all, we don't believe

18  this is an attorney-client issue.  There's letters on the

19  docket filed by the plaintiff's attorneys, and again, I

20  believe those statements are imputed to plaintiff, that

21  describe what occurred.  So if there was a privilege, it's

22  waived because it states that she reviewed these photographs.

23  There's two, I believe at least two letters, one of which

24  indicates she has reviewed photographs in the CCRB file, and

25  these are not the folks who she alleges assaulted her.

36

1   There's one statement like that.

2          And then there's also then I think more than one

3   letter that indicates the review of the remaining photographs

4   and indicating that the parties were in an attempt to identify

5   the proper John Doe defendants and these defendants, that

6   process is over, and we're amending the complaint to name

7   these two individuals.

8          So, first of all, to the extent there's an

9   attorney-client issue, I don't believe that there is because,

10  again, it's been waived and it's on the docket and those

11  are -- even though they're through counsel, there are

12  plaintiff's statements through counsel as what occurred, that

13  she did review them.

14         And that's how we got where we got.  We would not

15  have had -- like, how else did these two defendants get into

16  the case, Forgione and Weitzman?  She did not have -- their

17  name isn't in any other paperwork as reflecting involvement in

18  the case.  And it's clear on the docket that she reviewed

19  photographs.  Then we provided the names of those two

20  individuals that she identified.  And then those individuals

21  were named in the complaint as the defendants in the case.

22         THE COURT:  Let me just stop you right there.

23         Are you disputing, Mr. Harvis, that she did at some

24  point identify Forgione -- and who was the other defendant?

25         MR. THADANI:  Weitzman.

1          MR. HARVIS:  Yes.  Based on the information we had

2     at that time -- and these people are similar looking to the

3     descriptions that she provided, and so no, we're not denying

4     that.  But the City is the one making the motion that nothing

5     related to dismiss claims can be discussed at the trial, but

6     now we're going to be informing the jury of who all the prior

7     defendants were and how -- what the process was of amending

8     the complaint.

9          I mean, I understand -- I don't think that should be

10    done, but I can't imagine how that could be done without us

11    going through why all of that was necessary, which I don't

12    think is evidence that they want to have come in at the trial.

13         MR. THADANI:  May I address that.

14         So, first of all, I don't think our intent is to get

15    into amending complaints.  It's more about who she identified

16    as opposed to complaints were amended or not, who were named

17    as defendants.  I don't think we need to get into that level.

18         THE COURT:  I'm sorry.  So you do plan to ask her

19    about naming defendants?

20         MR. THADANI:  No.  No.  No, not intending.

21         THE COURT:  So just simply the fact of the

22    identification of two officers who are not defendants in this

23    case --

24         MR. THADANI:  I think it's as simple as, you review

25    photographs, and then showing her the two photographs of the

38

1    people she identified confirming those are the people she
2    identified, showing her the other four photographs of the
3    defendants; now you reviewed these photographs, you didn't
4    identify them.  Essentially like long and short.

5              With respect to the reference to sanctions and all
6    that, I think what I'd say is, first of all, it's unclear to
7    me why plaintiff's counsel can't simply say we didn't have
8    documentation at the time.  Like, for instance, if we ask
9    those questions on a redirect examination, why they can't
10   elicit the lack of certain documentation that they think is
11   important that would've affected that identification process
12   without raising sanctions and recommendations by a magistrate
13   judge that were not adopted.  And again, that would lead to a
14   mini trial with respect to the sanctions whether they're
15   appropriate or not.

16             Moreover --

17             THE COURT:  And I see your point about the
18   recommendations that weren't adopted, but the part of Judge
19   Pollak's R and R as to liability and as to the violations was
20   adopted and followed by Judge Donnelly and, again, referenced
21   and adopted followed by Judge Kovner in her summary judgment
22   decision when she declined to disturb the sanctions
23   recommendation but did adopt the liability portion.

24             So, you know, I see plaintiff's request as coming in
25   two parts.  They may want both of those, but potentially I

1    could see a middle ground in which -- and I'm not saying this

2    is what we're going to do, but in which the jury is told that

3    there were these 14 discovery violations and that the photos

4    of your clients currently were not produced or that the names

5    of them and that the records identifying them were not

6    produced until after those violations came to light, but is

7    not told what recommendations were from a magistrate that

8    ultimately weren't adopted by the district judge.

9              MR. THADANI:  Judge, a couple of points.  I'm not

10   sure what Your Honor means by the liability recommendation was

11   adopted.

12             THE COURT:  Sorry.  The aspect of the R and R,

13   there's a portion in Judge Donnelly's decision where she says

14   I'm adopting this portion of Magistrate Judge Pollak's

15   decision in full as to -- and I apologize if it wasn't the

16   word liability, but something along the lines as to the fault

17   or the violations themselves.

18             MR. THADANI:  Sure.

19             THE COURT:  Finding as fact that those were willful

20   and intentional violations.  And again, the number of them,

21   14, whether that comes in or not is, you know, something I'd

22   want to consider.

23             But what's your response to the argument that at the

24   very least if the jury is going to hear about the photographs

25   and the sequence, that the failure to reveal all of the

40

1    documentation, you know, that proves what is essentially

2    undisputed, which is the defendants' presence there

3    restraining her, all of that, shouldn't be told to avoid

4    confusion?

5          MR. THADANI:  So I think it goes to just the fact

6    that these are photographs of people.  Okay?  So in a criminal

7    case if you're identifying who robbed you and you're looking

8    at photographs, you can identify the person who robbed you.

9    You don't also then need to see the surveillance video, their

10   criminal history, everything about their -- all the evidence

11   in the case.  You don't need that to look at photographs.  I'm

12   looking at you, Your Honor, right now for the first time in

13   person.  If I see a photograph tomorrow, I'll say, oh, that's

14   Judge Morrison, I remember her.  I don't need to see anything

15   else to do that.

16         So, first of all, they're photographs -- I believe

17   plaintiff's counsel is using this as a way to get into

18   evidence something that should not be in evidence.  They

19   haven't really explained, okay, we got this paperwork later,

20   how did that affect the identification of looking at

21   photographs and identifying who you allege did something to

22   you?  It doesn't.  And again, the way -- if they want to

23   remedy that by indicating that they didn't get certain

24   documentation at that time, you didn't have the Hanrahan

25   report, you didn't have the memo books, you didn't have this,

1   you didn't have that, they could do that.  And that's a way

2   to -- if they believe that's a proper argument to make with

3   respect to the photograph identification, why it may not be as

4   foolproof as it otherwise may have been, they can do that

5   without raising the issue of sanctions being raised.

6          And again, I did raise this in the papers.  The

7   sanctions are against one of the five defendants that are

8   remaining in the case.  The City of New York, yes, is a

9   defendant in the case.  Obviously Your Honor is aware we have

10  a motion in limine with respect to that issue.  But without

11  getting into that specific issue, the four individual

12  defendants were not defendants in the case at the time.  The

13  stanchions were not asserted against them.

14         For the jury to hear that sanctions were being

15  asserted in a trial that they're defendants in is unfairly

16  prejudicial to them because they weren't involved, they

17  weren't parties to that.  And so that's another reason why

18  reference of the sanctions -- first of all, it's unnecessary,

19  because, again, they are photographs.  This is not an

20  allegation that we provided false photographs and then gave

21  them the real photographs or we gave them photographs of when

22  they were babies and then we gave them photographs of when

23  they were adults.  They're the same photographs.  No new

24  photographs came to light.

25         So again, I know plaintiff is raising this issue as

1   a conclusory, well, we didn't get the stuff, it's sanction

2   discovery misconduct, but how -- how did the viewing of

3   photographs, how would it be different if we had more

4   information. That frankly goes to her credibility. If we had

5   known that Camhi was involved, we wouldn't have picked Camhi.

6   That does go to her credibility. She's just picking the

7   person who she can most clearly say was involved versus the

8   person who actually did it. That's sort of the issue here.

9           THE COURT: Thank you. I think I understand your

10  argument.

11          Let me just go back really quickly to Captain

12  Hanrahan's investigation.

13          What's your position on what time or do you have any

14  information about when his investigation actually began? Was

15  it the same day as her arrest or the day she was taken to the

16  hospital? Was it shortly thereafter?

17          MR. THADANI: I believe it was within 12 hours of

18  when she was taken to the hospital.

19          THE COURT: Okay. And as I understand it, your

20  argument for the reason why the date on the report, the

21  incorrect date, which is six days before her arrest, is listed

22  is because he was using a template from another case, an

23  electronic template that he essentially pulled up on the

24  screen and filled out, and that's why we see not just the same

25  date, but also the same case number as the case that's not

1    about Ms. Martinez; is that right?

2              MR. THADANI:  Correct.

3              THE COURT:  Okay.  But as far as we know, there is

4    no evidence that he showed Ms. Martinez any photographs of any

5    of the officers who were at the precinct that night at all?

6              MR. THADANI:  No.

7              THE COURT:  Okay.  And we don't know why he didn't

8    do that other than if she was interviewed, she may have denied

9    that any officer caused her harm?

10             MR. THADANI:  I mean, it would require a fair amount

11   of speculation.  But if I'm permitted to speculate, I would

12   state that, yes, I mean, based on the report that's there, it

13   says that she denied wrongdoing by members of service.

14   Understanding that's not what she's alleging in this lawsuit,

15   I understand that, but that's what the document indicates.

16             Now, in an alternate universe where instead what it

17   reflected was she identified wrongdoing and I don't know who

18   it was, there may have been a photo array procedure done.

19   That's done sometimes.  I can't say for sure it would've been

20   done.  I don't know.  But it may have been.  So if I'm

21   speculating as to why it didn't happen though, I think it's

22   because the report does not indicate that plaintiff was

23   asserting wrongdoing and couldn't identify who did it.  It was

24   more that she denied it and that's the reason.

25             THE COURT:  Right.  Although, in some ways, isn't

1    that -- and I recognize with all your caveats that we are

2    speculating because he's not here one would certainly think

3    that an official investigation, just like he would document

4    who he interviews, he would document if he showed her

5    photographs.

6          And in some ways I think your last answer got back

7    to my original concern, which is, if the question in this case

8    really was the identities of the officers and her ability to

9    perceive and recall their faces, that would've been something

10   he would have looked into very early on as opposed to the

11   issue which we're dealing with today, which is really the same

12   issue he began to investigate, which is, were her undisputed

13   injuries caused by some improper use of force, failure to

14   provide her with timely medical care and/or failure to

15   intervene or not and who's telling the truth, not who's

16   accurately remembering faces?

17         MR. THADANI:  I understand that, Your Honor.

18   However, again, just to reiterate the point we made is, I'm

19   not saying that is the central issue in the case.  It is not

20   the central issue.  Frankly, it is still an issue in the case

21   because, again, plaintiff still hasn't identified who it is.

22   But I don't think it's the central issue in the case.

23         The central issue in the case is, which version of

24   two different events really wins the day?  But again, like, I

25   think the fact that she's alleging this happened to her, the

1    circumstances under which it happened to her, there's no

2    masks, we're in a room with two people by myself, it's well

3    lit, this is a traumatic, it's very serious allegations, my

4    fingers are bent backwards, I'm put in chokehold, my feet are

5    stepped on, my hair is pulled.  The fact that she then

6    describes them, what they look like, that's undisputed, I

7    don't see any way that's not coming in, and looked at

8    photographs, you know, understanding it's not immediately

9    thereafter, but looked at photographs of individuals who were

10   there at the precinct and identified certain people and, more

11   importantly, precluded the people who are on the case now, it

12   still speaks to her credibility just like, for instance,

13   Laliberte allegedly, 13 months before this incident, may have

14   given a false statement.  It was unclear, but may have, by

15   plaintiff's version of events, given a false statement with

16   respect to an unrelated event, that goes to credibility.

17          This goes to credibility because it speaks

18   specifically to her recollection of the events, what she is

19   stating about the events and where this is really a

20   credibility case about event A versus event B, it's a crucial

21   part in assessing her credibility.  And again, plaintiff's --

22   we didn't tell them to do this.  In the JPTO, they listed two

23   of the photographs and wrote by themselves -- we didn't tell

24   them to do it.  They wrote relevant to credibility.  They

25   wrote relevant to personal involvement.  They did that.

1          THE COURT:  I think I understand that as talking

2     about the defendants' credibility, or are you saying that the

3     photos are relevant to her credibility?

4          MR. HARVIS:  No, Your Honor, we're talking about the

5     defendants' credibility.

6          MR. THADANI:  Their photographs are relevant to

7     their credibility?

8          THE COURT:  Let me ask this because Mr. Thadani

9     raises a good point.

10          What, if anything, do you intend to offer with

11     respect to photographic evidence if I grant your motion to

12     preclude Ms. Martinez from being questioned about photos -- a

13     full array of 36 photos that you would get in discovery?

14          MR. HARVIS:  Yeah.  We would have no -- as far as

15     I'm concerned, I don't think we would have any use for any of

16     the photographs if we did that.  And again, I just want to

17     say, I mean, you know, it's not like in every case it's some

18     part of a preliminary process where the plaintiff is presented

19     with photographs.

20          I mean what Judge Pollak was attempting to do was

21     have Corporation Counsel identify these people.  And the only

22     reason that the photographs even entered the case was because

23     they professed to the Court that they couldn't do that because

24     there was no incident.  Because the individual officers,

25     whether they were defendants or not, concealed their

1    involvement.  Officer Ryan, who was the arresting officer,

2    went to CCRB and was asked, you know, 45 minutes of questions

3    about what happened that night, and he never made one mention

4    of Rosie Martinez.  And he allegedly went into a room and

5    she's punching a wall.  And so that's the record that we had.

6            We had a record of him denying, you know, omitting

7    that anything happened.  None of the documents that would've

8    showed us who did it, there wouldn't have been any photographs

9    in this case if they had just done the investigation that the

10   Court ordered them to do.  And so as a result of them not

11   doing that, they then created this situation where

12   manufacturing and using and through invading attorney-client

13   interactions and attempting to kind of read the tea leaves of

14   what we wrote on pages in the docket, they're now going to

15   cross-examine it on her and the jury's not going to hear the

16   context in which that was going on.  We think that that's

17   really prejudicial and misleading, and so that's -- that's

18   really what it comes down to.

19           MR. THADANI:  Your Honor, if you don't mind, just

20   because I have the JPTO in front of me, I just make a record

21   here.  On pages 20 and 21 on the JPTO, which is Docket 201,

22   this is with respect to Exhibits 23 and 25, they wrote, quote,

23   on Exhibit 23, Ryan's appearance -- and this is -- they listed

24   his photograph, Ryan's appearance is relevant to personal

25   involvement and plaintiff's credibility.

48

1          With respect to Exhibit 25 -- this was Digennaro's

2    photograph -- defendants' appearance is relevant to personal

3    involvement and plaintiff's credibility.

4          I just wanted to note that on --

5          MR. HARVIS:  And they do both match the description

6    that Ms. Martinez provided from the beginning.  So I don't

7    think that it doesn't -- I think that it supports her

8    credibility to the extent that it's appropriate to admit it,

9    but we think that it's going to go down a very misleading and

10   problematic path for us to admit it.

11         THE COURT:  Before we move on, because we have a lot

12   to cover, let me ask the parties to just supplement if you can

13   jointly -- and I hope this will be simpler than having you

14   each do it.  I'd just like to get a little more information as

15   to the timing and the manner of when all of these

16   36 photographs were provided to the plaintiff through her

17   counsel.  And the timing of any response that the City submits

18   is relevant, you're welcome to add, you know, anything you

19   think.  I just want to get a sense of the time that elapsed.

20         And to the extent -- I don't think you have it, but

21   you have any additional information about when Captain

22   Hanrahan's investigation began and ended.  If not, you can

23   just rely on the representations you made here today.  I know

24   we're trying to recreate something with a deceased witness and

25   an incomplete file.

1          MR. THADANI:  Just to clarify, because I'm not sure

2    if I heard correctly.  Did you want us to submit a joint

3    letter with respect to the timeline?

4          THE COURT:  Sure.  Why don't you submit the letter

5    as a proponent of the photographs.

6          MR. THADANI:  Okay.

7          THE COURT:  But please confer with your adversary to

8    the extent Mr. Harvis and Ms. Fett any differing statements or

9    accounts as to when those were provided to you.

10          MR. THADANI:  I believe the docket is pretty clear.

11    I mean I think I can do that just based on citing to the

12    docket.  If I have questions, I'll certainly reach out to

13    plaintiff's counsel.

14          THE COURT:  Thank you.

15          Let me just ask before we move on, Mr. Harvis, to

16    respond briefly to the City's argument that there's some

17    manifest unfairness in having the individual officers bear the

18    brunt of any taint from the sanctions history in discovery

19    violations since they were not individual defendants in the

20    case with the understanding the City is still a defendant and

21    that's a separate issue.

22          MR. HARVIS:  Right.  I mean I think it's a valid

23    concern to keep in mind that although, for example, Ryan

24    conceal his involvement and we do believe that that was

25    directly proximately caused part of what happened, we think

50

1    that that could be dealt with through a jury instruction just

2    saying that, you know, the individual defendants were not part

3    of the case at that -- I don't think we should be getting into

4    any of this, frankly.  I think it's really confusing for the

5    jury.  But I think if we had to deal with it, we would say

6    that the individual defendants were not a part of the case at

7    that time, and the City of New York, you know, is the one that

8    was responsible for complying with the Court's order,

9    something like that.

10              THE COURT:  Right.  Okay.  Thanks.

11              Speaking of jury instructions, I wanted to ask you

12   now about plaintiff's motion for an adverse inference

13   instruction to the jury about the prisoner pedigree form and

14   the prisoner holding pen roster.

15              So I've reviewed your briefs and the relevant

16   authorities and I know that the undisputed legal standard

17   here, which I don't think either side disputes, is that the

18   Court can grant an adverse inference for spoliation if and

19   only if, first, the party who had control over the evidence

20   had a duty to preserve it at the time it was destroyed,

21   second, the evidence was destroyed with a culpable state of

22   mind and, three, a reasonable trier of fact could find that

23   the evidence would have supported the movant's case.

24              I'm also aware with respect to the second prong, the

25   culpable state of mind, there is some authority in this

1    circuit that was cited by Judge Kovner in her Lekomstev,

2    L-E-K-O-M-S-T-E-V, decision that this state of mind can in

3    some cases be established by evidence of negligence.

4           So here's my question for the City.  My concern I

5    have here is that the City, you know, as you pointed out when

6    you were discussing the Hanrahan report, was I noticed very,

7    very early on because there was a prisoner injured in custody,

8    that this was an incident being investigated that there could

9    well be a notice of claim filed, some civil liability

10   resulting at the very least against the City even if they

11   hadn't identified the officers at that juncture.

12          And so, you know, by your account, the investigation

13   obviously didn't start six days before she was arrested, but

14   started very soon after.  And I realize at this point you

15   can't fix the exact date, but certainly very soon.  So why

16   wasn't that investigation enough to trigger a real duty on the

17   NYPD's part, the City's, to preserve these documents, the

18   holding pen roster and pedigree form, and why wasn't there

19   destruction or loss at the very least negligent?

20          MR. THADANI:  So first response is, as I mentioned

21   earlier, the investigation resulted in -- I understand the

22   plaintiff is going to dispute the proprietary of it, but the

23   investigation on its face closed with no allegation of

24   wrongdoing.  And so I don't know that that would necessarily

25   trigger a duty to preserve.

52

1        THE COURT:  Let me stop you right there.

2        So the investigation's conclusion obviously if it

3   results in no allegation of wrongdoing, you know as counsel

4   for the City, that certainly doesn't preclude lawsuits being

5   filed.  In fact, many cases the City has settled for

6   substantial sums had initial internal investigations that

7   resulted in findings of no liability on the part of the

8   officers.  And other cases the City's prevailed on at trial

9   have resulted in initial findings of no liability or

10  wrongdoing on the part of the officer.

11       So that does not -- once an investigation says we're

12  not going to discipline an officer, that doesn't mean the City

13  or the NYPD can start throwing away records.

14       MR. THADANI:  Sure.  I just want to make as a

15  preliminary -- I guess I'm drawing -- this is not my lead

16  point, but just to clarify.

17       THE COURT:  Sure.  And I asked you a very compound

18  question.

19       MR. THADANI:  My clarification just with respect to

20  that is, yes, you're right, there are findings of

21  unsubstantiated, exonerated, et cetera, leads to lawsuits.

22  But in those cases plaintiff, the claimant, the individual, is

23  still alleging wrongdoing even if there's no finding of

24  wrongdoing.

25       My distinction was, the paperwork for that

53

1    investigation indicate that the plaintiff was indicating no

2    wrongdoing by members of service and, therefore, to the extent

3    that that is accurate, there really wouldn't be a thought that

4    there's going to be a lawsuit if they've already talked to her

5    and she's like, no, I'm not saying police did anything wrong.

6              Putting that aside, I think our argument with

7    respect to the adverse inference is less about the duty to

8    preserve.  I think with respect to that it was more about the

9    individual defendants not having a duty to preserve,

10   understanding plaintiff's counsel made some arguments about

11   filing, which is a little bit different.  But our -- I mean, I

12   think part of it -- like, to the extent there's a duty to

13   preserve, I think the ques- -- our point would be more about

14   the nature of the documents, what these documents are.  Okay?

15             So the prisoner pedigree form is a document that is

16   reflected basically verbatim into the command log.  So the

17   document, we don't have the document, can't find the document,

18   the information is not lost to us.

19             THE COURT:  Tell me why that's the case.  Why is it

20   always the case that's what's on the form is the same as

21   what's in the command log?  Why would they have two separate

22   documents --

23             MR. THADANI:  That is what witnesses have testified

24   to and also what is the procedures in the patrol guide.  And,

25   moreover, I believe the function of this document -- I could

54

1    be wrong, and plaintiff's counsel can correct me certainly,

2    their function for this document is, it indicates that

3    plaintiff's physical condition was, quote, app normal,

4    apparently normal, at the time she got to the precinct.

5              THE COURT:  I'm sorry.  I lost a little bit.

6              Which document are we talking about, please?  Same

7    as the command log?

8              MR. THADANI:  Sure.  The prisoner pedigree form,

9    there are questions that are asked about an individual's

10   pedigree, their name, their date of birth, where they live,

11   their physical condition, et cetera.  That information is then

12   transcribed into an arrest stamp that's contained within the

13   command log that has that same information.

14             And I believe with respect to this document,

15   plaintiff's position is the relevance of the prisoner pedigree

16   card, which we don't have, is that it would have said

17   apparently normal as her physical condition.  However, the

18   command log says that her condition was apparently normal.  It

19   is undisputed, we're not disputing, that her condition was

20   reflected as apparently normal.  And, therefore, the document

21   itself is not really relevant to the issues in the case.  Yes,

22   we can't find it.  That doesn't automatically mean, well,

23   there's spoliation and adverse inference because we can't find

24   every single document that may have some relevance in the

25   case.

55

1          So I think with respect to that document, I think

2     from our perspective, it's a really easy issue because the

3     information that's being sought is reflected in other

4     documents, one; and two, it's an undisputed issue that it

5     relates to.

6          So what is the adverse inference?  How would this

7     have been unfavorable to us and unfavorable for her when the

8     information is undisputed and it's already documented in other

9     ways?

10          THE COURT:  Okay.  So I'm going to give plaintiff a

11     chance to respond to that in a minute, but why don't you go on

12     to your next point.

13          MR. THADANI:  And then with respect to the holding

14     pen roster, I believe the position they took in their papers

15     is that it would indicate her physical condition; however,

16     there -- I attached the document as an exhibit, there's no

17     space for that.  And I'm not sure exactly what their basis for

18     that is.

19          What it does indicate is who is being held and when

20     checks are being made on them.  So generally if you check on a

21     prisoner every 30 minutes, 15 minutes, you have to put the

22     time you check that individual.  So the prisoner pen roster

23     that I cite as an exhibit relates to another individual who

24     was arrested along with plaintiff and indicates those times.

25          THE COURT:  So is it your understanding that if an

1    officer is filling out the holding pen roster, they only put

2    in the checks, but there's no substantive information?  So

3    even if they went in and the person had had a heart attack or

4    passed out, they wouldn't put that on the roster at all?

5    They'd just say checked at 10:42 a.m.?

6              MR. THADANI:  No, I'm not saying that.  I tried to

7    address that in our papers too.  There's like two prong.

8    There's a remark section, so you can put comments.  It's not

9    necessarily physical condition per se.  But in the scenario

10   Your Honor provides, it's possible.  I don't know that that's

11   where it necessarily would be documented versus somewhere

12   else, but it may be, so I don't know want to discount that.

13             But really the function of the document is once

14   she's there, that's undisputed.  Right?  Then it's when is she

15   being checked on, that's two.  And then three, this remarks

16   section with respect to Danny Rivera, who was the other

17   individual that was arrested, all it said was he was taken to

18   Queens central booking.

19             THE COURT:  Right.  And if I understand your

20   argument, you're saying that essentially there's nothing to

21   instruct the jury adversely on because there's no basis to

22   believe that the document in any way would have contradicted,

23   in fact, it would've supported the officer's account that they

24   were coming as many times as they said, 17 or however many

25   times they checked on her; and, in fact, under remarks they

1  could well have said, you know, she's kicking the wall,

2  punching the wall, all the things that they alleged her to

3  have done?

4          MR. THADANI:  That may be there.  I think that would

5  refute a lot of plaintiff's argument in the case.  I don't

6  know.  With respect to what they think might've been there,

7  which it could have said, you know, injured hand, has to go to

8  the hospital, there's no real reason to think that because

9  they questioned the individual who is responsible for the

10 document and his testimony was he didn't think she needed

11 medical attention, he didn't observe injuries on her.

12         So yes, we don't have the document.  This is a

13 situation.  We don't have the document.  There's no dispute

14 about that.  But just because you don't have every single

15 document does not lead to an adverse inference.  Because I

16 don't think there's the showing here that an adverse inference

17 is warranted with respect to this document given what we know

18 would have said/even what it does say.

19         THE COURT:  Let me stop you right there.  Let me ask

20 plaintiff's counsel to address specifically this third prong

21 of the required findings.

22         What basis do you have from which a reasonable trier

23 of fact, meaning the jury, could find that the evidence would

24 have or could have supported -- sorry, excuse me, would have

25 supported your case on exactly what issues?

1          MR. HARVIS:  So just to step back for a second.  So

2     what happens is, she's arrested in the evening.  There's --

3     whatever happens overnight happens.  She's either hurt or she

4     hurts herself in their story.  And then, you know, these hours

5     pass from when the incident happens at 12:30 until I think

6     like 5:45 in the morning.  And then no ambulance is ever

7     called.  She's taken to go to central booking along with

8     Danny Rivera.

9          And Danny Rivera's testimony is that, you know, all

10    along she's screaming and crying, they're both demanding that

11    she have medical treatment, nobody is doing anything for them.

12    And then it's only when she gets to central booking and the

13    screener realizes that she's injured, that she goes to the

14    hospital.  And then when Camhi calls internal affairs to first

15    report this, the first time it's ever reported, it's after

16    she's already been checked out medically and they've already

17    confirmed that, you know, she doesn't have any broken bones or

18    whatever.  And so -- and then Camhi tells the internal affairs

19    investigator that she's good, but, you know, she's being

20    released from the hospital and she's going to go back to

21    central booking.  But she doesn't go back to central booking.

22    She gets brought back to the precinct.  And she's kept there

23    basically all day.

24          And so nobody has any explanation for why that

25    happened or really any recollection of it happening.  And so

1    it leaves a lot of questions, you know, that we don't have any

2    basis to answer that would potentially be answered by this

3    roster about, you know, after she's injured, who's checking on

4    her?  They're saying they're checking on her.  Is that

5    testimony true?  When Ryan says he checks on her 19 times, is

6    this a document that's going to show that that's, you know,

7    consistent with the documentation or it's refuted by the

8    documentation?  Of course we don't know what the remarks say.

9    But whenever there's spoliation, you never know what the

10   document is going to say.

11           And the Second Circuit has said that the person who

12   is dealing with a lost document can't be held to too strict a

13   standard because we're all speculating about what this

14   document shows.  And the reason -- Your Honor was exactly

15   right.  As soon as someone was injured in their custody, the

16   responsible thing for the municipality to do is to collect all

17   the documents and then figure it out later, whether it's a

18   valid -- you know, a valid issue or not.  And so --

19           THE COURT:  And I don't hear the City disputing you

20   on the duty to preserve part.  I think they've -- correct me

21   if I'm wrong, Mr. Thadani, but essentially conceded that there

22   was some duty on the City's part, if not the individual

23   defendants' part, to preserve these documents.

24           I think the concern that they have raised, which I'd

25   like you to address, is that even if you cannot say with any

60

1    certainty what these documents would have shown, what are you

2    actually have beyond pure speculation that there would've been

3    something helpful to your case in those documents that would

4    really justify this pretty extraordinary remedy of an adverse

5    inference?

6           MR. HARVIS:  Sure.  Well, I mean, we know -- just by

7    their very design, we know that the prisoner pedigree form is

8    designed to capture her physical condition, which is like the

9    most important issue in dispute.  And sure, we can assume it's

10   identical to the command log, but that's nothing but an

11   assumption.  And on these facts we think we have the right to

12   assume that it may have said something different.  Or even if

13   it did say the same thing, it would be another data point for

14   plaintiff to point to and say, look, how many different times

15   they wrote down that she didn't have any physical injury; it

16   was both the guy who did the pedigree form and the guy who did

17   the command log, they both had a chance to look at her.  I

18   actually think, of the two, the roster is the more probative,

19   the more likely to contain important information.

20          Because, again, there's been specific testimony

21   about how often she was checked on, and we think that goes to

22   both the veracity of that testimony and the officer's

23   credibility because, you know, it just -- it really raised a

24   lot of questions for us that they could check on her 19 times

25   after restraining her and not call her an ambulance.  And we

1    just think that that document would provide a lot of insight

2    into both that question and also, you know, where she was held

3    and why she was brought back to the precinct after being taken

4    to the hospital.

5              MR. THADANI:  If I may briefly.

6              So none of that goes to how the document is helpful

7    for them.  So the undisputed facts are, she came in apparently

8    normal.  That is good for them.  And that's -- and we're fine

9    with that.  Again, the allegation is something happened at the

10   precinct.  Whether it's caused by her or by the officers is

11   the disputed fact.  There's nothing that would've been

12   favorable to warrant an adverse inference in the pedigree

13   document.  That's one.

14             Two, with respect to the prisoner roster form, the

15   roster, to the extent it has times that being checked on, Ryan

16   putting times that he checked on her is not favorable to them.

17   There's nothing in the document that would be favorable to

18   them.  If they want to cross-examine, they can -- there's a

19   remedy here.  The cross-examination could be you're

20   claiming -- and this only would be relevant to the deliberate

21   difference claim, but you're claiming you checked on her every

22   30 minutes.  Do you have -- you have no documentation to prove

23   that you did that.

24             THE COURT:  So let me ask you this.  What are you

25   intending to argue that the jury could find that would or may

62

1   have been favorable to your client?  Not something that

2   supports -- I understand his point as being, if your

3   contention is they would've put fraudulent or fake information

4   in the pedigree form, that's something for which you would

5   impeach them.

6            But if you had the document, your case would be even

7   stronger rather than presuming, you know, that there was

8   something in there.  I mean, what are you intending to argue

9   that would justify this instruction the document would've

10  shown if preserved.

11           MR. HARVIS:  Because what it would've shown is that

12  he wasn't truthful when he testified that he checked on her

13  19 times.  That's what we think it could have shown.  You

14  didn't check on her at all.

15           THE COURT:  Because your contention is that I

16  checked on her 19 times was a belated fabrication, and that

17  the form itself would have not reflected the frequency of

18  those checks?

19           MR. HARVIS:  Yeah.  It either would've shown that he

20  didn't check on her at all, that there were remarks that

21  further undercut his testimony, or that he didn't check on her

22  as many times as he said.  You know, again, we're in a

23  difficult position.  We're the ones without the documents, so

24  we're just trying to figure out what it might have said.

25           MR. THADANI:  Your Honor, one last thing.  I don't

1   believe the case law allows that sort of inference on such a

2   speculative suggestion.  There has to be something more in the

3   record.  There was questioning about it.  We have the other

4   document, by the way, that, again, I -- the issue is not the

5   document; it's the second page.  So we have the document.  The

6   second page is lost.  And --

7              THE COURT:  What's on the first page?  Cover form?

8              MR. THADANI:  The first page includes Danny Rivera's

9   time in detention, includes the times he was checked on.  And

10  it's the second page -- presumably this would not have been an

11  issue if the page didn't run out, but it goes to the second

12  page.  Rosie Martinez, presumably, is on the top the page.

13             THE COURT:  And there's no dispute, I take it, that

14  the jury is going to be told that the second page regarding

15  Rosie Martinez is lost and cannot be located, right?  The

16  question is just whether they get an instruction that they may

17  presume something about the circumstances of its loss or

18  presume something adverse to defendants, because they're going

19  to be told that that document is missing and is not available

20  to them?

21             MR. THADANI:  I mean, I don't know that that's an

22  issue right now.  I mean, I think our view would be that the

23  fact -- I mean, look, I understand they're going to make a

24  different argument.  Our view would be that the fact that this

25  document in itself wasn't located or wasn't found is not

64

1    relevant to the issues to be determined at trial.  So I don't

2    know that the jury is necessarily going to be informed of

3    that.  Like to the extent we're -- our argument right now is

4    with respect to the adverse inference, we don't think the

5    showing has been made.  But separately as to whether the jury

6    should be informed that out of over the 10,000 of pages of

7    documents produced in this case were two pages not produced.

8    I'm not sure that's something we believe the jury needs to

9    necessarily know, well, this page wasn't produced, this page

10   wasn't produced.

11          However, to the extent they ask -- questioning,

12   again, I think that's entirely proper if Detective Ryan

13   testifies, I checked on her every 30 minutes and they ask him,

14   you don't have any document that supports that you did that, I

15   think that's fair, fair game, and I think that would be, you

16   know, something a jury would hear and there wouldn't be any

17   documentation supporting that.  They have to take his word or

18   not.

19          THE COURT:  And why couldn't we simply avoid the

20   adverse inference instruction problem by simply telling the

21   jury that the City's searched for and has been unable to find

22   that document and they were able to find it for Mr. Rivera and

23   not for Ms. Martinez without telling the jury what they could

24   or should find as a result of it?

25          MR. THADANI:  It could.  It could.

1          THE COURT:  Okay.

2          MR. THADANI:  Your Honor, I don't know that

3   Danny Rivera's document really -- I don't know.  I guess I

4   don't think they've listed it as an exhibit.  I could be

5   wrong.

6          MR. HARVIS:  Can I just say one other thing,

7   Your Honor, which is that -- you know, we talk about the

8   Hanrahan report.  Another thing that's important to remember

9   about the Hanrahan report is that, according to Hanrahan, both

10  Ryan and Camhi told Hanrahan that the incident where

11  Ms. Martinez had to be restrained took place in the holding

12  pen cells, which is a totally separate area of the precinct

13  from the juvenile room where she was held.

14          So, you know, I know we're going to discuss the

15  Hanrahan report, but I just -- you know, it's also probative

16  of the question of, if Ryan was checking on her 19 times in a

17  juvenile room, I think that that affects the credibility of

18  him telling Hanrahan that actually this took place on the

19  other side of the precinct in the holding pen cells.

20          THE COURT:  Understood.

21          So let's talk about the Hanrahan report.

22  Coincidentally that was next on my list.

23          So I have a question for plaintiff's counsel.  I

24  mean, I am concerned about this exhibit, that your purpose in

25  admitting it is to prove some kind of broader coverup at the

1  NYPD about this incident.  But the claims that essentially the

2  constitutional claims that related most closely to or for

3  which that evidence could arguably be relevant, supervisory

4  liability, denial of access to courts, those were all

5  dismissed by Judge Kovner.

6           So under what current claim that's going to go to

7  the jury is this report relevant and why is that the case?

8           MR. HARVIS:  Well, the report contains admissions of

9  these defendants that are not hearsay and reflect their

10 statements that are inaccurate about where this happened given

11 according -- well, we're going to find out from defense

12 counsel when this report was prepared.  I'm excited to find

13 out.  But whenever it was is presumably shortly --

14          THE COURT:  Well, to be fair, I think he's been very

15 candid that he doesn't -- he doesn't know and he's putting it

16 together based on inferences that we're all working with based

17 on a date listed that everyone concedes is the incorrect date

18 and the time in which these investigations would've typically

19 started, so...

20          MR. HARVIS:  Fair enough.

21          THE COURT:  So I know that the issue of the data is

22 one that we'd have to consider, if the report comes in,

23 whether it gets redacted, what the jury's told.

24          But putting that aside, what is there that is in the

25 report specifically that you couldn't otherwise get admitted

1    by cross-examining the defendants about their statements?  Why

2    does the report itself have to come in as opposed to simply

3    asking the officer defendants, you were interviewed by a

4    captain about this incident and you said X?  Why couldn't it

5    simply come in through cross?  Why do they have to seal the

6    report?  Because it's hearsay from a lot of people and an

7    author who isn't here.

8             MR. HARVIS:  Well, I don't think it's hearsay

9    because I think it's a business record where the officer was

10   an under an obligation to make accurate entries in this

11   report.  And it really -- all the substance of it is

12   admissions against people who are adverse parties in this

13   case.  So I don't see there being any hearsay, real valid

14   hearsay concern there.

15            And then I just think it's tremendously relevant

16   because this business record documents the first statements

17   that the officers made regarding this event, and they are

18   broadly inaccurate in ways that Judge Pollak has recognized in

19   her decision awarding sanctions.  And I think it's really not

20   in dispute.  And so I guess, you know, relevant evidence is

21   admissible and it's not hearsay.  And so I think the question

22   should be, why wouldn't it be admitted in our view because

23   it's a core relevant document.  It's a first business record

24   to document, you know, how the NYPD was looking at this.

25            And in our view, you know, we're not going to argue

1    any dismissed claims or try to get liability on any dismissed

2    claims.  But the fact that the officers took acts of

3    concealment and misled investigators about what happened here

4    is, in our view, strong circumstantial evidence to support the

5    claims that are being tried.  The reason why you lie about it

6    is because you committed excessive force.  The reason why you

7    lie about it is because you should have gotten, you know, an

8    ambulance for her.  The reason why you go to the hospital and

9    put wrong information in her medical records is because you're

10   trying to create a smoke screen of a narrative that's going to

11   avoid scrutiny of your conduct and avoid you being found out.

12   I think that's, you know, the quintessential reason why people

13   do things like that.

14        And I think if we're prohibited from being able to

15   argue that inference, I think that that -- I think that would

16   be unfair because I think it's strong evidence that supports

17   the claims that are going to the jury.

18        THE COURT:  So let me stop you there and ask the

19   City.  What's your response to Mr. Harvis's argument that this

20   is -- the report itself should come in as a standalone

21   document, as a business record, and specifically because it

22   contains admissions by the individual defendants?

23        MR. THADANI:  Okay.  Just to clarify the record

24   really quickly.  It's not the first record about this.  There

25   was a phone call by Lieutenant Camhi that also clarifies the

69

1    discrepancies in the report that Mr. Harvis is so excited

2    about.  But it's not the first record.  There were other

3    records first.

4              With respect to the document, just to clarify

5    initial point, we didn't actually move to preclude the

6    document.  We're moving to preclude the date and time error in

7    the document which indicates that the interviews occurred six

8    days beforehand.  I think it is -- look, there's an issue with

9    respect to the fact that the author of the document is

10   deceased, obviously, right?

11             THE COURT:  Right.

12             MR. THADANI:  And there are issues in the document

13   that can't be explained because he's deceased.  I think there

14   are issues with that.  I don't think that necessarily makes it

15   not a business record.  I think it is.  I don't think it's not

16   relevant.  I don't know whether the questioning can occur

17   without the document.  Whether the document itself needs to be

18   in front of the jury, I'm not so sure.  However, that's not

19   what our motion was.  Not to say we're waiving the right to

20   raise that objection at the appropriate time, but we did not

21   move in limine with respect to that, so I just want to make

22   sure that's clear.

23             THE COURT:  I mean, I would just say on that point,

24   you know, you have the right to raise an objection at any

25   point, but I would say, in part, because of the complicated

1    history on this case, in part, because he is deceased, I would

2    really like to try to resolve any questions about what parts

3    of his report do or do not come in, the dates, the

4    conclusions, the statements as far in advance of trial as we

5    can.

6              MR. THADANI:  Sure.

7              THE COURT:  So I'd ask you just now to tell me what

8    you anticipate objecting to and why.  It sounds like where you

9    are is, you don't have a problem with the report itself coming

10   in as long as the date itself is redacted or as long as, what,

11   you're permitted to make some kind of argument or introduce

12   the contrary exhibit about the other case to explain the date

13   without your witness here, the author?

14             MR. THADANI:  Sure.  Yes.  Okay.  So I think right

15   now what I can say is, our motion in limine was just very

16   narrow with respect to that error.  I think that I was a

17   little bit surprised but also not surprised that there was an

18   opposition with respect to just that, just the redacting the

19   document.  We didn't move to preclude.  I know what I said

20   about waiver.  I would say Your Honor -- if Your Honor has

21   already ordered us to provide a letter with respect to a

22   couple of issues, I think if Your Honor doesn't mind I just

23   want to consider whether we have an objection with respect to

24   other aspects of the report and indicate that in that letter.

25             However, as of now, I don't believe so.  I think the

1    issue is literally as narrow as I think it's just this bunch

2    of a portion, like a very small portion in the top corner of

3    the second page of the document, that has the wrong date and

4    the wrong time because it's -- one, it's obvious.  Forget

5    about whether there's another IAB report that proves it.

6    Let's just put aside for a second.  It's nonsensical that six

7    days before they interviewed about this incident.  It's

8    obvious that that's an error.  We just don't have the

9    individual here to explain it.

10            And plaintiff's counsel asserted in their motion

11   papers the parties should be free to argue whatever they want

12   with respect to that date and time error.  And I think that's

13   highly problematic because it's a distraction from the issues

14   to be decided in the case.  It's much simpler just to redact

15   that portion that's a mistake instead of having potentially a

16   mini trial, we're going to enter a document related to some

17   other individual who had an incident at the precinct six days

18   before that the jury is going to see to see, okay, well, the

19   number, the IAB code number is the same as the IAB code number

20   here, and so it must've been, like, that he used a template,

21   which is what I was surmising in the motion.  I don't know

22   that for a fact.  But that's the -- I don't want to say it's

23   the necessary inference, but it's sort of the most likely.

24            THE COURT:  I thought you made a very strong

25   argument in your papers.  It was among the many complicated

1    issues I was presented with.  That one actually seemed pretty

2    straightforward.  A lot of us are familiar with the electronic

3    template that explains the error.

4            And I guess my question for you is, if a report is

5    coming in which among other things has a conclusion from

6    someone who is deceased who can't explain the error but also

7    can't be cross-examined about the basis for his conclusion

8    that these defendants committed no misconduct and further, and

9    probably most troublingly, states as fact that Ms. Martinez

10   made certain statements that she not only denies making, but

11   actually maintains that that interview never took place, that

12   she was never given an opportunity internally to report what

13   happened or asked to give her side of the story, how is it

14   that the one piece of information on which the jury might find

15   Captain Hanrahan's care, diligence, even potentially

16   truthfulness, you know, gets redacted, but all the rest of it,

17   including Ms. Martinez's statements, comes in?

18           MR. THADANI:  I think there's a difference between

19   using the template document and writing in new information

20   than it is about what I guess they would allege is

21   fabrications.  They're also the ones seeking to admit the

22   document as opposed to us, at least at this stage.  They're

23   the ones affirmatively trying to use the document.  I assume

24   they have a theory or questioning to sort of cast doubt as to

25   specific aspects.  They've indicated as much, that there's

73

1    inconsistencies with respect to what Ryan and Camhi are saying

2    where certain events occurred.  I think there's a sloppy --

3    it's a sloppy report.  Okay?  Just frankly.  He's not here to

4    explain it, but the fact that that date is there, the fact

5    that the descriptions are what are they are given we have

6    other contemporaneous records that indicate that's not what

7    they were saying, it's a sloppy record.

8         But I don't think that's a reason to permit -- it's

9    a minor issue I think with respect to whether this should be

10   redacted or not, but it's a distraction.  And it's clearly

11   erroneous.  And I don't think it's necessary for defense or

12   for the Court to spend time introducing irrelevant documents

13   to prove or demonstrate or explain because the jury may be

14   like, why is the date six days before?  It's not the date of

15   the report, by the way; it's the date of the interviews.

16        THE COURT:  I understand.  My concern as well or

17   sort of broader is, you know, I don't know that we're going to

18   get past hearsay threshold with this report because everybody

19   agrees there's all kinds of indicia of unreliability.  You

20   might differ on what they are.  You're saying there's a time

21   and date error and a case number error.  They're saying

22   there's a whole interview that didn't happen.  I'm not saying

23   that certain statements couldn't come in, but it -- you know,

24   there are some broader issues with it.  Not to mention the

25   entire history of what happened in discovery and what the jury

74

1   hears about that, you know, still considering it.

2           But I guess I'd just ask plaintiff, so for what

3   purpose do you actually need the report?  And, you know, the

4   trial strategy is yours, but given that Ms. Martinez is

5   alleged to have made all of these admissions of her own that

6   this event never happened and she was never harmed in custody,

7   what purpose or what relevancy does this have to your case in

8   chief?

9           MR. HARVIS:  Well, it really just shows that the --

10  according to the defendants, you know, they provided

11  contradictory statements about where this event took place and

12  what it consisted of on the same day that, you know,

13  Ms. Martinez was injured.  So it's an immediate

14  contemporaneous inaccurate account of, you know, key parts of

15  the event.

16          THE COURT:  And it's your concern that if you just

17  simply cross-examine them and ask them, didn't you say this to

18  your captain when you were interviewed on this date and they

19  deny it, that you should be able to offer it as some sort of

20  business record impeachment or some other thing?  Why do you

21  need to offer it up front as opposed to simply asking him on

22  the stand and presuming -- I assume we're not going disavow

23  those statements or have they already?

24          MR. HARVIS:  That's a good question.  I don't recall

25  what their deposition testimony was on whether or not they

75

1    disavowed the statements.  But I guess the fact that the

2    City's investigation of this when it first happened was that

3    they say they conducted an interview of Ms. Martinez that they

4    didn't really conduct in which they say that she said that she

5    didn't make any complaints even though we have all this other

6    contemporaneous evidence that she was making complaints, both

7    from Danny Rivera, from the notice of claim, the 50-H.  I

8    mean, right then it wasn't like there was some late made, you

9    know, allegations.

10           And so the fact that the City conducted that kind of

11   investigation at the beginning, this self-serving

12   investigation where they categorize it as no allegation being

13   made, put down it happening in the wrong place, we think all

14   of that goes to the overall reasonableness of the defendants

15   and how they treated Ms. Martinez and her allegations.  And we

16   think it's relevant for the jury to hear about it.

17           MR. THADANI:  Your Honor, if I may briefly.  The

18   report is not created by the defendants though.  So this is

19   going to be a situation where this is a report they've never

20   seen.  So that's the theory is that this shows some kind of

21   wrongdoing on behalf of the defendants.  The defendants didn't

22   create the document.  They didn't review the document

23   beforehand.  They didn't confirm.  It's not like I testified

24   at a deposition and you review it and make sure the testimony

25   is accurate and prepare an errata sheet.  This is the document

1  that exists, but they didn't prepare it and they didn't get a

2  chance to correct it.  I just wanted to note that.

3          MR. HARVIS:  It's the City's employee, Hanrahan, so

4  we do have state law claims.  So the fact that -- you know, I

5  don't think it's inappropriate for the jury to consider

6  what --

7          THE COURT:  Well, but the state law claim is only

8  about responding at superior on excessive force on assault and

9  battery, right?  Essentially the state law version of

10 excessive force in which Hanrahan is not an individual

11 defendant.

12         MR. HARVIS:  That is true.

13         THE COURT:  Okay.  Let me just ask one more quick

14 question about the procedural history.

15         Was this argument that you made about the issue with

16 the date, meaning the explanation being that it came as a

17 template from another case, something that was raised before

18 Judge Pollak when she was considering sanctions?

19         MR. THADANI:  I don't think so.

20         THE COURT:  If you could check on that, I would

21 appreciate it.  I'm asking because while I found some

22 plausibility to your argument that that may explain the date

23 discrepancy, I'm a bit concerned that there was a factual

24 finding and essentially a legal finding that this was

25 significant in the history of the case and it goes to the

1   reliability of certain evidence, the potential usefulness to

2   the plaintiff that Magistrate Judge Pollak made that was then

3   adopted by Judge Donnelly and Judge Kovner that I'm not

4   empowered to disturb by saying, you know, I see this

5   differently so I'm just going to redact it.

6              MR. THADANI:  I'm happy to put in writing I can

7   confirm it.  The reason why I can confirm it is because I

8   wasn't able to figure it out until I got the document from the

9   other case and that was well after that.  I can confirm that.

10             THE COURT:  Well after the sanctions?

11             MR. THADANI:  Well after the sanctions order.  So I

12  could not have briefed it because I didn't know it to say it.

13  I only realized the template issue when I figured out there

14  was another IAB investigation or another internal

15  investigation with the same sort of code name numbers relating

16  to another case that happened to be on the date and time that

17  is error.  And again, that was much later in the case.  I can

18  confirm that in writing, but I can confirm that to you now.

19             THE COURT:  Okay.  Thank you.

20             Okay.  It is 4:05.  Why don't we take a five-minute

21  break and then come back.  Sounds good.  So we'll be back on

22  the record at 4:10.  Thank you.

23             (Recess taken.)

24             THE COURT:  We're back on the record.

25             Next I wanted to turn to the defendants' motion to

1    preclude allegations of the individual defendants' alleged

2    other misconduct.  I think I've now narrowed this down to two

3    areas of inquiry that the City is asking me to exclude.  One

4    is any inquiry or evidence as to this alleged undercount of

5    the amount of heroin found in plaintiff's apartment.  And the

6    second is Officer Digennaro's failure to properly complete an

7    entry in his memo book concerning the search of plaintiff's

8    apartment.

9            Am I right, that there's no other incidents other

10   than Laliberte's issue with the arrestee in 2013?

11           MR. THADANI:  I don't think I can answer that

12   question because I tried my best to surmise what they might

13   do.  And so yes, those three, as Your Honor has mentioned,

14   those two in Laliberte, I specifically identified I have a

15   catch-all towards the end, anything else.  It seemed like they

16   weren't really -- plaintiff wasn't pushing anything else.  So

17   I believe the answer is yes, but I think that question is

18   actually for them to say if they have something else they want

19   to offer that I don't know about.

20           THE COURT:  Plaintiff?

21           MR. HARVIS:  Is there anything else that we're going

22   to be crossing these defendants about besides --

23           THE COURT:  Specific incidents of misconduct

24   extrinsic to the incident involving Ms. Martinez other than

25   the two I just mentioned and the 2013 incident involving

1  Sergeant Laliberte.

2          MR. HARVIS:  It's hard for me to say because I

3  can't -- I mean, are there other -- is a specific incident of

4  misconduct when they, like, lied at their deposition?  Like,

5  for example, Digennaro initially testified at his first

6  deposition that there were buy reports showing that

7  Rosie Martinez had specific knowledge that Danny Rivera was

8  dealing drugs out of her apartment.  And then he came back for

9  a second deposition and disavowed all that and started saying

10 how that was wrong, that was a mistake.  I mean he lied.

11         THE COURT:  I'm not talking about that type.  I

12 understand inconsistencies in testimony and cross-examination

13 about both the incident itself involving Ms. Martinez and any

14 testimony or statements they've given about it.

15         I'm talking about extrinsic events happening either

16 prior to or after this event involving unrelated citizens,

17 defendants, that sort of thing.

18         MR. HARVIS:  I understand.  Okay.

19         So then I would say the answer to that question --

20 hold on one second.  I mean, I think -- Your Honor, I think

21 that there was an incident where Digennaro had a prior

22 finding -- finding of perjury, either perjury investigation or

23 perjury finding.  And so I just -- I don't -- I'm not familiar

24 enough with the facts right now to just even give the full

25 explanation of what it was, but I just want to flag that

1   because I do think that may be one additional -- do you want

2   to jump in on that?

3           MR. THADANI:  You're thinking of Forgione.

4           MR. HARVIS:  Thank you.

5           Then no.  The answer is no.

6           THE COURT:  Let's talk about the other two.  I have

7   a preliminary factual question about this alleged undercount

8   of the heroin.  I saw, I think in the briefing, it was alleged

9   that the undercount was by a single envelope, that there were

10  286 actually recovered, but he was alleged to have written or

11  he did write in his report that there were 285 or that was

12  both Officers Ryan and Digennaro.  But then in Pollini's

13  expert report, he made some mention of lab documents saying it

14  was 285 versus 290 that was actually recovered.

15          Does anyone know what the actual amount recovered

16  versus the undercount actually is?

17          MR. HARVIS:  That's a good question.  I think there

18  might be a discrepancy in the record about -- I think that in

19  one part of the record, it may say 290 versus 285, and in one

20  it may be 286 versus 287.  That's my understanding.

21          MR. THADANI:  I believe it's one.  And I would -- I

22  don't think I would've put that in if I didn't believe that

23  was accurate.  I think it is.  It may be that there's another

24  record that references 290.  But I believe there was an

25  investigation into this as well and paperwork created as a

1    result of that, and I believe that in that paperwork the

2    discrepancy is a one.

3            THE COURT:  And I take it the City's position is,

4    whether it's one or five, given the total amount, that that's

5    sufficiently minor or sufficiently due to error rather than

6    malfeasance that's it's not relevant to his credibility in

7    this case.

8            MR. THADANI:  Yes.  I think our position -- and

9    again, it is an overarching point about most of our motions in

10   limine is sort of trying to focus the case on what the case is

11   about and try to screen the distractions.  I think this is a

12   primary example of one of many and is another one, you know,

13   not necessarily I somewhat surprised that they opposed it.

14   It's an undercounting.  In theory it's beneficial for the

15   plaintiff who is being charged with the drugs that there was

16   an undercounting of the drugs.

17           But in any event, it's a mistake.  I think it's

18   easily explainable.  This is something we're going to spend

19   trial time on.  I don't know that there's any jury that's

20   going to, well, undercounting -- I mean, I don't have a

21   photograph of it, I was looking at it today actually.

22   They're, like, very tiny envelopes, like, smaller than these,

23   like, one of these, like, Post-it flags, that's how small they

24   are, and you're counting 300 of them in the middle of the

25   night, it's not crazy to undercount by one.

82

1        Should they have been more careful?  Probably.  But,

2   you know, to state that it goes to their credibility and their

3   truthfulness I think is a huge leap.

4        THE COURT:  Right.  Your position is a mistake

5   versus a lie, that those are two different things, and that

6   that really doesn't go to their credibility but --

7        MR. THADANI:  It would be different if it was, well,

8   we found cocaine, we found heroin or we found $2,000 or

9   $20,000.  It's not even necessarily the magnitude per se, but

10  the nature of the discrepancy at issue here, it's an

11  undercounting of one.

12       THE COURT:  So do defendants plan to offer any

13  evidence through the officer's testimony for questioning

14  Ms. Martinez about the amount of heroin that was recovered in

15  her apartment that -- as a result of the search?

16       MR. THADANI:  I'm not sure.  Possibly.  I mean,

17  maybe not with a specific number.  I mean if there was a

18  specific number, I would imagine is probably is subject to

19  cross to say, well, you miscounted the numbers.  So possibly.

20       THE COURT:  So if the number comes in, then the

21  undercount is fair game?

22       MR. THADANI:  I think it can be, you know, it can

23  be -- you know, for instance, if we had did something like

24  over X number, 250 over 270, I don't know that that

25  necessarily brings in a discrepancy versus saying it's 286

1   exactly.

2           THE COURT:  Why is that?

3           MR. THADANI:  Because the discrepancy is -- I

4   probably have to think about it a little bit more, but I think

5   there's a difference probably between, like, over 250 versus

6   exactly 285.  Well, actually, when you counted, you thought it

7   was -- actually, you know, I want to walk it back a little bit

8   because I'm not so sure that -- you know, whether that

9   evidence is presented or not -- let me take another step back.

10          Because I think there's a difference between the

11  fact and the discipline.  Okay?  So I think to the extent

12  they're trying -- and I think this relates to the other motion

13  too.  To the extent they're trying to elicit a fact that he

14  undercounted or a fact that certain information was not in a

15  memo book, I don't know that that -- that wasn't really our

16  motion.

17          Our motion was -- and I think maybe they've agreed,

18  but I'll let Mr. Harvis speak on it.  Our focus with this was

19  the discipline that resulted from it and the investigation

20  into the allegations.  That's sort of what our motion was

21  about, not to preclude questioning about you were investigated

22  with respect to undercounting, there was a substantiation,

23  here's what your discipline was, et cetera, if there was one,

24  same thing with the memo book.

25          THE COURT:  Just so I know the history, because I

1    obviously missed the mark on what I thought the motion was

2    about, there was an investigation and it was substantiated

3    that he undercounted?

4            MR. THADANI:  It was.  It was.

5            THE COURT:  And what was the discipline that he

6    received?

7            MR. THADANI:  I think it was like a retraining, but

8    I'm not 100 percent on that.  I believe it was something to

9    the effect, like formal training, something like that, but not

10   100 percent sure.

11           But that is sort of where our motion was targeted on

12   is more the discipline and the investigation.  I think --

13   again, I could be wrong -- plaintiff's counsel did not push on

14   that so much as push on the fact.  I'm not so sure we have an

15   issue with the fact per se.

16           Similarly, like with the memo, I know we haven't

17   gone to the memo, but to the extent they want to question

18   witnesses, I expect that they will, you didn't put -- what I

19   anticipate, I don't think this is revealing much, because

20   they're going to ask every witness, you didn't put in your

21   memo book that you observed Rosie Martinez punching the wall

22   and kicking the cabinets.  I mean, that's not where we're

23   moving to preclude.  We're moving to preclude --

24           THE COURT:  Let me ask plaintiff's counsel then.

25           What is the relevance of the undercount?  They're

85

1    not disputing that it happened, that he off by either one or

2    five envelopes.  What, if anything, is the relevance of the

3    undercount?  And do you have any problem with them; A,

4    introducing evidence or testimony that heroin was recovered in

5    the apartment as sort of part of the series of events of why

6    she was brought in for questioning to begin with; and if

7    that's not an issue, do you have a problem with them saying it

8    was over 200, 250, 285, whatever the number is?

9              MR. HARVIS:  Well, I think that on our theory of the

10   case, it has come in before the jury that there were drugs

11   founds in the apartment because that's why they were trying to

12   get information from --

13             THE COURT:  I assumed so, but I never like to assume

14   what any party or parties are agreeing on or think is

15   relevant.  So I'm glad we're all in agreement that that's at

16   least part of the narrative.  The jury will be told some

17   heroin was recovered.  And now the question is, will they be

18   told an amount?  And if so, is everybody in agreement that if

19   the amount is told -- first, should the jury be told an

20   amount?  Second, if the amount is told, should they be told

21   that there's no dispute that there was an undercount and told

22   through -- I'll assume he'll admit it in his testimony if he's

23   asked about it?  And then I guess third, are you seeking to

24   actually ask him about or introduce evidence that there was an

25   investigation and he was disciplined for it?  And if so, why?

1          MR. HARVIS:  So I think the number should come in.

2     I think the miscount should come in for really the same

3     reason.  They're both facts of what happened.  And no one's

4     disputing the fact that there's a miscount.  I think it's an

5     undisputed fact that he, in the performance of his official

6     duties, made a mistake.  They can argue it's a minor mistake.

7     If I'm the person to be accused of a drug crime, how much

8     drugs I have is not minor to me.  I think it's important.

9          And it also just bears noting that Digennaro, who's

10    a supervisor for Ryan, was also cited -- independent of what

11    comes before the jury, he was also investigated, he had a

12    responsibility to review the count.  He also failed to do that

13    properly.

14         So I'm just saying if we're talking about what

15    testimony will be elicited from these witnesses, I think it's

16    a fair minor point of discussion with both of them that, you

17    know, yes, there were this many numbers, but you got it wrong

18    and you were the supervisor and you got it wrong.

19         We're not seeking to offer the fact of their

20    discipline.  We don't believe that's relevant unless they open

21    the door.  But on the our case in chief, we don't there's any

22    independent relevance to the fact that they were disciplined.

23    So I think that answers the question.

24         THE COURT:  Okay.  So it sounds like we may not have

25    a dispute.

87

1          MR. THADANI:  I think so.

2          THE COURT:  Fantastic.

3          MR. HARVIS:  One down.  25 to go.

4          THE COURT:  15 or so more to go.  All right.

5          So let's turn now to something on which I suspect we

6   will probably still have a dispute, but I guess we'll see,

7   plaintiff's motion to preclude evidence of her February 2019

8   dispute with her neighbor or, as I saw on the video,

9   neighbors, it looks like there were two of them, in her

10  subsequent arrest.

11         So I think what may not be disputed is that

12  defendants may seek to either offer or ask plaintiff about the

13  March 1st hospital records that relate to this event where she

14  was taken to the hospital and I think by the officers after

15  she was arrested and given some medical treatment.  And

16  according to Mr. Thadani's letter, plaintiff is not objecting

17  to the records coming in, I think, provided that any reference

18  to the arrest in plaintiff's view is redacted from those

19  records.  Is that correct?

20         MR. HARVIS:  Yeah, subject to -- assuming they're

21  relevant, yes.

22         THE COURT:  Yes, okay.  So we'll deal with any

23  relevancy, but no other objections.

24         So I have a couple of threshold factual questions

25  for the parties about this incident.

88

1          Mr. Harvis, was Ms. Martinez ever charged with

2     assault or any other crime in connection with this incident?

3     And if she was, what was the result?

4          MR. HARVIS:  It's not in the record, Your Honor.  I

5     don't know the answer to that.  I believe that she was

6     charged, and I believe that the charges were dismissed.  But

7     that's really just not much more than my understanding.  I

8     don't have any documents and it's not in the record.

9          THE COURT:  Okay.  Does the City know the answer to

10    that?  Was there a conviction?

11         MR. THADANI:  I don't believe there was a

12    conviction.

13         THE COURT:  Okay.  So no conviction.

14         And so I think I now understand, thanks in part to

15    the supplemental letter, the purpose and the scope, but let me

16    just see if I have this right.

17         You're seeking to ask her about this incident, about

18    the allegations the neighbor made against her, and you think

19    it's important and relevant for her to be asked or the jury to

20    hear that she was arrested, because during the course of the

21    arrest, her hands were put into cuffs and she didn't complain

22    of any pain when she was being cuffed and she didn't complain

23    of any wrist or hand pain when she was in the hospital later;

24    is that right?  It's really just for damages in terms of the

25    extent of the injury?

1          MR. THADANI:  Yeah, it is right.  And I think the

2     timeline here is really important.  So it's not so much that

3     she was arrested, but I understand it's, like, interwind,

4     right?  So there's no escaping it.  I understand that.

5          But the key to the handcuffs, to us, it's a crucial

6     fact in this case given the timeline because -- and there's

7     actually -- I didn't brief this, I saw this afterwards, but

8     there's a minute entry on the docket that supports this on

9     February 14th of 2019.  And so that means this conference, it

10    occurred before Magistrate Judge Pollak two weeks before this

11    arrest.  Surgery likely set for March.  So she was just about

12    to get surgery on her wrist.  Two weeks before this incident,

13    she was about to get surgery.  So now you're talking about two

14    weeks later she is -- and I don't know if Your Honor has seen

15    the video.

16          THE COURT:  I have.

17          MR. THADANI:  But she's handcuffed -- she's told

18    she's handcuffed for a number of minutes.  Doesn't say

19    anything about I can't be cuffed, cuff me in a certain way, my

20    wrist hurts, I have a wrist injury, be careful, anything like

21    that.  The handcuffs are put on.  Nothing about, ow, my wrist

22    hurts.  No grimacing pain.  Nothing about, I'm about to have

23    surgery, please, if you have to handcuff me, can you handcuff

24    me a certain way?  Do I have to be restrained this way?  And

25    then nothing thereafter.

1          And then the fact -- obviously Your Honor has spoken

2     to the medical records.  And the fact that then after being

3     handcuffed for a period of time she goes to the hospital, no

4     complaints about her wrists.  After being handcuffed on the

5     wrist she's apparently about to have surgery on, she ends up

6     having the surgery in November of 2019, I believe, because

7     this arrest delayed it.  I don't think I'm speculating.

8     Plaintiff's counsel informed me of that during discovery.  And

9     so the time period really makes this pertinent.

10          It's not -- I understand there's a big difference

11     between this event happens in 2015 and this happens in 2019.

12     That I understand.  I think normally that would be a very

13     persuasive argument but for the fact that she's just about to

14     have surgery on her wrist and her wrist gets handcuffed and

15     she doesn't say anything.

16          THE COURT:  Right.  But doesn't -- I mean, I don't

17     know, I'm not medical doctor, but surgery can be for a lot of

18     reasons, including to restore range of motion, function, that

19     sort of thing.  It doesn't -- surgery four years after an

20     incident isn't always necessarily for the treatment of pain,

21     and I think we're going to hear that from her treating

22     physician and from the experts in this case.

23          MR. THADANI:  That is true, Your Honor.  I think if

24     that was the case, that would also be a persuasive argument.

25     But the records clearly bare out that the pain is a major

1    issue with respect to having the surgery.  This is not just a,

2    I need to have surgery because I've been waiting to get to it,

3    et cetera.  It is because there's pain.  Pain hasn't been able

4    to be healed, at least that's what the records -- some of the

5    records indicate.  The records are very inconsistent.  I

6    suspect that will be a theme of this trial.

7         But some of the records indicate there's pain,

8    consistent pain, other measures, like such as injections, such

9    as other physical therapy, et cetera, has not worked, and,

10   therefore, this surgery is necessary.  And I think because of

11   the timing, particularly literally the month of the surgery

12   about to happen and because it's handcuffing in particular to

13   that area of the body.

14        You know, if her injury was to her legs, I don't

15   think this would even be an issue that she got handcuffed on

16   her wrists.  Who cares?  But because it's literally her wrist

17   and that's what she's having the surgery on and it's due to

18   pain specifically, this all speaks to her credibility with

19   respect to damages and to causation with respect -- and more

20   really more so damages and her credibility and really the

21   credibility of some of her doctors too with respect to whether

22   the surgery was necessary, whether she had --

23        THE COURT:  I'm a little confused about it.  I

24   understood from your briefs this is really only relevant to

25   damages because of the --

1          MR. THADANI:  I misspoke.  The damages -- to some

2    extent, a credibility issue and a damages issue.

3          Credibility insofar as she's alleging she's in

4    significant pain, she's telling doctors she's in significant

5    pain to her wrist at this time, which is why it's a subjective

6    complaint and she is saying this in medical records, she's

7    saying this in connection with this lawsuit.

8          And then, again, this is evidence of, is she really

9    in pain?  Is it as serious as she's saying, because if your

10   wrist is really in debilitating pain such that you need

11   surgery and you're about to be cut open to cure that pain and

12   you don't even say anything, you know, there's -- I think

13   there's a -- I don't really see the world where she's in

14   significant pain such as the records bare out.  I believe her

15   testimony will bare out, and then you contrast that with these

16   events.

17         THE COURT:  You know, it's interesting because I

18   viewed the video a little differently when I saw it.  You

19   know, she's standing very still, she's compliant.  They're

20   putting a cuff around her wrist.  You know, it would be one

21   thing if it was the night of the incident when her wrist was

22   quite swollen and there might necessarily be some friction or

23   contact with the cuff.  You know, it seemed you almost had the

24   better argument with the point about her wielding the --

25   allegedly wielding a heavy object with the hand that's in pain

1   versus being passively cuffed, which just has a, you know,

2   loose metal bracelet around.  I mean I can understand you

3   potentially arguing to the jury you would've thought someone

4   in that kind of pain or with that kind of disability would

5   warn the officers, say something to them in advance, but

6   someone who's had an adverse experience with officers may have

7   a lot of reasons why they wouldn't do so, maybe fear that it

8   would get worse if they said that.

9          And I guess, you know, and just speaking a little

10  bit to what I observed on the video, I think the -- you know,

11  you would reference some admissions that she made.  I think

12  what you're really arguing is sort of admission by omission,

13  that she isn't saying anything about her pain, not that she

14  made an admission to any act, unless I'm missing something

15  here, and please tell me if I am, about use of her hands.

16          MR. THADANI:  Yeah.  So one thing just to make sure

17  I'm clear.  I was not meaning to not argue the first

18  component, which is the alleged use of the pipe and swinging.

19  I understood your question to be focused on the handcuffing,

20  which is why I addressed that first.

21          With respect to the admission, she does make

22  admissions.  She stated -- I don't think I put the quotes in

23  the letter.  She says, we started hitting on each other, I got

24  my phone and tried to hit him.  I tried to hit him with

25  whatever I can.  So she's being accused of what she did, and

1   then she's describing her version of the events, but while

2   doing so admits using her hands, swinging her hands, swinging

3   her phone, trying sort of -- there's other stuff too.  Those

4   are just some quotes there.  I think, you know, the videos --

5   you know, you can see what she says in the video.

6          So obviously that -- you know, to, I guess, circle

7   back to that point, that is also part of our contention, which

8   is that to the extent that she's alleging this pain and

9   injuries to her wrist, to her hands, that she would engage

10  potentially in that kind of an action, whether it be what she

11  was accused of or what she admitted to, either of those

12  events, also goes to her credibility, also goes to damages.

13         THE COURT:  But she's specifically asked about the

14  pipe, and she says no, I didn't have a pipe; all I had in my

15  hand was my phone.  So she never makes an admission about the

16  pipe.

17         MR. THADANI:  That's true.  She does not --

18         THE COURT:  The only basis for that is the statement

19  of a neighbor who himself was brought in, arrested, and I

20  assume not charged with anything.

21         MR. THADANI:  That's true.  She made counter

22  allegations against him.  You know, I don't know if Your Honor

23  is interested in this, but just so I can raise it because it

24  was raised in reply and we didn't have a chance to respond to

25  it, plaintiff's counsel indicated that we didn't disclose him.

1    That is not accurate.  We did disclose him as the complainant

2    as a witness.  He's not on our witness list.  That was on

3    March 21st, 2019.

4         THE COURT:  So you're not planning to offer any

5    testimony from him; you just simply want to ask her about this

6    incident and potentially, if allowed, impeach her with the

7    video to the extent she --

8         MR. THADANI:  If necessary.  In theory, he's an

9    impeachment witness, but we -- I mean, it depends.  I mean in

10   theory, Your Honor and Judge Kovner didn't require the listing

11   of impeachment witnesses or impeachment evidence.  He is a

12   potential impeachment witness.  Depending on her testimony, I

13   don't know what she's going to testify to with respect to this

14   if there's questioning permitted on it.

15        But as Your Honor has noted, there's a lot of

16   paperwork.  Your Honor had asked us specifically for what are

17   the documents we intend to question on.  I think I tried to

18   clarify to Your Honor that we weren't intending to question

19   about documents.  There's a lot of documents I didn't provide

20   because we're not intending to go there, arrest reports, 9-1-1

21   calls, 9-1-1 reports, criminal court complaints, all kind of

22   other documents relating to this.  I think the video would be

23   potentially the impeachment evidence I wanted to flag for

24   Your Honor given the inquiry.

25        THE COURT:  So, okay, I think I understand your

1   position.

2           Let me just ask plaintiff's counsel to respond and

3   specifically to address the argument that though there is some

4   potential unfair prejudice to her from the jury seeing a video

5   or even just hearing about a separate arrest, particularly in

6   a case where no charges either were brought or she certainly

7   was never convicted of any crime, putting that prejudice

8   aside, there is some potential and maybe potentially

9   significant relevance to damages in that she makes statement

10  about getting into an altercation with a neighbor and then

11  going to the hospital not complaining of hand pain and not

12  saying anything to the officers when she's about to be cuffed

13  about, careful with my hand, you know, it's very painful, that

14  sort of thing.

15          MR. HARVIS:  Well, I guess I think a number of

16  things.  One is that the -- it certainly is -- you know,

17  there's no dispute that she has a hand injury.  So this isn't

18  a situation where they're, you know, trying to argue that this

19  video proves that there was -- that her wrist wasn't injured.

20  I don't think that that's an argument that the City could make

21  on this record.  I don't think that's really what they are

22  trying to argue.  And I think that the specifics here are very

23  important.

24          First of all, the fact that it's happening in an

25  arrest is inherently prejudicial, so I think that creates a

1   barrier to admissibility that I think has to be overcome by

2   some sort of substantial showing of relevance.

3

4                  (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Continuing.)

2        MR. HARVIS:  And I think as Your Honor said, the

3  fact that having been traumatized in handcuffs and abused by

4  police and not given medical treatment in 2015, I think that

5  there would be good reason for Ms. Martinez not to want to go

6  above and beyond in having a big back and forth discussion

7  with them about her wrist which is being handcuffed.  As Your

8  Honor, said there's no indication that they were overly tight

9  handcuffs or even that they, at all, made any, kind of,

10  contact that would be painful with her wrist, so I think we're

11  making a lot of, kind of, assumptions there about how her

12  wrists felt in that moment, and that therefore she had some

13  failure to articulate pain that she must have been feeling.  I

14  think that that is a flawed assumption, I think that as Your

15  Honor said.

16        In terms of the back and forth about this neighbor

17  incident, I think that the fact of the dispute itself is

18  prejudicial because it's just the jury hearing about some

19  other argument that she had that I think would allow him to

20  draw the impermissible conclusion that she's just an

21  argumentative person, and you know, which would be support

22  their narrative of what happened that night.  I don't think

23  there's anything that is inherently incompatible with having a

24  wrist injury in 2015 means that you couldn't, you know,

25  attempt to defend yourself with a cell phone in 2019.  I don't

1   think that that has the kind of direct connection that you

2   would need to see here in order for this to be, you know, a

3   valid area of examination.  I just think the prejudice far

4   outweighs the probative value, and I think that it's a

5   separate issue on the question of the medical record.  I think

6   that if you -- if they had a good-faith basis to argue that

7   there was something in the medical record itself that was

8   inconsistent with her having had the injury that she had,

9   like, they did a test of her wrist and her range of motion was

10  perfect or something like that, I think that would be a closer

11  question.  But I think that just arguing that she doesn't, on

12  one particular trip to the hospital that isn't about wrist

13  pain, she doesn't happen to mention wrist pain, I think it's a

14  bit of a stretch, and I think it's -- I don't think that

15  there's -- I don't think they have a good-faith basis to say

16  to her on the stand, now, you know, you were in the hospital

17  in 2019 and you didn't mention your wrist pain, and she could

18  just -- she may not have --

19            THE COURT:  Well, they could certainly -- to the

20  extent -- I'm not saying this is what would happen, because I

21  understand some of the circumstances around the altercation,

22  if, in theory, the records were entered without any reference

23  to an arrest or to cuffing or to the NYPD, she says she's an

24  assault victim in the records, but, you know, they do do some

25  exam, they're doing a thorough reporting of pain, they can ask

1  her and she can answer, why isn't that, at least, something

2  that tends to make a fact at issue more or less probable that

3  goes to the jury's consideration of her damages and frankly,

4  as Mr.Jadi [phonetic] said, her reliability as a reporter in

5  terms of what kind of pain she's in and why she's suffering.

6           I mean, why isn't she saying, I'm going to have

7  surgery in two weeks?  These are all questions she could all

8  answer on cross.

9           MR. HARVIS:  Right.  I mean, the question is, is it

10  probative to whether or not she had a wrist injury in 2015,

11  that on a particular day in 2019, when she's alleged to have

12  perpetrated a pipe attack that she disputes, whether or not

13  she should have mentioned that she had pain in her wrist that

14  day.  I'm just not seeing why her -- the fact that she hasn't

15  put that in the record at her medical visit allows them to

16  argue that she's an unreliable historian about what happened

17  in 2015.  I just -- I don't see the connection.

18           THE COURT:  Okay.  I think I understand your

19  position.

20           Do you want to respond?

21           MR. THADANI:  Yes, Your Honor, if I may.  Just a few

22  points.  I'll try to be brief.  And I know, it's a lawyer

23  saying that.

24           THE COURT:  That's okay.  I was a lawyer for 20

25  years making all kinds of false promises about being brief.

1          MR. THADANI:  I'll try to.

2          First, Your Honor, plaintiff's counsel stated

3   there's no dispute there's an injury.  So there is.  I mean,

4   there is going to be a dispute about whether she needed the

5   surgery, whether she was truly in pain at that time period.

6   So this is going to be an issue.  And frankly, the fact that

7   she doesn't mention her paint to other doctors is also going

8   to be an issue in this case outside of this medical record.

9   So I just want to make sure I preview that.

10          Second of all, it's not just that she didn't mention

11  it, it is she is asked.  If you look at the medical records

12  and she is asked about different parts of her body and she

13  doesn't say anything about her wrist.  It's not like, tell me

14  what's wrong with you.  There's in the records every part of

15  her body is referenced plus, minus, pain, swelling,

16  tenderness, et cetera.  So she was asked a question and she

17  gave an answer, and it was, you know, either untruthful or

18  potentially could have been untruthful.

19          A lot of plaintiff's counsel argument are weight

20  argument, not about the actual probative value.  It's about

21  weight, this could be an answer, this could be an explanation,

22  she didn't --

23          THE COURT:  The most important thing is that the

24  court reporter get a record, so everyone has my blessing to

25  slow down, and I'll let you know if we are running out of

1    time.  But week can all take it as slow as we did at the

2    beginning.

3              MR. THADANI:  The other thing I'll note as an aside

4    is that this is not that dissimilar from the question we

5    talked about at the beginning of this conference which is with

6    Laliberte, so there is an excessive force allegation.  They're

7    trying to admit it for truthfulness.  Here we have -- that's

8    potentially prejudicial because it relates to a use of force.

9    Here, we're talking about prejudice with respect to the fact

10   of an arrest.  But then this goes directly to damages and her

11   credibility, based of showing of pain, not showing pain,

12   taking this action, not taking this action, certain

13   admissions.  I do want to draw that comparison because, you

14   know, I think it relates to some of the arguments being made.

15             THE COURT:  All right.  Thank you.  I think I

16   understand everyone's position.

17             Okay.  Next.  The Fortune Society medical records,

18   plaintiff had moved to preclude them.

19             Is there still a dispute about the whether those

20   medical records with any reference to prior arrest being

21   redacted?  Is plaintiff disputing the relevancy which you're

22   entitled to do, I just want to clarify if we had a dispute

23   over these or not.

24             MR. HARVIS:  Yes, we are disputing that, Your Honor.

25   These records are from several years before the incident, and

1  they do contain extrinsic information about the prior arrest

2  and the dispute with her neighbor, and then they also just

3  have a lot of irrelevant medical information in them about,

4  you know, things are not at issue in this case.  And I mean, I

5  supposed we could discuss with the City, you know, a way that

6  they could redacted, assuming that they can tell us what in

7  there is relevant.  But from what we have seen, it seems like

8  it's pretty completely irrelevant.

9           MR. THADANI:  Can I just make one initial point?

10          THE COURT:  Absolutely.

11          MR. THADANI:  So the fact that there's as much

12  reference to us as the City is kind of exactly why we have the

13  motion that we have.

14          THE COURT:  I'm using this outside the jury's

15  presence.

16          MR. THADANI:  Sure.  I understand.  But that's, sort

17  of, the function behind some of the motion practice, and

18  that's an aside.

19          With respect to the document, I don't know -- I'm

20  hoping I can say something that makes this not an issue, so

21  we've indicated we've withdrawn it as an exhibit, we would use

22  it for impeachment purposes only.  Presumably, as a

23  preliminary matter, means a jury is not necessarily seeing

24  this document.  It's really, like, I don't know what the

25  plaintiff's going to testify to.  There are statements here,

1    these records reflect statements she made about her employment

2    history, about her emotional damages, about her medical

3    history.  There's a lot of stuff here.  I redacted some things

4    that were somewhat particularly sensitive.  But this is

5    really, like -- I think this gets remedied by the questions

6    asked on cross, not so much the document because depending on

7    her answers and whether the questions are allowed to be asked,

8    we don't get here until there's a question and there's an

9    answer, and then this becomes credibility.  And then even

10   then, it's to show her, presumably, and you made this

11   statement, and she denies or doesn't deny.  It's not

12   necessarily something that goes to the jury.  So I'm not sure

13   this is really, like, an issue.  Maybe I'm wrong, and that's

14   okay.  But I'm thinking this is really an issue about

15   questions about trial testimony, as opposed to the document,

16   because it's not a document that's necessarily going to go to

17   the jury when it was before.  It was, they moved, it was an

18   exhibit, we reconsidered our position.  It's no longer an

19   exhibit.  It's an impeachment document.  In theory, we didn't

20   even have to list it, but it's there.

21              THE COURT:  And I see its value potentially as an

22   impeachment document in the limited areas.  I took at quick

23   look at it where it addresses her employment history and

24   plaintiff is claiming economic damages and future earnings.  I

25   mean, I think -- I'll tell you now, I see some of the things

1   in there as being areas of, at best, very tangential inquiry

2   given the time period in advance, and my other concern is that

3   jurors may know because we live in New York City that the

4   Fortune Society is a diversion program or a post-release

5   reentry program for people who have had some involvement with

6   the justice system.  You know, to the extent you want to ask

7   her about you were seeing a mental health counselor, you were

8   seeing a social worker, I'd be a little concerned about that

9   reference, given how commonly it's known, and that it might

10  indicate some prior justice system involvement that's really

11  more prejudicial than probative in this case.

12          MR. THADANI:  I understand that concern.  I think,

13  frankly, this is almost like a depends what happens at trial

14  what she says.  So I don't want to over-redact because I don't

15  know what her testimony is going to be, I don't know what it's

16  going to be on direct or cross.  However, to the extent that

17  there's something that's potential inconsistent with the

18  records, I think -- and there may be questioning about them, I

19  think there's a couple of different remedies.  One is to raise

20  it at sidebar before it's raised in front of the jury, and an

21  alternative could be not mentioning, like, the name of the

22  facility or even the type of facility.  I don't know that that

23  necessarily matters.  I think so much as it's a medical

24  professional.  Presumably you're honest with people you talk

25  to about your medical history, et cetera.  Like, it doesn't

1  necessarily have to be a mental health or even naming the name

2  of the place.  I think because the point would be you

3  testified X on the stand, you previously said Y, generally.

4  I'm over-simplifying, Your Honor, obviously, but, like, that's

5  the idea.  I don't know that it's specifically the Fortune

6  Society matters or that it's specifically to a mental health

7  professional necessarily matters.  So I think that may be

8  remedied.

9       THE COURT:  But I think to the extent it's

10  impeachment, and we're talking, again, about circumstances

11  under which a person would be expected to give a complete

12  account, the source does matter.  I don't think we would say

13  it was a doctor if it was a social worker or if it was a

14  therapist or it was someone else.  So -- a teacher or a

15  friend.

16       So I mean, statements are statements, and she can

17  explain the context.  I'm just concerned that when we're

18  talking about something that did arise out of a prior arrest

19  which everyone agrees should not come in, that we closely

20  tailer the impeachment, if any, to the statements, rather than

21  the circumstances.

22       So why don't we keep that mind.  I don't want to

23  create a mountain out of a molehill here since the parties are

24  essentially in agreement that the records themselves from the

25  Fortune Society are not being offered, that she may be cross

1   examined, if she opens the door, to some statements made, but

2   with the understanding no not to mention of the Fortune

3   Society will be made, and if you can agree on how you,

4   perhaps, in advance would like to characterize the

5   circumstances under which these statements are made so that we

6   don't a lot of sidebars at issue during trial, I think that

7   would be helpful.  All right.

8           MR. THADANI:  Understood.

9           THE COURT:  Okay.  Next, I wanted to briefly address

10  defendant's motion to preclude evidence that defendants failed

11  to read plaintiff her Miranda rights.  I do understand, and I

12  don't need to you to restate your substantive argument that

13  the Supreme Court's case of *Vega versus Tekoh*, T-E-K-O-H, in

14  which the U.S. Supreme Court clearly held that an officer's

15  failure to read a suspect their Miranda warnings does not on

16  its own constitute a violation of a Constitutional Right and

17  the essentially that we not have a trial about a claim that is

18  A, not cognizable, and B, not presented here regardless.

19          So I guess I would just ask plaintiffs to tell me

20  first how do we keep this from being a mini trial about

21  failure to read Miranda rights, given that that's not at issue

22  here and can't be, and what relevance do you think this has

23  to, specifically, the three claims that are still here?

24          MR. HARVIS:  Sure.  We don't want to make it a mini

25  trial.  I don't even think there's any dispute at all about it

1    that would warrant a mini or a major trial.  I mean Rosie

2    Martinez said she wasn't Mirandized and the officers say she

3    wasn't Mirandized.  So it's just a very, I think, integral

4    fact that reflects, in our view, the way that they were

5    treating Ms. Martinez, just like any other fact, where she was

6    held, how she was handcuffed and restrained and spoken to, the

7    fact that they decided against their own training, against the

8    Constitution, although it may knot be an independently -- you

9    know, right that can independently be vindicated through a

10   civil action for damages, does not mean that it is not a

11   requirement under the Constitution and under the patrol guide,

12   that if you're going to engage in custodial interrogation

13   which everyone agrees happened here, that she would be told

14   about her rights and she wasn't.  We're not going to ask the

15   jury to award damages, but it would be, in our view,

16   unnecessary and it would serve no purpose for Ms. Martinez to

17   be prohibited from testifying about one of the facts that

18   shows that the officers were prepared to question her without

19   following the proper guidelines.

20            THE COURT:  So I think I would tend to agree with

21   your point if the officers were actually conceding that they

22   had an obligation to read her her rights and did not do so.

23   And maybe I'm providing an explanation the officers themselves

24   haven't begin.  But my understanding I think from some

25   excerpts was deposition is that, at least, one of the officers

1    is contending that he believed he didn't need to read her her

2    rights because he wasn't actually questioning her, he was

3    just, in his words, interviewing her and taking pedigree

4    information.

5              Is that -- I guess I should ask defense counsel.

6              Is that his position and is there anything else

7    relevant --

8              MR. HARVIS:  I'm happy to address.  And again, I do

9    promise at the beginning of this conference when I stated we

10   we were splitting up the topics, that is true still.

11             THE COURT:  Mr. Kinney is ready to get in there.

12             MR. THADANI:  That is still true.  They're waiting

13   to see what Your Honor brings them next and it just all

14   happened to fall on me.  But perhaps that will change at some

15   point.

16             But just to address your question first and then

17   some of the points Mr. Harvis made.

18             First of all, that is correct.  I think actually the

19   warnings are not required.  It's a -- Miranda is a rule about

20   preclusion.  So if you get a statement that incriminates  you

21   and you didn't give the warnings, they're precluded.  So

22   that's -- and moreover, I think your question got to, like,

23   characterization, so plaintiff's counsel just stated it's

24   undisputed that this was a custodial interrogation.  That is

25   not undisputed.  There is a different patrol guide section

1    relating to debriefing which is what this was.  And it may

2    sound like semantics, but it is a difference.  The difference

3    is, in a custodial interrogation, the questioning is seeking

4    to incriminate the person who's being questioned.  In a

5    debrief, which I think actually is undisputed this is a

6    debrief, given I know what plaintiff's counsel's version of

7    the events are is they're asking about other crimes, other

8    information to help gather information.  So there was an

9    intelligence officer in this case.  He's one of the defendants

10   in the case.  His job is to debrief every prisoner about

11   information concerning guns, primarily, but other information

12   of crime in the neighborhood.  So he can investigate that

13   information.   In fact, that's how there's a search warrant in

14   case for plaintiff's apartment was from a debrief from another

15   arrest that occurred about one or two weeks earlier.  That's

16   how we got here in the first place, was from a debrief --

17             THE COURT:  So let me ask you, regardless of what

18   the patrol guide says, are the officers in this case -- had

19   any of them individually, as individuals, not the City, per

20   your request, as well as the law, are any of them -- have any

21   of them affirmatively stated that they believed that they were

22   not an obligation to give her her Miranda warnings at any

23   point during the many hours that she was held in custody

24   against her will at the station in cuffs, and if so, what is

25   the basis for their claim?

1    What have they said is the reason they haven't read

2  her her warnings.

3    MR. THADANI:  Yes, and I think it's because of the

4  nature of the questioning.  And I think the questioning was

5  about -- from our view, it's a little bit different, but I

6  think it reaches the same conclusion.  In our version, it

7  is -- she was asked about firearms, guns, other crime, and in

8  their version, she was asked about where Danny Rivera got his

9  drugs.

10    THE COURT:  So it's individual defendants have each

11  claimed that at no point after recovering 285 or however many

12  it was glassine envelopes of heroin in her apartment did they

13  ever ask her if she knew anything about those drugs or knew

14  where they came from?

15    MR. THADANI:  I'm not sure about what the testimony

16  of everybody.  I think this questioning was really all

17  centered on one particular defendant, Digennaro, in

18  particular, and I believe his testimony is that he debriefed

19  her, very short period of time asked her where -- asked her

20  about -- they're saying about Danny Rivera.  Our position is

21  that he was asking about firearms and other crimes and she

22  refused to talks to him, so he never really got into the

23  substantive questioning, so it never got to Miranda rights.

24  And again, like, our view -- plaintiff's counsel mentioned it

25  wouldn't be a mini trial.  I think our view is that there

1  would be since, first of all, it listed several exhibits about

2  this there's a patrol guide entry, they have portions of the

3  student guide that they seek to enter with respect to the

4  this, they have an expert witness, presumably, who they want

5  to speak on this, and our position is they're not required,

6  they can explain why they weren't provided and the danger -- I

7  think our concern, primarily, over all of of this is first of

8  all, it's tangential to the issues in the case which is was

9  there force used on her or not, but more importantly there is

10 really significant danger of unfair prejudice.  If you tell a

11 lay person whose knowledge is from television and from movies

12 this person wasn't, quote, read their rights, no matter what

13 instruction you give to that jury about damages, don't take

14 this into account, this is not part of the claim, once you

15 hear that, there's a significant danger of unfair prejudice,

16 confusion -- especially when there's going to be, I think the

17 amount of questioning they seek to have, the amount of

18 exhibits they seek to have on it, they have a whole witness to

19 talk about it.  This is not, like, a one-question-and-done

20 sort of thing, at least as it's being proposed now, and

21 frankly, just hearing about it even from the plaintiff in

22 terms of what happened in her version, they're going to hear

23 that, and then that's enough to create an unfair prejudice

24 especially given, I think, the minimal probative value, if.

25          Any, of this testimony which is just it's parts of

113

1   the story.

2           THE COURT:  I guess I understand your point.  I

3   think two things.  First, I would appreciate it, since I just

4   asked to you tell me from memory what the individuals answered

5   to this question was within the next few days, if you could in

6   the letter you're already going to submit, just address what,

7   if anything, the individual defendant said about the reasons

8   why -- I understand it's undisputed that she was not read her

9   rights -- but the reasons why they didn't do so, because one

10  thing I'd like to consider and again, as with all of theses

11  issues is, I'm not sure where I'm going to come down, is

12  whether this issue, in fact, goes to their credibility about

13  the other events in the precinct that night, because I think

14  there is certainly a scenario under which a jury could find

15  that their claim that they did not question her at all about

16  the drugs in her apartment is itself not credible.  If they're

17  citing that as the reason, I should think it tends to make it

18  more relevant to the dispute about what happened and how she

19  was treated and what their interactions with her were then if

20  they said, we asked her some basic questions, we talked to her

21  about Rivera, but that didn't rise to the level of

22  interrogation, and they have a good faith belief they don't

23  need to read her her rights.  But I'd likes to see what the

24  testimony is to the extent it was addressed, and I certain

25  hear your point about this being a side issue in the trial --

1          MR. THADANI:  One thing as a caveat, I don't know

2    that all of them were asked about this, so obviously, I can

3    only provide based on the testimony.  And again, I think it

4    will bear out is again, like, from our position is she didn't

5    want to the talk, so there was nothing.  But I understand

6    that's a dispute of facts.

7          THE COURT:  Right.  And I'm aware that there's parts

8    of her deposition where she say she asked for a lawyer and

9    wasn't given one, and that would be a disputed claim claim

10   whether she was read her rights or not, because whether she

11   was read them or not, if she asked or a lawyer, she's supposed

12   to be given one, so that's not really relevant to Miranda,

13   except that I could see a world where a jury wonders, well, if

14   she asked for one and she knew her rights, then why wasn't she

15   given one.

16         Okay.  Let's move on.  Expert witness Pollini and

17   the NYPD Patrol Guide and the defendant's motion to preclude

18   or limit his testimony.

19         So I know this report was written some time ago

20   before Judge Kovner ruled on summary judgment, so I am

21   presuming, and plaintiff's counsel can confirm if this is not

22   the case, that there are, at least, significant portions of

23   his report that will not be reflected in his trial testimony

24   because they relate to claims that have since been dismissed.

25         Is that right?

1          MR. HARVIS:  That's correct, Your Honor.

2          THE COURT:  So the only question for me to decide is

3    whether he meets the standard for relevance and admissibility

4    under Rule 702, either as to liability or damages or both on

5    the three remaining claims, excessive force, deliberate

6    indifference to her serious medical needs, and the officers'

7    failure to intervene, as well as the related state law claims.

8          Is that right?

9          MR. HARVIS:  Yes.

10          THE COURT:  So you know, one concern I have with

11   this report on the excessive force issue -- and I certainly

12   know he's been admitted an as an expert before on cases with

13   similar issues -- I think here there was a fair amount of

14   language in the report that if he were to testify to it, I

15   would have a jury disregard it, and I hope it will not come

16   out of his mouth in which he says things like, the defendant's

17   used excessive and unreasonable force.  In which he cites

18   Ms. Martinez's version of events as facts.  So he says that

19   they punched her, slapped her, kicked her.  It occurred to me

20   this might have been inartfully written and that what he meant

21   to do was say, under her version of events, this constitutes

22   excessive force.

23          Is that correct?

24          MR. HARVIS:  Yeah.  I don't see him having much of a

25   role in deciding whether or not the force that was used is

116

1    excessive.  I think that's where his value to the jury will

2    probably be at its lowest point, in general.

3         THE COURT:  Do you plan to offer him as an expert on

4    excessive force in any way related damages?  That is how far

5    outside the bounds of permissible conduct it was if -- and

6    again this is with an, if, the jury credits her version of

7    events over the officers' which is of course the question for

8    them to decide.

9         MR. HARVIS:  I think that yes -- the answer is yes.

10   I think that in the context of whether or not it was a use of

11   force, how this sort of incident should be treated and

12   documented, is something that he would testify about.  But in

13   terms of how far beyond the force that you would be permitted

14   to use in that circumstance, this was, I don't know because it

15   really is -- there really was no reason for any force to be

16   used.  So I could imagine a set of facts where there might be

17   an expert to talk about, you know, this was the amount of

18   permissible force, and this is how much they exceeded it.  But

19   since here, she was a handcuffed woman, you know, in this

20   room, I don't think anyone's going to argue that there was any

21   amount of force that was justified.

22        THE COURT:  Well, I could certainly see it -- and

23   maybe it's not even worth getting into because it's not this

24   case -- a scenario where just like when an officer is subduing

25   somebody in the course of arrest and has to use some force to

1    retain them, here, if what the officer said was true and she

2    was harming herself, destroying property, causing damage to

3    property, some force may be justified.  But since Ms. Martinez

4    is claiming that's not what happened, he's not here to testify

5    about whether that's appropriate.  And I think I understand

6    that what you -- the parts of his report that you are

7    currently offering his testimony on in light of the dismissed

8    claims is that the credibility of their claim that they

9    intervened in self to stop her from self-harming is undermined

10   by their failure to follow police procedures on the paperwork;

11   is that correct.

12          MR. HARVIS:  That's right.  And then also regardless

13   of the injury or its cause, that the steps they failed to take

14   during those hours that she was sitting in the room are

15   also -- deviate from accepted police practices.

16          THE COURT:  Okay.  So let me ask defense counsel

17   then, why is testimony from the police practices expert not,

18   at least, relevant in the jury's consideration of proper

19   procedures that could or should be used if your own clients'

20   version of events is true, and why is that something that's

21   not outside the experience and knowledge of the average jury,

22   kind of what to do in a station house when an arrestee engages

23   in self-harm or otherwise causes a danger to themselves or

24   others.

25          Who would like to address that?

1          MS. McKINNEY:  Me, Your Honor.

2          This goes to two points, Your Honor.  In part, this

3     argument also goes to defendant's point 10 in their motions in

4     lim, also moving to preclude any motion of patrol guide

5     sections.

6          The Joseph Pollini, you know, plaintiff's purported

7     police practices expert relies very heavily in his report on

8     various patrol guide sections which defendants argue are not

9     relevant in this cases.  It's not the controlling legal

10    standard, particularly in cases like this where Plaintiff

11    Martinez is asserting that her constitutional rights were

12    violated.  The courts have been very clear that that is not

13    the controlling law in these cases which is generally why

14    patrol guide sections are often precluded in this case.  If

15    you look at the -- Mr. Pollini's reports, he relies very

16    helpful on patrol guide practices.  That would be the first

17    argument.

18         The second point to our argument is that these

19    opinions in the reports are unnecessary because they relate to

20    lay matters.  He relies very heavily on a lack of improper

21    documentation, which again, does not necessitate an expert

22    report or opinion in this type of case.  This is something

23    that could easily be elicited through cross-examination of any

24    of the individual officers on the stand when asked, you know,

25    did you create there report?  If so, why not?  You do not need

1    a purported expert to take the stand to try to explain what is

2    essentially just a lay person's opinion about whether or not

3    documentation in this case should have been created.  The

4    remaining issues --

5              THE COURT:  I'm sorry, when you say, a lay person's

6    opinion, you mean that the jurors would be able to evaluate as

7    lay people whether certain police forms or procedures should

8    have been followed, and how old they had have that knowledge

9    about whether the officers -- I certainly understand that the

10   officers can and will testify about paperwork they prepared

11   and why.  But how is the jury going to have a basis to assess

12   whether the officers are truthful and correct in their

13   statements without the testimony from another person trained

14   and who has some expertise in that area as a check, of sorts,

15   because Ms. Martinez herself certainly doesn't have that

16   experience or background, so why can't she call an expert to

17   rebut that?

18             MS. McKINNEY:  Because the officers as NYPD officers

19   have their own baseline knowledge of how these procedures of

20   paperwork are done.  They can be cross-examined on that point.

21             Additionally, if you look at Mr. Pollini's opinion

22   which we note in our motions in lim, essentially, he arguing

23   that if information is not properly documented in the case,

24   that it simply didn't happen which is something that has been

25   previously rejected in the Circuit, an opinion that has been

1   previously rejected in the Circuit, because it is a conclusion

2   that is far too speculative to be admissible expert testimony

3   and therefore, it's going to be substantially more prejudicial

4   than it is probative in this case and should be precluded on

5   those grounds, as well.

6          Again, the remaining issues in this case are

7   excessive force, whether or not officers failed to intervene

8   in this excessive force allegation, and to be very clear, the

9   defendants' position is that the plaintiff is completely

10  fabricating this alleged beating at the hands of officers.

11  That it simply didn't happen.  You do not need the patrol

12  guide sections as plaintiff's counsel admitted or an expert to

13  go on the stand to tell anybody in the room that if an

14  individual, any arrestee is handcuffed and not resisting, that

15  of course, it would be excessive force and a Constitutional

16  violation for any officer to beat that individual.

17         THE COURT:  And just to stop you there, I take it on

18  that point.

19         As it has in other cases, the defendants, the City,

20  the individuals officers wouldn't object to an instruction to

21  the jury that while it will be up to them to resolve a dispute

22  about what happened on that night, if they find that the

23  officers bent Ms. Martinez's thumb back, threatened her,

24  slapped her, choked her -- you know, I'm paraphrasing, but I'm

25  sure we will discuss what that instruction would like -- that

1   I could instruct them that that constitutes excessive force,

2   and so your position is they don't need an expert to tell them

3   that because they're going to be so instructed, and the real

4   question is what they're going to find as a factual matter on

5   that claim?

6           MS. McKINNEY:  Yes.  And also that patrol guide

7   sections are not the controlling law as to what should or

8   should not have been documented and whether or not that makes

9   it more or less likely that this Constitutional violation

10  occurred, and therefore, it should also be precluded on those

11  grounds, as well.

12          THE COURT:  Okay.  I think I understand your

13  position.

14          Is there anything else outside what you argued in

15  your papers on either the patrol guide sections or the expert

16  that you'd like to bring to my attention?

17          MS. McKINNEY:  One second.

18          THE COURT:  Sure.

19          MR. THADANI:  Just a couple of things, Your Honor.

20          First of all, I think just to balance out the point

21  my colleague made is, what is the relevance of the failure to

22  document.  To the extent they're trying to argue that this one

23  event happened over the other because there was no unusual

24  occurrence report or there was no document in the command log

25  and there was nothing in the memo book, I'm not sure how

1  that's relevant.  And frankly, there is contemporaneous

2  documentation in the case anyway.  We know.  We just talked

3  about it.  We talked about Hanrahan's report, the IAB call

4  made by *lieutenant Cam reporting what was observed, et

5  cetera.  So a lot of this has to do with the failure to

6  document, but that's not what the case is about.  The case is

7  about whether there was a use of force or not.

8          THE COURT:  Let me stop you there, because I

9  definitely understand your position.  I think -- I certainly

10  see the strength of your argument on the excessive force

11  claim.  I think where plaintiff makes a fair point, and I'll

12  just ask you to address this specific thing, is that they're

13  not saying the failure to document is itself the violation,

14  it's that the gap in Pollini's view -- and you'd be free to

15  cross-examination Mr. Pollini about why he's wrong, or have

16  your clients explain why he's wrong -- but that what he

17  identities as the discrepancy between their version of events

18  and what they claim were the self-inflicted injuries by

19  Ms. Martinez and her conduct, versus the paperwork that they

20  actually prepared, the individuals they did or didn't notify

21  whether that happened, is something from which the jury could

22  say belies of truth of their claim.  That if, in the universe

23  where what they say happened, they would have filled out forms

24  A, B, and C, they would have notified individuals one, two,

25  three, and the fact that they didn't do that is something from

1   which the jury could find this didn't happen.  That's more

2   argument, but that's the relevancy of those sections of the

3   guide and relevancy of his testimony.

4         So please it will me why plaintiff is wrong --

5         MR. THADANI:  Sure.  So I think this pivots to the

6   point I was jumping in to raise any way which is now that we

7   know thanks to Your Honor's order which specific patrol guides

8   we're talking about here -- and I don't know if Your Honor

9   wants me to go through each one, because there's a fair amount

10  and I have something to say about each one and how they

11  don't -- either they're completely tangential because they

12  relate to, not this issue, about rather, arrest processing or

13  releasing a prisoner which didn't happen here, which I don't

14  know why that's even on this list.  But even the -- Pollini is

15  tieing his report to the plain language of the patrol guide.

16  He is basically just, the patrol guide says X, they didn't do

17  X, so Y.  So I'm not sure in his report he really applies any

18  expertise besides he knows how to read the parole guide.

19        With respect to the patrol guide entries, they don't

20  say what plaintiff is asserting they say.  If you look at the

21  specific sections, like, for instance, there's a section on

22  unusual occurrence, it has description of what an unusual

23  occurrence is.  This item, this sequence of events is not an

24  option there.  They have procedures about what to do when a

25  prisoner requires treatment.  That's fair.  But the version --

1    the contention here is whether she required treatment or not,

2    not so much what should have happened if you thought that she

3    didn't need treatment.

4              They have -- I mean, they have a entry with respect

5    to Miranda which obviously we've spoken about, so I won't

6    touch on.  The same thing with the student guide section.  I

7    hinted at this, there's two arrest processing sections which

8    the arrest is not an issue.  There's no false arrested claim.

9    I'm not sure why -- whether or not -- how she was processed or

10   whether she was transported from the scene to the precinct

11   really relates to any of the issues in dispute in the case.

12   Two ten thirteen is the one that's probably the least related.

13   It has to do with release of prisoners only applies when

14   either you determine that the plaintiff didn't commit the

15   crime or the DA's office says they're not pursuing charges.

16   Not the case here.  There's one on force guidelines which -- I

17   think one is we made the case that Ms. McKinney has already

18   raised this, given the allegations here, if the jury believes

19   plaintiff's version, there's no dispute that it's a excessive

20   force, and the problem with the force guidelines patrol guide

21   entry is that really it's going to --- if the jury is going to

22   see that, is going to get that, it's essentially an alternate

23   form of jury instructions.  If you look at the actual entry,

24   it talks about the factors once you take into account with

25   respect to whether or not forces is excessive or not --

125

1          (Continued on the following page.)

1          THE COURT:  Given the late hour, I understand a lot

2     of your concerns.

3          Let me ask plaintiff this.  If Mr. Pollini is

4     allowed to testify as an expert on the issues that you've

5     identified here today, do you have any need to independently

6     introduce the patrol guide's sections that you've submitted

7     other than as something that he may reference in his testimony

8     specifically tied to opinions that he's giving about these

9     issues?

10          MR. HARVIS:  No.  The only other use for them that I

11     could see beyond Peliny discussing them is just to the extent

12     they come up in cross-examination.  And that would not be to

13     offer them before the jury, and that would not be to offer

14     them before the jury, and that would only be on relevant

15     topics.  It would not be on the things that are of concern to

16     the defense counsel.

17          THE COURT:  So what I'm going to ask you to do --

18     and again, I haven't yet ruled on the issue of whether he can

19     testify altogether is, I'll leave it to you as to when.  The

20     quicker you do it, the easier it will be for me to give you a

21     prompt ruling, so it's in everyone's interest to do it

22     relatively quickly.  Why don't you confer with your expert.

23     Identify not just the sections of the guide, but the specific

24     provisions within there upon which he intends to rely on the

25     three remaining claims, provide them to your adversary, and

1    then let's see if we have any dispute about whether those can

2    come in.  He's not testifying on Miranda, even if that issue

3    comes in.  He's testifying on excessive force only potentially

4    as to damages.  And even then, the guide section may not be

5    relevant because of what it addresses.

6              So I'll just ask you to narrow it as best you can

7    and identify those sections and let's see if we have a

8    dispute.  And if we do, then defense counsel can send me a

9    letter and let me know the basis for your objections in that

10   context.  And if I have it in time to rule on when I do the

11   written ruling on the rest, I will.  If not, we can save it

12   for trial.  All right?

13             MR. HARVIS:  Yes, Your Honor.

14             THE COURT:  Okay.  Let's talk next about another

15   expert, Dr. McMahon, the orthopedic surgeon.

16             So I've reviewed his report and I understand the

17   opinions that he formed as of the date of his report in 2017.

18   I know that he has not, according to defense counsel, updated

19   his report since February of 2017.

20             Let me ask plaintiff's counsel, do you have any

21   intention of having him testify about any treatment she

22   received or her condition after the date of his report?

23             MR. HARVIS:  No.

24             THE COURT:  Okay.  So if that's the case, then let

25   me ask defense counsel, what grounds do I have to exclude it

128

1    on the ground -- you know, on the basis that it hasn't been

2    updated?  And isn't anything that you've argued with respect

3    to the lack of reliability or validity of his opinion

4    something that you can address through cross-examination about

5    how he hadn't examined her in, I guess, close to five years

6    now, maybe more?  And doesn't that really go to weight rather

7    than the admissibility?

8            MS. MCKINNEY:  Defendants are not going to object as

9    long as they do limit Dr. McMahon's testimony to anything

10   prior to February 3rd, 2017, in the report.

11           THE COURT:  Okay.  And I take it that means he's

12   also not going to rely on any records of hers produced after

13   that date?

14           MR. HARVIS:  That's correct.

15           THE COURT:  Okay.  All right.  Let's go to one that

16   I expect may be a little trickier on the defendants' motion to

17   require plaintiff to name two specific defendants in her

18   excessive force claim.

19           So, first, this references a point Mr. Thadani made

20   earlier.  I understand you didn't move for summary judgment on

21   the excessive force claim itself because there's clearly a

22   factual dispute, and, as you've said, if the jury credits

23   Ms. Martinez's version of event, they could certainly find

24   that someone engaged in excessive force from the NYPD that

25   night.

1           But my question is, why didn't you move for summary

2    judgment as to the individual officers that you represent on

3    the grounds that there was not enough evidence that any of

4    them as individuals committed the acts that they were alleged

5    to?

6           MR. THADANI:  That's a good question.  It's because,

7    as I noted earlier and the complaint still states, only

8    Forgione and Weitzman used excessive force at the time that we

9    filed the motion for summary judgment.  And so there, there

10   was an issue -- it was an issue of fact.  Use of force or not.

11   That's why we're here at trial.  It wasn't until opposing

12   summary judgment that the plaintiff finally changed from

13   Weitzman and Forgione to Ryan and one of three people.  And so

14   at that point -- we're past moving for summary judgment at

15   that point.

16          MR. HARVIS:  May I respond to that, Your Honor.

17          THE COURT:  Sure.

18          MR. HARVIS:  Yeah.  I mean, I think that's totally

19   misleading honestly because we had proceedings before Judge

20   Pollak, we were in front of Judge Pollak like on almost a

21   monthly basis.  She -- before the Court and with defendants

22   they knew that there was an evolution and we were getting

23   discovery and that they almost got their case dismissed

24   because of terminating sanctions on this very issue.  And

25   there was multiple conferences where we would go before Judge

1    Pollak and talk about where we stood and what was our current

2    understanding of who we thought it was and they're just -- the

3    idea that they were somehow -- it came out of left field that

4    these were the people that we were saying were potentially the

5    wrongdoers on the excessive force claim is just not true.  And

6    pleading in the alternative is totally accepted in the Second

7    Circuit.

8              And the City, and I use that purposefully here, is

9    liable regardless of who it was that actually hurt her on the

10   state law assault and battery claim, which was sustained at

11   summary judgment by Judge Kovner.  We don't need to show

12   personal involvement.  And so the jury -- if the jury is

13   somehow told that they cannot consider certain defendants as

14   having assaulted her, that would actually be intention with

15   what the law is on the assault and battery claim where there

16   is no personal involvement requirement.

17             And there is -- it is we believe perfectly

18   appropriate factual dispute to resolve by the jury.  We're not

19   suggesting that more than two officers did it, but we believe

20   it's for the jury to decide on evidence that the Court has

21   already held is sufficient to raise triable issues with

22   respect to these defendants.  We believe Judge Kovner

23   specifically reached that issue in the opinion and the

24   defendants did not seek reconsideration of that opinion.

25             And we don't see any reason -- we think that it

1   would be a wrong on the law for us to have to select it, and

2   particularly given the fact that there was strong evidence

3   here and findings from the Court that they were -- that they

4   concealed their identity and frustrated the fact-finding

5   process in terms of --

6           THE COURT:  So is it your position that the jury

7   should not be told and need not be told which of the two

8   defendants, that the verdict sheet could actually list all

9   four, and you will tell them there were two and it's up to

10  them and you don't even have to take a position as to which

11  two?

12          MR. HARVIS:  Well, I don't think that -- right.  I

13  think that the verdict -- the correct verdict sheet would list

14  all of them, but it would say underneath it, you know, you

15  should select two.  If you've selected two, go on to the next

16  question.  That would be how we would think it would be

17  appropriate, because we don't think this record -- you know,

18  we don't think -- since there's sufficient evidence that would

19  sustain a verdict as to personal involvement for any of these

20  four people on the excessive force claim, we think that it's

21  appropriate for the jury to make that final determination just

22  like any other question of fact.

23          THE COURT:  What's your response?

24          MR. THADANI:  Sure.  Okay.  So, first of all, to the

25  extent plaintiff's counsel is referencing -- I mean, if you

1    just look at the first two paragraphs of our reply to the

2    motion for summary judgment opposition, we expressed shock and

3    awe by the fact that this was happening.  That's how we

4    started the reply.

5              THE COURT:  That what was happening?

6              MR. THADANI:  That we've gone from these two

7    individuals.  Understood -- I think there was an understanding

8    that they were at some point perhaps going to come off of

9    Forgione and Weitzman to somebody else.  Who those people

10   were, I still don't know right now today.  I don't think they

11   know by the fact of what they just said, and that they picked

12   one and then one of three people.  We addressed that in

13   summary judgment.

14             It wasn't even an issue.  We didn't rule on

15   excessive force.  They brought it up as part of many different

16   issues that are raised on opposition.  We raised that in the

17   reply, immediately raising an objection to the fact that that

18   was happening.  Judge Kovner didn't rule on it because it

19   wasn't before her.  There was no issue with respect to

20   excessive force there.

21             With respect to -- they keep mentioning this

22   concealed identity.  I have no idea what that means.  I don't

23   even know how to respond to it.  I truly don't know what that

24   means, that the defendants were concealing their identity.

25             MR. HARVIS:  Can I tell you, Your Honor, what it

133

1   means?

2           THE COURT:  You can tell me.  Address me instead of

3   your adversary.

4           MR. HARVIS:  Thank you.  What it means is that Ryan

5   went in front of the CCRB and was asked 45 minutes of

6   questions about that night specifically and chose to say

7   nothing or acknowledge his involvement in grabbing

8   Ms. Martinez.

9           We -- Hanrahan -- there may be a facially plausible

10  explanation for it, but what Hanrahan -- there is a set of

11  facts in which he used the wrong numbers at the top, put down

12  the wrong date, said that she had been interviewed and didn't

13  make any complaints, and then filed their way in a drawer and

14  no one ever knew about it.  And as a result, we all spun our

15  wheels for like two years in discovery.

16          And so, you know, that is really what I'm getting at

17  when I talk about the concealment, that Ryan affirmatively

18  concealed that in his CCRB testimony, and that we think --

19  although now it's difficult because he's deceased, we think

20  that, you know, there was an effort also at kind of through

21  the Hanrahan report kind of putting this under the rug.

22          And we understand that may not be able to be fleshed

23  out at trial as much as we would like, but we certainly think

24  it's a valid contextual point to make.  I'm going to let

25  Mr. Thadani --

1          MR. THADANI:  Sure.  So I still don't know what that

2    means.  I truly mean that.

3          So the fact that Ryan -- I tried to explain this I

4    think in some of the papers, but again, there's a lot of

5    factual history here.  Ryan was questioned about allegations

6    made by a nonparty, Danny Rivera, with respect to what

7    happened.  With respect to Danny Rivera, yes, he did not

8    mention anything about Rosie Martinez punching the wall,

9    kicking cabinets.  He was not asked about that or his

10   observations relating to her at all.  I suspect that will come

11   out in trial very clearly.

12         THE COURT:  I'm sorry, even though she was the

13   injured prisoner that prompted Camhi's phone call to IAB,

14   Hanrahan never asked Ryan any questions about his observations

15   with Ms. Martinez at all?

16         MR. THADANI:  I apologize for not being clear.  So

17   Ms. Harvis is reflecting a CCRB investigation.  That is

18   completely separate from all of this.  That relates to --

19         THE COURT:  I see.

20         MR. THADANI:  -- allegations made by Danny Rivera

21   he's alleging excessive force against him.  And in connection

22   with an interview of Detective Ryan there, he did not speak to

23   what he observed Rosie Martinez doing.  He was not asked about

24   Rosie Martinez, and he was not asked about those observations.

25   Again, I know that will come out at trial.

1           THE COURT:  And he was not interviewed by Captain

2     Hanrahan?

3           MR. THADANI:  He was.  So with respect to that --

4     and that's the Hanrahan report we're talking about -- it

5     states that he observed her punching the wall and kicking

6     cabinets.

7           So this is not a -- I mean, I don't know how you can

8     say he's concealing his identity.  The most contemporaneous

9     document that reflects what he observes states that.  But also

10    as an aside, that's not concealing your identity.  The

11    plaintiff is stating this happened in a well-lit room, no

12    one's wearing masks.  I'm saying who did this?  There's been

13    video depositions, hours long, of every single person.

14    There's been photographs produced of every single person.  His

15    argument is concealing identity.  They're all saying it didn't

16    happen.  So in and of itself they're concealing their

17    identity, if that's your definition of it.

18          Plaintiff has the burden of proof, to prove personal

19    liability of specific people.  This is not let's put four

20    names and let's just see what the jury does and they'll put

21    check marks wherever they feel like.  That is not the law.

22    There are situations where the plaintiff cannot identify

23    somebody.  For instance, let's say they are, you know, facing

24    the ground and cannot see who is assaulting them among ten

25    officers.  That may be a situation that would make sense for

136

1    maybe something like this where I don't know who hit me

2    because I didn't see it.  So I can't say whether it was

3    Officer Jones or Smith or whoever.

4            But here that's not this case.  This case is, she

5    saw who did it.  She is alleging who did it.  This is not for

6    the jury to just decide, well, I increased my statistical odds

7    if I put four names on there and they get to pick two, I have

8    a better chance of winning now because it's not just two

9    people there.  There's -- I don't know this for a fact, but I

10   can't imagine there being any verdict form that is anything

11   like that, pick two.  So the first question is, did the

12   defendants use excessive force?  If so, pick whichever two you

13   feel like picking.  It's an ab- -- I think, frankly,

14   respectfully, absurd position.

15           THE COURT:  I mean that's a bit of a -- we all know

16   a verdict sheet would be much more specific than that and talk

17   about burdens and reasonable doubt and all that.  But I get

18   your point that there's a -- it's not a multiple-choice exam

19   regardless of what burden they're held to, that your position

20   is and you've cited some case law and support that at least by

21   the close of the evidence before the case goes to the jury, if

22   the plaintiff's contention is that two officers assaulted her,

23   your position is that she must make some assertion to the jury

24   about who those two were and they must decide if they credit

25   that allegation.

1           Is that the your accusation?

2           MR. THADANI:  I mean, in part.  I think it's -- I

3    don't know that it's appropriate or fair in these -- and

4    again, they keep raising sanctions in discovery and

5    misconduct.  We're past that now, right?  Discovery is closed.

6    All the discovery is done.  The sanctions already happened.

7    All the motions papers are done.  We're at trial now.  Okay?

8    And I don't think it's proper to raise a claim that they admit

9    is only against two people that she saw and then say I'm going

10   to bring it against four people.  I don't know that that's

11   fair.  I don't know that that's --

12          THE COURT:  When you say you don't think it's

13   proper, I know that you didn't move for summary judgment on

14   excessive force, are you disputing Mr. Harvis's statement that

15   you were on notice because of everything that happened before

16   Judge Pollak, the huge dustup that came when Officer Ryan's

17   statements came to light, when the Camhi phone call came to

18   light, that you weren't on notice that they were likely or

19   certainly going to be named as individual defendants in this

20   case?

21          MR. THADANI:  I think my expectation was they would

22   find -- at some point identify two people.

23          THE COURT:  Okay.

24          MR. THADANI:  I want to make it clear.  That's the

25   issue.  It's not that they changed from person A and B to

1   whoever else.  It's they're saying it's two people.  Name two

2   people.  And we would not have moved.  I can tell you right

3   now.  If they had done that before summary judgment practice,

4   we would not have moved for summary judgment.

5         THE COURT:  So let me just try to bring this part to

6   a close and see if I understand the issue.  And I apologize if

7   this was more clearly stated in your motion and I didn't grasp

8   it at the time.

9         What exactly is your motion in limen?  What are you

10  asking me to order?  It's a motion to have her name two

11  specific individuals for the excessive force claim.  When are

12  you saying she needs to name them?  What am I limiting and

13  what am I instructing plaintiff to do?

14        MR. THADANI:  So I think it is not appropriate for

15  the trial, at the beginning of the trial, for the claim of

16  excessive force to be against more than two individuals.  I

17  understand their argument with assault and battery.  That's

18  fine.  I get that.  But with respect to excessive force in

19  particular, if the allegation is two individuals use excessive

20  force on me, the trial should be -- when the trial begins and

21  when the jury is told what the claims are and even during

22  opening statements, before that starts, it should be -- the

23  claims should be asserted against two people, not let's see

24  what all the evidence is.  Both sides do a whole trial and at

25  the end right before closings we'll decide if even that's -- I

1    don't know if that's where Your Honor was leaning or not.  But

2    even that I think is inappropriate.

3          It should be the before the trial they decide we're

4    bringing this particular claim, assault and battery is a

5    separate thing, but with excessive force in particular where

6    they concede in the heading of their opposition, plaintiff

7    only brings this claim against two defendants.  Who are the

8    two defendants?  We already know presumably Ryan is one of

9    them unless that's a backtrack.  I don't know.  But the

10   affidavit said Ryan and one of these other three people.  So

11   really it's really just identifying one of the three people.

12         THE COURT:  I understand that point.  You buried in

13   there though a little reference to, well, assault and battery

14   is separate.  So you seem to concede that she wouldn't need to

15   choose based on assault and battery.  So as long as she's

16   going to have the opportunity to name any of the four because

17   of the City's liability if they find for her, what is the

18   point of artificially limiting her on the excessive force

19   claim?  Isn't the jury going to be incredibly confused when

20   they're told on the one hand you can find as a matter of state

21   law that any of four of these defendants assaulted her if you

22   believe that happened, but as a matter of federal law, you

23   have to pick two.  If I were a juror, I don't think I would

24   know --

25         MR. THADANI:  So in their JPTO, plaintiff's

140

1  indicated that assault and battery claim -- let's see if I can

2  find the page.  It's on page 2.  State law assault and battery

3  against City of New York.  That's the only defendant they have

4  for that claim.

5          Our position in line with the motion in limine we

6  made about the City of New York, the question should be, was

7  plaintiff -- something to the effect of, you know, did

8  plaintiff prove by a preponderance of the evidence that she

9  was subjected to an assault and battery on January 23rd, 2015?

10  There's no -- it's a yes or no question.  There's no Ryan,

11  Camhi, Digennaro, pick a -- flip a coin in the air, you know,

12  pick whoever you want.

13          THE COURT:  And you don't have any objection to it

14  going to the jury in that form, in some form, that

15  particular -- the state law?

16          MR. THADANI:  I think we have to see where the

17  evidence -- the evidence may not support that.  But to the

18  extent we're going into trial, right, and the claim is an

19  excessive force against two people, the City -- the state law

20  assault and battery is against the City, that's how it should

21  go through, excessive force against two people because

22  personal involvement matters for Section 1983 claim.  And

23  assault and battery against the City, okay.  That's the claims

24  that they are asserting going into the trial.

25          THE COURT:  Okay.  Do you have anything to add

1    besides the points you've already made specifically about the

2    issue of any authority you have that says you do not have to

3    name before trial who the two individuals are?

4            MR. HARVIS:  I would just point to Rule 8 and the

5    fact that alternative pleading is permitted under the Federal

6    Rules, and that we would be saying that Ms. Martinez alleges

7    that she was assaulted by Ryan and one of these other three.

8    One of the issues for the jury to decide is, was she

9    assaulted, and was it one of these three?

10           And we're not aware of any authority that

11   requires -- you know, we just have to have enough evidence to

12   show personal involvement.  And we think there's no way to

13   read Judge Kovner's decision other than, you know, agreeing

14   and holding that there was sufficient evidence presented that

15   would support the verdict for any of them.  And it's really a

16   question of whether at the close of the evidence we've shown

17   enough that would allow the jury to -- you know, to find that

18   two of the individuals actually committed it.

19           THE COURT:  All right.  Let's move now to

20   defendants' motion to preclude the plaintiff from seeking

21   economic damages.

22           Let me ask plaintiff to state briefly.  I was a

23   little unclear.  Maybe I am clear, but I just want to confirm.

24   What categories are you claiming by way of economic damages?

25   I think I read your submission only as to be future lost

1  earnings.  Is there anything else?

2        MR. HARVIS:  No, that's it.

3        THE COURT:  Okay.  And you're not introducing an

4  expert; you're just submitting her testimony and any

5  supporting documentation?

6        MR. HARVIS:  Yeah.  She was earning this amount and

7  now she can't work anymore, and this is how many years, you

8  know, she would be able to work.  It's pretty much a lay

9  argument.

10        THE COURT:  Okay.  So defendants, how are you

11  prejudiced at this date, and especially I would ask you to

12  just address given the sanctions history on your side why the

13  very drastic remedy of precluding an entire category of

14  damages should apply here given that she's not calling an

15  expert so we're not talking about a Rule 26 report that wasn't

16  disclosed in a timely fashion and we're really just talking

17  about her testimony and you're free to cross-examine her on

18  that?

19        MR. THADANI:  Sure.  I think the rule is there for a

20  reason.  They had to disclose her obligation.  It clearly

21  wasn't met.  I think you referenced something I was going to

22  reference.  Given the history of the case and given the

23  significant sanctions against the City with respect to

24  discovery in this case to not have a sanction at some sort for

25  the failure to disclose this information as it's required.

1        And, frankly, even forget about sanctions, I cited

2   case law where I think it was something to the effect of,

3   like, plaintiff proceeded at her peril.  They indicated that

4   they were going to provide this information and never did.

5   And the prejudice is they didn't comply with the rules.  They

6   still haven't, by the way, even written a response to this,

7   they could have supplemented their disclosures to give a

8   calculation.  They put, I think, 65,000 -- she was unemployed,

9   by the way, or not unemployed.  That will be an issue at

10  trial.  She gave inconsistent statements about her employment

11  history at the time she was arrested.

12       But putting that aside, she actually was just about

13  to get fired from her job that she was making the $65,000 per

14  year that they're using their calculation on apparently.  And

15  I don't know that $65,000 times pick a number of years out of

16  a hat is a sufficient calculation.  But, moreover, the key is,

17  the lack of disclosure.  And there was a requirement to

18  disclose and they chose not to do it.

19       THE COURT:  Right.  But preclusion is not a sanction

20  that operates every time there's a violation of the obligation

21  to disclose.  So even if I agree with you that she should have

22  affirmatively supplemented earlier, in what way are you

23  prejudiced to the point where the high bar for precluding her

24  from seeking an entire category of damages is met other than

25  there should be some sanction and at this point if this goes

144

1    to trial, I may only have two options, allow her to testify on

2    this or don't, allow them to seek those damages or don't?  How

3    does this really harm you because can't you just -- you know

4    what the number is now, they've given you the information they

5    intend to offer.  How are you prejudiced?

6                MR. THADANI:  No, that's fair.

7                THE COURT:  All right.  Okay.  Let's talk about

8    nominal damages then next.  This is the plaintiff's motion

9    that the jury not be instructed on nominal damages.

10               So I am inclined to defer this to the charge

11   conference when we see what the actual testimony is that comes

12   in about damages.  I guess what I'm wondering is, for the

13   defense on the excessive force claim, do you agree that if

14   they find for the plaintiff on liability given that she has

15   sustained some physical injury on excessive force or assault

16   and battery, that a nominal damages instruction would not be

17   appropriate?  And what we're really talking about is whether

18   she sustained any additional damages that are not nominal on

19   the other two claims?

20               MR. THADANI:  No.

21               THE COURT:  You don't?  Okay.  Tell me why.

22               MR. THADANI:  Okay.  So with respect -- I mean we

23   made our case with respect to the deliberate indifference

24   claim.  I think that's actually pretty strong, but your

25   question was about the excessive force.

1          At trial there's going to be a lot of evidence with

2     respect to these injuries.  And, first of all, the -- yes, I

3     mean, first of all, there's the different versions of events,

4     but it's possible a jury could find part of both versions of

5     events to be true and still find liability, that there was a

6     use of excessive force and she punched the wall and injured

7     herself.  So at that point then, her damages result from that

8     and not necessarily -- not necessarily the alleged excessive

9     force that they're presenting.  That's one.

10          Two is there's ultimate --

11          THE COURT:  What excessive force would they find

12     that she purchased the wall and --

13          MR. THADANI:  For instance, you could bend someone's

14     finger back and not cause an injury verses you punch the wall

15     and you cause an injury.  And so they could find that doing

16     this mechanism was excessive force under the circumstances but

17     didn't cause necessarily any injuries sufficient enough to

18     award compensatory damages.

19          The world exists.  Do I think it's likely?  Not

20     necessarily, but it's possible.  And it's not impossible.  I

21     think plaintiff tried to assert in their letter, it's

22     impossible to find nominal damages if the jury finds on

23     excessive force.  I cited case law that indicates that in

24     excessive forms claims -- I think even the case they cited

25     from the Second Circuit indicated basically the position I

1   just presented to you.

2          Moreover, aside from just like the sequencing of

3   events, there's also -- the medical records are fairly

4   complicated here.  There's some serious causation issue.  She

5   came in with a wrist wrap, arguably came in with the injury

6   already, understandingly apparently normal.  That's based on

7   observations and what she says, not based on what the records

8   show.

9          There's evidence that shows she reinjured herself

10  over time or may have or subsequent trauma caused her injuries

11  or long-term injuries, the nature of her work, she had

12  degenerative conditions.  There's a lot in the medical records

13  about where her actual injuries came from as opposed to the

14  use of force.  So there is a world where they could find that

15  the officers used excessive force, but it didn't cause

16  sufficient injury to merit compensatory damages.  That world

17  exists.

18          THE COURT:  All right.  Any response on that point?

19          MR. HARVIS:  No.  I think we should talk about it at

20  the charging conference.

21          THE COURT:  Yes, I'm going to defer consideration of

22  this until the charge conference.  I appreciate your

23  clarification and I am certainly thinking about the

24  possibility of nominal damages on excessive force in a

25  different way in light of your argument.  I think given --

1  just to preview kind of the issues that we may want to focus

2  on when we get to that point, I think given that in the Second

3  Circuit case that both parties cited, some of the other case

4  law I've reviewed on excessive force, the causation question

5  typically comes from when the events are undisputed and the

6  question is the reasonableness of the officers' use of force

7  under the circumstance.

8          Here we're really talking about a plaintiff and

9  defendants whose versions of what happened are diametrically

10 opposed.  And so I guess while I guess theoretically possible

11 for the jury to credit both versions of events; on the one

12 hand, they bent her thumb back and told her, you know, in sum

13 and substance we're doing this because you're not cooperating;

14 and on the other, she also self-harmed, I think that's

15 extremely unlikely and we're creating a risk of error if we

16 throw a nominal damages instruction in there because of that.

17 But I certainly want to hear the medical evidence that you

18 referenced and hear how the testimony comes in.  So I'm going

19 to defer consideration of this motion.

20         All right.  Let's see if we can briefly discuss -- I

21 do have a hard stop at around 6:15 -- defendants' motion to

22 preclude the testimony of what I understand are three

23 non-officer defendants witnesses, Pontecorvo, Trotter and

24 Valerga.

25         MR. HARVIS:  Your Honor said non-officer, but I

1  think you meant nonparty.

2          THE COURT:  Sorry.  Nonparty.  Thank you for that

3  correction.  Nondefendant officers, not non-officer

4  defendants.

5          So none of these three are defendants, am I right,

6  that those are the only three that plaintiff may seek to call

7  other than the individual defendants?

8          MR. HARVIS:  Well, no, actually.

9          THE COURT:  Other than for impeachment.

10         MR. HARVIS:  Hold on one second.  Sorry.  I just

11  want to -- I don't want to get this wrong.  There were --

12  we -- in our opposition, we talked about a couple of officers.

13         Did Your Honor mention Valerga?  I'm sorry.

14         THE COURT:  Yes.  Trotter, Valerga and Pontecorvo.

15         MR. HARVIS:  Then Your Honor is correct.

16         THE COURT:  Let's talk about Trotter.  To avoid

17  deciding unnecessary issues, is there any likelihood he will

18  actually be here since I gather he lives in Arizona and may be

19  outside of the subpoena power of the Court?

20         MR. HARVIS:  I guess not.

21         MR. THADANI:  Yes, correct.

22         THE COURT:  He has no intent to appear.  Okay.  If

23  he shows up, we can address his testimony when it happens, but

24  we will cross him off the list for now.

25         MR. HARVIS:  Okay.

1          THE COURT:  As to Valerga and Pontecorvo, I

2    understand from plaintiff's submissions that there are --

3    there is some documentation by Pontecorvo and Valerga --

4    sorry, some documentation that Pontecorvo made a written entry

5    regarding plaintiff's wounds being self-inflicted, and that

6    Valerga was deposed and said there was, in his words, a quote,

7    high probability, unquote, that he spoke with Defendant

8    Laliberte the day after the incident about what happened.  Is

9    that right?  Am I right about what arguably ties them to the

10   case?

11          MR. HARVIS:  Yeah.  You know, Trotter was the one

12   who -- both Trotter and Pontecorvo were at the hospital with

13   Ms. Martinez when this mysterious entry is made in her record

14   that a police officer reports that she was punching the wall.

15   I think that the evidence -- I think that that's true.  I

16   think that they both were there.  Nobody claims to remember

17   anything, so, you know, it's not going to be a long

18   examination.  But I do think that there are questions that

19   would be relevant to ask Pontecorvo about what happened at the

20   hospital.

21          THE COURT:  So given that record, you know, marginal

22   though it may be for relevance, but certainly by their own

23   statements tying them either to some account by the individual

24   officer or officer defendants and at least one of them making

25   an entry about what he was told or what he observed happened

1    to the plaintiff, why aren't we at least at the basic bar for

2    relevancy and we can deal with scope of their testimony if and

3    when they're called?

4           MR. FRANK:  Your Honor, so I'm understanding, excuse

5    me, that Pontecorvo was not at the hospital, so --

6           MR. HARVIS:  Not at that time.

7           MR. FRANK:  Not at that time.  So his statement in

8    the medical record, that statement that appeared in the

9    medical record is also just not relevant to any of the claims

10   or defenses at issue.

11          THE COURT:  When you say it's your understanding,

12   that's based on what, that he wasn't at the hospital?

13          MR. THADANI:  It's based on his memo book and then

14   the medical record.  The time of the medical record and the

15   time in the memo book for both Pontecorvo and Trotter of when

16   Pontecorvo was there, the times don't match.

17          THE COURT:  So what is your understanding as to why

18   he wrote an entry in his -- am I confusing the witnesses?

19          MR. HARVIS:  No.  Your Honor, it's that Trotter said

20   to -- Trotter at least seems to have said to the medical staff

21   that Ms. Martinez was observed punching the wall.  That's in

22   her medical record.  So it's not that Pontecorvo made a record

23   in his own note.  And Mr. Thadani may be right.  I certainly,

24   in my mind, thought of Trotter as being the more vital

25   witness.  So maybe we need to focus our efforts on getting him

1   back from Arizona rather than arguing about Pontecorvo.  I

2   think maybe we don't need Pontecorvo.  What we really need is

3   Trotter.  But we certainly want to argue about Valerga.

4           THE COURT:  Okay.  Yeah, I don't think there's any

5   point in calling a witness if the other records show he wasn't

6   actually present to say what somebody else reported, if he's

7   admitting that.  I'm thinking of Pontecorvo in this regard.

8           MR. HARVIS:  As I'm thinking about it though, now

9   that I'm thinking through Trotter being in Arizona, I mean,

10  I'm just not sure -- in our view -- I'm sure there's a

11  dispute, but in plaintiff's view and I think in Judge Pollak's

12  view, it's a critical fact that someone -- and we believe

13  Trotter -- you know, told medical staff that Ms. Martinez was

14  observed punching the wall because it raises all kinds of

15  questions of, you know, this hasn't even been reported yet

16  when this -- at the time stamp of the medical record shows the

17  officers hadn't called this in yet.  They were waiting to

18  hear.

19          And so I'm just trying to think out loud about how

20  that -- how that record is going to come in.  And if Trotter

21  is not there -- I think we may need to talk to the City about

22  trying to come up with something so that we can deal with that

23  issue.  But I don't think that calling Pontecorvo is the

24  answer.

25          THE COURT:  Okay.  Why wouldn't it come in through

1    the medical record?  I mean, it's a statement that's in the

2    medical record.  I guess it's not a statement for diagnosis

3    and treatment, but if no one is disputing that he made it --

4              MR. HARVIS:  I see.  Yeah.

5              THE COURT:  I mean it might be a statement.  It's

6    not her statement for diagnosis and treatment, but he is an

7    officer reporting to medical staff what he claims to have

8    seen.  I guess you're not claiming it's a statement offered

9    for its truth; you're claiming it's offered for something

10   totally different?

11             MR. HARVIS:  Right.  That would be our argument.  I

12   guess I want to give it some more thought, and I don't think

13   it will be an issue.  But if it is, we'll bring it to the

14   Court's attention.

15             THE COURT:  Why don't you confer and let me know if

16   there's any remaining dispute about these witnesses, and I'll

17   defer consideration of the motion until then.

18             MR. HARVIS:  That sounds good to me.

19             THE COURT:  All right.  I'm going to ask very

20   briefly.  We've got two more to go on my list of things that

21   are still in dispute that I had questions about.

22             One is plaintiff's motion to use leading questions

23   on direct examination of nondefendant officer witnesses.  I

24   know that no one or the defense counsel is not disputing that

25   they can lead the individual defendant officers when they call

153

1    them on direct, plaintiff I mean.  And I guess for plaintiff,

2    I have two brief questions for you.

3            One is, with respect to these non-officer defendant

4    witnesses, if in fact they're called, I'm not sure if any are

5    going to be called, you know, as you know, the prevailing

6    practice in this district is to deny this without prejudice

7    and give you leave to make the motion again if the witness

8    proves hostile at trial.

9            Is there any reason why I shouldn't do that here?

10   Any specific reason why you need to know in advance how

11   they'll be treated?

12           MR. HARVIS:  No, not really.  I just say we do have

13   their deposition testimony, so I think that gives us a little

14   bit more insight into how they're going to testify.  So I

15   think that might make it unnecessary to defer it.  But

16   certainly we don't have any objection if that's how the Court

17   wants to proceed.

18           THE COURT:  I think that's probably easier.  I mean

19   I think to the extent especially that they're claiming lack of

20   recollection and in light of Judge Pollak's decision, my

21   inclination is to give you some reign to lead them, but let's

22   see who's called and see what the issues are and we'll take it

23   from there.  All right?

24           MR. HARVIS:  Sounds good.

25           (Continued on the next page.)

154

1          (Continuing.)

2          THE COURT:  Okay.  Last motions and then we still

3  have some other matters to address.  The motion to admit --

4  this is plaintiff's motion to admit defendant's Rule 36

5  submissions.

6          You know, I'm aware of and I tend to agree with your

7  position that these are binding admissions.  I guess I'd just

8  ask the City to address plaintiff's argument that the whole

9  purpose of these admissions during discovery is to narrow the

10 issues in dispute of trial, and even if plaintiff could bring

11 this in by other means, that's not really for me to decide.

12 Once you've admitted it, they can present the evidence in the

13 fashion they think is best.

14         MR. THADANI:  Sure.  So you know, I think that I was

15 unclear what they were asking me for, because they presented

16 at stipulations initially.  So to the extent, as Your Honor

17 may know, we went through each one and for some of the them it

18 was just the witness is going to testify.  There's no need for

19 a stipulation.  To the extent that that's not what they're

20 seeking, per se, which it sounds like they're not, I don't

21 think those are the disputed one.  I think that the crux of

22 the argument really from our perspective to the extent it was

23 lost, like, I want to reiterate, is really about

24 admissibility.  So a lot these facts -- quote, unquote, facts

25 related to a lot of the other issues we've been talking about

155

1    today.  There are facts about the prisoner pedigree card,

2    about the prisoner roster form, about Hanrahan's reports

3    errors, about needing to give Miranda warnings.  Really

4    almost -- I mean, I have the specific numbers, but I mean,

5    most of them, there's a another motion in limine that bears on

6    it, and I cited cases and treatises which speaks to the issues

7    of just because there's an admission -- we're not running away

8    from them -- but just because there's an admission does not

9    mean it's admissible at trial because they're subject to rules

10   of admissibility.

11          And so really understanding, maybe putting aside the

12   ones where we argued with respect to the -- this is undisputed

13   or the witness can testify, putting those aside, there are

14   other ones that really speak more to admissibility, and then

15   there are a few, a handful that speak to completeness where

16   our admission was lengthier and they excerpted to take out

17   context of some of our admissions.  So to the extent that

18   there's an admission, it's the entire admission, not let's

19   just take the second half of the sentence, not the first half

20   of the sentence.

21          THE COURT:  Understood.  Okay.  So why don't we do

22   this, I hear your point, and I tend to agree with you that

23   some of this on relevancy depends on what my rulings are on

24   the other disputed motions.  So with the expectation and hope

25   that I will get you a ruling on that sufficiently in advance

1    of trial for you to confer on these, after you receive my

2    rulings on the other motions in limine, plaintiff's counsel,

3    why don't you provide your adversary with a statement of any

4    admissions you seek to offer tailored to the relevancy of

5    what's coming into the case, do your best to agree on the

6    language of those and what would come in, and hopefully,

7    before the final pretrial conference, you can let me know if

8    you've agreed, or if there's anything still in dispute.  And,

9    you know, can you address this at this time, but think about

10   how you'd like it to come in, if you want it to be something

11   read to the jury at the close the evidence or once we agree on

12   the language, you know, and the testimony, the appropriate

13   witness, just let me know.

14          Okay.  All right.  I think that's all I have on the

15   disputed motions.  I know there are some other motions

16   outstanding.

17          Mr. Thadani, you're looking as if you had something

18   else to say on that point.

19          MR. THADANI:  No.  I just want to flag before the

20   conference ends, three just, like, housekeeping points we

21   wanted to raise, but it doesn't have to be now.

22          THE COURT:  That's fine.  Let me go through a few

23   things that I have.  I think we'll probably still have some

24   time for that, and if not, we can address it at the next

25   conference, or if you need to have it addressed before then,

1   you can raise it with me in a letter.

2          Okay.  I noticed this was not actually the subject

3   of an independent motion from the defense, but that plaintiff

4   had listed, by my count, around 20 treating physicians as

5   potential witnesses in your joint pretrial order.

6          You know, I certainly think that I would, if you

7   actually attempted to call 20, ask you to limit them.

8          MR. HARVIS:  We're not going to be doing that.  I

9   think it's probably a handful, less than five, I think, and we

10  can try to get that list to the City -- to defense counsel,

11  you know, in advance of the final pretrial conference or as

12  soon as possible.

13         THE COURT:  Okay.  I think in advance, if you can,

14  and maybe ideally by before the Thanksgiving break, so if

15  there are any issues, we can address those.

16         Yes.

17         MS. McKINNEY:  And Your Honor, that was one of the

18  defendant's housekeeping points was to request that if

19  plaintiff could provide a more refind list of the treating

20  physicians that they do intend to call.  We do request -- I

21  think it would be helpful to provide a deadline.

22         Could we set a deadline at today's conference for

23  when they could provide us that list and also an order, if

24  possible, of those witnesses, as well.

25         THE COURT:  Why don't we deal with the witness order

1   point separately.

2        But do you have a timeframe in mind as to when you

3   think you can provide the list?  I know because they're

4   doctors, it may depend on their availability.

5        MR. HARVIS:  Precisely.  I would say -- can we say

6   November 21st.

7        Is that okay?

8        THE COURT:  That is nine-ish days in advance of

9   trial.

10       MR. HARVIS:  How about the 18th, Your Honor?

11       THE COURT:  Sure.  Why don't we say the 18th.

12       So November 18th.  And, you know, I know that none

13  of them are going to be offered as experts.  I will say I know

14  that particularly when one doctor works for, say, Queens

15  Medical Center, it's standard for them to review the patient's

16  chart and rely on the history notes to the extent that that

17  was something they actually relied on in the course of their

18  treatment of plaintiff, not something that they're looking

19  back at now.  But, you know, subject to that bound, they're

20  obviously not going to be given any opinions other than those

21  formed during their own diagnosis and treatment.

22       MR. HARVIS:  Right.

23       THE COURT:  Okay.  All right.  I think you may have

24  addressed this in our discussion about other misconduct.

25  There was an issue that came up, I think, as Ms. McKinney may

159

1    recall, I was observing Judge Kovner's trial in the Burnet

2    matter that she handled very deftly a weeks ago, and there was

3    an issue that came up mid-trial about adverse credibility

4    findings from one of the defendant's officers -- defendant

5    officers in an unrelated case, but on a list that was

6    maintained by the Queens County District Attorney for officers

7    who had been found by a Court to have not been credible in

8    that proceeding, and Judge Kovner ruled on the spot that it

9    was admissible because it went to credibility.  It's a very

10   fact-specific inquiry.  It would depend on the circumstances.

11   I would prefer not to have to deal with that mid-trial, so I

12   wanted to see if either party had inquired of the Queens

13   District Attorney as to whether any of the individual

14   defendants had had such a finding since there's now a central

15   list that I gather is maintained.  That should be something

16   that the parties could find out relatively quickly.  But if

17   any of the defendants happen to have that history and are on

18   the Queens DA's list, and you know, if it's not an issue, if

19   nobody seeks to present it, it's not an issue for me.  But if

20   either party -- I presume the plaintiff in this case seeks to

21   present it, it's something I would appreciate knowing about in

22   advance of trial.

23            MR. HARVIS:  Yeah, okay.  I don't have that

24   information right now.  But we will find out the answer, and

25   if there is -- if we find out in the affirmative, we'll submit

1   a letter to Your Honor.

2          THE COURT:  I think that would be great.  I think

3   you can confer with your opposing counsel and see if they

4   agree that it's properly the subject for impeachment under 608

5   or otherwise, if there's any objection to it coming in in the

6   cross of an officer.  If there's a problem, let me know the

7   dispute.

8          It also may be -- I don't know if other than defense

9   counsel in criminal cases, if plaintiffs in civil cases are

10  permitted to access that information or whether it's something

11  that only the City as counsel to those officers can get.

12  Obviously, you know, you have no reason necessarily to know

13  about it before, but it would be something that if you knew

14  about in the ordinary course of discovery, would be exchanged.

15  I don't think this list even existed at the time you were all

16  doing discovery in this case.  So it may be simpler and faster

17  for the City to make that inquiry as counsel for the officers,

18  so if they don't have any objection to that --

19          My mic just went out.  Are they shutting us down?

20          All right.  Thank you.

21          MR. HARVIS:  We would certainly appreciate that if

22  the City is able to make that inquiry, that would obviously be

23  much easier than us trying to do it.

24          MR. THADANI:  I don't know.  So I mean, I'm not

25  saying no.  I don't know what the process is for that.  So I

1    can look into it.

2         THE COURT:  I know Ms. McKinney, you probably have

3    the document that was used in your trial, so perhaps, you

4    could use that for reference.  I think if you contact the

5    executive office of the Queens District Attorney and just let

6    them know this is the list that sometimes they call it the

7    Brady list, sometimes they call it the adverse credibility

8    findings you're inquiring about, and give them the officers'

9    names, they could probably tell you pretty quickly whether

10   it's on, and if you would like to say the judge directed you

11   to make that inquiry, you're free to do so.

12        MS. McKINNEY:  I do know a liaison at the Queens

13   DA's Office that I would be happy to reach out to with that

14   inquiry.

15        THE COURT:  Terrific.  Thank you.

16        Lastly, joint pretrial order, it's very long,

17   includes a lot of exhibits that I suspect I'm going to give

18   you all the benefit of the doubt and say that you were being

19   over-inclusive to avoid any preclusion problems.

20        I do think it would be Helpful, particularly for

21   plaintiff to narrow down just as you have with the plaintiffs,

22   narrow down the list of exhibits.  I know you're waiting for

23   my ruling on a number of these motions.  So I was thinking

24   that you could narrow down your proposed exhibits, as well as

25   any objections that you may have, and submit it by the end of

162

1    the day, meaning, midnight on Monday November 21st.

2         Does that seem workable?

3         MR. HARVIS:  Sure.  A lot of them were already

4    intentionally blank, so I'm just saying it's a little

5    deceptive, the number.

6         MR. THADANI:  It's not 300, it's 200.

7         THE COURT:  Okay.  Scheduling-wise, as you guys --

8    sorry, you all probably know from reviewing my rules,

9    typically -- there is no typical, given how new I am to this

10   job, but I've been asking for proposed voir dire, verdict

11   sheets, and jury charges to come in 10 days before jury

12   selection.  We have the Thanksgiving holiday, but the 10 days

13   would fall on a Sunday, so Monday which I think is the 21st

14   would also be the day I'd ask you to submit those.

15        MR. THADANI:  I thought it was two weeks.

16        Am I wrong about that?

17        THE COURT:  It may have -- you know what, you may be

18   correct, and you may know my rules better than I do at this

19   point.

20        MR. THADANI:  I try.  That's what I have in my

21   calendar.

22        THE COURT:  Okay.  I'll welcome them sooner.  I

23   thought given the timeframe, given that you're still waiting

24   on the rulings on my motions in limine, if you'd like to have

25   until the 21st, you can.  If you'd like to do them before the

1   weekend, that's certainly appreciated.

2           Okay.  I want to talk to you briefly about voir

3   dire.  So I am going to actually do a written questionnaire.

4   In my experience, it actually saves a lot of time, and then

5   rather than have the individual jurors tell everybody out loud

6   how many children they have and do they have any lawyers in

7   their family, we could just do that on the questionnaire and

8   save the more complicated and revealing questions about

9   things, like, potential biases, all of that, for the

10  individual questioning.

11          I also think it tends to work better especially in

12  cases of this type where jurors may have some strong feelings

13  on either side, to question them not at sidebar, but in the

14  jury room.  So what I'd like to do is have a questionnaire

15  that has the biographical information in there, which would

16  include are things, like, lawyers this their family, law

17  enforcement members in their family, that sort of thing that

18  we may want to follow up on with individual questions.  Have

19  them do that with the written questionnaire, I'll then give

20  you time to review it, maybe half an hour or so, then I'll

21  deal with hardships.  We could do those at sidebars.  Deal

22  with the hardships first.  Once we have a pool of people who

23  have not been excused for hardships, we can take the first 14

24  and go to the jury room and question them one on one.  And

25  since we're doing it there, I don't have any objection to your

1   clients being present.  Obviously, they can't participate, but

2   I think sometimes it can be helpful for clients to share with

3   you their take on potential jurors when it comes time to do

4   the peremptories.

5        And I will probably rule on the cause challenges one

6   by one.  I don't trust my memory to remember who said what

7   seven jurors ago.  I had enough trouble following along when I

8   was observing other judges do it, much less doing it on my

9   own.  So you all should just be prepared to address the

10  for-cause challenges as they get excused one by one.  All

11  right.

12       And the rest, we can talk about at the final

13  pretrial conference.

14       Did we set a date for that yet?

15       THE COURTROOM DEPUTY:  The 28th.

16       THE COURT:  The 28th, okay.  So the 28th, the

17  afternoon of the 28th, I believe.  All right.  Good.

18       Lastly, but certainly not least, any potential

19  vehicle or avenue for settlement discussions at this point?

20       Have you spoken recently with your clients about

21  that possibility?

22       MR. HARVIS:  No.  We haven't -- I mean, I -- is it

23  okay if we go off the record just for the --

24       THE COURT:  Sure.  We'll go off the record.

25  (Whereupon, an off-the-record discussion was held at this

1   time.)

2           THE COURT:  Let's go back on the record.

3           Before we adjourn, I have nothing else.

4           Any of the parties have anything else you'd like me

5   to address?

6           MR. HARVIS:  No.  Nothing from plaintiff.  Thank you

7   for your time.  I appreciate it.  It's been so generous.

8   Thank you.

9           MR. THADANI:  I still do have three things.

10          THE COURT:  Okay.

11          MR. THADANI:  They're short, I think.

12          One is, I just want to the confirm that you will not

13  be holding trial on Fridays?

14          THE COURT:  Thank you for that question.  I meant to

15  address it.

16          So actually, unfortunately or fortunately, I am

17  going to be holding trial that Friday.  I believe it's

18  December 2nd, perhaps.

19          Is that right?  Yes.  Okay.

20          Yeah, because we're starting on a Wednesday, rather

21  than have the jury start, appear a day and a half or so of

22  testimony and argument and then take a three-day break, I am

23  inclined to do a half day on Friday just to give me time to do

24  some other matters and give you a break.  So I think we'll

25  probably go up to the lunch break at 1:00, and then excuse the

1    jurors and excuse you, and then we can reconvene on Monday.

2              MR. THADANI:  I'm glad I asked that question.

3              THE COURT:  I am too.

4              MR. THADANI:  The other one is, so I think we left

5    it with the three nonparty police officers Pontecorvo,

6    Trotter, and Valerga.  Plaintiff's counsel is going to

7    consider their position, we'll confer and see if there are

8    disputes.

9              Do I have that right?

10             MR. HARVIS:  That sounds good to me.

11             MR. THADANI:  I just wanted to the flag one other

12   individual.  I don't know if this was an inadvertent mistake

13   or you know, I'm not sure.  There's another nonparty.  His

14   last name is Ripple.  He is on the witness list, he was not in

15   the list of individuals plaintiff's counsel indicated no

16   longer seeking to call.  So I just --

17             MR. HARVIS:  We don't be need to call him.

18             MR. THADANI:  There you go.  That's taken care of.

19             So the last one is really, is there guidance in

20   terms of if we want to schedule a tech walk-through.

21             Let me back up.

22             Do you know whether the trial is going to happen in

23   this courtroom?

24             THE COURT:  It is going to be in this courtroom.

25             MR. THADANI:  Okay.  And to the extent that that's

Avery N. Armstrong, Official Court Reporter, RPR

1  the case, is there some guidance to schedule, like, an -- an

2  opportunity work with the technology and get familiar with it?

3          THE COURT:  Yes.  The good news is, at this

4  juncture, I do not have a lot scheduled in this courtroom over

5  the next few weeks.  We have some occasional conferences, but

6  a lot of them are by phone, and as of now, only one or two

7  other hearings.  So there should be plenty of time, so I think

8  you should contact my deputy Freddie Valderrama, and you're

9  welcome to have that time.

10          And we are trying to ensure that the screen has good

11  enough resolution for your exhibits to be seen.  I know that's

12  been an issue in some other parts of the courthouse, but we're

13  working on that with IT.

14          MR. THADANI:  That is all I have.

15          THE COURT:  And if you want to come in over

16  Thanksgiving break to do a tech walk-through, it'll be nice

17  and empty.  I'm kidding.  No one will be here.  But we'll do

18  it as close in time as possible.

19          Anything else?

20          MR. HARVIS:  Not from plaintiff.

21          THE COURT:  All right.  With that, we're adjourned.

22          (Whereupon, the matter was concluded.)

23              *     *     *     *     *

24

25