UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ROSIE MARTINEZ,

                                   Plaintiff,

              -against-

                                                             16 CV 79 (NRM) (CLP)
CITY OF NEW YORK, *et al.*,

                                   Defendants.
-------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR REMITTITUR

ELEFTERAKIS, ELEFTERAKIS & PANEK
80 Pine Street, 38th Floor
New York, New York 10005
(212) 532-1116

SCOTT A. KORENBAUM, ESQ.
14 Wall Street, Suite 1603
New York, NY 10005
(212) 587-0018

Attorneys for Plaintiff

SCOTT A. KORENBAUM, ESQ.,
GABRIEL P. HARVIS, ESQ.,
BAREE N. FETT, ESQ.,
        of Counsel

Dated: April 28, 2023

<u>Table of Contents</u>

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

The jury's punitive damages award appreciated the reprehensible nature
of the Officers' conduct; knowing full well that members of the 107th
precinct assaulted Ms. Martinez and caused her excruciating pain, the
Officers turned deaf ears to her pleas for medical assistance to ensure that
the perpetrators of the assault remained hidden from her injuries . . . . . . . . . . . . . . . . . . . . . . 7

    A.    The standards governing remittitur . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    Reprehensibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C    The ratio of punitive damages
        to compensatory damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    D.    Comparable civil or criminal penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    E.    The Officers' remaining arguments, including
        other case law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Table of Authorities</u>

<u>Cases</u>

*Beckford v. Irwin*
    49 F. Supp. 2d 170 (W.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bogle v. McClure*
    332 F.3d 1347 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*BMW of North America, Inc. v. Gore*
    517 U.S. 559 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Bridgeview Health Care Ctr. v. Clark*
09 C 5601, 2012 U.S. Dist. LEXIS 184089
(E.D. Ill. Sep. 28, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*DiSorbo v. Hoy*, 343 F.3d 172
(2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fresh v. Entm't U.S.A., Inc.*
340 F. Supp. 2d 851 (W.D.Tenn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Gagnon v. Ball*
696 F.2d 17 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gracia v. Sigmatron Int'l, Inc.*
842 F.3d 1010 (7th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Hamilton v. Lalumiere*
07 CV 148, 2011 U.S. Dist. LEXIS 15214
(D. Conn. Feb. 16, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ismail v. Cohen*
899 F.2d 183 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Jennings v. Yurkiw*
18 F.4th 383 (2d Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lampley v. Onyx Acceptance Corp.*
340 F.3d 478 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Lee v. Edwards*
101 F.3d 85 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Martinez v. City of New York*
16 CV 79, 2018 U.S. Dist. LEXIS 13409
(E.D.N.Y. Jan. 24, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Miranda-Ortiz v. Deming*
94 Civ. 476, 2001 U.S. Dist. LEXIS 7105
(S.D.N.Y. May 31, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Payne v. Jones*
711 F.3d 85 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Pearl v. City of Long Beach*
    296 F.3d 76 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Smith v. Wade*
    461 U.S. 30 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sooroojballie v. Port Auth.*
    816 Fed. Appx. 536
    (2d Cir. 2020) (Summary Order) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Williams v. Marinelli*
    13 CV 1154, 2017 U.S. Dist. LEXIS 21710
    (D. Conn. Feb. 8, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

Statutes and Other Sources

Fed. R. Civ. Proc. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

**Preliminary Statement**

After almost six years of litigation, which the defendants did their best to frustrate at every turn through sanctionable behavior, Rosie Martinez's federal claims of excessive force, failure to intervene and deliberate indifference to her medical needs against Detective Eric Ryan, Sergeant Joseph DiGennaro, Sergeant Keith Laliberte and Lieutenant David Camhi (the "Officers"), and her state law assault and battery claims against the City of New York, proceeded to trial.  Martinez claimed, among other things, that on January 22-23, 2015, two of the Officers injured her hands by handcuffing her too tightly and bending back her right thumb to such an extent that it caused ligament damage.  She also claimed that the Officers failed to provide her with medical care despite her repeated pleas for help.  In contrast, the Officers contended in virtually identical testimony that Ms. Martinez injured herself by repeatedly punching a bulletin board with significant force, and that she never requested medical assistance.

Following seven days of trial testimony and deliberations, the jury returned a verdict in favor of Ms. Martinez and against defendant City of New York in the amount of $200,000 for compensatory damages on her state law claims of assault and battery.  The jury also found in favor of Ms. Martinez against the Officers on her federal claim of deliberate indifference to her medical needs.  The jury awarded nominal damages on this claim, and awarded $100,000 in punitive damages against each of the Officers.  Declaration of Scott A. Korenbaum Submitted in Opposition to Defendants' Post-trial Motion ("Korenbaum Dec."), dated April 28, 2023, at ¶ 2 and Exh. 1.  In response to Special Interrogatories requested by the Officers, the jury found that Ms. Martinez had complained of extreme pain while in the 107th precinct, that each of the Officers knew that Ms. Martinez "had complained of, or was otherwise experiencing, extreme pain[,]" and that each of the Officers did not "reasonably believe — even if he was mistaken —

that the plaintiff was not experiencing extreme pain while at the 107th precinct." Korenbaum Dec. at ¶ 3, and Exh. 2.

The Officers move, pursuant to Rule 59 of the Federal Rules of Civil Procedure, for a remittitur of the punitive damages award. They contend that the jury's punitive damages award is excessive because the Officers' "conduct was not sufficiently reprehensible to justify such substantial punitive damages awards[,]" and the jury's punitive damages awards are severely disproportionate in light of each defendant's respective conduct and the relatively [*sic*] culpability of such conduct." Memorandum of Law in Support of Defendants' Motion for Remittitur ("Offs. Memo") at 1. They do not seek judgment as a matter of law or a new trial. Korenbaum Dec. at ¶ 5.

This Court should deny the Officers' motion because their arguments ignore the egregiousness of their conduct. Knowing full well that two of their brethren assaulted Ms. Martinez and caused her excruciating pain, the Officers turned deaf ears to her pleas for medical assistance to ensure that the perpetrators of the assault remained hidden from Ms. Martinez. In reaching its verdict, the jury heard and saw how the Officers concocted a story that Ms. Martinez injured herself, how they failed to comply with Departmental procedures for documenting injuries, and how they perjured themselves at trial about these very facts. That Ms. Martinez did not establish for the jury that the Officers' failure to provide her with medical care caused her any additional damages did not lessen the malice motivating their conduct.

**Statement of Facts**

Because the Officers move for a remittitur, the Court must view the evidence at trial in the light most favorable to Ms. Martinez.  *See Jennings v. Yurkiw*, 18 F.4th 383, 387 n.1 (2d Cir. 2023) (in considering a motion for remittitur, "We view the facts in the light most favorable to Jennings, the prevailing party, and view all evidence in the light most favorable to sustaining the jury's verdict.") (citing, among other cases, *Payne v. Jones*, 711 F.3d 85, 98-99 n.10 (2d Cir. 2013)).[1]  Here, the jury readily found the following facts.

On the evening of January 22, 2015, members of the 107th precinct executed a search warrant in Ms. Martinez's apartment and found heroin and U.S. currency in the possession of her then boyfriend, Danny Rivera.  The police arrested Rivera and brought him to the 107th precinct.  Ms. Martinez was not home at the time of Rivera's arrest.

Ms. Martinez received a call from a neighbor who told her she needed to return to the apartment.  When Ms. Martinez arrived home she was arrested and taken to the 107th precinct.  At the precinct Ms. Martinez was placed in the Juvenile Room and handcuffed to a bench by her left wrist.  (Tr. 99-100; 1005-12.)[2]

Ms. Martinez remained in the Juvenile Room for a number of hours before officers

---

[1]  The Officers incorrectly contend that the Court, "'is free to weigh the evidence and 'need not view it in the light most favorable to the verdict winner.'"  Offs. Memo at 4 (quoting *Miller v. City of Ithaca*, 10-cv-597, 2015 U.S. Dist. LEXIS 168614, at *17 (N.D.N.Y. Dec. 17, 2015) (quoting *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634-35 (2d Cir. 2002)).  In *Farrior*, the Second Circuit was referring to the Rule 59 standard of review for a new trial based on the weight of the evidence, and not a motion for a remittitur.  Ms. Martinez hopes this fundamental misunderstanding of the principles governing the Court's review explains the Officers' failure to view the evidence in a light most favorable to her.

[2]  The relevant pages of the transcripts of the trial are annexed to the Korenbaum Dec. as Exhibit 3.

-3-

approached her.  The handcuffs were extremely tight and she was in great pain.  (Tr. 1018.)  She complained to Ryan, telling him that her hand was numb.  Ryan left without providing her any assistance.  (Tr. 1019-20.)

Ms. Martinez described what happened next.  She told the jury how two officers, one of whom was DiGennaro, entered the Juvenile Room.  Ms. Martinez complained to these officers about the pain in her left wrist.  She was taken to another room where these officers pressured her to cooperate against Rivera.  (Tr. 1021-25.)  Ms. Martinez had no relevant information.  In response, DiGennaro said "that's it, you know, you're not cooperating, you are going down."  (Tr. 1026.)  He then recuffed Ms. Martinez and returned her to the Juvenile Room.  Once inside, she was re-handcuffed to the bench.  Again, Ms. Martinez's complaints of the handcuffs being too tight fell on deaf ears.  (Tr. 1026-27.)

Ms. Martinez sat in the Juvenile Room for what she described as a long time before two other officers entered the room.  She thought these officers were Camhi and Laliberte.  (Tr. 1028-31.)  She described how her wrist had become numb and that she begged them to loosen the handcuffs.  They did not.  Instead, these Officers asked her to give up Rivera.  When she failed to provide them with any information because she could not, they assaulted her by pulling her hair, choking her and slapping her.  Laliberte also "grabbed [Ms. Martinez's] right hand, he took [her] thumb and he pushed it away in the opposite side."  (Tr. 1032-36.)  The jury heard Ms. Martinez describe how she was screaming at the top of her lungs.  (Tr. 1037.)

The jury heard ample evidence that the Officers knew that Ms. Martinez needed immediate medical attention.  They heard how she complained to Laliberte and Camhi.  (Tr. 1039.)  How on six separate occasions multiple officers entered the Juvenile Room and she

-4-

complained about how much pain she was in and how her hand was numb.  Tellingly, she heard

them say "she's still too bruised."  (Tr. 1040-41.)  Ms. Martinez made clear to the jury how she

told every officer, including the Officers, who entered the room that she desperately needed

medical attention.  (Tr. 1043-44.)

Rivera corroborated Ms. Martinez's testimony in critical respects.  He described that he

had been arrested and taken to the 107th precinct.  When Ms. Martinez arrived at the precinct

about two hours later, he told the jury that Ms. Martinez appeared fine.  (Tr. 352.)  He then

described how he subsequently heard Ms. Martinez screaming in pain.  And when they took Ms.

Martinez to Rivera in an attempt to make her talk, he described how she was crying and could

not stand upright.  (Tr. 353.)  How he later heard Ms. Martinez screaming in pain for what

seemed like 3-4 minutes.  And when he again saw Ms. Martinez, he told the jury she was crying,

had mucous coming out of her nose and she could not be fingerprinted because she was in such

pain.  (Tr. 355-56.)

The jury also heard how the Officers did everything in their power to ensure that the

officers who injured Ms. Martinez would not be discovered.  The Officers each denied assaulting

Ms. Martinez.  They all denied seeing anyone assault Ms. Martinez.  (Tr. 190-92 (Ryan); 264-65

(DiGennaro); 327-29 (Laliberte); Camhi (492-93).)  In an effort to shift blame from the offending

officers, Ryan, DiGennaro and Camhi each described in identical detail how Ms. Martinez

allegedly injured her right hand.  According to these Officers, while handcuffed to the bench in

the Juvenile Room, Ms. Martinez punched the wall with some force, kicked a metal cabinet and

-5-

was generally "flipping out."  (Tr. 96-98 (Ryan); 236 (DiGennaro); 402-03 (Camhi).)[3]

To support their claim that Ms. Martinez caused her own injuries, each Officer testified that it was not an unusual or uncommon occurrence for an arrestee to punch a wall.  While Laliberte did not recall Ms. Martinez punching the wall or kicking the filing cabinet even though as the Desk Sergeant he had a clear view inside the Juvenile Room from where he sat (Tr. 281, 302-03), he, too, testified that it was not an uncommon occurrence for a detainee to punch a wall. (Tr. 322-23.)  The jury necessarily rejected their testimony.  Korenbaum Dec. at Exh. 1.

The Officers' efforts to protect the members of the Department who injured Ms. Martinez included additional measures, such as the failure to document anywhere that Ms. Martinez was injured.  Apparently recognizing this could cut both ways, the Officers each testified that there was no need to document Ms. Martinez's injuries because it was not an uncommon occurrence. This meant there was no mention of Ms. Martinez's injuries, regardless of how inflicted, in memobooks, Medical Treatment of Prisoner Forms, the Command Log or anywhere else.  (Tr. 183-88 (Ryan); 259-60 (DiGennaro); 322-23 (Laliberte); 481-83 (Camhi).)  But Lieutenant Paul Valerga, who at the time was the Commanding Officer of the 107th Precinct, directly contradicted the Officers' testimony in material respects.  Perhaps most important, Valerga testified that if Ms. Martinez had punched the wall, as the Officers contended, it should have been noted in the Medical Treatment of Prisoner Form.  (Tr. 771-72.)

The Officers all denied that Ms. Martinez ever complained she was in pain or requested medical assistance.  (Tr. 180-81 (Ryan); 260-61 (DiGennaro); 327-29 (Laliberte); 492-93

---

[3] Camhi testified that he did not see Ms. Martinez kick the file cabinet but that he heard what sounded like the kicking of a cabinet.

(Camhi).)  In their answers to the Special Interrogatories requested by the Officers, the jury

rejected their testimony.  The jury specifically found that Ms. Martinez complained or otherwise

indicated that she was in extreme pain, that each of the Officers knew she had complained of or

was otherwise experiencing extreme pain, and the Officers did not reasonably believe she was

not experiencing extreme pain.  (Korenbaum Dec. at ¶ 3, Exh. 2.)

**Argument**

**The jury's punitive damages award appreciated the
reprehensible nature of the Officers' conduct; knowing full
well that members of the 107th precinct assaulted Ms. Martinez
and caused her excruciating pain, the Officers turned deaf ears
to her pleas for medical assistance to ensure that the
perpetrators of the assault remained hidden from her**

The jury fully appreciated what the Officers had done in awarding $100,000 in punitive

damages against each of them.[4]  Instead of fulfilling their constitutional obligation to provide Ms.

Martinez with necessary medical attention, they set out to protect their own.  They consciously

chose to eschew preparing the paperwork required by the Department.  They consciously chose to

concoct the lie that Ms. Martinez injured herself.  And they consciously chose to deny Ms.

Martinez the necessary medical attention because she was "still too bruised."  (Tr. 1040-41.)

The Officers ignore the evidence the jury accepted in moving for remittitur.  They

contend that remittitur is warranted because "the defendants' conduct was not sufficiently

reprehensible to justify such substantial punitive damages awards[,]. . . the jury's punitive

damages awards are severely disproportionate in light of each defendant's respective conduct and

the relatively [*sic*] culpability of such conduct[,] . . . and the excessiveness of the jury's punitive

---

[4]  Ms. Martinez incorporates the facts discussed above into her argument.  She identifies
additional information by citation where appropriate.

-7-

damages awards is underscored by reference to not only punitive damages awards in other deliberate indifference cases but also by reference to other police misconduct cases, including those in the excessive force context, which involve far more culpable conduct than that of the defendants here."  Offs. Memo at 1.

In advancing their arguments, the Officers violate the principles governing the Court's review by failing to view the evidence in a light most favorable to Ms. Martinez.  They downplay the insidiousness of the Blue Wall of Silence that animated their actions. And they ignore relevant case law that supports the jury's award.  This Court should deny the Officers' motion.

**A. The standards governing remittitur**.

In *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996), the Second Circuit articulated the criteria governing a review of an award of punitive damages:

> Punitive damages are available in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." . . . .
>
> * * *
>
> [T]he Supreme Court [has] erected three guideposts that should assist us in the application of our standard, by which we deem excessive a punitive damage award that "shocks our judicial conscience," *Hughes*, 850 F.2d at 883. These guideposts include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Gore*, [517 U.S. at 575]. . . .

*Lee*, 101 F.3d at 808-09.

The Court must view the evidence in a light most favorable to Ms. Martinez in exercising its review. *Payne*, 711 F.3d at 98-99 n.10. "[T]he ultimate question is whether the award 'shock[s] the judicial conscience' or amounts to a miscarriage of justice." *Jennings*, 18 F.4th at 389 (quoting *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990)). As the Second Circuit recently reiterated, "determining the amount of damages is a quintessential responsibility of juries." *Jennings*, 18 F.4th at 390.

The jury appropriately assessed punitive damages against each defendant. *Gagnon v. Ball*, 696 F.2d 17, 19 n.2 (2d Cir. 1982). The Officers do not argue otherwise. Similarly, in fashioning its award of punitive damages, the jury heeded the Court's instructions, which included the following: "If you decide to award punitive damages, then you should consider the reprehensibility of the liable defendant's conduct in assessing damages. The reprehensibility of a defendant's conduct includes, but is not limited to, whether there was deceit, insult, or intended or reckless injury, and whether defendant's conduct was motivated by bias, prejudice, or by a desire to obtain some type of benefit or profit." (Tr. 1432.) The "guideposts" identified in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), supports the jury's award of punitive damages.

**B. Reprehensibility**.

"Reprehensibility," as the Supreme Court has recognized, is often the most critical factor in weighing a punitive damages award. *Gore*, 517 U.S. at 575. The Second Circuit has implicitly recognized it as the critical factor. *DiSorbo v. Hoy*, 343 F.3d 172, 187-88 (2d Cir. 2003) (recognizing the second and third *Gore* factors frequently supply little guidance to the

reviewing court); *Lee*, 101 F.3d at 810-11 (same).  Reprehensibility is best assessed by focusing on the following non-exclusive aggravating factors: "(1) whether a defendant's conduct was marked by violence or presented a threat of violence; (2) whether a defendant's conduct evidenced trickery or deceit as opposed to mere negligence, and (3) whether the record supports a finding of intentional malice." *Jennings*, 18 F.4th at 390 (citation omitted).[5]  Here, the Officers' actions carried the threat of violence, were callous (they denied Ms. Martinez medical assistance) and deceitful (the Officers did everything in their power to ensure that no evidence existed of the injuries inflicted upon Ms. Martinez by their colleagues).

The jury found that one or more members of the Department seriously injured Ms. Martinez.  Korenbaum Dec. at Exh. 1.  Their answers to the special interrogatories established that Ms. Martinez was in extreme pain and that each Officer knew she was in extreme pain.  Korenbaum Dec. at Exh. 2.  The jury left no doubt with these answers to the Special Interrogatories insisted upon by the Officers that they rejected the two principal arguments the Officers presented at trial: (1) that Ms. Martinez injured herself by punching the bulletin board in the Juvenile Room; and (2) that she never complained about any injury.  Korenbaum Dec. at Exh. 2. Against this backdrop the reprehensible nature of the Officers' conduct is clear.

The jury had ample evidence of deceit by the Officers.  The jury's award of punitive damages recognized that they engaged in a course of conduct designed to protect the officer(s) who injured Ms. Martinez.  At each step of Ms. Martinez's detention the Officers had choices.  At each step of the way they intentionally made the wrong decision to protect the perpetrator of

---

[5] Another relevant factor is "whether a defendant has engaged in repeated instances of misconduct."  *Lee*, 101 F.3d at 809 (citing *Gore*, 517 U.S. at 576).

the assault on Ms. Martinez.  Knowing Ms. Martinez needed medical assistance because she was in extreme pain, they were legally required to take her to the hospital or call EMS.  They did not. Knowing that she had been injured, the rules and regulations of the New York City Police Department required the Officers to prepare paperwork documenting her injuries.  They did not. And knowing that Ms. Martinez had complained about her injuries on the way to Central Booking and upon her arrival there, they gave testimony, whether to IAB, Captain Hanrahan, or the jury, that perpetuated the lie that Ms. Martinez had injured herself by striking the bulletin board in the Juvenile Room and kicking the metal file cabinet.  *See Pearl v. City of Long Beach*, 296 F.3d 76, 87 (2d Cir. 2002) ("Knowing what [plaintiff] contends the true facts were, he had reason to believe they were lying, and, because their versions were identical, it was a reasonable inference that the officers had agreed to present their allegedly false versions.").[6]

The jury readily concluded that the Officers had engaged in an after the fact cover up designed to protect the officer(s) who assaulted Ms. Martinez.  In *Jennings*, the Second Circuit made clear that such conduct bore directly on the reprehensibility of the defendants' actions. *Jennings*, 18 F.4th at 391 ("The reprehensible nature of the officers' conduct is underscored by the elaborate steps they took to cover up their misconduct.  The jury heard and was entitled to consider a record that included falsified charging documents, false accounts of the beating, faked or exaggerated injury, and perjured trial testimony."); *see id.* at n.3 (rejecting as a bad argument

---

[6]  In recommending that judgment be entered against the defendants, Magistrate Judge Pollak noted evidence of deceit surrounding Ms. Martinez's injuries. *See Martinez v. City of New York*, 16 CV 79, 2018 U.S. Dist. LEXIS 13409, *71 (E.D.N.Y. Jan. 24, 2018) (footnote omitted) ("This suggests either a failure to conduct even the most superficial investigation by counsel or, of deeper concern, that counsel was deliberately not informed due to a cover-up perpetrated by the NYPD officers from the Precinct.").

-11-

that "'alleged behavior outside of the liability findings' is irrelevant to the determination of punitive damages"). Other Circuits agree. *See*, *e.g.*, *Gracia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1025 (7th Cir. 2016) (in upholding a $250,000 punitive damages award on plaintiff's claim of retaliation, the Court noted that "[o]ne of the purposes of punitive damages is to limit the defendant's ability to profit from its wrongful conduct by escaping detection.") (citation omitted); *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 486 (7th Cir. 2003) ("the evidence clearly supported a finding that Onyx engaged in a cover-up in flagrant violation of Title VII, thus warranting a large punitive damages award" in the amount of $270,000); *Bogle v. McClure*, 332 F.3d 1347, 1359, 1362 (11th Cir. 2003) (recognizing that the defendants' reprehensible racial discrimination was accompanied by post-discrimination conduct covering up their wrongful intent warranted punitive damage awards of $1,900,000 to each of seven plaintiffs and imposed on the board of trustees for a public library system and its director); *Fresh v. Entm't U.S.A., Inc.*, 340 F. Supp. 2d 851, 858-59 (W.D.Tenn. 2003) (in an action alleging claims of assault, battery and false imprisonment, the trial court found the company's cover up of intentional wrongdoing relevant to a finding of reprehensibility, and remitted the punitive damages award to $717,610.36).

The jury's verdict and answers to the Special Interrogatories left no doubt that they found the Officers had committed perjury at trial. The *Jennings* Court made clear that the jury could consider the Officers' perpetuation of the lies they had consistently told through their actions and inactions. *Jennings*, 18 F.4th at 391.[7] This makes sense because it accords with the recognition

---

[7] Ms. Martinez does not contend that every time a jury rejects a defendant's testimony the jury can award punitive damages. But blatantly perjurious and coordinated testimony that perpetuates a cover up, which the jury readily concluded occurred here, is a factor that is

of the awesome power law enforcement officers possess when they invoke the full weight of the

State against often defenseless citizens. *Lee*, 101 F.3d at 810. Providing false testimony to

justify otherwise unjustifiable behavior is part and parcel of that misuse of power. Here, the

Officers knew that one or more of their colleagues intentionally injured Ms. Martinez, a

defenseless citizen, took concrete steps to hide this unconstitutional conduct, and then

maintained that fiction through trial in an attempt to avoid responsibility – and it appears to have

succeeded given the jury's finding that an assault and battery occurred but its finding of no

liability against the Officers on Ms. Martinez's excessive force claim. This gross abuse of

authority deserves to be punished. Excluding their perjured testimony, the Officers' actions were

egregious. If the Court considers it, the reprehensibility of their conduct is only amplified.

The Officers' intentional failure to obtain necessary medical attention for Ms. Martinez

was the hallmark of callousness. Referring to deliberate indifference, the Court instructed the

jury that "the plaintiff must prove that the individual defendant actually knew about the

plaintiff's serious medical need and either knew or should have known that failing to provide

medical treatment could result in the unnecessary infliction of extreme pain." (Tr. 1423.) In

*Jennings*, the Second Circuit emphasized the defendants' failure to provide the plaintiff with

necessary medical care when considering reprehensibility: "Even though Jennings had visible

injuries, he was brought straight to the police precinct, placed in a cell, chained to a bar, and

denied the medical attention he requested." *Jennings*, 18 F.4th at 390. Substitute Ms. Martinez

for Mr. Jennings and similar results ensue.

The Officers contend their conduct was not that reprehensible because there was no

_____

appropriately considered in the reprehensibility calculus.

violence or threat of violence, there was no deceit or repeated instances of misconduct.  Defs.

Memo at 6-7.  Ms. Martinez demonstrates above that the Officers' arguments regarding a lack of

deceit falls flat given the Court's obligation to view the evidence most favorably to her, which

the Officers fail to do.  Regarding the lack of prior instances of misconduct by the Officers, that

is a consideration when assessing punitive damages; it is not an obstacle to an otherwise justified

award of punitive damages, as *Jennings* makes clear.[8]  And the argument provides no succor to

Laliberte, about whom the jury heard two disturbing incidents in which he lied to IAB to protect

himself from disciplinary action.  The first instance involved an incident in which he admitted

that IAB caught him lying about punching a handcuffed prisoner.  The other involved his lying to

IAB about another incident where his improper interactions with a civilian were captured on

videotape.  (Tr. 314-17.)

Although the Officers correctly note that their actions did not involve violence or threats

of violence, their argument proves too much.  While the jury did not find that Camhi and

Laliberte used excessive force against plaintiff, their verdict was consistent with the conclusion

that Ryan and/or DiGennaro committed the assault.  Given the Officers' misconduct throughout

the litigation, this should not be lightly discounted.  Moreover, the Second Circuit has made clear

that even in the context of nominal damages awards in cases where no physical or emotional

injuries were proven to the jury's satisfaction, the jury can consider the weight and power behind

the force of the State in assessing punitive damages.  As it noted,

> There is, however, an element of real and threatened force that
> could have aroused the jury.  As a police officer, Edwards

---

[8] None of the defendants in *Jennings* had prior instances of misconduct that the jury heard about.

> exercised an authority backed by the weight and force of the state power.  His decision to charge Lee falsely was implemented merely by an entry on a form, but that act nevertheless had the power to set into motion the coercive apparatus of the state, which is ultimately rooted in a willingness to use force.

*Lee*, 101 F.3d at 810 (citation omitted).  Here, the Officers also ignore that the jury's finding of liability was rooted in violence.  Ms. Martinez, isolated and helpless inside the 107th Precinct, needed immediate medical attention because she was the victim of an assault by law enforcement, which the jury concluded the Officers knew of.

**C. The ratio of punitive damages to compensatory damages**.

In order to determine if there is a permissible ratio of punitive damages to compensatory damages, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred."  *Gore*, 517 U.S. at 581 (quotation marks and citations omitted).  The Second Circuit has emphasized that this factor weighs little in its analysis.  *Payne*, 711 F.3d at 103.  *See Lee*, 101 F.3d at 811.  Here, the Officers understandably do not address this prong.  As such, it is waived.  In *Lee*, the Second Circuit approved of a punitive damages award of $75,000 in the face of an award of nominal damages, which in today's dollars totals $143,005.[9] Regarding the facially disproportionate ratio, the Court recognized that "in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration."  *Lee*, 101 F.3d at 811.

---

[9] *Jennings*, 18 F.4th at 393 & n.7 (recognizing the need to adjust prior awards for inflation and utilizing the CPI Inflation Calculator of the United States Bureau of Labor).

**D. Comparable civil or criminal penalties.**

District courts may also compare punitive damages awards to civil or criminal penalties for similar conduct to ensure that defendants had adequate notice of the severity with which society views their actions. *Gore*, 517 U.S. at 583-84. Again, the Officers pose no argument. As such, it, too, is waived. The Second Circuit has emphasized that this factor also weighs little in the remittitur analysis. *Payne*, 711 F.3d at 103.

**E. The Officers' remaining arguments, including other case law**.

The Officers present two additional arguments in support of their motion. The first is frivolous. They claim that the jury's award of $100,000 per Officer is not supported by the evidence "given their respective conduct." Here is their argument:

> Whereas plaintiff testified that she asked defendant Ryan for medical attention at least three times and defendant Ryan testified that he checked on plaintiff every thirty minutes, plaintiff testified that she asked defendant Laliberte for medical attention only once and that he checked on her only once after the alleged assault. . . . Moreover, there was no evidence that defendants DiGennaro or Camhi checked on plaintiff after the alleged assault at all or that plaintiff ever asked either of them for medical attention. Thus, it cannot be said that each of the defendants' conduct was equally culpable to justify equal punitive damages awards.

Defs. Memo at 7. The Officers' argument fails because it does not view the evidence most favorably to Ms. Martinez. For example, the quote ignores that Laliberte was the Desk Officer (Tr. 281); he would have heard Ms. Martinez's cries of pain and pleas for assistance and seen her since he had an unobstructed view of the Juvenile Room. (Tr. 302). It similarly ignores that Camhi, the Lieutenant Commander of the 107th Precinct and its highest-ranking officer on the overnight tour, testified that he personally observed the self-injury and physically restrained Ms.

-16-

Martinez, necessitating his awareness of her injury.  (Tr. 400-06).  Finally, the argument fails for

the distinct, yet related reason that it ignores the jury's factual findings as reflected in the Special

Interrogatories.

The Officers' final contention is that the jury's award of punitive damages is excessive

when compared to other case law.  They correctly note that the Court should compare the jury's

award to comparable cases.  Offs. Memo at 8.  But the Officers again ignore the significance of

their misconduct in advancing this argument, and ignore a body of relevant case law that supports

the jury's awards.

President Nixon learned the hard way that the cover up can be worse than the crime.

*Bridgeview Health Care Ctr. v. Clark*, No. 09 C 5601, 2012 U.S. Dist. LEXIS 184089, at *13-14

n.5 (E.D. Ill. Sep. 28, 2012).  Here, the reprehensibility of the Officers' actions rested primarily

in their willingness to cover up the misconduct of their fellow officers who used violence against

Ms. Martinez.  When viewed in this light, the Second Circuit's decision in *Sooroojballie v. Port*

*Auth.*, 816 Fed. Appx. 536 (2d Cir. Jun. 4, 2020) (Summary Order), is instructive.  *Sooroojballie*

involved claims of hostile work environment based upon race and national origin discrimination.

The defendant made discriminatory comments to the plaintiff on three occasions over the course

of 12 to 14 months, *id.* at *11-12, intentionally interfered with his "professional advancement

and potential promotions, drafted a series of false counseling memoranda, and falsely accused

plaintiff of committing vandalism by intentionally sabotaging a boiler."  *Id.* at *13-14.  In

upholding a $150,000 punitive damages award against a single defendant, the Second Circuit

found "the malicious nature of [defendant's] discriminatory conduct, including not only a pattern

of harassing behavior, but also evidence of a false accusation that Sooroojballie sabotaged

-17-

equipment[,]" supported the jury's award of $150,000 in punitive damages.  *Id.* at *26-27.

Other courts have also recognized that substantial punitive damages awards are appropriate to deter malefactors from benefitting from their misconduct.  As noted, in *Gracia*, 842 F.3d at 1025, the Seventh Circuit upheld a $250,000 punitive damages award on plaintiff's claim of retaliation, noting that "[o]ne of the purposes of punitive damages is to limit the defendant's ability to profit from its wrongful conduct by escaping detection."  In *Lampley*, 340 F.3d at 486, the Seventh Circuit recognized that "the evidence clearly supported a finding that Onyx engaged in a cover-up in flagrant violation of Title VII, thus warranting a large punitive damages award" in the amount of $270,000.  And in *Bogle*, 332 F.3d at 1359, 1362, the Eleventh Circuit recognized that the defendants' reprehensible racial discrimination, accompanied by post-discrimination conduct covering up their wrongful intent, warranted punitive damage awards of $1,900,000 to each of seven plaintiffs and imposed on the board of trustees for a public library system and its director.  *See also Fresh*, 340 F. Supp. 2d at 858-59 (in an action alleging claims of assault, battery and false imprisonment, the trial court found the company's cover up of intentional wrongdoing relevant to a finding of reprehensibility, and remitted the punitive damages award to $717,610.36).

The conduct of the Officers was far more egregious than the conduct of the defendants in *Sooroojballie*, *Gracias*, *Lampley* and *Bogle*, which involved claims of discrimination and retaliation in the workplace.  Without minimizing the scourge of unlawful discrimination in the workplace, misconduct by law enforcement officers directed at defenseless citizens like Ms. Martinez is of a greater magnitude.  Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct, and to deter him or her, and others in the same

-18-

position, from engaging in similar conduct in the future. *Smith v. Wade*, 461 U.S. 30, 49 (1983). If recent events teach us anything, such actions have not abated.  The jury's punitive damages awards recognized the need to deter the Officers, and others like them.

For these reasons, and others, the case law the Officers rely upon is inapposite.  *Hamilton v. Lalumiere*, 07 CV 148, 2011 U.S. Dist. LEXIS 15214 (D. Conn. Feb. 16, 2011), did not involve a motion for a remittitur.  In *Miranda-Ortiz v. Deming*, 94 Civ. 476, 2001 U.S. Dist. LEXIS 7105, *44-48 (S.D.N.Y. May 31, 2001), and *Beckford v. Irwin*, 49 F. Supp. 2d 170, 185-86 (W.D.N.Y. 1999), the trial courts denied the defendants' respective motions for remittitur, which bespeaks nothing about whether a punitive damages award is so high as to "shock the conscience."  If anything, *Miranda-Ortiz* and *Beckford* recognize that small damages awards can lead to disproportionately large punitive damages awards.  *Miranda-Ortiz*, 2001 U.S. Dist. LEXIS 7105, at *47-48 ("even a cursory review of the many punitive damage awards in our Circuit involving § 1983 claims shows that the $15,000 awarded in the case at bar is considerably below the average.") (citing, among other cases, *Lee*, *supra*); *Beckford*, 49 F. Supp. 2d at 186 ("the court is aware that penalties in § 1983 cases can far exceed the punitive damages award that was granted to plaintiff.") (citing *Lee*).

*Williams v. Marinelli*, 13 CV 1154, 2017 U.S. Dist. LEXIS 21710 (D. Conn. Feb. 8, 2017), is also inapposite.  In *Williams*, the plaintiff alleged that correction officers failed to protect him from an assault by an inmate.  After trial, the jury awarded the plaintiff $250,000 in compensatory damages and $400,000 in punitive damages against defendant Marinelli.  As relevant to the Officers' motion, the trial court granted the defendant's motion for a remittitur of the punitive damages award, reducing it to $50,000 after surveying what it determined to be the

relevant body of case law, *id.* at \*84-86, which represents $62,000 in today's dollars.  Notably absent from the *Williams* Court's discussion of remittitur is any discussion about deceit, which, as detailed above, informed the jury's punitive damages award.[10]

### Conclusion

The Officers' actions were reprehensible.  They denied Ms. Martinez the prompt, medical attention she was constitutionally entitled to receive for the purpose of protecting their fellow officers.  In so doing, they created a web of lies that they perpetuated from the moment Ms. Martinez left the 107th Precinct for Queens Central Booking to the onset of the litigation and through trial.  The jury recognized that and punished them appropriately.  The Court should deny

---

[10]  The remaining case law the Officers cite is also inapposite.  Offs. Memo at 9-10.  They either rejected motions to remit or did not involve a motion for a remittitur.  As for the cases in which remittitur was granted, none involved the level of deceit practiced by the Officers.

the Officers' motion for a remittitur in its entirety, together with such other and further relief as is

just and proper.

Dated:  April 28, 2023
       New York, New York

                    Respectfully submitted,

                    SCOTT A. KORENBAUM, ESQ.
                    14 Wall Street, Suite 1603
                    New York, New York 10005
                    (212) 587-0018

                    ELEFTERAKIS, ELEFTERAKIS & PANEK
                    80 Pine Street, 38th Floor
                    New York, New York 10005
                    (212) 532-1116

                    Attorneys for Plaintiff

                    By: _____
                            Scott A. Korenbaum

SCOTT A. KORENBAUM, ESQ.,
GABRIEL P. HARVIS, ESQ.,
BAREE N. FETT, ESQ.,
     of Counsel

-21-