UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ROSIE MARTINEZ

                   Plaintiff,                MEMORANDUM AND ORDER
                                           16-CV-79 (NRM) (CLP)

         -against-

CITY OF NEW YORK, Police Officer ERIC
RYAN, Lieutenant DAVID CAMHI, Sergeant
JOSEPH DIGENNARO, and Sergeant KEITH
LALIBERTE,

                   Defendants.
------------------------------------------------------------------x

NINA R. MORRISON, United States District Judge:

       Now pending before this Court are Defendants' remaining motions following

a trial at which the jury awarded Plaintiff compensatory and punitive damages on

claims that her civil rights were violated while she was physically injured in police

custody in January 2015.  Defendants seek judgment as a matter of law pursuant to

Rule 50 of the Federal Rules of Civil Procedure on Plaintiff's assault and battery

claim against the City of New York and her deliberate indifference claims against

the four individual officer-defendants; they also seek an order of remittitur under

Rule 59 of the Federal Rules of Civil Procedure, arguing that the jury's award of

$100,000 in punitive damages against each individual officer-defendant was

excessive.  In addition, Defendants argue that all four individual officers are

entitled to qualified immunity on Plaintiff's deliberate indifference claims.  The

Court has considered the parties' oral pre-verdict motions made on December 9,

2023, the parties' oral post-verdict motions made on December 13, 2023, as well as

written briefs on Defendants' Rule 59 motion.  For the reasons outlined herein, Defendants' Rule 50 motions and Rule 59 motion are each DENIED.

## FACTS AND PROCEDURAL HISTORY

Sometime after 7:30 PM on January 22, 2015, Plaintiff Rosie Martinez ("Plaintiff"), who was employed at the time as a housecleaner for a private family in Manhattan, returned from work to find a number of officers of the New York City Police Department ("NYPD") standing in her apartment in Queens.[1]  Trial Transcript ("Tr.") 447:10–21; 1001:8–14; 1003:7–10; 1005:21–1006:6; 1038:8–11. Earlier that evening, NYPD officers had effectuated a search on Plaintiff's home and discovered that Danny Rivera, Plaintiff's then-boyfriend, possessed a quantity of heroin which, at the time of the search, was in a box next to a couch in Plaintiff's living room.  Tr. 148:15–20, 173:8–174:12; 222:13–21; 247:5–248:7; 350:24–351:18; 1024:14–16.  Plaintiff and Rivera had, at that time, been dating for several months; she testified that they did not live together, but that she had given Rivera temporary access to her apartment that day so that he could install a new washing machine while she was at work.  Tr. 350:9–23; 366:1–13; 1024:8–1025:1.

Upon her arrival, the officers arrested Plaintiff and subsequently transported her to the 107th Precinct in Queens, New York, where she was detained until the following morning.  Tr. 248:8–21; 352:21–23; 1010:25–1011:3.  At some point while

---

[1]  The Court assumes the parties' familiarity with the facts of the case and summarizes only those facts relevant to the pending motions.

in custody, Plaintiff suffered an injury to her hand—an injury so serious that, when she was later escorted from the 107th Precinct to Central Booking in the early hours of January 23, 2015, she could not be placed in a single pair of handcuffs due to her pain and swelling.  Tr. 1052:4–14.  Upon her arrival at Central Booking, the officers on duty immediately directed Plaintiff's escorting officers to take Plaintiff to the hospital.  Tr. 1052:25–1053:3.

Plaintiff filed this action under 42 U.S.C. § 1983 and related provisions of New York state law on January 7, 2016, asserting that two NYPD officers deliberately injured her while she was in handcuffs after she told them during an interrogation that she did not know anything about Mr. Rivera's drugs, including where he had acquired his heroin.  *See* ECF No. 1, ¶¶ 12–17; ECF No. 99, ¶¶ 34–39.  Throughout the course of this litigation, Defendants have disputed Plaintiff's version of events, asserting that she injured herself while in custody.  *See generally Martinez v. City of New York*, 16-cv-79, 2018 WL 604019 (E.D.N.Y. Jan. 24, 2018) (summarizing Defendants' exhibits and deposition testimony supporting the contention that Plaintiff's injuries were self-inflicted).  After years of substantial delay—attributable largely to discovery misconduct by the City of New York so egregious that then-Chief Magistrate Judge Cheryl Pollak recommended sanctions that included the entry of a default judgment against the Defendants[2]—the action proceeded to trial.

---

[2]  For additional details on the parties' factual allegations and the procedural history of this case, see *Martinez*, 2018 WL 604019 (then-Chief Magistrate Judge Pollak's Report and Recommendation to Judge Ann M. Donnelly); *Martinez v. City*

At trial, the jury was presented with constitutional claims under Section 1983 against four defendant officers, and a state law claim of assault and battery against the City of New York.  Specifically, Plaintiff brought excessive force claims against Defendants Eric Ryan, Joseph DiGennaro, Keith Laliberte, and David Camhi; failure to intervene claims against these four defendants; claims of deliberate indifference to medical needs against these four defendants; and an assault and battery claim against the City of New York under the doctrine of *respondeat superior*.

Jury selection began on November 30, 2022.  On December 1, 2022, the jury was impaneled, and the parties presented opening arguments.  Plaintiff began her case-in-chief on December 5, 2022.  *See* Minute Entries dated November 30, December 1, and December 5, 2022.

Over five days, Plaintiff elicited lay testimony from defendants Ryan, DiGennaro, Laliberte, and Camhi; from non-defendant Paul Valerga, another officer with the NYPD; and from Mr. Rivera, who was also in custody at the 107th Precinct on the night of Plaintiff's alleged assault.  Plaintiff also introduced expert testimony from former NYPD lieutenant Joseph Pollini and medical testimony from Dr. Thomas Scolaris and Dr. Mark McMahon.  Defendants cross-examined each of Plaintiff's witnesses and presented testimony from their own medical expert, Dr.

---

*of New York*, 16-cv-79, 2018 WL 1835935 (E.D.N.Y. Apr. 18, 2018) (Judge Donnelly's Order partially adopting Judge Pollak's Report and Recommendation); *Martinez v. City of New York*, 564 F. Supp. 3d 88 (E.D.N.Y. 2021) (Judge Kovner's Order partially granting and partially denying Defendants' motion for summary judgment).

Salvatore Lenzo.  On December 8 and 9, 2022, Plaintiff herself testified.  *See* Minute Entries dated December 6, 7, 8 and 9, 2022.

From these witnesses, the jury heard sharply conflicting accounts as to the cause and scope of the injuries that Plaintiff suffered on the night of January 22, 2015.[3]  Plaintiff introduced evidence, in the form of both testimony and exhibits, supporting her claim that she was unlawfully assaulted by two New York City police officers while she was restrained in handcuffs.  During her own testimony, Plaintiff described how, after she was arrested on January 22, 2015, she was tightly handcuffed by her left hand to a bench in the juvenile room of the 107th Precinct. Tr. 1011:17–20; 1012:8–11; 1019:3–10.  Shortly thereafter, officers escorted her to speak with defendant DiGennaro, who attempted to get information from her as to where Mr. Rivera acquired his heroin.  Tr. 1023:15–1024:7.  When she told the officers that she did not know anything about his drugs or the source(s) from which he had obtained the drugs, Tr. 1025:16–1026:9, she was handcuffed again to a bench in the juvenile room, Tr. 1026:16–1027:3, at which point the next several minutes developed, in Plaintiff's words, "like a horror movie."  Tr. 1035:19–22.  Two officers entered the room and again demanded that Plaintiff tell them "whatever [she] knew about Mr. Rivera."  Tr. 1028:19–1029:1; 1032:20–23.  When Plaintiff again told the officers that she did not know anything about Mr. Rivera's drugs,

---

[3]  Plaintiff was taken into custody at the 107th Precinct on the night of January 22, 2015 but was not brought to Central Booking until the early hours of January 23, 2015.  It is therefore unclear from the record whether Plaintiff suffered injuries on January 22 or January 23—that is, whether she was injured before or after midnight.  For ease of reference, this opinion will refer to "January 22, 2015" as the date on which all relevant events took place at the 107th Precinct.

including any information about his supplier, the officers proceeded to choke her, slap her, stomp on her feet, pull her hair, and bend back her right thumb in retaliation for her failure to tell the officers the information they wanted to hear. Tr. 1032:24–1037:25.

Defendants, for their part, offered a sharply different account of the events that took place on January 22, 2015—presenting the jury with a stark credibility dispute as to what transpired at the 107th precinct that night. Defendants testified that they did not remember much from that night. *See* Tr. 97:15–98:10; 106:5–11; 108:19–21; 145:3–5; 171:12–22; 176:3–5; 180:9–12; 201:15–19; 294:2–5; 300:1–14; 303:14–25; 305:16–20; 320:11–15; 330:16–18; 331:4–13; 405:15–23; 412:12–17; 414:24–415:16; 417:12–17; 433:12–16. But they claimed to remember clearly that no one interrogated or even questioned Plaintiff about any aspect of the NYPD's investigation into Mr. Rivera's drug dealing while she was in custody (other than defendant DiGennaro, who claimed he attempted to "debrief" her for a few "seconds" but immediately walked away when she declined to speak with him). Tr. 178:23–179:9; 220:5–22; 252:15–253:4; 321:24–322:7; 475:16–476:3. Defendants also claimed to clearly remember that no officer assaulted Plaintiff. Tr. 190:9–192:23; 264:24–265:18; 328:2–329:6; 416:13–19. Instead, they testified, Plaintiff was so angry about having been arrested that she injured *herself* while in custody. According to Defendants, while Plaintiff was handcuffed in the juvenile room, they witnessed her repeatedly punch her right hand against a wall—backwards and over her head—without provocation. Tr. 174:19–175:3; 179:10–24; 180:13–16; 236:7–21;

238:18–24; 402:24–403:8; 474:3–9; 477:1–479:1; 493:6–25.  Defendants DiGennaro
and Camhi further claimed that they specifically saw Plaintiff inflict these injuries
on herself by jamming her thumb against the wall as she punched her right hand
backwards.  Tr. 238:18–24; 402:24–403:8.

The parties also disagreed about the extent and causation of Plaintiff's
physical injuries, as well as whether there was any indication that she required
medical care while in custody.  Plaintiff introduced evidence that her hand was
visibly swollen and that she frequently cried out in pain during the nearly five-hour
period after her injury and before officers transported her to Central Booking.  Tr.
354:21–355:24; 1041:23–1043:19.  Mr. Rivera testified that Plaintiff, shortly after
sustaining her injury, was crying uncontrollably, could not initially be fingerprinted
without experiencing extreme pain, and had visible "finger marks" on her neck.  Tr.
356:8–15; 362:10–363:9; 362:15; 363:13–18; 397:23–25.  Plaintiff elicited testimony
from defendant Camhi acknowledging that other officers had noted that Plaintiff
had "some visible swelling" on her hand when she was transported to Central
Booking.  Tr. 424:21–25; 484:10–14.  Plaintiff testified that, after her assault, she
informed "literally . . . everybody" that entered the juvenile room that she was in
need of medical attention.  Tr. 1042:25–1043:3.  Plaintiff also introduced evidence
that, after she was transported out of the 107th Precinct, the officers who processed
her at Central Booking immediately directed that she be taken to the hospital for
treatment of her injuries.  Tr. 1052:21–1053:3.

Defendants, for their part, testified that although it took them roughly five hours after Plaintiff sustained an injury to take her to Central Booking and then to Queens General Hospital, Tr. 418:11–21, this delay was unremarkable because Defendants frequently checked on Plaintiff and concluded that she was not visibly injured, and because Plaintiff at no point informed the officers that she was in need of medical attention.  Tr. 107:4–18; 180:17–181:9; 260:21–261:17; 480:9–481:7; 492:23–493:5.  Defendants further claimed that far from being an unusual occurrence, they have observed arrestees punch walls with great frequency (with one officer claiming this was almost "a daily occurrence" and another estimating he had observed it "a thousand" times), but that the "vast majority" of arrestees do not suffer any injury.  Tr. 109:1–10; 260:6–20; 322:19–323:10; 482:23–483:2.

Although Defendants testified that the lack of documentary evidence of Plaintiff's injury from when she was in custody suggests that no assault ever took place, Plaintiff introduced evidence supporting the inference that such lack of documentation was merely further evidence of an attempted cover-up by the individual defendants, and that the log book entries and other contemporaneous records that did support the officers' account were falsely prepared in furtherance of that cover-up.  For example, Plaintiff testified that Defendants delayed in bringing Plaintiff from the 107th Precinct to Central Booking in an attempt to cover up the assault, hoping that the swelling on Plaintiff's injuries would subside so that the officers could present Plaintiff to Central Booking in better shape.  Tr. 1040:15–1041:12.  Plaintiff also introduced an audio recording of a phone call that defendant

8

Camhi made to the Internal Affairs Bureau ("IAB") on at roughly 9:00 a.m. on January 23, 2015 regarding Plaintiff's injuries after Central Booking directed the officers to take Plaintiff to the hospital.  In the call, defendant Camhi informed IAB that Plaintiff experienced self-inflicted injuries while in custody, and emphasized to IAB that Plaintiff's injury "wasn't caused by MOS" (*i.e.*, by any "members of service").  Tr. 422:22–423:1.  Yet Plaintiff also elicited testimony demonstrating that no contemporaneous documentation existed to support this account, Tr. 300:17–301:20; 304:1–305:7; 401:24–402:8; 413:22–415:5, despite the fact that an arrestee's injuries must, according to Plaintiff's expert Joseph Pollini (a former lieutenant commander of the NYPD cold case homicide squad and former commanding officer of the NYPD 81st Detective Squad, Tr. 499:11–15), be documented in the precinct's command log, Tr. 518:9–22.  Plaintiff also noted that defendant Camhi made this phone call nine hours after Plaintiff sustained her injuries and three hours after defendant Camhi testified he first learned that Plaintiff had sustained an injury. Tr. 411:5–21.  Defendant Camhi claimed that he waited so long to call IAB because he could not get in touch with Plaintiff's escorting officers, who could not get cell phone reception at the hospital. Tr. 489:11–24.  But on summation, Plaintiff challenged the credibility of defendant Camhi's claimed reason for the delay in making this report, in light of the amount of time that elapsed (approximately nine hours between Plaintiff's injury and defendant Camhi's call to IAB). Tr. 1392:6–10.

Finally, Plaintiff challenged the defendant officers' credibility through evidence that defendant Laliberte had, on two previous occasions, lied to NYPD

investigators about arrests that he conducted, including one arrest in 2015 during which he punched an arrestee, Tr. 314:9–317:16; evidence that defendant DiGennaro had stated in a previous deposition that Plaintiff was present when Mr. Rivera purchased narcotics, when in fact she was not, Tr. 228:9–19; and evidence that defendant Ryan prepared a document riddled with false information to effectuate the arrest of a civilian in a different criminal case, Tr. 160:4–162:19. Defendants, for their part, asserted that they had not knowingly lied in those instances and had attempted to remedy these inaccurate statements at the appropriate times, Tr. 162:20–163:1; 188:21–189:23, 229:2–9, though defendant Laliberte acknowledged that his initial statement to investigators regarding the 2015 arrest was in fact false, and that he only admitted to having punched the arrestee once he was confronted with video evidence documenting his actions.  Tr. 314:9–315:3; 317:9–16.

Prior to and at trial, Plaintiff had consistently alleged that only two officers had assaulted her.  However, she brought claims of excessive force against all four officers, pleading their identities as her assailants in the alternative.  *See generally* ECF No. 99, ¶¶ 91–93.  Because Defendants did not move for summary judgment on Plaintiff's excessive force claim, the claim proceeded against all four named defendants, *see Martinez*, 564 F. Supp. 3d at 92–93, even though all parties agreed that, as a logical matter, only two of the four defendants, at most, could be liable on this claim.  On direct examination, Plaintiff—who had, in the preceding week, sat in the same room as the four officers for the first time since her night in custody nearly

10

eight years earlier—identified defendants Camhi and Laliberte as her assailants. Tr. 1029:7–1032:6. When asked by her counsel if she could name these officers, Plaintiff responded "I don't know them by name but I recognize their faces." Tr. 1029:6. On cross-examination, however, Defendants confronted Plaintiff with an affidavit she had signed in opposition to summary judgment in 2020 asserting that defendant Ryan was one of her assailants, and in which she further stated that she believed the other assailant was either defendant Laliberte, DiGennaro, or Camhi. Tr. 1225:4–1226:5. Plaintiff conceded that her signature was indeed at the bottom of that affidavit. Tr. 1225:8–15.

On December 9, 2022, Plaintiff rested,[4] Tr. 1307:12–13, and the parties raised various motions for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure.

Defendants first moved to dismiss Plaintiff's deliberate indifference claims against all four defendants. Tr. 1312:19–21. Defendants argued that Judge Rachel P. Kovner, to whom this action was previously assigned and who decided Defendants' motion for summary judgment, had "treated this claim as one asserting a delay of treatment and not a denial of medical treatment," Tr. 1312:21–23; that the alleged delay in Plaintiff's medical treatment was "at most five hours" which "is not a sufficiently lengthy delay under the circumstances to rise to a constitutional violation," Tr. 1313:2–5; that Plaintiff's injury was "not sufficiently serious to rise to

---

[4] For scheduling reasons, Defendants' one witness, Dr. Salvatore Lenzo, was called during Plaintiff's case-in-chief. *See* ECF Minute Entry dated December 8, 2022. The parties therefore rested simultaneously. Tr. 1307:12–1308:4.

a constitutional violation," Tr. 1313:7–8; that the medical records in evidence do not support Plaintiff's assertion that she was experiencing extreme pain, Tr. 1313:9–18, 1314:18–1315:3; and that no evidence in the record suggests that Plaintiff's condition worsened due to the delay in treatment, Tr. 1313:19–24. Defendants further argued that they are entitled to qualified immunity on this claim, both because there exists no clearly established law that a failure to provide medical attention for Plaintiff's asserted injury rises to a constitutional violation, and because the defendant officers could have been reasonably mistaken about the extent of Plaintiff's injury and pain. Tr. 1321:15–17, 1321:25–1322:17.

Defendants then moved to dismiss Plaintiff's excessive force claims against defendants Camhi and Laliberte. Tr. 1315:17–20.[5] Specifically, Defendants argued that no reasonable jury could credit Plaintiff's in-court identification of defendants Camhi and Laliberte as her two assailants, arguing that Plaintiff's description of the two officers' appearance was inconsistent with that of defendants Camhi and Laliberte. Tr. 1315:21–22. Defendants also argued that the medical records in evidence did not support Plaintiff's claim that she was assaulted. Tr. 1315:22–1316:13, 1317:8–24. Defendants also moved to dismiss Plaintiff's failure to intervene claims against defendants Ryan and DiGennaro, arguing that there was "no evidence" in the record that these defendants knew about Plaintiff's alleged assault or had the opportunity to intervene even if they did. Tr. 1320:9–1321:13.

---

[5] During the same colloquy, the Court, on consent from both parties, dismissed Plaintiff's excessive force claims as against defendants Ryan and DiGennaro. Tr. 1315:10–16, 1326:17–1327:1.

Plaintiff then moved under Rules 50(a) and 54(b) for judgment as a matter of on her claim of assault and battery against the City of New York.  Tr. 1323:3–4, 1324:14–24.  Plaintiff directed the Court's attention to the City of New York's extensive history of discovery violations in this action, which then-Chief Magistrate Judge Pollak summarized in an opinion recommending terminating sanctions to then-presiding Judge Ann Donnelly.  *See* ECF No. 113.  Plaintiff argued that although Judge Donnelly declined to enter terminating sanctions against Defendants, she wrote that she "would consider additional appropriate sanctions" at trial if the defendants "claim a lack of memory" when testifying about the alleged incident, which is indeed in part how the individual defendants testified at trial.  Tr. 1323:7–1324:7.  In light of these trial developments, Plaintiff's argued that judgment as a matter of law on her assault and battery claim against the City of New York was the "proper[] remedy."  Tr. 1324:15.  The Court reserved judgment on both parties' motions.  Tr. 1322:18–21, 1325:1–2.

On December 13, 2022, the jury returned its verdict.  The jury found that one or more New York City police officers had indeed assaulted Plaintiff on the night of January 22, 2015, and that all four individual defendants had been deliberately indifferent to Plaintiff's serious medical needs in the hours after that event.  ECF No. 237 at 2–4.  However, the jury returned a verdict for Defendants on Plaintiff's excessive force claims.  ECF No. 237 at 1.  Prior to deliberations, the jury had been instructed (and the parties agreed) that the elements of an excessive force claim under Section 1983 are identical to those required to find liability for assault and

battery under New York law—except for the fact that in the former (§ 1983) claim, the jury must also find that Plaintiff had proven the personal involvement of each individual officer-defendant by a preponderance of the evidence, whereas on Plaintiff's state law claim, the jury need find only that *an* NYPD officer or other City employee, whether or not his or her identity was known, had committed the acts in question. Tr. 1425:15–1426:4. Thus, the jury's verdict apparently reflects its conclusion that Plaintiff had indeed met her burden of proving that she was physically assaulted by one or more NYPD officers while in police custody on the night in question—in other words, that it credited Plaintiff's account, and disbelieved Defendants' claim that she "injured herself" while at the 107th precinct—but had not established the identities of her individual assailant(s). Further, in keeping with the Court's instructions that there can be no Section 1983 liability for failure to intervene absent a verdict for Plaintiff on her excessive force claim(s), Tr. 1423:22–1424:2, the jury proceeded to enter a verdict for all four individual defendants on Plaintiff's failure to intervene claims. ECF No. 237 at 2–3.

On her assault and battery claim, the jury awarded Plaintiff $200,000 in compensatory damages against defendant City of New York. ECF No. 237 at 2. On her deliberate indifference claims, the jury awarded Plaintiff $1 in nominal damages, and $100,000 in punitive damages against each individual defendant, for a total punitive damages award of $400,000. ECF No. 237 at 4.

At Defendants' request, the Court then directed the jury to answer certain factual questions relevant to Defendants' qualified immunity defense by means of a

special interrogatory, which the jury returned on the same day. *See* ECF No. 239. The jury found that, on the night that Plaintiff was assaulted while in custody, Plaintiff had "complain[ed] of, or otherwise indicate[d] that she was experiencing extreme pain," that all four individual defendants were "aware that the [P]laintiff had complained of, or was otherwise experiencing, extreme pain," and that no individual defendant "reasonably believe[d]—even if he was mistaken—that the [P]laintiff was <u>not</u> experiencing extreme pain." ECF No. 239 at 1–2 (emphasis in original).

While the jury deliberated over the special interrogatory, Defendants renewed their motions for judgment as a matter of law.[6] Defendants acknowledged that the jury's verdict had mooted their Rule 50(a) motions on Plaintiff's excessive force and failure to intervene claims. Tr. 1503:11–16. However, Defendants then stated that "with respect to assault and battery and deliberate indifference, we renew our Rule 50 motion on the same grounds that we raised them before." Tr. 1503:16–19. Defendants also informed the Court that they planned to file a written motion to set aside the jury's compensatory and punitive damages awards as "excessive and against the weight of the evidence." Tr. 1503:20–23. Defendants' Rule 59 motion was fully briefed for the Court on May 12, 2023. *See* ECF Nos. 242, 257, 260.

---

[6] At this time, Plaintiff stated that she, too, was "renewing the motion [she] made . . . at the 50(a) stage." Tr. 1503:5. However, Plaintiff's 50(a) motion for judgment as a matter of law against the City was rendered moot in light of the fact that the jury found defendant City of New York liable on Plaintiff's assault and battery claim, a point which Plaintiff acknowledged during a video conference held on February 10, 2023.

## ANALYSIS

I. **Defendants' Rule 50 Motions for Judgment as a Matter of Law—Insufficient Evidence**

A. **Legal Standard**

A court may grant judgment as a matter of law only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998). To that end, the Court must "give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Id. See also Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."); *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 142 (2d Cir. 2001) ("When reviewing a grant of judgment as a matter of law, we are obliged to take the evidence in the light most favorable to the party opposing the motion, and must defer to the jury's assessment of the evidence and the reasonable inferences drawn from it.").

For the moving party to prevail, there must be "such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture" or the evidence must be "so overwhelming that reasonable and fair minded persons could only have reached the opposite result." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 56 (2d Cir.1993); *Advance Pharm.,*

*Inc. v. United States*, 391 F.3d 377, 390 (2d Cir. 2004).  In light of this extremely high standard, judgment as a matter of law under Rule 50 is granted on "rare occasions."  *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992).

## B. <u>Application</u>

### i.   <u>Assault and Battery</u> [7]

---

[7] As a procedural matter, the Court assumes without deciding that Defendants' motion for judgment as a matter of law on Plaintiff's assault and battery claim is properly before it.  After the jury delivered its verdict, Defendants stated that "with respect to [Plaintiff's] assault and battery" claim, they were "renew[ing their] Rule 50 motion on the same grounds" that they had raised previously.  Tr. 1503:16–19.  However, at the Rule 50(a) stage, Defendants only moved to dismiss Plaintiff's excessive force claims against defendants Camhi and Laliberte, not her assault and battery claim against the City of New York.  *See* Tr. 1315:17–1318:24.

A pre-verdict motion for judgment as a matter of law "must specify the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2).  A Rule 50(b) motion, in turn, "can be granted only on grounds advanced in the preverdict motion."  Fed. R. Civ. P. 50 Advisory Committee Note (2006).  It follows, then, that a "Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter."  *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012).  On such a posture, the movant's burden is much higher than it would be had the motion been properly made at the Rule 50(a) stage; the movant must demonstrate that judgment as a matter of law is necessary "to prevent manifest injustice."  *Id.* at 153; *cf. Diageo N.A., Inc. v. W.J. Deutsch & Sons Ltd.*, 17-Civ.-4259, 2022 WL 4093752, at *3 (S.D.N.Y. Sept. 7, 2022) (denying a motion for judgment as a matter of law on Defendant's counterclaims after Defendant only moved at the Rule 50(a) stage for judgment as a matter of law on Plaintiff's claims); *cf. Pereyra v. Fancy 57 Cleaners, Inc.*, No. 11-Civ.-1522, 2013 WL 1385205, at *3-4 (S.D.N.Y. Mar. 20, 2013) (concluding that defendants were "procedurally barred" from seeking judgment as a matter of law on grounds that they failed to raise at the Rule 50(a) stage.  Because the Court concludes that Defendants' motion fails even assuming it was properly raised and preserved, it need not reach the question of whether Defendants failed to preserve its Rule 50 motion to dismiss Plaintiff's assault and battery claim.

The Court, viewing the record in the light most favorable to Plaintiff, *see Meloff*, 240 F.3d at 142, concludes that more-than-sufficient evidence exists from which a reasonable jury could have concluded that Plaintiff was assaulted by one or more New York City police officers on the night of January 22, 2015.  The following is only some of the evidence in the record that supports this result.

First, Plaintiff herself testified in great detail that she was assaulted by two police officers on the night of January 22, 2015.  Plaintiff testified that while she was handcuffed to a bench in the juvenile room of the 107th Precinct, two New York City police officers (namely, defendants Camhi and Laliberte)[8] entered the room and slapped her, pulled her hair, stomped on her feet, choked her, and bent back her thumb when she failed to provide the officers with information about where her then-boyfriend Danny Rivera had acquired the heroin that the officers had recovered from Plaintiff's apartment earlier that evening.  Tr. 1032:24–1037:25.  Plaintiff's account of her assault was buttressed by testimony from Mr. Rivera, who was in custody at the 107th Precinct at the same time as Plaintiff, that he heard Plaintiff scream, Tr. 353:19–355:24, and witnessed that Plaintiff's wrist was so

---

[8]  In light of the jury's divergent verdicts on Plaintiff's excessive force claim and her assault and battery claim, it seems likely to the Court that the jury found that although Plaintiff was assaulted by one or more employees of the NYPD, Plaintiff had not met her burden of proving that either defendants Camhi or Laliberte were her assailants.  Because Plaintiff asserted her state assault and battery claim against the City of New York under the doctrine of *respondeat superior*, however, the jury was free to find for Plaintiff on her assault and battery claim but find for Defendants on Plaintiff's § 1983 excessive force claim given her burden of proving personal involvement.  The jury's verdict, therefore, is not inconsistent—indeed, it reflects the jury's careful adherence to the Court's instructions.

severely injured that NYPD officials could not initially fingerprint her, Tr. 356:4–15.  A reasonable jury could have certainly found from the testimony of these two witnesses that Plaintiff was assaulted while she was in custody on the night of January 22, 2015.  Although the defendant officers provided contrary testimony during trial—alleging that Plaintiff in fact suffered a self-inflicted injury when she repeatedly jammed her thumb against the wall behind her while she was handcuffed to a bench at the precinct—the jury was, of course, entitled to credit these lay witnesses' testimony over Defendants'.  *See Reeves*, 530 U.S. at 151 (noting that on a Rule 50 motion the court "must disregard all evidence favorable to the moving party *that the jury is not required to believe*" (emphasis added)).  The jury was also free to discount Defendants' version of events in light of contrary exhibits and testimony—for instance, although Defendants argued that Plaintiff injured herself when she angrily "flipp[ed] out," Tr. 129:2–5, the command log that documented Plaintiff's condition when she was first processed at the precinct marked her "mental condition" as "[a]pparently normal," Tr. 290:22–291:4.  Mr. Rivera also testified that, while he was in a holding cell, he witnessed Plaintiff's entry into the 107th Precinct and she looked "perfectly fine."  Tr. 353:14–18.

Photographic evidence also supported the jury's verdict on this claim.  Plaintiff introduced into evidence several photographs taken roughly twenty-four hours after her assault showing that her face was bright red, indicating—consistent with her testimony—that she had been slapped.  Tr. 933:20–935:21.  Plaintiff also introduced into evidence a photograph showing dirty footprints on the tops of her

shoes, indicating—consistent with her testimony—that her feet had been stomped on. Tr. 936:20–937:15. Perhaps most tellingly, Plaintiff introduced a photograph of her injured hand taken shortly after being released from custody that shows that her fingernails remained, in the words of counsel for both parties, "perfectly manicured." Tr. 1353:13; 1376:13. From this photograph, a reasonable jury certainly had evidence upon which to find that Plaintiff did not repeatedly jam her own thumb into a wall while she was in custody as Defendants claim, given the lack of any chips, scrapes, or other marks on her neatly manicured thumb (or on her thumb or fingers themselves).

The medical evidence in the record, contrary to Defendants' assertion, supports Plaintiff's version of events. Although Defendants argue that the medical records in evidence do not indicate that Plaintiff was slapped or choked as she alleges, Tr. 1315:22–1316:13, those same records also provide ample support for Plaintiff's account. To highlight only the most obvious example, the record of her hospital visit on January 23, 2015, logged at approximately 6:00 a.m., states that Plaintiff suffered from an "assault." Tr. 698:8–15.

Similarly, the parties each presented testimony from well-qualified medical experts, who offered conflicting opinions as to the likeliest source of Plaintiff's injuries. Plaintiff's witness Dr. Mark McMahon, an orthopedic surgeon, Tr. 614:12–615:1, testified that Plaintiff's injury, as evidenced by, *inter alia,* MRI scans taken several months after her night in custody, was consistent with her thumb forcibly being bent backwards as she claimed (and as Defendants had denied), Tr. 641:20–

643:7; 644:3–11; 695:19–696:3.  Plaintiff also introduced expert testimony from Dr. Thomas Scolaris, an orthopedic surgeon who performed surgery on Plaintiff's left wrist, that the injuries to Plaintiff's left wrist were consistent with her allegations of excessively tight handcuffing.  Tr. 786:24–787:8, 796:18–24; Tr. 805:24–806:11.  On the other hand, Defendants' witness Dr. Salvatore Lenzo, an orthopedic surgeon, testified that Plaintiff's injury was instead consistent with her thumb being repeatedly jammed against a wall.  Tr. 878:24–25; 888:16–889:7; 922:23–923:5.  The jury was again free to credit Plaintiff's expert testimony over Defendants'.

In sum, the Court concludes that there is clearly not "such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture" nor that the evidence on Defendants' favor was "so overwhelming that reasonable and fair minded persons could only have reached the opposite result."  *Lambert*, 10 F.3d at 56.  Indeed, the evidence in the record strongly supports the jury's finding that one or more NYPD officers assaulted Plaintiff on the night of January 22, 2015.  Therefore, as to Plaintiff's assault and battery claim, Defendants' motion for judgment as a matter of law is denied.

### ii.   **Deliberate Indifference**

The Court similarly concludes that the jury's finding of liability on Plaintiff's claim of deliberate indifference is easily supported by sufficient evidence in the record when taken in the light most favorable to Plaintiff.  *See Meloff*, 240 F.3d at 142.

As a threshold matter, several arguments that Defendant made orally at the
Rule 50(a) stage—that the alleged delay in Plaintiff's medical treatment was "at
most five hours" which "is not a sufficiently lengthy delay under the circumstances
to rise to a constitutional violation," Tr. 1313:2–5; that no evidence in the record
suggests that Plaintiff's condition worsened due to the delay in treatment, Tr.
1313:19–24; and that the Court previously "treated this claim as one asserting a
delay of treatment and not a denial of medical treatment," Tr. 1312:21–23—are best
described as arguments that Plaintiff has failed to state a claim, rather than
arguments that there exists insufficient evidence in the record from which a
reasonable jury could find for Plaintiff on these claims.  In any event, at this stage,
the Court finds these arguments unpersuasive for the same reason Judge Kovner
rejected them in her order denying summary judgment on Plaintiff's claim for
deliberate indifference. *See Martinez*, 564 F. Supp. 3d at 88.  And because the
arguments that undergird Defendants' 50(a) motion are nearly identical to those
that Defendants unsuccessfully raised at summary judgment, the law of the case
doctrine "counsels [this C]ourt against revisiting" Judge Kovner's prior rulings,
given that Plaintiff's allegations regarding her delay in medical treatment remained
consistent, and Defendants have failed to cite "an intervening change of controlling
law, the availability of new evidence, or the need to correct clear error or prevent
manifest injustice." *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (citation
omitted).

Defendants first argue that Plaintiff's claim cannot rise to a constitutional violation because she was left in pain for "at most five hours." Tr. 1313:2–5; *see also* Defs.' Motion for Summary Judgment, ECF No. 186 at 31 ("Although plaintiff alleges that defendants delayed in providing her with medical treatment for a period of five hours . . . such an alleged delay is not sufficient to support plaintiff's deliberate indifference claim."). However, Judge Kovner earlier held—based on the evidence developed during pretrial discovery—that a jury could find that "Ms. Martinez' pain was sufficiently severe that its treatment qualified as a serious medical need" as long as it "infer[red] that Ms. Martinez was left in serious, untreated pain for hours." *Martinez*, 564 F. Supp. 3d at 104. *Cf. McMillon v. Davidson*, 873 F. Supp. 2d 512, 514 (W.D.N.Y. 2012) ("Severe pain can itself constitute a serious medical need for Eighth Amendment purposes."). There were not material changes in the evidence developed at trial that would warrant a departure from Judge Kovner's ruling at the Rule 50(a) stage—indeed, Plaintiff testified in great detail that she repeatedly begged NYPD personnel for medical attention while sitting in the juvenile room after her assault because she was experiencing great pain. Tr. 1041:23–1043:19.

Second, Defendants argue that Plaintiff's injuries did not worsen as a result of Defendants' delay in providing her with medical care. Tr. 1313:19–24; *see also* Defs.' Motion for Summary Judgment, ECF No. 186 at 31 (arguing same). However, even if no evidence existed in the record to show that Plaintiff's injury worsened due to the delay, such a finding is not necessary for the jury to conclude that Defendants

were deliberately indifferent to her serious medical need, in light of the fact that (as Judge Kovner previously held) a plaintiff can satisfy this requirement if the jury finds that she was experiencing extreme pain. *Martinez*, 564 F. Supp. 3d at 104 ("While Ms. Martinez has submitted no evidence that the delay in treatment worsened her injury, allegations of a 'condition of urgency' that 'may produce ... extreme pain' satisfy the objective prong of the analysis." (quoting *Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015)).

Third, Defendants argue that the Court previously "treated this claim as one asserting a delay of treatment and not a denial of medical treatment," which is true. Tr. 1312:21–23; *see Martinez*, 564 F. Supp. 3d at 104 ("When a detainee's deliberate indifference claim involves delay in treatment, not denial of treatment, the analysis of the medical need focuses on the challenged delay rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious." (quotation marks omitted and cleaned up)). But during trial, Plaintiff—consistent with Judge Kovner's analysis of her claim at summary judgment—indeed litigated this claim solely as one constituting a delay of treatment, rather than a denial of treatment. And with good reason: as Defendants are well aware, there was undisputed evidence presented at trial that Plaintiff was ultimately taken to Queens General Hospital in the early morning hours of January 23, 2015—but only after officers at the 107th Precinct brought her to Central Booking, at which time the Central Booking personnel who began processing Plaintiff determined that she needed immediate medical care. Tr. 1052:21–1053:3.

Defendants do raise two arguments under Rule 50(a) that the evidence in the record is insufficient for a jury to conclude that the defendant officers were deliberately indifferent to Plaintiff's serious medical need: first, that Plaintiff's injury was "not sufficiently serious to rise to a constitutional violation," Tr. 1313:7–8, and, second, that the medical records in evidence do not support Plaintiff's assertion that she was experiencing extreme pain, Tr. 1313:9–18.

Defendants' first argument fails. The objective prong of the deliberate indifference to medical need test—that is, whether or not the plaintiff was indeed experiencing a serious medical need—can be satisfied if the plaintiff is experiencing a condition that "may produce . . . extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). In its special interrogatory, the jury found that Plaintiff was indeed experiencing extreme pain on January 22, 2015 as a result of her injuries. This jury finding has ample support in the record, including Plaintiff's testimony that she "screamed [at] the top of [her] lungs" during the assault itself and that she repeatedly asked for medical attention from the defendant officers, Tr. 1037:5; 1041:23–1043:19, as well as Mr. Rivera's testimony that he could hear Plaintiff's screams from elsewhere in the precinct, Tr. 354:21–355:24, that her hand was visibly injured, 357:17–358:1, that she was uncontrollably crying when he first saw her after the assault, Tr. 362:15; 363:14–17, that her hand was in so much pain that she could not initially be processed for fingerprinting, Tr. 356:8–15; 362:10–363:9, and that she had visible finger marks on her neck, Tr. 397:25.

Finally, Defendants argue that the medical records in evidence do not support Plaintiff's assertion that she was experiencing extreme pain, Tr. 1313:9–18, 1314:18–1315:3, since Plaintiff reported to an EMT after she was taken to Central Booking that she was experiencing a pain level of "six out of ten."  Putting aside the fact that a person reporting experiencing pain at a level of six out of ten might be experiencing very severe pain indeed—since a person experiencing *no* pain would presumably report a level of *zero* out of ten—the jury was free to infer from the other evidence in the record already discussed in this opinion that Plaintiff's pain was even more severe in the hours before she was redirected from Central Booking to the hospital's emergency room, while she languished at the 107th precinct and before she ever even saw the medical personnel to whom she reported this pain metric.  Medical testimony in the record also supports a jury finding that Plaintiff's pain was severe.  For example, Plaintiff's medical records demonstrate that she was still taking pain medication and had received an injection of cortisone in her wrist over a week after her assault, which Dr. McMahon testified "is a sign of how bad the injury was." Tr. 634:1–5.  Dr. McMahon reached the same conclusion regarding the severity of Plaintiff's original injury when he was shown medical evidence that Plaintiff was still complaining of hand pain two months after her assault, Tr. 635:19–636:10, that Plaintiff was underdoing occupational therapy ten months after her assault, Tr. 648:14–25, that Plaintiff was seeking neurological treatment over year after her assault, Tr. 652:20–653:6, and that Plaintiff still complained of pain and swelling in her hands two years after the assault, Tr. 659:3–8; 668:3–10.  While

Defendants argued that these conditions could well have been caused by Plaintiff's physically demanding work as a housekeeper, *see* Tr. 1359:10–1360:18, the jury was, of course, free to credit Plaintiff's own testimony and that of her expert witnesses and reject Defendants'.

In sum, the evidence in the record, considered in the light most favorable to Plaintiff, is plainly sufficient for a jury to find that Plaintiff was experiencing a serious medical need in custody, and that the defendant officers were deliberately indifferent to that need. *Galdieri–Ambrosini*, 136 F.3d at 289. Therefore, with respect to Plaintiff's claims of deliberate indifference, Defendants' Rule 50 motion on the basis of insufficient evidence is denied.

## II.   Defendants' Rule 50 Motions for Judgment as a Matter of Law— Qualified Immunity

### A. Legal Standard

Qualified immunity is a legal doctrine that "shields government officials performing discretionary functions from liability for civil damages." *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (quotation marks omitted)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). If an official violates a plaintiff's constitutional or federal statutory rights, she may nonetheless be entitled to qualified immunity in one of two ways.

First, even if the government official's conduct is prohibited by federal law, the official is entitled to qualified immunity "if the plaintiff's right not to be subjected to such conduct . . . was not clearly established at the time it occurred." *See Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002); *Zellner*, 494 F.3d at 367 (noting that qualified immunity applies "insofar as [an official's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known") (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (quotation marks omitted)); *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (noting that the relevant right must have been clearly established "at the time" that the violation occurred). "To determine whether a right is clearly established," a court must consider "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). *See also Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) ("[A] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful."). The relevant case law need not be factually identical to the case at issue in order to be "clearly established" for purposes of qualified immunity, and officials "can still be on notice that their conduct violates established law even in novel factual circumstances" as long as the relevant case

law provides officials with "fair and clear warning" that their conduct is unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741, 746 (2002) (citation omitted). On the other hand, however, "courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question of whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (citation and quotation marks omitted).

Second, even if government officials violate a plaintiff's clearly established rights, they "will nonetheless be entitled to qualified immunity 'if it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner*, 494 F.3d at 367 (quoting *Oliveira v. Mayer*, 23 F.3d 642, 648 (2d Cir. 1994) (cleaned up)). *See, e.g., Muschette ex rel A.M. v. Gionfriddo*, 910 F.3d 65, 69–72 (2d Cir. 2018) (concluding that although the defendant officer violated plaintiff's clearly established rights, the officer was qualifiedly immune because "it was objectively reasonable for him to believe that, given the undisputed facts, his conduct complied with this clearly established law").[9]  However, "if, on an objective basis, it is obvious

---

[9] When considering a qualified immunity defense, the Second Circuit's approach to analyzing the "reasonableness" of an officer's actions has varied, with some panels of the Court undertaking this analysis when deciding whether the relevant constitutional right was "clearly established," and others proceeding with a separate "reasonableness" analysis after concluding that the underlying constitutional right was indeed clearly established. *Compare Scott*, 616 F.3d at 105 (employing the former approach to evaluate whether a right was clearly established by considering, *inter alia*, "whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful"), *with Zellner*, 494 F.3d at 367 (employing the latter approach to consider whether, even if the constitutional right(s) at issue were clearly established, "it was objectively reasonable for [the

that no reasonably competent officer would have concluded" that his actions were lawful, the defendant "will not be immune." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The purpose of the doctrine is to "give officials room to act with confidence in gray areas by absolving from personal liability 'all but the plainly incompetent or those who knowingly violate the law.'" *Figueroa v. Mazza*, 825 F.3d 89, 99–100 (2d Cir. 2016) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

The applicability of qualified immunity is a "mixed question of law and fact." *Manganiello v. City of New York*, 612 F.3d 149, 164–65 (2d Cir. 2010) (citation omitted). Even if a defendant officer violated a plaintiff's clearly established constitutional rights, he is "still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (quoting *Malley*, 475 U.S. at 341). To that end, "[a] contention that— notwithstanding a clear delineation of the rights and duties of the respective parties at the time of the acts complained of—it was objectively reasonable for the official to believe that his acts did not violate those rights has its principal focus on the particular facts of the case." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (quotation marks omitted).

---

officer-defendants] to believe their acts did not violate those rights"). In light of this potentially conflicting guidance, and out of an abundance of caution, this Court considers the reasonableness of the defendant officers' actions twice, through different lenses: once when considering whether Plaintiff's right to receive adequate care for serious medical needs as a pre-trial detainee was clearly established as of January 22, 2015, and again when analyzing whether the officer-defendants' actions were nonetheless objectively reasonable.

Because the applicability of qualified immunity may therefore turn on factual nuances, factual questions relevant to the defense "must be resolved by the factfinder"—for example, by special interrogatory. *Kerman*, 374 F.3d at 109. Once the jury delivers its factual findings, the court must then decide whether the doctrine of qualified immunity is applicable "on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court." *Zellner*, 494 F.3d at 367.

## B. <u>Application</u>

### i.    <u>Qualified Immunity and Deliberate Indifference</u>

As a threshold matter, it is far from clear whether it is ever possible for an officer to be qualifiedly immune on a deliberate indifference claim once the jury has found that officer liable. Indeed, several federal appellate courts have concluded that, unlike in the context of many other constitutional violations, "[a] finding of deliberate indifference is inconsistent with a finding of good faith or qualified immunity" because "those deliberately indifferent to the plaintiff's right could not show that they had not violated established statutory or constitutional rights of which a reasonable person would have known." *Albers v. Whitley*, 743 F.2d 1372, 1376 (9th Cir. 1984) (cleaned up), *rev'd on other grounds*, *Whitley v. Albers*, 475 U.S. 312 (1986); *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996)

(concluding in the Eighth Amendment context that qualified immunity cannot apply to a claim of deliberate indifference because no one "could reasonably have believed that he could have deliberately ignored a known threat or danger"); *McKee v. Turner*, 124 F.3d 198, at *4 (6th Cir. 1997) ("[I]t would not make any sense to permit a prison official who deliberately ignored the serious medical needs of an inmate to claim that it would not have been apparent to a reasonable person that such actions violated the law."). And many district courts have also concluded that "deliberate indifference and qualified immunity are mutually exclusive." *Herrera Cano v. Cnty. of L.A.*, No. CV 18-8305, 2020 WL 6650780, at *8 (C.D. Cal. Oct. 20, 2020) (quoting *Trap v. United States*, 2016 WL 6921128, at *3 (C.D. Cal. May 12, 2016)); *Facey v. Dickhaut*, 91 F. Supp. 3d 12, 35 (D. Mass. 2014) ("Some courts have found that the qualified immunity analysis and the Eighth Amendment deliberate indifference analysis fold into each other, reasoning that a reasonable officer would know that conduct amounting to deliberate indifference violates the Eighth Amendment."). At least one federal appellate court, however, has suggested that there may exist some logical ground for a simultaneous finding of deliberate indifference and qualified immunity, albeit without reaching the issue after dismissing the plaintiff's claim on other grounds. *Miller v. Solem*, 728 F.2d 1020, 1025 (8th Cir. 1984) (discussing potential application of qualified immunity in lawsuit alleging that prison officials were deliberately indifferent to plaintiff's "right to be reasonably protected from known dangers of attacks by fellow inmates," which

was "clearly established" at time of alleged prison assault, but affirming grant of summary judgment for defendants on liability) (citation omitted).

This Court shares the view of the numerous courts cited above that have suggested or found that, as a logical matter, it may not be possible for two such findings—liability against a defendant on a deliberate-indifference claim, which is then vitiated by a defense of qualified immunity—to ever coexist in the same case. To do so would require a Court to find that even after a jury has determined, based on legally sufficient evidence, that an officer had the requisite knowledge and mental state to make him *deliberately* indifferent to a plaintiff's serious medical need, that same officer still somehow harbored an *objectively reasonable belief* that he was not violating the detainee's right to receive appropriate medical attention. Notably, in their motion for summary judgment and in in their oral Rule 50(a) motions, Defendants argued that they were entitled to qualified immunity on Plaintiff's deliberate indifference claim, but in neither instance did they point the Court to any case, from any jurisdiction, in which, as here, the jury concluded as a factual matter that (1) the plaintiff was experiencing extreme pain, (2) an individual defendant actually knew that she was experiencing extreme pain, and (3) the individual defendant did not "reasonably believe" otherwise—yet the court nonetheless concluded that the officers' failure to provide the plaintiff with appropriate medical care was somehow objectively reasonable. But without clear guidance from the Second Circuit on this particular question, the Court proceeds with a standard qualified immunity analysis.

## ii.   **The Law Was Clearly Established**

The Court first concludes that Plaintiff's constitutional right to receive adequate medical care as a pre-trial detainee had been clearly established under the Fourteenth Amendment to the Constitution for decades prior to the night that she was taken into custody on January 22, 2015.  Indeed, the constitutional right in question "was defined with reasonable specificity," both the Supreme Court and the Second Circuit have long recognized this right, and, particularly in light of the jury's answers to the Court's special interrogatory, "a reasonable defendant would have understood that his or her acts were unlawful" on the facts that the defendant officers faced on the night of Plaintiff's detention.  *Scott*, 616 F.3d at 105.

A pre-trial arrestee's right to adequate medical care has been defined with specificity through a long-established two-part test.[10]   First, under the "objective" prong of the standard, the detainee must demonstrate that she was suffering from a "sufficiently serious" medical condition, defined as "a condition of urgency, one that may produce death, degeneration, or extreme pain."  *Hill v. Curcione*, 657 F.3d 116,

_____

[10]  Whereas deliberate indifference claims in the pre-trial context are cognizable under the Fourteenth Amendment, deliberate indifference in the post-trial context (that is, among detainees who have been convicted of a crime) are cognizable under the Eighth Amendment.  However, the Supreme Court has made clear that the Eighth Amendment case law provides a constitutional floor for pre-trial detainees asserting claims of deliberate indifference to medical care, since "the due process rights of [an arrestee] are at least as great as the Eighth Amendment protections available to a convicted prisoner."  *See, e.g.*, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  As such, judicial opinions that analyze Fourteenth Amendment deliberate indifference claims regularly cross-cite to standards developed in the Eighth Amendment context, and the Court does the same here.

122 (2d Cir. 2011); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  "Factors

relevant to the seriousness of a medical condition include whether a reasonable

doctor or patient would find it important and worthy of comment, whether the

condition significantly affects an individual's daily activities, and whether it causes

chronic and substantial pain."  *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir.

2006) (quotation marks omitted and cleaned up).  More specifically, however, a

serious medical need has long been defined as one that "could result in . . . the

unnecessary and wanton infliction of pain."  *Harrison v. Barkley*, 219 F.3d 132, 136

(2d Cir. 2000).  Second, under the "subjective" prong of the standard, an officer only

violates the Fourteenth Amendment if—at least according to Second Circuit case

law as of January 22, 2015—the officer was "actually aware" that the pretrial

detainee was suffering from a serious medical condition but nonetheless failed to

take appropriate action.  *Caizzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).[11]

---

[11]  When deciding whether a defendant officer violated a plaintiff's "clearly established" constitutional right, a court must look to the law as it existed at the time of the alleged violation.  *DiStiso*, 691 F.3d at 240.  In the present case, Plaintiff alleges that the defendant officers were deliberately indifferent to her serious medical needs on January 22, 2015.  Prior to that date, the Court of Appeals for the Second Circuit had concluded that a pre-trial detainee's Fourteenth Amendment deliberate indifference claim, like a prisoner's Eighth Amendment deliberate indifference claim, turned in part on whether the plaintiff could prove that the offending official was subjectively aware of her serious medical need and nonetheless ignored it.  *Caizzo*, 581 F.3d at 72.  Since that date, however, the Court of Appeals for the Second Circuit has overruled *Caizzo*, concluding that a pre-trial detainee can raise a colorable deliberate indifference claim even "when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm" as long as the official "knew or *should* have known" that a certain condition "posed an excessive risk to health and safety" for a pretrial detainee yet the official failed to act.  *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (emphasis added).  In other words, since the

The Court concludes that this two-part test, which had existed for at least two decades on the night of Plaintiff's assault, *see Farmer v. Brennan*, 511 U.S. 825 (1994), was indeed defined "with reasonable specificity" as of 2015, and readily put these defendant officers on notice as to their constitutional duties when exercising custody over a pre-trial detainee experiencing a medical emergency. *Scott*, 616 F.3d at 105.

Second, both the Supreme Court and the Second Circuit have recognized a pre-trial arrestee's right to medical care for injuries or other serious medical needs. *See, e.g.*, *City of Revere*, 463 U.S. at 244 ("The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police."); *Liscio v. Warren*, 901 F.2d 274 (2d Cir. 1990) (reversing district court's grant of summary judgment on pre-trial detainee's Fourteenth Amendment claim of deliberate indifference to medical need); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) ("[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical

_____

night of Plaintiff's assault, the Second Circuit has loosened the "subjective" prong for a claim for deliberate indifference, allowing a plaintiff to prevail by proving that even if the officer was not knowingly indifferent to her medical needs, he was recklessly so.

In light of the Court's obligation to consider Defendants' qualified immunity defense in relation to the law as it existed at the time of their conduct, it will apply the *Caizzo* standard. The legal distinction between *Caizzo* and *Darnell* is not meaningful, however, in light of the jury's determination, as reflected in its responses to the Court's special interrogatory, that all four defendant officers *were* subjectively aware that Plaintiff was suffering from extreme pain on January 22, 2015, *see* ECF No. 239 at 1–2, but nonetheless failed to act for nearly five hours.

condition and did so because of his deliberate indifference to that need."); *Caiozzo*, 581 F.3d at 69 ("[A] person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the Due Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody, or the Due Process Clause of the Fourteenth Amendment if held in state custody."). This, too, supports a finding that the law regarding constitutionally adequate medical care for pre-trial detainees was clearly established in January 2015.

Third, a reasonable officer would have understood from this case law that defendants' conduct on January 22, 2015, as found by the jury, was unlawful. As outlined above, the case law made clear to any reasonable officer that a pre-trial arrestee's Fourteenth Amendment right to adequate medical care is violated if (1) she is experiencing extreme pain, and (2) the relevant officer(s) actually knew of this fact yet failed to take appropriate action. In response to the special interrogatory, the jury found that both of those requirements were present on the night of Plaintiff's assault: Plaintiff had complained of extreme pain while she was custody, and each individual officer was subjectively aware of that pain yet did not act until they brought her to Central Booking early the next morning. The jury further found that none of the four defendants "reasonably believe[d]" that the Plaintiff was *not* in extreme pain while she was in their custody. The Court concludes that the jury's findings of fact are readily supported by the trial record. Thus, the third prong of *Scott* is also satisfied.

Moreover, while factually identical Supreme Court or Second Circuit case law need not exist for a right to be clearly established, *Hope*, 536 U.S. at 741, 746, the Court notes that the Second Circuit found a strikingly similar set of factual allegations to state a constitutional claim nearly two decades before the night that Plaintiff was injured at the 107th Precinct. *See Weyant*, 101 F.3d at 850, 857.  In *Weyant v. Okst*, the Court made clear that an officer violates a pre-trial arrestee's Fourteenth Amendment rights when an arrestee experiences a non-lethal medical emergency and the arresting officers bring the plaintiff to an intermediary NYPD facility for multiple hours, rather than directly to the hospital; similarly, here, Defendants delayed Plaintiff's medical treatment when they brought her to Central Booking several hours after she first reported experiencing extreme pain, rather than to a hospital.  The plaintiff in *Weyant*, while being arrested, informed his arresting officers that he was a diabetic and believed he was going into insulin shock.  *Id.* at 849.  The plaintiff alleged that he was "pale, dizzy, perspiring profusely, trembling uncontrollably, hardly able to talk, and repeatedly losing consciousness" before the plaintiff "perk[ed] up" after a non-defendant officer administered an insulin shot.  *Id.* at 857.  Yet the arresting officers did not take him to a hospital, instead processing his arrest and taking him to the barracks.  *Id.* at 849–850.  The Court reversed the district court's grant of summary judgment, holding that a jury that believed the plaintiff's account "could infer that [the defendants] received information, and could see for themselves that [the plaintiff]

was in serious need of immediate medical care and yet denied him such care because they were deliberately indifferent to that need." *Id.* at 857.

In sum, the Court concludes from the foregoing analysis that, as of January 22, 2015, the law around deliberate indifference in the pre-trial context was "defined with reasonable clarity" in light of the fact that "the Second Circuit ha[d repeatedly] recognized the right," and that "a reasonable defendant would have understood from the existing law" that the defendant officers' conduct was unlawful. *Pico*, 356 F.3d at 490. Plaintiff's constitutional right to adequate medical care as an arrestee, which defendants violated, was therefore clearly established on the day of her assault.

### iii.    **Defendants' Actions Were Not Objectively Reasonable**

The Court further concludes that no reasonable officer could have believed in the "particular factual context" present to the individual defendants on January 22, 2015, that their conduct did not violate Plaintiff's Fourteenth Amendment rights. *Walczyk*, 496 F.3d at 154. *Zellner*, 494 F.3d at 368 ("Once the jury has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court.").

The jury found, as memorialized in its responses to the special interrogatory, that (1) Plaintiff was experiencing extreme pain, (2) each individual defendant was specifically aware that Plaintiff was experiencing extreme pain, and (3) no individual defendant reasonably believed that Plaintiff was *not* experiencing

extreme pain.  ECF No. 239 at 1–2.  These findings are amply supported by the record, including Plaintiff's testimony regarding the extent of her extreme pain, testimony that certain defendant officers frequently checked on Plaintiff during the five hours prior to bringing her to Central Booking, Tr. 128:9–23, Plaintiff's testimony that these officers waited to bring Plaintiff to Central Booking because her bruising was still too noticeable, Tr. 1041:7, and testimony by both Plaintiff and Mr. Rivera that she repeatedly cried out for help and complained of pain after sustaining her injuries, Tr. 362:15; 363:14–17; 1042:25–1043:3.  No reasonable officer who was subjectively aware that a detainee in his custody was experiencing extreme pain but deliberately waited five hours to transport her from the 107th Precinct—and then transported her to Central Booking, and not to a medical facility—could have believed that he was not violating the detainee's constitutional rights.  Indeed, Defendants had no difficulty conceding that "it is not okay" for an officer "to refuse medical treatment to someone in custody who requires medical treatment and who is asking for medical treatment."  Tr. 172:15–21.  Although they each denied having done so here, the jury found to the contrary, and those findings—and the specific evidence on which they were based—establish that the officers' conduct was not objectively reasonable.

*     *     *

For these reasons, the Court concludes that the defendant officers are not entitled to qualified immunity on Plaintiff's claim of deliberate indifference. Defendants' Rule 50(a) motion on this theory is therefore denied.

III.   **Defendants' Rule 59 Remittitur Motion**

A. **Legal Standard**

Under Rule 59 of the Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a new trial on all or some of the issues" after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1).  A motion for a new trial based on excessive damages is cognizable under this rule.  *See, e.g.*, *Tretola v. Cnty. of Nassau*, 14 F. Supp. 3d 58, 80 (E.D.N.Y. 2014).  If a district court judge concludes that a jury verdict is excessive, she may either "order[] a new trial without qualification" or order a new trial "conditioned on the verdict winner's refusal to agree to a reduction (remittitur)."  *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)).  *See also Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir.1995) ("If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount.").

As a general matter, the standard of review for a Rule 59 motion is "[u]nlike [that for] a motion for judgment as a matter of law under Rule 50(b)" because "in considering a motion for a new trial under Rule 59 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'"  *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 65 (E.D.N.Y. 2002) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998)).

However, the Second Circuit has offered conflicting guidance as to whether this standard applies to Rule 59 remittitur motions in particular, with the Court at one point stating in dicta that "[o]n a motion to set aside or reduce a jury verdict for excessiveness, trial courts . . . are required to view all evidence in the light most favorable to sustaining the jury's verdict." *Payne v. Jones*, 711 F.3d 85, 98 n.10 (2d Cir. 2013).[12]

Regardless of any favorable inferences that may (or may not) be afforded to a prevailing plaintiff when reviewing the trial evidence, however, the Second Circuit has made clear that a jury's verdict should "rarely be disturbed," and a Rule 59 remittitur motion, as is true on any motion for a new trial, should therefore only be granted if the verdict was "seriously erroneous or a miscarriage of justice." *Farrior v. Waterford Bd. Of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002).

Punitive damages awards are "an integral part of the remedy in a civil rights action." *Zarcone v. Perry*, 572 F.2d 52, 54 (2d Cir. 1978). Indeed, because a jury has "wide discretion" to award punitive damages in a civil rights action, a district court "may refuse to uphold a punitive damages award" only when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Hughes v. Patrolmen's*

---

[12] The parties disagree over the applicable standard, with Defendants arguing that the Court is, as with any Rule 59 motion, free to weigh the evidence, and Plaintiff arguing that the Court must view the evidence in the light most favorable to her as the non-movant. Because the Court concludes that Defendants' remittitur motion fails even under Defendants' preferred standard, the Court need not settle this disagreement.

*Benevolent Ass'n of N.Y., Inc.*, 850 F.2d 876, 883 (2d Cir. 1988)).  To that end, a district court must look to three "guideposts" when deciding whether a punitive damages award is excessive: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996)).  *See also Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021) (same).  These factors, however, are "non-exhaustive."  *Jennings*, 18 F.4th at 390 (quoting *Gore*, 517 U.S. at 574–75 (Scalia, J., dissenting) ("[T]he Court nowhere says that these three 'guideposts' are the *only* guideposts; indeed, it makes very clear that they are not.")).  Indeed, "in gauging excessiveness," a court must also be mindful of the dual purposes served by an award of punitive damages in the civil right context: "to punish the defendant and to deter him and others from similar conduct in the future."  *Lee*, 101 F.3d at 808–09 (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)).[13]

---

[13] After the jury returned its verdict, Defendants indicated that they would also submit written briefs moving the Court to set aside the jury's compensatory damages award as excessive.  Tr. 1503:20–23.  However, Defendants ultimately limited their motion to the jury's punitive damages award.  *See generally* ECF Nos. 244, 260.  The Court therefore considers Defendants' motion withdrawn as it relates to Plaintiff's compensatory damages award.

### B. Application

##### i.    Degree of Reprehensibility

The Court must first consider the reprehensibility of each defendant's

conduct in this action.  In *Gore*, the Supreme Court defined this factor as "perhaps

the most important" in the Court's analysis of whether the jury's damages award is

excessive.  *Gore*, 517 U.S. at 575.  To guide its consideration on this factor, the

Court must decide whether or not three "aggravating factors" exist with respect to

each defendant: "(1) whether a defendant's conduct was marked by violence or

presented a threat of violence, (2) whether a defendant's conduct evinced trickery or

deceit as opposed to mere negligence, and (3) whether the record supports a finding

of intentional malice." *Jennings*, 18 F.4th at 390.  *See also Lee*, 101 F.3d at 809

(defining the relevant aggravating factors as "(1) whether a defendant's conduct was

violent or presented a threat of violence, (2) whether a defendant acted with deceit

or malice as opposed to acting with mere negligence, and (3) whether a defendant

has engaged in repeated instances of misconduct.").

These factors all weigh against Defendants.  First, Defendants' deliberately

forced Plaintiff to endure a multi-hour delay after sustaining extremely painful

physical injuries in their custody before she was provided with access to any

medical care.  The jury concluded that each individual officers knew that Plaintiff

was experiencing extreme pain.  Plaintiff testified that she repeatedly begged for

medical care.  Nonetheless, the four individual officers let Plaintiff, who had just

been subjected to a violent assault by one or more NYPD officers while in handcuffs,

and over whom the individual defendants had absolute control, remain in pain and without access to treatment for hours.  Even assuming *arguendo* that Defendants' conduct did not constitute "overt violence," it certainly entailed "an element of real and *threatened* force that could have aroused the jury," *Lee*, 101 F.3d at 810 (emphasis added), since Plaintiff had no idea as she sat handcuffed to a bench whether her pain levels might increase even further, or whether she might suffer from long term physical damage without the medical care she needed.  And for any person, the protracted denial of access to medical care while in such extreme pain, even if not an act of overt violence, is a stressful and fear-inducing scenario.

As for the second and third aggravating factors, Plaintiff presented ample evidence supporting her claim that the defendant officers were motivated by deceit and malicious intent—indeed, "[t]he reprehensible nature of the officers' conduct" in this action included evidence of "steps they took to cover up their misconduct," and the jury was entitled to consider "a record that included . . . falsified accounts . . . and perjured trial testimony."  *Jennings*, 18 F.4th at 391.  The jury heard ample testimony, and saw several trial exhibits, that supported the inference that the defendant officers in this action not only delayed in providing Plaintiff with adequate medical care, but did so specifically for the purpose of attempting to cover up the actions of Plaintiff's NYPD assailant(s).  For example, Plaintiff testified that the defendant officers repeatedly checked on Plaintiff in the hours after her assault, Tr. 1040:15–10:41:1, and that Plaintiff overheard the officers say to each other "she's too, she's still bruised" before leaving the room, Tr. 1041:7.  The jury also

heard a recording of a phone call made by defendant Camhi to IAB describing Plaintiff's self-injuries, which Plaintiff argued—and the jury was free to agree—was made in a pretextual attempt to create a favorable paper trail to hide the conduct of Plaintiff's assailant(s), and presented an array of circumstantial evidence to support her claim that the officer-defendants intentionally delayed in bringing Plaintiff to Central Booking to cover up the fact of her assault.  In sum, the trial record strongly supports the inference that each of the defendants acted deliberately indifferent to Plaintiff's severe medical need in a manner that was malicious, deceitful, or both.  A jury is clearly entitled to award punitive damages in such a scenario.  *Jennings*, 18 F.4th at 392 ("[B]ecause of the deterrent function" of punitive damages awards, "extra-compensatory damages are warranted where the misconduct was designed to escape detection."); *see also Kemezy v. Peters*, 79 F.3d 33, 35 (7th Cir. 1996) (describing the special need for punitive damages awards "[w]hen a tortious act is concealable" since, in the absence of punitive damages, a repeated tortfeasor "will not be confronted by the full social cost of his activity").

Defendants argue that the jury's $100,000 punitive damages award against each defendant was inappropriate because the defendants were "[n]ot [e]qually [c]ulpable."[14]  Yet the jury heard specific evidence supporting a finding that each of

---

[14]  The Court pauses to note the potential ethical quandary into which the Office of the Corporation Counsel may place itself by making this argument while representing all four officers.  Defense counsel argue that some defendant officers were more culpable than others—and suggest in their brief that defendant Ryan was the most blameworthy, and therefore most deserving of punitive damages, because he checked on Plaintiff after her injury more frequently than the other defendant officers.  *See* ECF No. 244 at 11 ("[I]t cannot be said that each of the

the four defendants engaged in reprehensible conduct related to Plaintiff's denial of

medical care while in extreme pain—either by intentionally concealing her injuries

for the purpose of covering up the assault committed against her, maliciously

ignoring Plaintiff's serious injury and cries of extreme pain, or both. For instance,

the jury heard that defendant Ryan personally checked on Plaintiff repeatedly

throughout the night as the officers confided in each other that Plaintiff was still too

injured to be taken to Central Booking. Tr. 1041:2–22. The jury heard that

defendant Laliberte not only checked on Plaintiff at least once but was also

stationed directly outside the juvenile room as Plaintiff languished in pain for hours

without access to medical care. Tr. 1041:1–24. The jury not only learned that

defendant Camhi personally restrained Plaintiff while she sustained her injuries,

Tr. 403:15–24, but it also heard an audio recording of the call that defendant Camhi

made to IAB reporting Plaintiff's injury as self-inflicted and insisting that her

injury "wasn't caused by MOS," Tr. 422:22–423:1—statements that the jury must

have concluded were false in light of its finding on Plaintiff's state law assault and

battery claim (*i.e.,* that her injuries were in fact caused by New York City police

officers). *See* ECF No. 237 at 2. The jury heard Plaintiff's testimony that, when she

---

defendants' conduct was equally culpable to justify equal punitive damages awards.
. . . [A]t the very least, the awards against defendant DiGennaro, Camhi and
Laliberte must be reduced."). In their reply, Defendants clarified that they raised
this argument to "demonstrate[] a lack of care by the jury" when it considered
punitive damages as to each defendant. ECF No. 260 at 13. But the Corporation
Counsel represents defendant Ryan and must advocate for him as zealously the
other defendants named in this action. That is especially so in light of the fact that
the Corporation Counsel informed the Court by letter on February 22, 2023 that the
City has not yet decided whether it will indemnify the individual officers to this
action for Plaintiff's punitive damages award. *See* ECF No. 248 at 3.

attempted to speak through her tears to Mr. Rivera while being fingerprinted and crying out in pain, defendant DiGennaro did not even acknowledge her complaints or inspect her wrist to determine whether she required medical attention, but instead told Plaintiff "not to speak Spanish in there." Tr. 1045:2–8.

Defendants insist that Plaintiff is somehow estopped from arguing that the jury could conclude that evidence of a cover-up is relevant to Plaintiff's deliberate indifference claims, since in summation, Plaintiff raised this argument to the jury only when addressing her excessive force claims. ECF No. 260 at 7, 9–11. Defendants' argument has two significant flaws.

First, the Second Circuit has made clear that even acts of misconduct which do not themselves form an independent basis of liability may nonetheless be relevant to a jury's assessment of punitive damages if there exists a "nexus" between that misconduct and other conduct that gave rise to liability. *Jennings*, 18 F.4th at 391 n.3. In *Jennings*, the Court rejected the defendants' proposition that "a punitive award cannot rest on conduct independent from the acts upon which liability was premised," and concluded that the jury, when awarding punitive damages, was entitled to consider the elaborate steps that the officers took to cover up their use of excessive force, even though that cover-up did not itself form the basis of liability on that claim. *Id.* Therefore, even assuming *arguendo* that Plaintiff only asked the jury to award punitive damages because of actions they took to cover up the unconstitutional use of force in causing her underlying injuries, the jury was nonetheless entitled to consider those facts when deciding whether to

48

award punitive damages against the officers whom it found to be deliberately indifferent to Plaintiff's medical needs.  This is because ample evidence at trial supports a finding that the officers decided to delay Plaintiff's access to medical care for approximately five hours after she was assaulted in hopes of concealing the true source of her injuries, *i.e.,* that they were intentionally inflicted upon Plaintiff by one or more police officers while she was restrained in handcuffs, in retaliation for her failure to provide them with information to assist their ongoing narcotics investigation.

Second, Defendants' argument misstates the record on which it is premised: the trial court record does not indicate that Plaintiff ever argued to the jury that Defendants' attempts to cover up Plaintiff's assault should be considered only with respect to her excessive force claim.  First, Plaintiff's counsel *did* argue to the jury that Defendants were deliberately indifferent to Plaintiff's medical need specifically for the purpose of concealing Plaintiff's assault.  Tr. 1395:9–13 ("And every time a cop would come in, [Plaintiff] would say help me. I need medical attention.  And Ms. Martinez told you they looked at her and sa[id] oh, is the swelling still there.  Oh, no.  It's still too red.  Can't get you help yet.  It's way too visible now.").  Second, the Court instructed the jury that it could award punitive damages if it concluded that an individual defendant's conduct on January 22, 2015 was "done in a reckless or call[o]us disregard of, or indifference to, the rights of the injured person," Tr. 1431:14–16, and that the jury should assess the size of the appropriate punitive damages award if it concluded that the defendant's behavior, *inter alia*, involved

49

acts of "deceit," or were "motivated by . . . a desire to obtain some type of benefit," Tr. 1432:8–10.  These instructions as to punitive damages did not differ with respect to Plaintiff's various claims, and with respect to her deliberate indifference claim, the jury had ample evidence upon which to conclude, consistent with the Court's instructions, that each officer-defendant acted deceitfully or maliciously in the five hours Plaintiff spent sitting in pain because he was motivated in that time to hide the true source of Plaintiff's injury.  The jury concluded that the officer-defendants, by waiting five hours to bring Plaintiff to Central Booking (at which point Plaintiff's escorting officers were directed to bring Plaintiff to the hospital immediately), were deliberately indifferent to her urgent medical need.  In light of the significant trial evidence that Defendants actively and consciously attempted to evade detection of Plaintiff's injuries, the evidence certainly supports the conclusion that the defendant officers' delay was motivated by both deceit and a desire to obtain a benefit—namely, for the individual defendants and/or their fellow officers not to face discipline or other consequences for having assaulted a handcuffed detainee in retaliation for her refusal (or, as Plaintiff testified, her inability) to provide incriminating information to further their investigation into Mr. Rivera's drug purchases.

In sum, even when independently weighing the evidence favorable to Plaintiff against that favorable to Defendants, the Court concludes that the four officer-defendants' actions were sufficiently reprehensible to justify the jury's

punitive damages award for each defendant.  The first *Gore* factor, therefore, weighs in favor of Plaintiff.

### ii.  Ratio of Punitive to Compensatory Damages

As a general matter, a court considering whether a punitive damages award is excessive should consider the size of the award relative to the size of any compensatory damages that the jury awarded for the same conduct.  However, "in a § 1983 case in which the compensatory damages are nominal . . . the use of a multiplier to assess punitive damages is not the best tool."  *Lee*, 101 F.3d at 811.  In this case, the jury awarded Plaintiff $1 in nominal damages for her deliberate indifference claims.  Both parties agree that the Court need not address this factor on these facts, ECF Nos. 244 at 8–9; 257 at 19, and the Court therefore considers it neutral.

### iii.  Comparison with Punitive Damages Awards in Similar Cases[15]

"Courts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases."  *Payne*, 711 F.3d at 104.  However, a court's task is not simply to "balance the number of high and low awards and reject the verdict . . . if the number of lower awards is greater," *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990), because "the

---

[15]  Neither party has made any argument to the Court as to the relevance of the *Gore* factor regarding comparable civil or criminal sanctions to Defendants' motion.  *See* ECF Nos. 244 at 9; 257 at 20.  The Court therefore considers this factor to be neutral.

factual differences between cases can make it difficult to draw useful comparisons." *Payne*, 711 F.3d at 105. Rather, the court must "focus instead on whether the verdict lies within the reasonable range." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012).

As a threshold matter, the Second Circuit has indicated in police misconduct cases that a punitive damages award against an individual officer in the range of $125,000 to $175,000 would be "substantial," and the Court has implicitly considered such an award to be a rough upper range for punitive damages against any one defendant officer. *Payne*, 711 F.3d at 105. However, since that time, the Second Circuit made clear in *Jennings* that courts must adjust previous awards for inflation before comparing those awards with the jury's award in the case before them. *Jennings*, 18 F.4th at 393 n.7.

In *Jennings*, an excessive force case, the Court affirmed the district court's denial of defendants' remittitur motion to reduce the jury's punitive damages award, including a $250,000 award against one defendant. *Jennings*, 18 F.4th at 393. The Court looked to other Second Circuit cases that concerned "similarly reprehensible conduct" and concluded that the award fell below punitive damages awards that the Court had previously upheld *after* those awards were adjusted for inflation. *Id.* (concluding that prior Second Circuit decisions had affirmed punitive damages awards of $438,000 in total against two officer-defendants and $319,000 against one officer-defendant after those awards were adjusted for inflation) (citations omitted). And even assuming that *Payne* can be read to set a

presumptive upper-limit for punitive damages awards in police misconduct cases, that ceiling would be at least $225,000 per officer-defendant in today's dollars[16]—more than double what Ms. Martinez's jury awarded here.[17]

In the present case, Court concludes that, when compared against punitive damages awarded in cases whose facts are comparable to the present case, a punitive damages award of $100,000 against each officer for their deliberate indifference unquestionably "lies within the reasonable range" established by those cases. *Zeno*, 702 F.3d at 671.

The Court looks first to *Jennings*, an excessive force case in which the Second Circuit sustained the jury's punitive damages award, including an award of $250,000 against one officer. The $100,000 awarded against each defendant in this action is less than half of the $250,000 punitive damages award sustained by the Second Circuit against the most culpable officer in *Jennings*. Moreover, both cases

---

[16]   All relevant totals have been adjusted for inflation using the Bureau of Labor Statistics' Inflation Calculator. *See* CPI Inflation Calculator, U.S. Bureau of Lab. Stat., bls.gov/data/inflation_calculator.htm.

[17]   In fact, in light of courts' obligations after *Jennings* to adjust prior punitive damages awards for inflation when comparing amounts, any presumptive upper limit set by *Payne* would be much higher. In *Payne*, which was decided in 2013, the Court noted that in *King v. Macri*, 993 F.2d 294, 299 (2d Cir. 1993) it had twenty years earlier (in 1993) concluded that an award of $125,000 to $175,000 would be "substantial." *Payne*, 711 F.3d at 105. In today's dollars, however, any ceiling set by the *Payne* court based on *King*'s 1993 jury award would be nearly $400,000, an outcome that is, in any event, more consistent with other Second Circuit caselaw. *See, e.g.*, *Jennings*, 18 F.4th at 393 (affirming punitive damages award of $250,000 against individual defendant officer); *Ismael*, 899 F.2d at 184 (vacating district court's remittitur of $150,000 punitive damages award in police misconduct case, an amount equal to over $350,000 in today's dollars).

involve significant steps taken by the officers to cover up their assault, making defendants' actions in both cases especially deserving of punitive damages.[18]  In fact, the Court in *Jennings* concluded that the $250,000 punitive damages award against the most culpable defendant fell within the range set by other comparable cases "even if we were to ignore that [the officer-defendants] took steps to conceal their use of excessive force.  Taking the officers' deliberate concealment of evidence into account only heightens the degree of malice associated with their excessive force and further confirms that the punitive damages were supported by the record evidence." *Jennings*, 18 F.4th at 393–94.

The Court recognizes that Defendants highlight several district court cases in which awards for punitive damages fell below $100,000 per officer on claims of deliberate indifference.  *Williams v. Marinelli*, No. 13-cv-1154, 2017 WL 11473740

---

[18]   In a similar vein, Defendants list in their brief several cases in which courts ultimately affirmed punitive damages awards smaller than $100,000 per officer-defendant, even though those cases involved "brutal[] beat[ings]" not present in this case.  *See* ECF No. 244 at 13–14,  Even assuming that those cases involved acts of violence in which the civil rights violations were arguably more extreme than the ones in this action, the Court does not consider them to be appropriate comparators in light of the Second Circuit's guidance in *Jennings* that punitive damages can be awarded not only when an officer-defendant inflicts egregious violence, but also when the officer takes steps to intentionally cover up misconduct. This result is also consistent with the basic legal distinction between compensatory and punitive damages.  By way of analogy, if an officer subjects an arrestee to force so excessive that it causes severe injuries, but the officer's actions (though unreasonable) show little or no ill intent, a jury might properly award the arrestee high compensatory damages for the injuries she suffered, but low (or no) punitive damages.  Conversely, if an officer subjects an arrestee to excessive force that ultimately causes less significant physical injuries, but the evidence shows that the officer acted with substantial malice and intent to inflict harm, a jury would be within its right to award low compensatory damages and comparatively high punitive damages.

(D. Conn. Feb. 8, 2017) ($50,000); *Hamilton v. Lalumiere*, No. 7cv148, 2011 WL 674023 (D. Conn. Feb. 16, 2011) ($1,000); *Miranda-Ortiz v. Deming*, No. 94 Civ. 0476, 2001 WL 604017 (S.D.N.Y. June 1, 2001) ($10,000 and $5,000); *Beckford v. Irvin*, 49 F. Supp. 2d 170 (W.D.N.Y. 1999) ($15,000 and $10,000). *See* ECF No. 244 at 12–13. These cases all differ from the present case, however, in a critical respect: they involved no attempts by officers to cover up their misdeeds.

It is also true that published decisions reflect a "relative dearth of punitive damages awards for claims of deliberate indifference to serious medical needs," *Williams*, 2017 WL 11473740, at *25 (citation omitted). This makes it appropriate to look to other comparable cases in the area of police misconduct: punitive damages awarded against officers who attempted officers to cover up misconduct they or their fellow officers were found to have committed.[19]  When gauged against those cases, *see supra,* the Court concludes that the jury's punitive damages award of $100,000 per officer falls well within this permissible range.

*     *     *

In sum, the Court concludes that the jury's award of $100,000 in punitive damages against each officer-defendant in this action is not so high as to shock the judicial conscience. Defendants' Rule 59 remittitur motion is therefore denied.

---

[19]  Defendants, in their reply, challenged Plaintiff's citations to punitive damages awards in cases outside the police misconduct context, which Plaintiff alleged were comparable in other respects. *See* Defs.' Reply, ECF No. 260 at 15–19 (citing P. Opp., ECF No. 256 at 21–23). In light of the other cases cited *supra*, the Court need not consider the additional authorities proffered by Plaintiff.

## **CONCLUSION**

For the reasons outlined above, Defendants' remaining post-trial motions are each denied.


SO ORDERED.

/s/ Nina R. Morrison                    
NINA R. MORRISON
United States District Judge


Dated: July 19, 2023
Brooklyn, New York